# UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| John Colt Landreth, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | Civil Action No. _____ |
| ) | |
| Keith R. Leigh,  Pool, Leigh & Kopko, ) | |
| P.C. (formerly known as Pool & Leigh, ) | |
| P.C.), an Illinois professional ) | |
| corporation,   Robert M. Eschbach, ) | |
| and the City of Ottawa, Illinois, ) | |
| a municipal corporation, ) | |
| ) | |
| **Defendants.** ) | |

### <u>COMPLAINT AT LAW AND JURY DEMAND</u>

Plaintiff, **John Colt Landreth**, by his attorneys, Myers, Berry, O'Conor & Kuzma, Ltd.,

complaining of the defendants, **Keith R. Leigh**, **Pool**, **Leigh & Kopko, P.C.** (formerly known as

Pool & Leigh, P.C.), an Illinois professional corporation, **Robert M. Eschbach** and the **City of**

**Ottawa, Illinois**, an Illinois municipal corporation, states as follows:


### Jurisdiction and Venue

1.      This action arises, in part, under a federal statute, 42 U.S.C. §1983.

2.      All defendants reside in this judicial district.

**Allegations Common to All Counts**

The allegations in paragraphs 3 through 121 are common to all counts and are incorporated in each count as if set forth therein.  Each of the exhibits attached to this Complaint is incorporated herein to the same extent as if set forth *verbatim*.

## Parties

3.      Plaintiff **John Colt Landreth** ("*Landreth*") is a real estate developer and broker.

4.      Defendant **Keith R. Leigh** ("*Leigh*") is an attorney who, on information and belief, was at all times alleged herein licensed and in good standing in the State of Illinois.

5.      Leigh is, and at all times alleged herein was, an experienced attorney.   On information and belief, Leigh has practiced law continuously since October 1973.

6.      At all times alleged herein, Leigh held himself out as a competent attorney.

7.      At all times alleged herein, Leigh held himself out as having special expertise in municipal and local government law.

8.      Defendant **Pool, Leigh & Kopko, P.C.** ("*Pool, Leigh & Kopko*") is an Illinois corporation.  At all times alleged herein prior to February 1, 2006, Pool, Leigh & Kopko, P.C. was known by its former corporate name of "Pool & Leigh, P.C."  On or about February 1, 2006, Pool & Leigh, P.C. changed its corporate name to "Pool, Leigh & Kopko, P.C."  On information and belief, at all times alleged herein, Pool & Leigh, P.C. (now known as "Pool, Leigh & Kopko, P.C.") was organized as a professional corporation under the Professional Service Corporation Act (805 ILCS 10/1 *et seq.*) and provided professional legal services through its shareholders, directors, officers and employees.

9.      On information and belief, at all times alleged herein prior to February 1, 2006, Pool & Leigh, P.C. (now known as "Pool, Leigh & Kopko, P.C.") was associated with Raymond P. Fabricius, P.C., another professional corporation.

10.     On information and belief, at all times alleged herein prior to February 1, 2006, Pool & Leigh, P.C. (now known as "Pool, Leigh & Kopko, P.C.") did business under the name "Pool, Leigh & Fabricius."

11.     Hereinafter, "Pool, Leigh & Kopko" refers to and includes "Pool & Leigh, P.C." or "Pool, Leigh & Fabricius," as the context requires.

12.     On information and belief, at all times alleged herein, Leigh was the sole shareholder, director and officer of Pool, Leigh & Kopko.

13.     Defendant **City of Ottawa, Illinois** (the "*City*") is, and at all times alleged herein was, an Illinois municipal corporation and body politic operating under the provisions of the Illinois Municipal Code, 65 ILCS 5/1-1-1 *et seq.*

14.     At all times alleged herein, Pool, Leigh & Kopko was, or held itself out to be, "corporation counsel" to the City.

15.     On information and belief, at all times alleged herein, there was in effect a "professional services agreement" between the City and Pool, Leigh & Kopko which designated Pool & Leigh, P.C. as "corporation counsel."

16.     On information and belief, at all times alleged herein, Leigh was the duly appointed and acting City Attorney for the City of Ottawa, Illinois.

17.    On information and belief, at all times alleged herein, in addition to acting as City Attorney for the City of Ottawa, Leigh represented other municipal and local governmental bodies on a regular basis.

18.    On information and belief, at all times alleged herein, in addition to representing the City of Ottawa as "corporation counsel," Pool, Leigh & Kopko represented other municipal and local governmental bodies on a regular basis.

19.    On information and belief, at all times alleged herein, the majority of Leigh's practice was devoted to representing municipal and local governmental bodies, with the City being his largest client.

20.    Defendant **Robert M. Eschbach** ("*Eschbach*") was elected to the Office of Mayor of the City of Ottawa in April 1999. He has served as Mayor continuously since that date.

21.    On information and belief, at all times alleged herein, Eschbach was a licensed attorney in good standing in the State of Illinois.

22.    Prior to being elected Mayor, Eschbach had practiced law in Ottawa for more than 20 years.

23.    After being elected Mayor, Eschbach has continued to practice law in the City of Ottawa.

## Factual Allegations Common to All Counts

*Section 8-1-7 of the Illinois Municipal Code*

24.     At all times alleged herein, there was in effect in the State of Illinois Section 8-1-7 of the Illinois Municipal Code ("*Section 8-1-7*").  Section 8-1-7 is set forth in its entirety in Exhibit "A" to this Complaint.  Insofar as Section 8-1-7 is relevant to this action, it provides in pertinent part:

> § 8-1-7.
>
> Sec. 8-1-7. (a) Except as provided otherwise in this Section, no contract shall be made by the corporate authorities, or by any committee or member thereof, and no expense shall be incurred by any of the officers or departments of any municipality, whether the object of the expenditure has been ordered by the corporate authorities or not, unless an appropriation has been previously made concerning that contract or expense. Any contract made, or any expense otherwise incurred, in violation of the provisions of this section shall be null and void as to the municipality, and no money belonging thereto shall be paid on account thereof.  *   *   *
>
> (b) Notwithstanding any provision of this Code to the contrary, the corporate authorities of any municipality may make contracts for a term exceeding one year and not exceeding the term of the mayor or president holding office at the time the contract is executed, relating to: (1) the employment of a municipal manager, administrator, engineer, health officer, land planner, finance director, attorney, police chief or other officer who requires technical training or knowledge; (2) the employment of outside professional consultants such as engineers, doctors, land planners, auditors, attorneys or other professional consultants who require technical training or knowledge; (3) the provision of data processing equipment and services; or (4) the provision of services which directly relate to the prevention, identification or eradication of disease. In such case the corporate authorities shall include in the annual appropriation ordinance for each fiscal year, an appropriation of a sum of money sufficient to pay the amount which, by the terms of the contract, is to become due and payable during the current fiscal year.

25.     On information and belief, at all times alleged herein, Leigh, an experienced attorney with a concentration in municipal and local government law, was familiar with Section 8-1-7.

26.     At all times alleged herein, the members of the Ottawa City Council were Eschbach, Edward V. Whitney ("*Whitney*"), Wayne A. Eichelkraut, Jr. ("*Eichelkraut*"), William E. Walsh ("*Walsh*") and Dale F. Baxter ("*Baxter*").

27.     On information and belief, at all times alleged herein, Leigh was an agent or employee of Pool, Leigh & Kopko and was acting as such within the scope of his employment.

28.     At all times alleged herein, Eschbach was the Mayor of the City of Ottawa and was acting as such within the scope of his office.

---

*Events Leading up to Execution of Consulting Agreement*

29.     On February 26, 2003, Eschbach and then City Engineer and Director of Community Development, Gary Pike ("*Pike*"), met with Landreth to discuss industrial development opportunities in Ottawa and to explore how the City might utilize Landreth's experience and expertise to promote commercial and industrial development in Ottawa, particularly within an industrial park located in the City of Ottawa (the "*Ottawa Industrial Park*").

30.     Between February 26, 2003 and approximately July 31, 2003, the City and Landreth negotiated the terms of an agreement whereby the City hired Landreth to provide consulting, development and marketing services designed to increase and promote the commercial, industrial and economic base of the City.

31.     On information and belief, within a short time after Eschbach and Pike met with Landreth on February 26, 2003, the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) knew that the City was negotiating the terms of a consulting agreement with Landreth.

32.    On April 26, 2003, as required by Section 8-2-9 of the Illinois Municipal Code (65 ILCS 5/8-2-9), the City Council passed Ordinance No. 28-2003 approving and adopting its annual appropriation ordinance for the fiscal year commencing May 1, 2003 and ending April 30, 2004.

33.    The City did not appropriate for the Consulting Agreement in its annual appropriation ordinance for the fiscal year commencing May 1, 2003 and ending April 30, 2004.

34.    Pool, Leigh & Kopko undertook to represent both the City and Landreth in drafting the Consulting Agreement, as Section 15 of the Consulting Agreement reflects:

> 15.    Disclosure.  The parties have jointly utilized the law firm of Pool, Leigh & Fabricius with respect to this Agreement, and each party acknowledges this fact and hereby expressly authorizes such representation.
> *   *   *

35.    Landreth was not represented by separate counsel during the negotiation or drafting of the Consulting Agreement.

36.    Leigh, and Pool, Leigh & Kopko, knew that Landreth was not represented by separate counsel during the negotiation or drafting of the Consulting Agreement.

37.    During the negotiation and drafting of the Consulting Agreement, Landreth communicated with Pike and Leigh by telephone, fax and e-mail.

38.    Neither Leigh, nor Pool, Leigh & Kopko, discussed Section 8-1-7 or the implications of a municipality's failure to strictly comply with Section 8-1-7 with Landreth – either during the negotiation or drafting of the Consulting Agreement or at any time thereafter.

39.    Leigh, and Pool, Leigh & Kopko, knew that in order for the Consulting Agreement to be a lawful obligation of the City – "binding, valid and specifically enforceable according to its terms" against the City – Section 8-1-7 required the City Council to appropriate for the Consulting Agreement *before* the agreement was executed.

40.     Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) knew that in order for the Consulting Agreement to be a lawful obligation of the City – "binding, valid and specifically enforceable according to its terms" against the City – Section 8-1-7 required the City Council to appropriate for the Consulting Agreement *before* the agreement was executed.

41.     That the City had not made a previous appropriation for the Consulting Agreement was a material fact and a fact basic to the transaction since it went to the very validity of the contract itself.

42.     After April 26, 2003 – while the City and Landreth were negotiating the terms of the Consulting Agreement – Leigh, and Pool, Leigh & Kopko, knew that the City had not appropriated for that contract as required by Section 8-1-7.  Neither Leigh, nor Pool, Leigh & Kopko, disclosed this fact to Landreth, although they were under a duty to do so.

43.     After April 26, 2003 – while the City and Landreth were negotiating the terms of the Consulting Agreement – Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) knew that the City had not appropriated for that contract as required by Section 8-1-7.  Neither Eschbach nor any of the other City Council members disclosed this fact to Landreth, although they were under a duty to do so..

44.     After April 26, 2003 – while the City and Landreth were negotiating the terms of the Consulting Agreement – Leigh, and Pool, Leigh & Kopko, knew that in order for the contract to be a lawful obligation of the City – "binding, valid and specifically enforceable according to its terms" against the City – the City would have to amend its annual appropriations ordinance prior to

executing the contract.  Neither Leigh, nor Pool, Leigh & Kopko, disclosed this fact to Landreth, although they were under a duty to do so.

45.    After April 26, 2003 – while the City and Landreth were negotiating the terms of the Consulting Agreement – Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) knew that in order for the contract to be  binding, valid and specifically enforceable against the City, the City would have to amend its annual appropriations ordinance prior to executing the contract. Neither Eschbach nor any of the other City council members disclosed this fact to Landreth, although they were under a duty to do so.

46.    After April 26, 2003, during the time that Pool, Leigh & Kopko was drafting the Consulting Agreement, Leigh, and Pool, Leigh & Kopko, knew that the City had not appropriated for that contract as required by Section 8-1-7.  Neither Leigh, nor Pool, Leigh & Kopko, disclosed this fact to Landreth, although they were under a duty to do so.

47.    After April 26, 2003, during the time that Pool, Leigh & Kopko was drafting the Consulting Agreement, Leigh, and Pool, Leigh & Kopko, knew that in order for the contract to be a lawful obligation of the City – "binding, valid and specifically enforceable according to its terms" against the City – the City would have to amend its annual appropriations ordinance prior to executing the contract.  Neither Leigh, nor Pool, Leigh & Kopko, disclosed this fact to Landreth, although they were under a duty to do so.

48.    During the time that the City and Landreth were negotiating the terms of the Consulting Agreement, Pike represented to Landreth that the City would make the payments under the Consulting Agreement from tax increment financing ("TIF") funds.

49.     The agreement, as finally negotiated between the City and Landreth, was reduced to writing and is entitled "Consulting, Development and Marketing Agreement Between the City of Ottawa, Illinois and John Colt Landreth" (the "*Consulting Agreement*").  A true and correct copy of the Consulting Agreement is attached hereto as Exhibit "B."

50.     Pool, Leigh & Kopko drafted the Consulting Agreement.

---

*The City Approves and Enters into the Consulting Agreement with Landreth*

51.     At its regular meeting on August 5, 2003, the City Council passed and approved Resolution No. 93-2003 entitled "A Resolution Authorizing the Execution of a Consulting, Development and Marketing Agreement Between The City of Ottawa and John Colt Landreth."  A copy of Resolution No. 93-2003 is attached hereto as Exhibit "C."

52.     Resolution No. 93-2003 expressly authorized and directed the Mayor and City Clerk to execute the Consulting Agreement.

53.     On information and belief, Pool, Leigh & Kopko  drafted Resolution No. 93-2003.

54.     On August 5, 2003, when the City Council passed and approved Resolution No. 93-2003, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) knew that the City had not appropriated for that contract as required by Section 8-1-7 and, consequently –

(a)     that the Consulting Agreement was *not* a lawful obligation of the City;

(b)     that the Consulting Agreement was *not* "binding, valid and specifically enforceable according to its terms" against the City;

(c)     that the Consulting Agreement *did* "violate [a] presently existing provision of law" to which the City was subject – namely, Section 8-1-7; and

(d)     that the Consulting Agreement *was null and void* and unenforceable by Landreth.

55.     On August 5, 2003 – despite the fact that the contract was void *ab initio* – Eschbach and City Clerk Elizabeth Taylor executed the Consulting Agreement on behalf of the City.

56.     At the time Landreth executed the Consulting Agreement,, he relied upon the following representations set forth in paragraphs b. and c. of Section 12 of the agreement:

> 12.    <u>Warranties</u>.  The parties warrant and represent that:
>
>                  \*  \*  \*
>
> b.     ***This Agreement is binding, valid and specifically enforceable according to its terms against each party;***
>
> c.     ***This Agreement does not violate any presently existing provision of law … to which such party may be subject;***

57.     At the time Landreth executed the Consulting Agreement, he relied upon the following representations, covenants and assurances set forth in Section 7 of the agreement:

> 7.    <u>Revocation</u>.  The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, **the City agrees** and covenants **not** to revoke or rescind this Agreement or to institute any proceeding or action **to challenge the validity of this agreement** or in any way to rescind, modify or alter said agreement, ***understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so.*** \*  \*  \*     [emphasis added]

58.     On or about August 5, 2003 – believing the contract to be "binding, valid and specifically enforceable according to its terms" – Landreth executed the Consulting Agreement.

59.     At the time Landreth executed the Consulting Agreement, the City did not advise

Landreth –

(a)     that the Consulting Agreement was *not* a lawful obligation of the City;

(b)     that the Consulting Agreement was *not* "binding, valid and specifically

enforceable according to its terms" against the City;

(c)     that the Consulting Agreement *did* "violate [a] presently existing provision

of law" to which the City was subject – namely, Section 8-1-7; and

(d)      that the Consulting Agreement *was null and void* and unenforceable by

Landreth.

60.     The initial term of the Consulting Agreement was 24 months: from August 5, 2003

to August 5, 2005.

---

*Landreth and the City Perform Under the Consulting Agreement*

61.     In August 2003, with the City's knowledge and approval, Landreth began his

consulting and development duties pursuant to the Consulting Agreement.

62.     For more than 27 months – from August 2003 through November 15, 2005 –

Landreth served as the City's economic development consultant and performed the duties and

obligations imposed upon him by the Consulting Agreement.

63.     For more than 27 months – from August 2003 through November 15, 2005 –  while

serving as the City's economic development consultant, Landreth  devoted more than one-half of

his professional time to economic development efforts on behalf of the City.

64.    For more than 27 months – from August 2003 through November 15, 2005 – the City accepted, utilized and benefitted from the services Landreth provided.

65.    Landreth would not have provided services to the City during the period from August 2003 through November 15, 2005 if he had known that the Consulting Agreement was:

(a)    void *ab initio;*

(b)    not a lawful obligation of the City; and

(c)    neither binding, valid nor specifically enforceable against the City according to its terms.

---

*Pertinent Provisions of the Consulting Agreement*

<u>Section 3(a)</u>

66.    In Section 3(a) of the Consulting Agreement the City agreed to pay Landreth a monthly retainer of $5,000.00 and to reimburse his expenses. Section 3(a) of the Consulting Agreement provides:

> 3.    <u>Obligations of City</u>.  In order to provide a continuous and reliable source of funding for economic development within the City and OIP:
>
> (a) the City shall pay to Landreth the sum of $5,000.00 upon the execution of this agreement and the further sum of $5,000.00 on the same day of each succeeding month during the term of this agreement; said sum shall be for Landreth's monthly retainer; together with an [sic] monthly amount not to exceed $2,000.00 for Chicago support staff, travel, telephone; and similar items of expense.

67.    Each month – for 27 months – during the period August 2003 through October 2005, the City paid Landreth the monthly retainer of $5,000 specified by Section 3(a) of the Consulting Agreement.  On information and belief, these payments to Landreth were reviewed and approved

each month by Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter).

68.     During the period August 2003 through July 2005, the City reimbursed Landreth for his expenses pursuant to Paragraph 3(a) of the Consulting Agreement.  On information and belief, these payments to Landreth were reviewed and approved by Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter).

Section 3(d)

69.     In Section 3(d) of the Consulting Agreement, the City agreed to pay Landreth additional compensation "equal to 1½ % of the actual project cost of all industrial developments occurring within the City during the term or any extension of this agreement."  Section 3(d) of the Consulting Agreement provides:

> 3.     Obligations of City.  In order to provide a continuous and reliable source of funding for economic development within the City and OIP:
>
> *   *   *
>
> (d)   [the City shall pay to Landreth]  the further and additional sum equal to 1 ½% of the actual project cost of all industrial developments occurring within the City during the term or any extension of this agreement. Such sum shall be paid one-half (½) upon the commencement of construction based upon the estimate of project cost, and the balance shall be paid upon completion of construction as soon as the total project cost is determined. The phrase "project cost" shall include the cost of land, direct and indirect building costs, and site preparation as shown on the building permit, but shall not include machinery, equipment or any item of personal property. Compensation for industrial developments, which occur outside existing TIF Districts, will be negotiated on a case by case basis and mutually agreed upon.          [emphasis in original]

70.     Section 3(d) was an integral and material provision of the Consulting Agreement which was mutually beneficial to the City and Landreth because, while Section 3(d) afforded Landreth an opportunity to earn substantial fees, the City did not become obligated to pay Landreth

any additional compensation under Section 3(d) unless new industrial development projects occurred in Ottawa during the term of the Consulting Agreement.

71.     The inclusion of Section 3(d) was a material inducement for Landreth to enter into the Consulting Agreement. Landreth would not have entered into the Consulting Agreement without the inclusion of Section 3(d) or a similar provision.

72.     In April 2004, construction of the Motorcycle Tour Conversion ("*MTC*") project commenced. On information and belief, the MTC project was completed in the Fall of 2005.

73.     As a result of the construction of the MTC project, Landreth became entitled to a substantial fee – in excess of $37,000.00 – pursuant to Section 3(d) of the Consulting Agreement.

74.     In February 2005, the City paid Landreth $15,879.00 pursuant to Section 3(d) of the Consulting Agreement. The amount so paid was the first installment of the Section 3(d) fee owed to Landreth in connection with the MTC Project.

75.     In the Fall of 2004, construction of the PetSmart warehouse/distribution center in the Ottawa I-80 North TIF Redevelopment Project Area (the "*PetSmart Project*") commenced. On information and belief, the PetSmart Project was completed in June 2005.

76.     As a result of the construction of the PetSmart facility, Landreth became entitled to a substantial fee – approximately $500,000.00 – pursuant to Section 3(d) of the Consulting Agreement (the "*PetSmart fee*").

77.     On June 1, 2005, Landreth and Eschbach met. Landreth inquired as to the status of the PetSmart fee. Eschbach told Landreth that the City had not contemplated paying Landreth any fees in connection with the PetSmart project.

_____

*The City and Landreth Agree that Landreth Will Work for the City After August 5, 2005*

78.     On June 20, 2005, Landreth and Eschbach met and agreed to extend the Consulting Agreement without change for an additional six months – or until February 5, 2006 – while they attempted to negotiate a new agreement.

79.     Sometime after June 20, 2005, Leigh drafted an amendment to the Consulting Agreement that extended the term of the contract for six months without any other substantive change.  This amendment was never provided to Landreth.

80.     At the request of the City and with the knowledge and approval of Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), Landreth continued to perform the duties and obligations required of him under the Consulting Agreement after August 5, 2005.

81.     Subsequent to August 5, 2005, with the knowledge and approval of Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), the City continued to pay Landreth the $5,000.00 monthly retainer required by Section 3(a) of the Consulting Agreement

_____

*The City Proposes a New Consulting Agreement*
*Which Requires Landreth to Relinquish PetSmart Fee*

82.     On August 23, 2005, Leigh, through his assistant, Nicole Conrad, sent an e-mail to Landreth with a draft of a proposed new consulting agreement.

83.     The proposed new consulting agreement substantially changed the terms of the Consulting Agreement.   Among other changes, the proposed new consulting agreement required that Landreth relinquish the PetSmart fee.

84.     During the period between August 23, 2005 and October 18, 2005, Landreth attempted to negotiate the terms of a new consulting agreement with the City, but the City refused to negotiate with Landreth in good faith and instead the City:

(a)     repeatedly demanded that Landreth relinquish his right to the PetSmart fee; and

(b)     repeatedly insisted that the terms of the proposed new consulting agreement – in particular, the City's demand that Landreth relinquish the PetSmart fee – were not negotiable, but rather were "take it or leave it" terms.

85.     Throughout the period of their negotiations, Landreth refused to accede to the City's demand that he relinquish the PetSmart fee.

86.     On September 6, 2005, the City adopted Resolution No. 106-2005 authorizing the City to enter into a new six-month consulting agreement with Landreth.  A copy of Resolution No. 106-2005 and the new six-month consulting agreement proposed by the City in Resolution 106-2005 (the "*proposed six-month consulting agreement*") are attached hereto as Exhibit "D."

87.     After passing Resolution 106-2005, the City sent the proposed six-month consulting agreement to Landreth and requested that he sign it.  Landreth refused to sign the proposed six-month consulting agreement because, among other things, it required him to relinquish the PetSmart fee.

_____

*The Consulting Agreement is Amended*
*So That the City Can Retain a $50,000 Grant From the State of Illinois*

88.    On or about October 17, 2005, City Clerk Shelly L. Munks faxed to Landreth a document entitled "Amendment to the Consulting, Development and Marketing Agreement Between the City of Ottawa, Illinois and John Colt Landreth" (the "*Amendment*").  Ms. Munks requested that Landreth sign and return the Amendment so that it could be acted upon by the City Council at its October 18 meeting.

89.    On information and belief, Leigh, and/or Pool, Leigh & Kopko, drafted the Amendment.

90.    On or about October 18, 2005,  Landreth signed and faxed the Amendment back to the City.

91.    The Amendment added the following subparagraph (m) to paragraph 4 of the Consulting Agreement:

> The Illinois Department of Commerce and Economic Opportunity and the Auditor General of the State of Illinois, or any of their duly authorized representatives, shall have full access to and the right to examine any pertinent books, documents, papers and records of Landreth involving transactions related to the Grant Agreement between the City and DCEO, Grant No. 04-20105, for a period of five years from the later of the expiration or termination of said Grant Agreement between the City and DCEO.

92.    This addition of subparagraph (m) to paragraph 4 of the Consulting Agreement was mandated by the State of Illinois Department of Commerce and Economic Opportunity ("*State of Illinois DCEO*") in order for the City to retain a $50,000.00 grant for the marketing of the Ottawa Industrial Park.

93.     On information and belief, when the City applied for this grant, it represented to the State of Illinois DCEO that it intended to use $26,500 of the grant proceeds to pay for Landreth's services under the Consulting Agreement.  On information and belief, the City did not disclose to the State of Illinois DCEO that the Consulting Agreement was void *ab initio*.

94.     On information and belief, the City subsequently represented to the State of Illinois DCEO that it had used $26,500 of the grant proceeds to pay Landreth for services provided under the Consulting Agreement.  On information and belief, the City did not disclose to the State of Illinois DCEO that the Consulting Agreement was void *ab initio*.

95.     On October 18, 2005, the City passed and approved Resolution 126-2005 which authorized and directed the Mayor and City Clerk to execute the Amendment. A copy of Resolution No. 126-2005 and the Amendment referred to therein is attached to this Complaint as Exhibit "E."

96.     On October 18, 2005, when the City passed and approved Resolution 126-2005, Leigh, Pool Leigh & Kopko, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter)  knew that the Consulting Agreement was void and unenforceable because the City had not made an appropriation for the contract before it was executed.

97.     The City submitted the Amendment to the State of Illinois DCEO.

98.     When the Amendment was submitted to the State of Illinois DCEO, Leigh, Pool, Leigh & Kopko, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) knew that the Consulting Agreement was void and unenforceable because the City had not made an appropriation for the Consulting Agreement before it was executed.

99.     On information and belief, when the City submitted the Amendment to the State of Illinois DCEO, the City did not advise the State of Illinois DCEO that the Consulting Agreement was void and unenforceable.

100.     On information and belief, as a result of submitting the Amendment to the State of Illinois DCEO, the City was entitled to retain a $50,000.00 State of Illinois DCEO grant.

101.     On information and belief, when the City obtained the $50,000.00 grant from the State of  Illinois DCEO, the City did not advise the State of Illinois DCEO that the Consulting Agreement was void and unenforceable.

102.     On information and belief, the City has never advised the State of Illinois DCEO that the Consulting Agreement was void and unenforceable.

103.     On information and belief, the City has retained the $50,000.00 State of Illinois DCEO grant and has not offered to refund the grant money to the State of Illinois.

---

*The City Stops Payment on the Check Issued*
*in Payment of Landreth's October 2005 Retainer*

104.     On or about October 24, 2005 – after receiving notification from the State of Illinois DCEO that the Amendment was acceptable – the City stopped payment on the $5,000.00 check it had issued to Landreth for his monthly retainer for October 2005.

---

*After Landreth Signs the Amendment to the Consulting Agreement,*
*the City Terminates Landreth When He refuses to Relinquish PetSmart Fee*

105.    On October 25, 2005 – the day after the City was notified by the State of Illinois

DCEO that the Amendment was sufficient to enable the City to retain Grant No. 04-20105 – Leigh,

referring to the Consulting Agreement, sent an e-mail to Landreth which stated:

> Colt,
>
> I understand that you have indicated that you will not sign the proposed six month
> extension to your consulting agreement with the City. In view of that, the City will
> not be making any further payment because there is no agreement.  The original
> agreement has expired by its own terms.
>
> Initially, I understood that the council simply wanted to extend the original contract
> for six months to provide time for its review.  I prepared an amendment that merely
> extended the term for six months without any other substantive change.  When that
> was presented to the city council, several members of the council requested
> additional changes before they would consider any extension of the agreement.
>
> Therefore, I prepared a second amendment that incorporated the requested changes.
> It is that amended agreement which you have declined to execute, and without a
> contract there exists no legal authority to make payments under the terms and
> provisions of the expired agreement.
>
> I also note that you are required under the original agreement to provide the city
> with a list of Prospects within 30 days of the termination of the agreement.  In as
> much as the agreement terminated (expired) on August 5, 2005, you are required to
> submit the list of Prospects on or before September 5, 2005.  Under the
> circumstances, I urge you to do this immediately.
>
> Keith

A copy of Leigh's October 25, 2005 e-mail to Landreth is attached to this Complaint as Exhibit "F."

106.    The "amended agreement" to which Leigh refers in his October 25, 2005 e-mail and

which, in Leigh's words, Landreth "declined to execute" required Landreth to relinquish the

PetSmart fee.

---

*The City and Leigh Again Ratify the Consulting Agreement*

107.    On December 13, 2005, Leigh faxed a letter to Landreth in regard to the list of prospects Landreth had provided to the City in response to Leigh's October 25, 2005 e-mail.  A copy of Leigh's December 13, 2005 letter to Landreth is attached to this Complaint as Exhibit "G."  In this letter Leigh repeatedly refers to compensation to which Landreth might become entitled under Section 9 of the Consulting Agreement:

> Upon termination of this agreement, Landreth shall provide the City with a list of Prospects within thirty days of termination. Said list will serve as a registration of prospects with the City.  In the event that any of these prospects shall purchase land in a City TIF district or future TIF district (or any other location as mutually determined) within one year of the termination of this agreement, then Landreth shall be paid a fee in accordance with Section 3(d) hereof. In the event that any of the prospects purchases land as aforesaid within the period of 13 to 24 months following termination of this agreement, then Landreth shall be paid 75% of the fee provided in Section 3(d) hereof.          [emphasis in original]

---

*The City Refuses to Pay Landreth Under the Consulting Agreement*

Section 3(d) Fees

108.    On or about December 8, 2005, Landreth billed the City for a Section 3(d) fee in connection with the "Varney Land Swap."  A copy of Landreth's Invoice # 0155 dated 12/08/2005 is attached to this Complaint as part of Exhibit "H."

109.    On or about February 7, 2006, Landreth billed the City for a Section 3(d) fee in connection with the MTC project.  A copy of Landreth's Invoice # 0157 dated Feb. 7, 2006 is attached to this Complaint as part of Exhibit "I."

110.    On or about February 7, 2006, Landreth billed the City for a Section 3(d) fee in connection with the PetSmart project.  A copy of Landreth's Invoice # 0158 dated Feb. 7, 2006 is attached to this Complaint as part of Exhibit "J."

111.    On or about February 7, 2006, Landreth billed the City for a Section 3(d) fee in connection with the International Titanium Powder project.  A copy of Landreth's Invoice # 0159 dated Feb. 7, 2006 is attached to this Complaint as part of Exhibit "K."

Retainers and Expenses

112.    On or about December 12, 2005, Landreth billed the City for expenses under Section 3 of the Consulting Agreement.  A copy of Landreth's Invoice # 0154 dated 12/12/2005 is attached to this Complaint as part of Exhibit "L."

113.    On or about January 11, 2006, Landreth sent a letter to Eschbach in which Landreth set forth the City's failure to negotiate in good faith with regard to a new consulting agreement.  In this letter, Landreth also submitted a demand for payment of the following items:

Retainer

| | | |
|---|---|---|
| October Retainer | $5,000.00 | |
| November Retainer (50%) | 2,500.00 | |
| | | $7,500.00 |

Expenses

| | | |
|---|---|---|
| August 2005 | $1,941.68 | |
| September 2005 | 1,956.02 | |
| September 2005 (Non-recurring) | 520.00 | |
| October 2005 | 1,792.51 | |
| October 2005     (Non-recurring) | 1,000.00 | |
| November 2005 | 1,246.92 | |
| November 2005 (Non-recurring) | 682.00 | |
| | | $9,139.13 |

| | | |
|---|---|---|
| Total Expenses | | $16,639.13 |

114.    The City refused to pay any of the invoices described in paragraphs 108 through 112 or any of the amounts set forth in paragraph 113.

———————————————

*Landreth Files Suit Against the City*

115.    On February 2, 2007, Landreth brought an action against the City to recover the amounts he had earned and was entitled to receive under the Consulting Agreement (the "*contract action*"). A copy of the complaint filed by Landreth in the contract action is attached to this Complaint as Exhibit "M."

———————————————

*The City Now Asserts that the Consulting Agreement is Void ab Initio and Unenforceable*

116.    More than three and a half years after the Consulting Agreement was executed, the City, for the first time, asserted that the contract was void and unenforceable.  On April 4, 2007, the City filed a Motion to Dismiss the contract action on the basis that the Consulting Agreement was null and void because the City had not previously made an appropriation for the contract, as required by Section 8-1-7.  In its Motion to Dismiss, the City asserted:

> 6.    The Budget & Appropriation of the City of Ottawa for the fiscal year commencing May 1, 2003 and ending April 30, 2004 did not make an appropriation for the Agreement or any expense related thereto.
>
> 7.    ***Without a prior appropriation for the Agreement or the expenses thereof, the Agreement is null and void.***  (emphasis added)

A copy of the Motion to Dismiss filed by Leigh on behalf of the City is attached to this Complaint as Exhibit "N."

117.    Attached to the City's Motion to Dismiss was an Affidavit of City Clerk Shelly L. Munks in which she stated:

> 6.    The Budget & Appropriation of the City of Ottawa for the fiscal year ending April 30, 2004 did not contain an appropriation for the Agreement or any expense related thereto.

*Page 24 of 50*

118.    In addition to asserting that the *City's* failure to have made an appropriation for the Consulting Agreement made the contract *void ab initio* by virtue of Section 8-1-7 and unenforceable by Landreth (even though the City and Landreth had performed under it for 27 months), Leigh also asserted that Section 4-5-16(c) of the Illinois Municipal Code (65 ILCS 5/4-5-16(c)) precluded the City Council from expending money for the Consulting Agreement.

119.    On September 13, 2007, the City filed its Reply Brief in the contract action and asserted that the exception in Section 8-1-7(b) for contracts relating to the employment of "outside professional consultants" (such as Landreth) did not exempt such contracts from the "prior appropriation requirement of Section 8-1-7(a)."

---

*Landreth's Contract Action Dismissed*

120.    On February 28, 2008, the City's Motion to Dismiss the contract action was heard by the Circuit Court of LaSalle County, Illinois.  After argument, the court entered an order dismissing the contract action with prejudice, the court finding that "Section 8-1-7 of the Illinois Municipal Code bars the action because (1) there was no prior appropriation for the contract sought to be enforced and (2) the contract sought to be enforced, or the financial obligations thereunder, would extend beyond the term of the mayor in office at the time the contract was executed."  A copy of the order entered February 28, 2008 dismissing the contract action is attached to this Complaint as Exhibit "O."

121.    Illinois courts have strictly applied Section 8-1-7 and neither equitable estoppel nor ratification may be asserted against a municipality to permit enforcement of a contract where the

municipality failed to comply with Section 8-1-7.  As a consequence, Landreth's state law remedies are inadequate or severely limited.

---

## COUNT I

## 42 U.S.C. §1983 – *Monell* Claim

## (Landreth v. City)

122.    Count I is brought pursuant to 42 U.S.C. §1983, which provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, * * *

123.    Resolution No. 93-2003, passed and approved by the City Council on August 5, 2003, directed the City to enter into a contract – the Consulting Agreement – which was void *ab initio*.

124.    After Resolution No. 93-2003 was passed,  Eschbach as Mayor and City Clerk Elizabeth Taylor executed the Consulting Agreement on behalf of the City.

125.    The Consulting Agreement was neither binding, valid nor specifically enforceable against the City because an appropriation had not previously been made concerning that contract, as required by Section 8-1-7.  Because the  Consulting Agreement violated Section 8-1-7, it could not be enforced against the City if for any reason the City failed to honor its contractual obligations.

126.    The City induced Landreth to enter into the Consulting Agreement and to provide valuable services to the City thereunder by affirmatively representing to him that the agreement was *"binding, valid and specifically enforceable according to its terms against."*

127.    The City induced Landreth to enter into the Consulting Agreement and to provide valuable services to the City thereunder by affirmatively representing to him that the agreement did "*not violate any presently existing provision of law*" to which the City was subject.

128.    The City induced Landreth to enter into the Consulting Agreement and to provide valuable services to the City thereunder by:

(a)    promising Landreth that the City would not challenge the validity of the contract;

(b)    acknowledging that Landreth was relying on the representations contained in the agreement; and

(c)    assuring Landreth that he had that he had "every right to" [rely on the representations ans financial commitment contained in the agreement].

129.    For more than two years, the City induced Landreth to promote Ottawa as a site for commercial and industrial development projects and to provide consulting, development and marketing services to the City by acting in all respects as if the Consulting Agreement were valid and enforceable.  Specifically –

(a)    from August 2003 through October 2005, the City paid Landreth the $5,000.00 monthly retainer pursuant to Section 3(a)  of the Consulting Agreement;

(b)    from August 2003 through July 2005, the City reimbursed Landreth for his monthly expenses pursuant to Section 3(a) of the Consulting Agreement; and

(c)     in February 2005, the City paid Landreth $15,879.00 pursuant to Section 3(d) of the Consulting Agreement in connection with the MTC project.

130.    The City established, carried out and enforced a policy whereby it was able to obtain valuable professional services under the pretext of a valid and enforceable agreement and subsequently refuse to pay for such services by:

(a)    passing Resolution 93-2003 directing the City to enter into a contract it knew was void *ab initio* and unenforceable by Landreth;

(b)    executing the Consulting Agreement when it knew that the contract was void *ab initio* and unenforceable by Landreth;

(c)    expressly representing to Landreth that the Consulting Agreement was "binding, valid and specifically enforceable according to its terms" when the City knew that the contract was void and could not be enforced against the City by Landreth;

(d)    expressly representing to Landreth that the Consulting Agreement did "not violate any presently existing provision of law" to which the City was subject when the City knew that the agreement violated Section 8-1-7 and Section 4-5-16 of the Illinois Municipal Code; and

(e)    paying Landreth his monthly retainer fees and reimbursing Landreth's expenses, as required by the Consulting Agreement, even though it knew that such payments were unlawful.

131.    For more than two years, Landreth performed his duties under the Consulting Agreement and provided valuable consulting, development and marketing services to City.

132.    For more than two years, the City benefitted from the services Landreth provided pursuant to the Consulting Agreement.

133.    The City has refused to pay Landreth the compensation to which he became entitled under the express terms of the Consulting Agreement.

134.    Resolution No. 93-2003 directed the City to perform an unlawful act – i.e., to enter into a contract for which no appropriation had previously been made. Section 8-1-7 renders such contracts void *ab initio* and unenforceable against the City.  Nevertheless, in order to induce Landreth to provide valuable services to the City, the City falsely represented to Landreth that the contract was binding, valid and enforceable according to its terms against the City.  Resolution No. 93-2003, together with the City's false representations, thus created a policy which enabled the City to obtain valuable services and not pay for them.

135.    The City enforced this policy when –

(i)    contrary to the promises contained in Section 7 of the Consulting Agreement, it challenged the validity of the agreement in Landreth's state court contract action; and

(ii)    caused the state court contract action to be dismissed with prejudice on the basis that the Consulting Agreement was void *ab initio* and unenforceable by Landreth because the *City failed to comply with Section 8-1-7* – even though the City had affirmatively represented to Landreth that the contact was "binding, valid and specifically enforceable according to its terms."

136.    The City's enforcement of this policy unconstitutionally deprived Landreth of a valuable and protectable property interest, to wit: the compensation he had already earned and was entitled to be paid pursuant to the Consulting Agreement if that agreement had been valid and enforceable.

137.    The City's policy has the direct effect of absolutely precluding a party who contracts with the City to provide goods or services from seeking any redress in the state court for breach of contract if the City subsequently decides – for any reason or no reason – that it doesn't want to pay for the goods or services.

WHEREFORE, Landreth prays for the following relief against the City:

(i)      compensatory damages in an amount equal to the amounts Landreth had already earned and would be entitled to receive under the Consulting Agreement if it were a valid and enforceable obligation of the City;

(ii)     punitive damages in such amount as the trier of fact shall determine  to be appropriate;

(iii)    the costs of this action, including a reasonable attorney's fee as authorized by 42 U.S.C. §1988;

(iv)     such other and further relief as may be appropriate and just.

---

## COUNT II

### 42 U.S.C. §1983

### Deprivation of Protectable Property Interest – Substantive Due Process

### (Landreth v. City)

138.    Count II is brought pursuant to 42 U.S.C. §1983, which provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State .   .   .   subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress,  *  *  *

139.    The Fourteenth Amendment to the United States Constitution guarantees Landreth a substantive due process right to be free from arbitrary, irrational and  illegitimate government actions.

140.    As alleged with greater particularity previously in this Complaint, the City passed a resolution directing it to enter into a contract with Landreth – the Consulting Agreement –  for which a previous appropriation had not been made.

141.    Because there had been no previous appropriation for the Consulting Agreement, as required by Section 8-1-7, the contract was void *ab initio* and unenforceable.

142.    Notwithstanding that the Consulting Agreement was void *ab initio* and unenforceable against the City, the City affirmatively represented to Landreth that the agreement was "binding, valid and specifically enforceable according to its terms" against the City and that the agreement did not "violate any presently existing provision of law" to which the City was subject. Both representations were patently false at the time they were made.

143.    Notwithstanding that the Consulting Agreement was void *ab initio* and unenforceable against the City, for more than two years the City acted as if the agreement were valid in order to induce Landreth to promote the City of Ottawa to commercial and industrial development prospects and otherwise provide valuable services to the City pursuant to the Consulting Agreement.

144.    By treating the Consulting Agreement as if it were valid, the City benefitted from the services Landreth provided to the City for more than two years.

145.    However, when Landreth became entitled to the PetSmart fee – a fee of nearly $500,000.00 – the City refused to pay him.

146.    Only after Landreth sued the City to enforce the Consulting Agreement did the City assert that the contract was void *ab initio* because the *City itself* had failed to make an appropriation for the contract, as required by Section 8-1-7.

147.    The conduct by the City as alleged herein was an arbitrary, irrational and illegitimate abuse of government power.

148.    The conduct by the City as alleged herein has caused Landreth to be deprived of a valuable and protectable property interest, to wit: the compensation he had already earned and was entitled to be paid pursuant to the Consulting Agreement if that agreement had been valid and enforceable.

149.    Because the Illinois courts have strictly interpreted Section 8-1-7 so as to absolutely preclude any action for breach of a contract which does not comply with Section 8-1-7, by inducing Landreth to enter into a contract that the City knew did not comply with Section 8-1-7 and was, therefore, void *ab initio* and unenforceable, the City was able to obtain valuable services from Landreth and yet refuse to pay for those services with impunity.  Landreth's state court remedies were thus rendered inadequate.

WHEREFORE, Landreth prays for the following relief against the City:

(i)    compensatory damages in an amount equal to the amounts Landreth had already earned would have been entitled to receive under the Consulting Agreement if it were a valid and enforceable obligation of the City;

(ii)    punitive damages in such amount as the trier of fact shall determine  to be appropriate;

(iii)    the costs of this action, including a reasonable attorney's fee as authorized

by 42 U.S.C. §1988;

(iv)    such other and further relief as may be appropriate and just.

---

### COUNT III

### Fraud

### (Landreth v. Leigh)

150.    Leigh knew that the City's failure to strictly comply with Section 8-1-7 made the

Consulting Agreement *void ab initio* and unenforceable by Landreth.  Leigh did not disclose this fact

to Landreth, although he had a duty to do so.

151.    Leigh knew that the City had not made an appropriation for the Consulting

Agreement when Resolution 93-2003 was passed and when the contract was subsequently executed

by the City and Landreth.  Leigh did not disclose this fact to Landreth, although he had a duty to do

so.

152.    Leigh knew when Resolution 93-2003 was passed and when the contract was

subsequently executed by the City and Landreth that the Consulting Agreement was not "binding,

valid and specifically enforceable according to its terms against [the City]" – and in fact was void

and unenforceable.  Leigh did not disclose this fact to Landreth, although he had a duty to do so.

153.    Although Leigh knew when Resolution 93-2003 was passed and when the Consulting

Agreement was subsequently executed by the City and Landreth that the City had not made an

appropriation for the Consulting Agreement as required by Section 8-1-7 – and that, consequently,

the Consulting Agreement was void and unenforceable – Leigh drafted the Consulting Agreement in such a way as to conceal that fact from Landreth and to deceive Landreth and induce him to sign the Consulting Agreement.  More specifically, Leigh drafted the following representations which he included in Section 12:

> 12.   <u>Warranties</u>.  The parties warrant and represent that:
>
> * * *
>
> **b.**   ***This Agreement is binding, valid and specifically enforceable according to its terms against each party;***
>
> **c.**   ***This Agreement does not violate any presently existing provision of law … to which such party may be subject;***

In addition, Leigh drafted and included the following provision in the Consulting Agreement:

> 7.   <u>Revocation</u>.  The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, the City agrees and covenants not to revoke or rescind this Agreement or to institute any proceeding or action to challenge the validity of this agreement or in any way to rescind, modify or alter said agreement, ***understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so.*** * * *   [emphasis added]

154. When Resolution 93-2003 was passed and when the Consulting Agreement was subsequently executed by the City and Landreth, Leigh knew that the representations set forth in paragraphs b. and c. of  Section 12 were false.

155.   Leigh intended for Landreth to rely on the representations contained in Section 12 of the Consulting Agreement.

156.   Landreth relied on the representations contained in Section 12 of the Consulting Agreement, which representations were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

157.    Leigh intended for Landreth to rely on the representations, covenants and assurances contained in Section 7 of the Consulting Agreement.

158.    Landreth relied on the representations, covenants and assurances contained in Section 7 of the Consulting Agreement, which representations, covenants and assurances were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

159.    As a direct and proximate result of his reliance on the representations contained in Section 12 of the Consulting Agreement and the representations, covenants and assurances contained in Section 7 of the Consulting Agreement, Landreth was damaged in that he:

(a)    provided professional consulting, development and marketing services to the City for more than 27 months;

(b)    devoted more than one-half of his professional time during the period August 2003 through October 2005 to providing professional services to the City;

(c)    was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had been "binding, valid and specifically enforceable according to its terms" against the City – as represented in paragraph b. of Section 12;

(d)    was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had not violated several "presently existing provisions of law" to which the City was subject – Sections 8-1-7 and 4-5-16(c) of the Illinois Municipal Code among them – contrary to the representation in paragraph c. of Section 12.

WHEREFORE, Landreth prays for the following relief against Leigh:

(i)      compensatory damages in an amount equal to the amounts Landreth had already earned and would be entitled to receive under the Consulting Agreement if it were a valid and enforceable obligation of the City;

(ii)     punitive damages in such amount as the trier of fact shall determine  to be appropriate;

(iii)    the costs of this action; and

(iv)    such other and further relief as may be appropriate and just.

_____

**COUNT IV**

**Fraud**

**(Landreth v. City of Ottawa)**

160.    When Resolution 93-2003 was passed on August 5, 2003 and when the contract was subsequently executed by the City and Landreth, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh as City Attorney knew that the City had not previously made an appropriation for the Consulting Agreement.  Neither Eschbach or any of the other City Council members nor Leigh as City Attorney disclosed this fact to Landreth, although they had a duty to do so.

161.    Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh as City Attorney knew when Resolution 93-2003 was passed and when the contract was subsequently executed by the City and Landreth that the Consulting Agreement was

not "binding, valid and specifically enforceable according to its terms against [the City]" – and in fact was void and unenforceable.  Neither Eschbach or any of the other City Council members nor Leigh as City Attorney disclosed this fact to Landreth, although they had a duty to do so.

162.    Although Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh as City Attorney knew when Resolution 93-2003 was passed and when the Consulting Agreement was subsequently executed by the City and Landreth that the City had not made an appropriation for the Consulting Agreement as required by Section 8-1-7 – and that, consequently, the Consulting Agreement was void and unenforceable – Eschbach and the other City Council members caused or permitted the Consulting Agreement to be drafted  in such a way as to conceal that fact from Landreth and to deceive Landreth and induce him to sign the Consulting Agreement.  More specifically, Eschbach and the other City Council members caused or permitted the following representations to be included in the agreement:

> 12.    <u>Warranties</u>.  The parties warrant and represent that:
>
> *   *   *
>
> b.    *This Agreement is binding, valid and specifically enforceable according to its terms against each party;*
>
> c.    *This Agreement does not violate any presently existing provision of law … to which such party may be subject;*

In addition, Eschbach and the other City Council members caused or permitted the following provision to be included in the Consulting Agreement:

> 7.    <u>Revocation</u>.  The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, the City agrees and covenants not to revoke or rescind this Agreement or to institute any proceeding or action to challenge the validity of this agreement or in any way to rescind, modify or alter said agreement, *understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so.* *   *   *    [emphasis added]

163.    When Resolution 93-2003 was passed and when the Consulting Agreement was subsequently executed by the City and Landreth, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh as City Attorney knew that the representations set forth in paragraphs b. and c. of  Section 12 were false.

164.    Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh as City Attorney intended for Landreth to rely on the representations contained in Section 12 of the Consulting Agreement.

165.    Landreth relied on the representations contained in Section 12 of the Consulting Agreement, which representations were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

166.    Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh as City Attorney intended for Landreth to rely on the representations, covenants and assurances contained in Section 7 of the Consulting Agreement.

167.    Landreth relied on the representations, covenants and assurances contained in Section 7 of the Consulting Agreement, which representations, covenants and assurances were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

168.    Although Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh as City Attorney knew that the Consulting Agreement was void and unenforceable against the City, the City nevertheless acted as if the Consulting Agreement were valid and enforceable and fraudulently induced Landreth to act as the City's economic development

consultant and to provide consulting, development and marketing services to the City under the Consulting Agreement. More specifically:

(a)   for more than two years, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), with Leigh's knowledge, knowingly permitted Landreth to perform consulting services for the City pursuant to the Consulting Agreement;

(b)   for more than two years, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), with Leigh's knowledge, knowingly accepted and utilized the services Landreth provided under the Consulting Agreement;

(c)   during the period August 2003 through October 2005, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), with Leigh's knowledge, caused the City to pay Landreth the $5,000.00 monthly retainer pursuant to Section 3(a) of the Consulting Agreement – even though Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh knew that such payments:

(i)    were unlawful;

(ii)   were made in violation of both Section 8-1-7 and Section 4-5-16(c) of the Illinois Municipal Code; and

(iii)  could subject the City Council to criminal penalties;

(d)   during the period August 2003 through October 2005, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), with

Leigh's knowledge, caused the City to pay Landreth's expenses pursuant to Section 3(a) of the Consulting Agreement – even though Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh knew that such payments:

    (i)      were unlawful;

    (ii)     were made in violation of both Section 8-1-7 and Section 4-5-16(c) of the Illinois Municipal Code; and

    (iii)    could subject the City Council to criminal penalties;

(e)    in February 2005, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), with Leigh's knowledge, caused the City to pay Landreth $15,879.00, being the first installment of the fee to which Landreth became entitled pursuant to Section 3(d) of the Consulting Agreement as a result of the MTC project – even though Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh knew that such payment:

    (i)      was unlawful;

    (ii)     was made in violation of both Section 8-1-7 and Section 4-5-16(c) of the Illinois Municipal Code; and

    (iii)    could subject the City Council to criminal penalties;

(f)    in October 2005, Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter), with Leigh's knowledge, caused the City to pass Resolution No. 126-2005 approving the Amendment and authorizing

and directing the Mayor and City Clerk to execute the Amendment in order for the City to retain a $50,000.00 grant from the State of Illinois DCEO – even though Eschbach and the other City Council members (Whitney, Eichelkraut, Walsh and Baxter) and Leigh knew that the Consulting Agreement was void and unenforceable and violated Section 8-1-7; and

(g)     in October 2005, needing Landreth's signature on the Amendment in order for the City to retain a $50,000.00 grant from the State of Illinois DCEO, the City, at the direction and request of Eschbach, with Leigh's knowledge, requested that Landreth sign the Amendment – even though Eschbach and Leigh knew that the Consulting Agreement was void and unenforceable and violated Section 8-1-7.

169.    As a direct and proximate result of his reliance on (i) the representations contained in Section 12 of the Consulting Agreement, (ii) the representations, covenants and assurances contained in Section 7 of the Consulting Agreement and (iii) the City's actions and conduct, as more particularly alleged in the immediately preceding paragraph, Landreth was damaged in that he:

(a)     provided professional consulting, development and marketing services to the City for more than 27 months;

(b)     devoted more than one-half of his professional time during the period August 2003 through October 2005 to providing professional services to the City;

(c)     was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had been "binding, valid

and specifically enforceable according to its terms" against the City – as represented in paragraph b. of Section 12;

(d)    was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had not violated several "presently existing provisions of law" to which the City was subject – Sections 8-1-7 and 4-5-16(c) of the Illinois Municipal Code among them – contrary to the representation in paragraph c. of Section 12.

WHEREFORE, Landreth prays for the following relief against the City of Ottawa:

(i)    compensatory damages in an amount equal to the amounts Landreth had already earned and would be entitled to receive under the Consulting Agreement if it were a valid and enforceable obligation of the City;

(ii)     the costs of this action; and

(iii)    such other and further relief as may be appropriate and just.

---

## COUNT V

## Negligent Misrepresentation

## (Landreth v. Leigh)

170.    At all times alleged herein, Pool, Leigh & Kopko was engaged by the City as "corporation counsel."

171.    Leigh drafted the Consulting Agreement as an employee or agent of Pool, Leigh & Kopko, the City's "corporation counsel."

172.     Leigh drafted the Consulting Agreement for the benefit of both the City and Landreth. In doing so, Leigh was providing information for the guidance of Landreth in his business transactions with the City.

173.     Leigh had a duty to exercise reasonable care to supply truthful and accurate information to Landreth.

174.     At all times alleged herein, Leigh possessed superior knowledge to Landreth insofar as matters of municipal law were concerned.

175.     At all times alleged herein, Leigh possessed superior knowledge to Landreth insofar as the business and legal affairs of the City were concerned.

176.     Leigh and the City intended for Landreth to rely on the representations contained in the Consulting Agreement, in particular the following representations contained in Section 12:

b.     *This Agreement is binding, valid and specifically enforceable according to its terms against each party;*

c.     *This Agreement does not violate any presently existing provision of law … to which such party may be subject;*

177.     Landreth relied on the representations contained in Section 12 of the Consulting Agreement, which representations were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

178.     Leigh and the City intended for Landreth to rely on the representations, covenants and assurances contained in Section 7:

7.     <u>Revocation</u>.  The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, **the City agrees** and covenants **not** to revoke or rescind this Agreement or to institute any proceeding or action **to challenge the**

**validity of this agreement** or in any way to rescind, modify or alter said agreement, *understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so.* * * *     [emphasis added]

179.     Landreth relied on the representations, covenants and assurances contained in Section 7 of the Consulting Agreement, which representations, covenants and assurances were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

180.     When he drafted the Consulting Agreement, and thereafter on August 5, 2003 when Resolution 93-2003 was passed and the Consulting Agreement was subsequently executed by the City and Landreth, Leigh breached the duty of care he owed to Landreth to supply truthful and accurate information and was guilty of negligence in that:

(a)     Leigh knew or should have known that the City had not made an appropriation for the Consulting Agreement;

(b)     Leigh knew or should have known that the City's failure to have made an appropriation for the Consulting Agreement in the City's annual appropriation ordinance for the fiscal year commencing May 1, 2003 or in a supplemental appropriation ordinance made the agreement void and unenforceable against the City;

(c)     although Leigh knew or should have known that the Consulting Agreement was void and unenforceable against the City, he included a representation in the contract which expressly stated that the agreement was "binding, valid and specifically enforceable according to its terms" against the City;

(d)     although Leigh knew or should have known that the Consulting Agreement violated Section 8-1-7 and Section 4-5-16(c) of the Illinois Municipal Code, he included a representation in the contract which expressly stated that the agreement did "not violate any presently existing provision of law" to which the City was subject.

181.    As a direct and proximate result of his reliance on the representations contained in Section 12 of the Consulting Agreement and the representations, covenants and assurances contained in Section 7 of the Consulting Agreement, Landreth was damaged in that he:

(a)     provided professional consulting, development and marketing services to the City for more than 27 months;

(b)     devoted more than one-half of his professional time during the period August 2003 through October 2005 to providing consulting and other services to the City;

(c)     was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had been "binding, valid and specifically enforceable according to its terms" against the City – as represented in paragraph b. of Section 12;

(d)     was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had not violated several "presently existing provisions of law" to which the City was subject – Sections 8-1-7 and 4-5-16(c) of the Illinois Municipal Code among them – contrary to the representation in paragraph c. of Section 12.

WHEREFORE, Landreth prays for the following relief against Leigh:

(i)     compensatory damages in an amount equal to the amounts Landreth had already earned and would be entitled to receive under the Consulting Agreement if it were a valid and enforceable obligation of the City;

(ii)    the costs of this action; and

(iv)   such other and further relief as may be appropriate and just.

---

## COUNT VI

### Negligent Misrepresentation

### (Landreth v. Pool, Leigh & Kopko, P.C.)

182.    At all times alleged herein, Pool, Leigh & Kopko was engaged by the City as "corporation counsel."

183.    Pool, Leigh & Kopko drafted the Consulting Agreement as the City's "corporation counsel."

184.    Pool, Leigh & Kopko drafted the Consulting Agreement for the benefit of both the City and Landreth.  In doing so, Pool, Leigh & Kopko was providing information for the guidance of Landreth in his business transactions with the City.

185.    Pool, Leigh & Kopko had a duty to exercise reasonable care to supply truthful and accurate information to Landreth.

186.    At all times alleged herein, Pool, Leigh & Kopko possessed superior knowledge to Landreth insofar as matters of municipal law were concerned.

187.    At all times alleged herein, Pool, Leigh & Kopko possessed superior knowledge to Landreth insofar as the business and legal affairs of the City were concerned.

188.    Pool, Leigh & Kopko and the City intended for Landreth to rely on the representations contained in the Consulting Agreement, in particular the following representations contained in Section 12:

> b.    *This Agreement is binding, valid and specifically enforceable according to its terms against each party;*
>
> c.    *This Agreement does not violate any presently existing provision of law … to which such party may be subject;*

189.    Landreth relied on the representations contained in Section 12 of the Consulting Agreement, which representations were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

190.    Pool, Leigh & Kopko and the City intended for Landreth to rely on the representations, covenants and assurances contained in Section 7:

> 7.    <u>Revocation</u>.  The City understands the long-term nature of this Agreement and the long-term nature of economic development. Therefore, **the City agrees** and covenants **not** to revoke or rescind this Agreement or to institute any proceeding or action **to challenge the validity of this agreement** or in any way to rescind, modify or alter said agreement, ***understanding that Landreth is relying upon the representations and financial commitment contained herein and has every right to do so.*** *  *  *    [emphasis added]

191.    Landreth relied on the representations, covenants and assurances contained in Section 7 of the Consulting Agreement, which representations, covenants and assurances were an inducement to him to enter into the Consulting Agreement and to perform his contractual duties thereunder.

192.    When Pool, Leigh & Kopko drafted the Consulting Agreement, and thereafter on August 5, 2003 when Resolution 93-2003 was passed and the Consulting Agreement was subsequently executed by the City and Landreth, Pool, Leigh & Kopko breached the duty of care it owed to Landreth to supply truthful and accurate information and was guilty of negligence in that:

(a)    Pool, Leigh & Kopko knew or should have known that the City had not made an appropriation for the Consulting Agreement, as required by Section 8-1-7;

(b)    Pool, Leigh & Kopko knew or should have known that the City's failure to have made an appropriation for the Consulting Agreement in the City's annual appropriation ordinance for the fiscal year commencing May 1, 2003 or in a supplemental appropriation ordinance made the agreement void and unenforceable against the City;

(c)    although Pool, Leigh & Kopko knew or should have known that the Consulting Agreement was void and unenforceable against the City, it included a representation in the contract which expressly stated that the agreement was "binding, valid and specifically enforceable according to its terms" against the City;

(d)    although Pool, Leigh & Kopko knew or should have known that the Consulting Agreement violated Section 8-1-7 and Section 4-5-16(c) of the Illinois Municipal Code, it included a representation in the contract which expressly stated that the agreement did "not violate any presently existing provision of law" to which the City was subject.

193.    As a direct and proximate result of his reliance on the representations contained in Section 12 of the Consulting Agreement and the representations, covenants and assurances contained in Section 7 of the Consulting Agreement, Landreth was damaged in that he:

(a)    provided professional consulting, development and marketing services to the City for more than 27 months;

(b)    devoted more than one-half of his professional time during the period August 2003 through October 2005 to providing consulting and other services to the City;

(c)    was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had been "binding, valid and specifically enforceable according to its terms" against the City – as represented in paragraph b. of Section 12;

(d)    was deprived of substantial fees he had earned and would otherwise have been entitled to be paid if the Consulting Agreement had not violated several "presently existing provisions of law" to which the City was subject – Sections 8-1-7 and 4-5-16(c) of the Illinois Municipal Code among them – contrary to the representation in paragraph c. of Section 12.

WHEREFORE, Landreth prays for the following relief against Pool, Leigh & Kopko:

(i)    compensatory damages in an amount equal to the amounts Landreth had already earned and would be entitled to receive under the Consulting Agreement if it were a valid and enforceable obligation of the City;

(ii)    the costs of this action; and

(iii)    such other and further relief as may be appropriate and just.

Date: March 20, 2006

**John Colt Landreth**, Plaintiff

By:    s/ Richard J. Berry                                    

Richard J. Berry ARDC #198269
Member of Trial Bar
MYERS, BERRY, O'CONOR & KUZMA, LTD.
130 East Madison Street
Ottawa, IL 61350
E-mail address: rberry@mdbok.com
Tel.  815-434-6206

### Jury Demand

Plaintiff demands that all issues triable by a jury be decided by a jury of twelve persons.

**John Colt Landreth,** Plaintiff

By:    s/ Richard J. Berry                                    

One of his Attorneys

Richard J. Berry,  ARDC #198269
MYERS, BERRY, O'CONOR & KUZMA, LTD.
130 East Madison Street
Ottawa, IL 61350
E-mail: rberry@mdbok.com
Ph. 815-434-6206