# LABOR AGREEMENT

Between

## UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA

Local 23
Rockford, Illinois

and

Piping Industry Council
Rockford Area
Incorporated

Effective
June 1, 2002 through May 31, 2007



EXHIBIT
2

# LABOR AGREEMENT

Between

## UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA

Local 23
Rockford, Illinois

and

Piping Industry Council
Rockford Area
Incorporated

Effective
June 1, 2002 through May 31, 2007



# TABLE OF CONTENTS

|  | PREAMBLE | 1 |
| ARTICLE I | RECOGNITION | 2 |
| ARTICLE II | WORK WEEK & HOURS | 5 |
| ARTICLE III | TERM SUPERVISION STEWARDS APPRENTICES | 15 |
| ARTICLE IV | JURISDICTION QUALITY CONTROL | 19 |
| ARTICLE V | TOOLS - CLOTHING | 21 |
| ARTICLE VI | TRAVEL EXPENSE | 24 |
| ARTICLE VII | TRAVEL PAY | 25 |
| ARTICLE VIII | WORK REQUIREMENTS | 26 |
| ARTICLE IX | STATE & FEDERAL INSURANCE | 28 |
| ARTICLE X | APPRENTICES | 29 |
| ARTICLE XI | EMPLOYEE EXAMINATIONS | 30 |
| ARTICLE XII | JOINT CONFERENCE COMMITTEE | 31 |
| ARTICLE XIII | CODES - CEP | 36 |
| ARTICLE XIV | FUNDS | 36 |
| ARTICLE XV | NON-DISCRIMINATION | 47 |
| ARTICLE XVI | NO STRIKE - NO LOCKOUT | 49 |
| ARTICLE XVII | MANAGEMENT RIGHTS | 50 |
| ARTICLE XVIII | TRADE JURISDICTION | 51 |
| ARTICLE XIX | TERM & EFFECTIVE DATE | 60 |
|  | SUBSTANCE ABUSE | 61 |
|  | INDEX | 73 |
|  | JURISDICTION MAP | 75 |

Savanna Ordinance Depot. Other than the exceptions as noted, this includes all cities, towns, and villages in these respective counties and such other jobs or territorial jurisdiction that may be granted and assigned to the jurisdiction of the Union (see attached jurisdictional map).

# ARTICLE I
# RECOGNITION

## Section 1.1. Union.

The Union has demonstrated to the Association that it has majority support by presenting authorization cards, signed by employees, authorizing the Union as the employees' exclusive bargaining representative. The Union has unequivocally demanded recognition as the employees § 9(a) representative.

The Association, on behalf of the Employers, has on the basis of objective and reliable information, confirmed that a clear majority of the plumbers, pipe fitters and refrigeration fitters in the Employers' employ have designated, are members of, and are represented by the Union

2

---

| | LOCAL 23 USE ONLY |
| --- | --- |
| | Request #: _____ |
| | Date/Time: _____ |
| | Entered By: _____ |
| | LU23 Bus. Rep. _____ |

*PICRA / LOCAL 23 EMPLOYEE REQUEST FORM*
*Local 23    815/397-0350    815/397-0466 (Fax)*

Request made by:                    Report to:

Employer _____                     Address _____
Address _____

City _____    City _____
State _____   State _____
Zip _____     Zip _____
Phone ( ) _____   Phone ( ) _____
Fax ( ) _____   Report on _____ at _____ am/pm
Signature _____   Employer representative
Printed name _____   at job site
Filed on ___/___/___ at _____ am/pm

Note: Please use a separate form for each request where skill requirements differ.

**Affirmative Action Requirements**
(indicate number of persons requested)
☐ No such requirements
☐ Qualified Minority(ies)
☐ Qualified Female(s)

| Pipe Fitter | Plumber |
| --- | --- |
| ☐ General Pipe Fitting Skills | ☐ Illinois License |
| ☐ Ammonia Systems | ☐ Medical Gas Certified |
| ☐ Steam Systems | ☐ Service Work |
| ☐ Service Work | |

Welding    Test Required
☐ Sick ............ ☐
☐ Carbon ☐
☐ Stainless ☐
☐ Heli-Arc
☐ Carbon ☐    **Additional Requirements**
☐ Stainless ☐    ☐ Certificate of CFC Qualification
☐ M.I.G. Welder ....... ☐

Job Description/Estimated Duration: _____
_____
_____
_____
_____
_____
_____
_____
_____

3

for purposes of collective bargaining. The Association, therefore, and on behalf of the Employers, unconditionally acknowledges and confirms that the Union is the sole and exclusive bargaining representative of the Employees of the Employers within the Territorial and Trade Jurisdiction of the Union pursuant to § 9(a) of the National Labor Relations Act.

(a) Any Local 23 member may be requested from the referral book, by name, (in writing) by a contractor. For every one member a contractor request, the next member sent to that contractor will be referred by the Local from the referral book and per the contractors required qualifications (per a PICRA/Local 23 Employee Request Form).

**Section 1.2-Favored Nation.** In the event that Local #23, individually, enters into a collective bargaining agreement with another party which extends more favorable contract terms than those set forth herein, then the contractors signatory to this agreement may elect to be covered by any or all of such more favorable contract terms by serving written notice of same upon the Union. This provision shall not apply to any contract terms set forth in National or

International Agreements, Multi Union contracts, and contracts with Government Bodies.

All individual contracts negotiated by the Union with other parties shall be submitted to, and placed on file with, the PICRA office.

## ARTICLE II

## WORK WEEK AND HOURS

**Section 2.1.   Reporting and Pick Up.** Employees shall report for work, whether at job, shop or supply house, at ten (10) minutes before the regular starting time, and shall be allowed reasonable time to pick up tools, etc., before the regular quitting time.

**Section 2.2. Hours.** Monday through Friday, an eight (8) hour straight time shift will consist of eight (8) consecutive hours between the time of 6:00 a.m. and 4:30 p.m. upon mutual consent of Employer and Employee and notice to the Union.

Any loss of time can be voluntarily made up on Saturday, of the same workweek, at the base straight-time hourly wage rate plus applicable fringe benefit fund contributions, by mutual

agreement between the Employer, the Employee and the Union. Under no circumstances will an employee be allowed to make up lost time on Sundays, Holidays or the following workweek. An Employer may not lay off, discharge or discriminate against any employee for refusal to work on a Saturday make-up day. Local Union 23 must be notified for approval prior to implementing this make-up provision.

**Section 2.3. Four tens.** A four day work week consisting of four (4) ten (10) hour days may be worked. The work day shall be between the hours of 6:00 a.m. 6:30 p.m. The work week shall be Monday through Friday. The minimum that shall be worked to establish a four (4) day ten (10) hour work schedule shall be one week. The day off may be Monday through Friday due to holidays or weather related days. If working overtime the previous week, any time in excess of (8) eight hour per day the holiday or rain out week will be paid at 1 1/2 time the straight time rate.

**(a) Overtime.** All hours worked before or after scheduled ten (10) hours shall be paid at overtime rates described in Article II. Should it be required, to work five (5) days while working

6

scheduled 4/10 work week, overtime shall be paid on a daily basis in accordance with Article II. Fifth day of 4 day work week and Saturday will be paid at 1 1/2 times the straight time rate.

**Section 2.4. Mutual Starting Times.** Daily and weekly starting times established in this section shall be by a mutual agreement between the employer and a majority of the Employees at the shop or job site.

**Section 2.5. Continuity of Employment.** It shall be the policy of all parties subject to this Agreement to maintain continuity of employment for Employees and to regulate and operate all work within these regular work days.

**Section 2.6. Saturday Rate.** Except as provided in Section 2.2 all work performed on Saturdays shall be compensated at one and one-half (1 1/2) times the straight-time hourly wage rate.

**Section 2.7. Service Overtime.** All overtime service work will be paid at one and one-half (1 1/2) times the regular rate. All service work performed on Holidays (New Year's Day, Easter, Decoration Day, Fourth of July, Labor Day, Veteran's Day, Thanksgiving Day and

7

Christmas Day) will be paid at the rate of double (2) times. Should a question arise whether the work is actually service, it shall be decided in accordance with the grievance procedure provided in this Agreement.

**Section 2.8.  Portal-to-Portal Pay.**  The portal-to-portal rate of pay (as in Article II, Section 2.7) starts at the employees residence or a 25 mile radius of the contractors shop, whichever is closer.

**(a)**  If the employee lives outside of the 25 mile radius and travels to a job within the 25 mile radius he shall receive the travel pay rate as per Article VI, Section 6.2. When he reaches the 25 mile zone he shall then start receiving the portal-to-portal rate as per Article II, Section 2.7.

**(b)**  If the employee lives outside of the 25 mile radius and travels to a job outside of the 25 mile zone, he shall receive the portal-to-portal rate as per Article II, Section 2.7.

**Section 2.9.  Overtime - Time & One Half.**  Work that cannot be rescheduled during normal day shift hours due to interference of production, will be paid at the rate of one and one-half (1 1/2) times the regular rate; after 8 hours

8

Monday - Friday; all hours on Saturday except as provided in Section 2.2. Should there be a question in regards to rescheduling work, it shall be decided in accordance with the grievance procedure provided in this Agreement.

**Section 2.10.  Service Hours.**  Employers doing service work may work eight (8) hours a day, Tuesday through Saturday. The work day shall conform to Section 2.2 of this Agreement upon mutual consent between the Employer and the Employee and notice to the Union. Should a question arise whether the work is service it shall be decided in accordance with the grievance procedure provided in this Agreement.

**Section 2.11.  Overtime - Double.**  All other time (excluding service as stated in Section 2.7), including Sundays, Holidays (New Year's Day, Decoration Day, Fourth of July, Labor Day, Veterans Day, Thanksgiving Day and Christmas Day) will be paid at the rate of double (2) time.

The following seven (7) days shall constitute the legal holidays within the terms of this Agreement and will be celebrated on nationally recognized days: (actual calendar day): New Year's

9

Day, Decoration Day, Fourth of July, Labor Day, Veterans Day, Thanksgiving Day and Christmas Day.

**Section 2.12. Records Access.** The Union shall have access to Employer payroll records through the use of the trust fund accounting firm. The auditing expense will be borne by the firm. The Union when there are questions of compliance with pay rates on overtime provisions of the Agreement and claimed violation shall be subject to the grievance procedure of this Agreement.

**Section 2.13. Show Up Time.** An Employee reporting for work at the regular starting time and for whom no work is available, shall receive pay for two (2) hours at the basic hourly rate of wages, unless he has been notified within a reasonable amount of time before leaving his home not to report.

**(a) Weather Conditions.** An Employee reporting for work at the regular starting time at a shop or job, and for whom no work is available due to weather conditions, will receive two (2) hours pay for reporting time. To be eligible to receive such reporting pay, the Employee must

10

check in at the job or shop at the regular starting time and remain there for two (2) hours. In order to qualify for the pay provided for in this Article, the Employee must remain on the job available for work during the period of time for which he receives pay unless released sooner by the Employer's superintendent or, in his absence, the foreman.

**(b) Weather Conditions.** The Employer shall have sole responsibility to determine availability of work due to weather conditions. When the conditions set forth in this paragraph occur on an overtime day, or on shift work, the premium rate shall be paid.

**Section 2.14. Coffee Break.** A coffee break not to exceed ten (10) minutes in the morning and ten (10) minutes in the afternoon, from the Employee's lunch container, immediately adjacent to his work area shall be allowed.

**(a)** An additional ten (10) minute break will be granted in lieu of a dinner break when on a twelve (12) hour shift. In the best interests of the industry as a whole, Employees shall avoid congregating in groups during breaks. Service men shall avoid coffee breaks until completion

11

of service call.

**Section 2.15. Shift Time-Construction Work.** When two (2) shifts are employed for a period of five (5) consecutive days or more, the shift employed between the hours of 8:00 a.m. and 4:30 p.m. shall receive the regular rate of pay and shall be identified as the First Shift. The Second Shift will be between the hours of 4:30 p.m. and 1:00 a.m. Floating starting time may apply as in Section 2.2. of this Article.

| | | |
|---|---|---|
| 8:00 a.m.-4:30 p.m. | 1st Shift | Regular Pay |
| 4:30 p.m.-Midnight | 2nd Shift | 15% Premium Pay |
| Midnight-8:00 a.m. | 3rd Shift | 25% Premium Pay |

(a) When three (3) eight hour shifts are employed, the third shift shall start at 12.01 a.m. Monday and end at 8:00 a.m. Monday and shall be known as 3rd Shift. The next shift shall start at 8:00 a.m. Monday and shall be known as 1st Shift. The next shift shall start at 4:30 p.m. Monday and end at 12:00 Midnight, and shall be know as the 2nd Shift. Employees working the 1st Shift shall receive the regular rate of pay,

12

employees working the 2nd Shift - 15% and 3rd Shift shall receive premium pay for eight hours at the regular rate, in addition thereto premium pay equal to 25% of the regular rate, which shall be identified as shift premium rate. Twelve (12) hour shifts shall not be worked except by prior permission of the Joint Conference Committee.

(b) Overtime shift work performed beyond an eight-hour shift from midnight Sunday to midnight Friday, except the 2nd Shift on Friday night, shall be paid for at one and one-half (1 1/2) times the regular shift premium rate for the 2nd and 3rd Shifts, to a maximum of 12 hours. After 12 hours, the rate shall be double time. In cases where the 2nd Shift on Friday continues into Saturday, work performed by such shift after midnight Friday shall be paid for at the rate of double the rates provided in Section 2.16 above.

(c) Shift work performed after midnight Friday to midnight Sunday shall be paid for at double the rates provided in Section 2.16 below. In cases where the 2nd Shift on Sunday continues into Monday, work performed by such shift after midnight Sunday shall be paid for at one and one-half (1 1/2) times the rates provided in Section 2.15 above.

13

(d) Shift work performed on holidays or days observed as holidays shall be paid for at twice the rates as provided in Section 2.16 below.

(e) No Employee shall work in two shifts except the job superintendent or supervision foreman, both of whom, if working, shall receive the regular overtime for all time in excess of one shift per day.

(f) A special shift will be established to take care of maintenance and service of existing facilities. This shift will allow a longer service day for each shop and serve as a vehicle to protect the union portion of maintenance and service work. This shift would start no later than 4:00 pm, and continue for 8 hours and allow (1/2) hour for lunch. An employee would be allowed an eight (8) hour non-work period between a special shift and a regular workday. Special shift differential would be fifteen percent (15%). Employee would be guaranteed eight (8) hours and would be given notice on preceding day that this shift was forthcoming.

(g) A 2nd shift does not require a 1st shift and a 3rd shift does not require a 1st or 2nd shift.

**Section   2.16.      Pay    Requirements.**

Employees will be **paid weekly** on the third day following the end of the weekly payroll period, no later than end of shift on that day, at the job site unless that day is a Holiday, then pay day would be the following day.

When an employee is discharged or laid off, he shall be paid no later than end of shift that day.

**Section 2.17. Termination Slip.** When an employee is discharged or laid off he shall be provided a termination slip showing condition of discharge; i.e., Voluntary quit, Reduction in force, Fired for cause, etc. Forms to be supplied by union.

## ARTICLE III

## TERM SUPERVISION
## STEWARDS APPRENTICES

**Section 3.1. Term of Agreement.** The term of this Agreement shall be sixty (60) months. This agreement shall become effective on June 1, 2002 and continue in force through May 31, 2007.

(a) **Effective June 1, 2002**
Total package will be **$40.21.**

Effective **June 1, 2003**
Total package will be **$42.21**

Effective **June 1, 2004**
Total package will be **$44.21**

Effective **June 1, 2005**
Total package will be **$46.21**

Effective **June 1, 2006**
Total package will be **$48.21**

**Section 3.2. Foremen.** On any job where six (6) or more men are working, a Local No. 23 U.A. member shall be a foreman. He shall receive seven percent (7%) additional pay above the basic wage rate.

**(a)** On any job where eleven (11) or more men are working, a local 23 area foreman shall be designated. The area foreman shall receive ten percent (10%) additional pay and the foreman shall receive seven percent (7%) additional pay above the basic wage rate.

**(b)** A Local 23 General foremen shall be employed on all jobs with twenty-five (25) or more men. They shall be paid twenty-five percent (25%) above the basic wage rate. When a supervisor is involved in shift work, he shall

16

receive the shift premium based on his supervisory pay.

**(c)** Additional foremen, for each additional ten (10) men after a General Foreman has been designated, shall be designated.

**(d)** On all jobs requiring groups of thirty (30) or more, the following rates shall apply:

| | |
|---|---|
| Journeyman | Base Rate |
| Foremen | plus 10% |
| Area Foremen | plus 15% |
| General Foremen | plus 25% |
| Superintendents | plus 35% |

**Section 3.3. Supervision Reduction.** Upon completion of the project, it shall be understood that the Employer may reduce, if required, the pay of the Employee to the journeyman scale. Overtime rate paid to Employees will prevail on Employees working in supervisory capacities.

**Section 3.4. Job and Shop Steward.** Stewards shall be required on all jobs with a total of five (5) or more Employees. Stewards shall not work in a supervisory capacity and shall not be paid more than journeyman's scale and shall be selected by the Local Union. A steward

17

shall be a working Employee appointed by the Business Manager. The Union shall notify the Employer of the appointment of each Steward, and the Employer, before laying off or discharging Steward, shall notify the union of his intention to do so. The Employer shall not discriminate against a Steward or lay him off or discharge him on account of action taken by him in the performance of his union duties.

**Section 3.5. Apprentice Rates.** Apprentice rates of pay working under the provisions of this Agreement for apprentices are as follows:

1st year - 40% of Journeyman rate
2nd year - 50% of Journeyman rate
3rd year - 60% of Journeyman rate
4th year - 70% of Journeyman rate
5th year - 80% of Journeyman rate

End of 5th year - 100%, provided the apprentice has completed the requirements of the J.A.C.

(a) All increases for apprentices will become effective on anniversary date of June 1 or September 1, provided the J.A.C. approves the raise or advancement.

18

# ARTICLE IV

# JURISDICTION - QUALITY CONTROL

**Section 4.1. Trade Jurisdiction.** Supervision, laying out, setting of sleeves, hangers, inserts, cutting of holes and openings, installation, placing erection, maintenance, repair and handling of all piping fixtures, equipment, appurtenances, and such necessary valve fittings, etc. are recognized as coming under the jurisdiction of the United Association of Plumbers & Pipefitters as defined by the fifty (50) Articles of Jurisdictional Award of the A.F.L.-C.I.O. (the Fifty Articles of Jurisdiction of the United Association are recognized and shall be a part of this Agreement). See Article XVIII of this Agreement.

(a) All piping installation within the Union's jurisdiction which has traditionally and in the past been cut, threaded, welded and/or fabricated by Employees in the bargaining unit shall be cut, threaded, welded and/or fabricated by said Employees either on the job site or in the Employer's shop.

19

**Section 4.2. Quality Control.** Quality Control (hereinafter QC). Any Journeyman assigned by his Employer to act as a QC Inspector, QC Lead Inspector, QC Supervisor, QC General Supervisor and Welding Supervisor and assumes the responsibility of the job shall be employed by the Employer on the following schedule.

(a) QC Inspectors shall receive the regular journeyman wage rate, per eight (8) hour day, and shall be paid proportionately for all overtime work.

(b) QC Lead Inspectors shall receive ten percent (10%) per hour more than the regular journeyman wage rate, per eight (8) hour day, and shall be paid proportionately for all overtime work.

(c) QC Supervisors shall receive fifteen percent (15%) per hour more than the regular journeyman wage rate, per eight (8) hour day, and shall be paid proportionately for all overtime work.

(d) QC General Supervisors shall receive twenty-five percent (25%) per hour more than the regular journeyman wage rate, per eight (8) hour day, and shall be paid proportionately for all overtime work.

(e) It is understood that all Quality Control personnel and Welding Supervisors shall be members of the bargaining unit and that the provisions of this article shall only be applicable for work performed at Nuclear Generating Facilities or Fossil Fuel Generating Facilities and is not applicable for single purpose facilities used within a particular residential, commercial or industrial project.

**Section 4.3. Welding Supervision.** Welding Supervisors shall receive ten percent (10%) per hour more than the regular journeyman wage rate, per eight (8) hour day, and shall be paid proportionately for all over time work.

# ARTICLE V

# TOOLS - CLOTHING

**Section 5.1. Tools.** All tools and equipment of every description will be furnished by Employer with the exception of one pair of pliers, one six foot ruler and one torpedo level which shall be furnished by the Employee, it being understood that such tools and equipment furnished by Employer shall be of quality in keeping with all safety rules and regulations.

20

21

Employee will be responsible for tools in case of continual carelessness. Employer will furnish proper tool boxes and necessary locks and storage space on the job to properly protect tools and equipment. Whenever a job requires tool cribs, the cribs shall be manned by a Journeyman in Employees bargaining unit.

Careless use of tools and equipment shall be grounds for disciplinary action and/or dismissal by the Employer.

(a) In cases where the Employer does not furnish all service tools for the refrigeration Employee, the Employer shall pay the Employee a minimum tool rental of $1.00 per day, per present list of basic tools. The Employee will not be eligible for the tool rental until they have their recommended list. In the case where an employee starts working for a new Employer, the tool rental shall be pro-rated between the previous and new Employer, if applicable.

(b) These monies are to be paid during the last pay period of each quarter. Employers will make available a rider on their insurance policy to cover replacement cost of tools if Employees

22

wish to pay the premium.

(c) List of basic tools:
Set of box end wrenches
Set of open end wrenches
Various crescent wrenches
Refrigeration valve stem wrenches
Refrigeration flair nut wrenches
Refrigeration flair tool (sets)
Refrigeration pinch off tool (sets)
Refrigeration swedging tool
Copper tube cutter
1/2" and/or 3/8" drive socket set
Allen set screw wrenches
Various screw drivers (Phillips and Slot)
Steel or wooden rule
8" level
Charging and testing manifold gauge set with hoses
Pocket thermometer
Pliers (regular and needle nose)
Water pump pliers
Wire stripper
Voltage and amp tester
Ohm tester
Side cutter
Two pipe wrenches (12" & 14")
Presto lite soldering outfit

23

Flashlight
Ball pein hammer
Claw hammer
Crowbar
Hacksaw
Tool Box
Punches and chisels
Various files
Trouble light

**Section 5.2. Protective Clothing.** When welders are employed on a job, the Employer shall furnish protective clothing which shall include sleeves, aprons, gloves, etc. The welders shall be held responsible for this clothing, except for wear and tear or if stolen from the Employer's job location.

## ARTICLE VI
## TRAVEL EXPENSE

**Section 6.1. Employee Vehicle.** Employees shall be furnished transportation by Employer during working hours from shop to job, job to job, and job to shop (except Employee's use of own car for personal use).

24

**Section 6.2 Employee Mileage.** In cases where Employees are required to use their own car for transportation, from shop to job, job to job, and job to shop during working hours, they shall be paid mileage per government standard on a day to day basis.

**Section 6.3 Employee Car Restriction.** Employees shall not use their own car at any time or any conditions for hauling materials or tools.

## ARTICLE VII
## TRAVEL PAY
## OUTSIDE JURISDICTION

**Section 7.1. Travel Assignments.**

When traveling into a different jurisdiction, travel pay shall be paid at a rate of whatever the current IRS auto mileage allowance is per mile from the shop or home whichever is closer to the jobsite.

If the jobsite is more than 100 miles away and/or an overnight stay is required, then a room and $25.00 per day for meals will be provided by the Contractor. This rate is to be con-

25

sidered a minimum rate.

7.1(a) If an employee is riding in a contractor's truck, he may be picked up at a site mutually agreed on a direct route to the jobsite and shall receive $0.20 a mile from the pickup point.

**Section 7.2.**

Employees sent to supervise and install work in the jurisdiction of other U.A. Locals shall base their pay rate on the highest rate paid, and shall pay all negotiated fringe benefits to the L.U. #23.

**Section 7.3. Travel Time.**

Employees are expected to be on the jobsite at the normal starting and quitting time. If the job ends at less than an 8-hour day, the employee will be paid for actual hours worked and will be paid mileage to the shop or home, whichever is closer.

## ARTICLE VIII
## WORK REQUIREMENTS

**Sections 8.1. Work Requirement.** No Employee subject to the provisions of this

Agreement shall be required to work for any Employer who employs other than members of the United Association of the different branches of the Plumbing, Pipefitting, and Refrigeration and Air Conditioning trade. The Union will cooperate with the Employer in attempting to provide available skilled journeymen or apprentices.

**Section 8.2. Employer Subcontracting.** The Employer agrees, on a construction job site, to sub-contract to only those contractors having an agreement with the Northwestern Illinois Building and Construction Trades Council.

(a) Employers subject to this Agreement will employ only recognized tradesmen on the various other branches of work and trade and agree to sublet work only to recognized employers.

**Section 8.3. General Savings Clause.** It is the intention of the parties hereto to comply with all provisions of the National Labor Relations Act of 1947, as amended. Should any article or section of any article of this Agreement be declared unlawful, then such article or section of article shall become null

and void, and the parties agree to meet to negotiate substitute provisions therefore on thirty (30) days prior written notice, and the other legal provisions of the Agreement shall not be effected thereby. In the event there shall be enacted by applicable Federal or State legislation or regulation, which administrative body now in existence or hereafter created such legislation or regulation which is at variance with the terms of the Agreement shall to that extent be deemed to modify the provisions of this Agreement.

## ARTICLE IX

## STATE AND FEDERAL INSURANCE

**Section 9.1.  State & Federal Insurance.** Employer agrees to carry, at all times, Worker's Compensation and pay all required Employer contributions for state and federal unemployment insurance on all Employees in the bargaining unit and such other Employer contributions and taxes as may be required of employers by federal, state, or municipal governments or agencies and for old age and Social

Security benefits. Employers will file with Union the various account numbers of these funds and satisfactory evidence of insurance coverage in the form of valid certificates of insurance indicating coverage of the Employees in the bargaining unit. All Employers will be subject to the Building Trades Agreement of the Northwestern Illinois Building and Construction Trades Council, AFL-CIO of Rockford, Illinois.

## ARTICLE X

## APPRENTICES

**Section 10.1. Apprentices.** Apprentices will be placed in shops and be subject to the rules and supervision of the Joint Apprenticeship Committee representing all branches of the Plumbing, Pipefitting and Refrigeration and Air Conditioning Industry, and all apprentices shall be subject to the rules of the Union, and the provisions of this Agreement.

**Section 10.2 Apprentice Ratios**

Three separate lists are to be established, one (1) each for Plumbers, Pipefitters, and HVAC

call or vote to cast a full vote for its representatives and it shall be counted as though all were present and voting.

(a) Powers and Duties. The Joint Conference Committee shall have jurisdiction to settle all disputes and grievances that might arise between Employers and Employees and carry out the terms of this Agreement. The Committee shall be the arbitration vehicle and shall have full power to enforce this Agreement and enforce working rules for the parties subject to this Agreement. It shall have power to impose such penalties from time to time, as it may deem advisable. It shall have the right to summon any individual subject to this Agreement as principal or witness to a dispute, such summons to be served through the Chairman or Secretary of the Joint Conference Committee in a manner to be prescribed by the Committee.

(b) Disputes and Grievances. All disputes and grievances must be arbitrated, and the decision of the Committee with respect thereto shall be final and binding on all parties subject to this Agreement and there shall be no work stoppage or abandonment of the work during such arbi-

32

tration. Nothing contained herein shall prevent any Employer from dealing directly with his Employee with respect to any grievance or dispute.

(c) Procedure. Should a dispute or grievance arise between the parties hereto or between an Employer and an Employee, or an officer or representative of either party, or between members of one party and members of the other party, such dispute or grievance shall be submitted within two pay periods in writing to the respective Chairman of the Employer Negotiating Committee and Business Manager of the Union with a copy to the Joint Conference Committee. Should the Employer Chairman or Business Manager fail to agree and dispose of the matter within twenty-four (24) hours, the dispute or grievance shall then be taken up by the Joint Conference Committee for adjudication. The Committee shall hear the evidence and render its decisions as expeditiously as possible. All decisions shall be determined by a majority vote. Should the committee be unable to decide the issue, it shall immediately refer the matter to the Umpire hereinafter provided for, and the Umpire's decision shall be final and binding upon the parties

33

hereto. Under no circumstances is work to be stopped or the manner of performing the same interfered with pending the result of the arbitration.

(d) Vacancies. Should a member of the Joint Conference Committee be unable to serve because of suspension, resignation or any other reason, his successor shall be selected by and from the organization in which he holds membership.

(e) Failure of Committee to Meet. Failure on the part of Joint Conference Committee to meet as provided in this Agreement and to present and maintain a quorum for the consideration of any matter referred to it shall be a violation of this Agreement on the part of the Association or the Union whose members on said Committee failed to have present sufficient representation to transact business as provided for in this agreement and the subject matter or dispute involved may then be referred by either of the parties hereto to the Umpire provided for herein whose decisions shall be final and binding upon all parties.

(f)    Compensation    and    Expenses.

34

Compensation for services rendered by members of the Joint Conference Committee may be fixed, determined and paid by the party hereto in which said representative holds membership, and expenses incurred by the Committee, outside of compensation to its members in carrying out its functions shall be borne equally by the parties to this Agreement.

(g) Umpire. The Joint Conference Committee shall immediately upon the execution of this Agreement select an Umpire and a successor to act hereunder during the term of this Agreement.

(h) Quality work. By joint agreement, both the Employer and Union recognize the value and importance of quality in workmanship, and conduct on the job by Employees. An effort to avoid negligent acts in these areas by Employees shall be encouraged by all parties concerned. Repeated negligent acts on the part of Employees shall be cause for review and action by a Joint Committee composed of equal representation of Employers and Union.

35

# ARTICLE XIII

## CODES - CEP

**Section 13.1. Codes.** It shall be the policy of all parties of this Agreement to make all plumbing, heating, piping and cooling installations in conformity with the governing codes.

**13.2. Continuing Education Program.** Each Journeyman employed by an employer covered by the Agreement shall be required to attend Continuing Education Programs (CEP's). Minimum CEP attendance shall be ten (10) hours per calendar year. CEP's shall not be a condition of employment. Local 23 will exchange (CEP) information with PICRA quarterly. Four (4) of the ten (10) hours shall be mandatory safety training.

# ARTICLE XIV

## FUNDS

**Section 14.1. Trust Funds.** The parties have heretofore established the following Funds:

1. Rockford Pipe Trades Industry Pension Fund, Trust Agreement effective April 1, 1966.

36

2. Health and Welfare Fund, Trust Agreement effective January 1, 1957.

3. Journeyman and Apprentice Training Fund, Trust Agreement effective January 1, 1957.

4. Piping Industry Council of the Rockford Area (Education Fund as of June 1, 1991) Trust Agreement effective October 1, 1964.

5. The Rockford Pipe Trades Industry 401(k) Plan, Trust Agreement effective January 1, 1998.

**Section 14.2. Inseparability.** The above Funds shall continue as part of the Agreement, and it is hereby mutually agreed that the Education Fund under Article XIV, and the Union's Working Dues under Article XIV, is a distinct contract and constitutes one inseparable and indivisible Collective Bargaining Agreement in this contract and legality affecting either of these provisions shall nullify both of these Funds in total.

**Section 14.3. Employer Contributions.** The Employer shall contribute to each respective Fund for each hour paid to each Employee covered by this Agreement.

37

Contributions shall be made as follows:

1. Contributions for straight time-as stated below

2. Contributions for time and one-half-1 1/2 times rate below

3. Contributions for double time-two times rate below

4. Pension Contributions are not required to be paid for first year apprentices.

Effective date:
6-1- 2002

| Pension | $5.28 |
| H&W | $3.83 |
| Training | .50 |
| Education | .22 |
| Joint Venture in Safety | .03 |
| International Training Fund | .05 |

| 6-1-2003 | To be announced |
| 6-1-2004 | To be announced |
| 6-1-2005 | To be announced |
|  | .05¢ to Education Fund |
| 6-1-2006 | To be announced |

**Section 14.4. Education Fund.** As of January 1, 1992, any contractor under the Power House Maintenance Modification Agreement that does not contribute to the Education fund shall pay monies allotted to that Education Fund into the Apprentice Training Fund.

**Section 14.5. Contribution Payments.** Contributions to each of the foregoing funds shall be due and payable on or before the tenth (10th) day of the following month, covering hours paid to each employee through the last payroll period in the prior calendar month. Each Employer shall file a monthly report in the form established by the regulations of the Fund.

**Section 14.6. Contribution Delinquencies.** Delinquency or Failure to Make Contributions or to File Report:

Any Employer who fails to report or to make contributions due to any of the foregoing Funds before the fifteenth (15th) day of the month in which it is due, or who issues an insufficient check shall be considered delinquent, etc., therefore, obligated and liable and subject to

the following:

(a) Each delinquent Employer shall pay to the Fund involved, interest on unpaid contributions at the rate of Prime + two percent (2%) per annum from the first day of the month following the month in which they are due until paid.

(b) A delinquent Employer shall pay all reasonable attorney's fees, court costs, interest, audit costs and other expenses incurred in the enforcing of collection for these Funds.

(c) A delinquent Employer shall be liable to any Employee affected by such delinquency for a sum equal to the value of the benefits lost to the Employee by reason of delinquency of such Employer.

(d) A delinquent Employer shall be liable to reimburse any Fund for the cost or value of any benefits which may be made available by the Trustees to any Employee affected by the failure of the delinquent to contribute or to report to the Fund involved.

(e) The union shall remove employees covered by this Agreement from employment with a delinquent Employer providing advance notice

40

of not less than forty-eight (48) hours is given of such action to the delinquent Employer. Such removal of Employees and cessation of work by employees for such delinquent Employer shall continue until the administrator of the Fund involved verifies that there is no money owing to the Fund by such Employer.

(f) When Employees are removed from an Employer's shop because of delinquency in payment of fringe benefits or wages, the Employer shall pay to all such removed Employees sixteen (16) hours, including time worked on the date of removal, if any, at their regular rate of pay plus fringe contributions, in the same manner as if they were employed on the job. When the delinquent wages and/or fringe contributions are paid and the account is cleared in full, and the Employees notified to return to work prior to said sixteen (16) hours, then and then only, the Employer shall be liable only for those hours the Employees were off the job because of such violation of contract, and provided further, that if they are not available to return to work within two (2) hours of such notice, they shall receive pay for only two (2) hours after receipt of such notice by the union.

41

**(g)** Men removed from the job may accept a work order to a different Employer and still be eligible to be transferred back to the Employer from which they were removed, providing the delinquencies were corrected and the transfer effected within sixteen (16) hours of the removal time and provided such Employees shall not be reimbursed under this Section for time they were paid while working for another Employer.

**Section 14.7.  Bond Requirement.**

(a) Each Employer employing union employees shall furnish a surety bond in the following amounts.

One (1) to six (6) employees $20,000; Seven (7) to twenty (20) employees $60,000; Twenty-One (21) employees and over $100,000.

This surety bond will guarantee payment of all fringe benefits contractually due hereunder including working dues.

(b) The surety bond shall be on bond forms approved by the parties hereto.

(c) There shall be no men referred until bond on approved bond form has been furnished.

42

(d) The surety bond supplied by the Employer shall be referred to the Joint Board of Trustees administering the various Trust Funds for disposition.

**Section 14.8.  Reporting Errors - Audit.** Whenever an Employer claims that his failure to make the required contributions was due to honest or clerical error and requests relief for that reason, it shall be considered, providing the Employer agrees in writing, to an audit of his records by an auditor provided by the Joint Board of Trustees.  If the audit reveals to the Trustees that such failure to pay was not due to honest mistake or clerical error, then the Employer shall pay the cost of the audit; any Employer shall be entitled to credit for or refund of money paid to any Trust Fund by reason of clerical error or mistake, and trustees are authorized to refund such monies.  The acceptance of any contributions from any Employer shall not release or discharge him from the obligation to contribute for all hours paid under this Agreement for which no contributions have actually been received notwithstanding any statement, restriction or qualification appearing on any check from any Employer.

43

**Section 14.9. Trust Incorporation.** Each of the foregoing Trust Agreements are incorporated herein and made a part of this Collective Bargaining Agreement and are made counterpart to each other.

**Section 14.10. Trust Payments.** It is further agreed that payments to the above Trusts will continue at the rates set forth above until changed or amended by agreement of the parties to this Agreement.

**Section 14.11.   Discontinuation.**   In the event the monies normally paid to the Pension Fund and Health and Welfare Fund are discontinued, the amounts paid to those funds for the Employees in the bargaining unit shall be added to the Employees' wages.   The Training Fund and Education Funds shall remain to be paid to their respective Funds.

**Section 14.12. Dues Check-Off.** During the life of this Agreement and in accordance with the provisions of Sections 302 (c) of the Labor-Management Relations Act, 1947, as amended, and within the terms of the Authorization of Check-Off of Dues from the Employees, the Employer agrees to deduct Union initiation fees and membership dues levied in accordance with the Constitution and By-laws of the Union from the pay of each Employee who executes or has executed and delivered to the Employer a valid authorization for Check-Off of Dues.

**Section 14.13. Building Trades Deduction.** The Employer agrees to deduct three cents ($.03) per hour worked for the Northwestern Illinois Building and Construction Trades Council assessment.

**Section 14.14. Target Program Deduction.** The Employer agrees to deduct ($.25) per hour worked for the U.A. Local 23 Target Program.

(a) The U.A. Local 23 Target Program and this deduction shall be forwarded along with the one designated for the Northwestern Illinois Building and Construction Trades Council Assessment.  In the event the monies normally paid to U.A. Local 23 Target Fund are discontinued, the amounts paid for those funds for the Employees in the bargaining unit shall be added to the Employees wages. This fund may be terminated at the sole discretion of the Union and any remaining funds in the Target Program shall remain in the program until expended for the

above referenced use.

**(b)** To qualify for the Target Program the contractor must be a participant to the program prior to the awarding of the contract to the targeted job.

## Section 14.15 Political Action Check-Off.

During the life of this Agreement, the Employer agrees to deduct from the pay of each Employee any of the following: 1) any applicable uniform dues assessed pursuant to the by-laws of the Illinois Pipe Trades Association or the Union and authorized pursuant to a valid dues check-off authorization, 2) any applicable uniform political action contribution assessed pursuant to the By-Laws of the Union or the Illinois Pipe Trades Association and authorized pursuant to a valid dues check-off authorization, and 3) a voluntary political action contribution of $.01 per hour worked (or such other uniform amount upon notice from the Union and authorization in writing from individual Employees) to the U.A. PAC Fund for those Employees who authorize the deduction of this amount as a political action contribution, by signing a check-off authorization card. Any

such amounts collected shall be sent to the Union on a monthly basis and shall be accompanied by a list of names of those Employees for whom such deductions have been made and the amount deducted for each such Employee. Collections for voluntary political action contributions pursuant to 3) above are voluntary in nature and will be transmitted by the Union to the U.A. PAC Fund.

Employees can only change the amount of deductions once a year, Employers may write one check to cover all Union Member deductions (PAC, Target, Building Trades, Union Dues).

## ARTICLE XV
## NON-DISCRIMINATION

**Section 15.1. Compliance.** The parties to this Agreement acknowledge that they are subject to State and Federal law and municipal Ordinances regarding equal opportunity and fair employment and, therefore, will jointly take the necessary steps to comply with these laws and ordinances to assure, within the scope of this Agreement, compliance with equal oppor-

tunity and fair employment practice laws and ordinances and agree the employment referral, or selection of all Employees shall be on the basis of qualifications without regard to race, color, sex, age, handicap, religion, national origin and ancestry.

**Section 15.2. Safety.** All work of the Employers shall be performed under safety conditions which conform to those contained in all applicable Federal, State and Municipal statutes, rules, and regulations. All Employers and Employees are required to comply with such regulations and any additional safety rules posted by the Employer and agreed to be reasonable by the representatives of the Union. Any disregard of the applicable Federal, State or Municipal rules and regulations or posted safety rules will subject the Employee to disciplinary action; and should the Employer, after being given notice by the Employee of a violation of the above and the Employer does not immediately correct said violation, the Employee is free to leave the job site or refuse to perform work which is in violation of the above.

(a) Employees should be encouraged to partic-

48

ipate in certain regularly scheduled safety related seminars provided by the Union, Employer, or Employer Trade Organization. These seminars will be scheduled after the regular working hours and in sufficient advance time to provide for easy scheduling.

**Section 15.3. Change Notice.** This agreement shall be in effect through May 31, 2007 and thereafter continue in effect from year to year unless either party hereto shall notify the other in writing sixty (60) days prior to May 31, 2007 or May 31 of any additional contract year, of any intention to negotiate any changes or amendments to this agreement.

Such notice shall be sent by registered mail to respective bargaining groups.

## ARTICLE XVI

## NO STRIKE - NO LOCKOUT

**Section 16.1. No Strike.** During the term of this Agreement, the Union will not cause, permit, or authorize in any fashion, nor will any of the members of the Union take part in any strike, sit-down, sympathy strike, slow-down or

49

any other kind of work stoppage or interference with the work, whether total or partial. Any and all disputes arising between the Union and the Employer or under the terms of this Agreement shall be handled as provided in Article XII herein. There shall be no work stoppage due to unauthorized or illegal strikes, lockouts, disputes or grievances.

**Section 16.2. No Lockout.** The Employer agrees that during the term of this Agreement, the Employer will not engage in any lockout.

**Section 16.3. Enforcement.** Nothing in this Agreement shall be construed to limit or restrict the Union or Employer's right to pursue any and all remedies available under law or under Article XII of this Agreement in the event of a violation of this Agreement.

## ARTICLE XVII
## MANAGEMENT RIGHTS

**Section 17.1.  8 for 8.** It is the intent of all parties to this Agreement that the employee will furnish a full, fair day's work for a day's pay.

**Section 17.2.   Management Control.**

Management shall be the sole judge of the size and composition of the work force. Management shall have the prerogative of controlling its operations, introducing new or improved methods or facilities and changing methods or facilities, subject to the limitations set forth in this Agreement.

The Employer is vested with the right to relieve Employees from duty because of lack of work or other legitimate reasons, to promote, suspend, demote, transfer, discipline, or discharge for just cause.

**Section 17.3.   Moonlighting.** The Union shall not sanction any employee performing any plumbing, heating, cooling or pipe work after his regular hours for other than his current Employer. Any employee violating this Section shall be dealt with in accordance with the provisions contained in Article XII.

## ARTICLE XVIII
## TRADE JURISDICTION

**Section 18.1.  Work Jurisdiction.** The following is the jurisdiction of work of the United

Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada quoted from the UA Constitution as revised and amended at Las Vegas, Nevada, August 12-16, 1991.

1. All piping for plumbing, water, waste, floor drains, drain grates, supply, leader, soil pipe, grease traps, sewage and vent lines.

2. All piping for water filters, water softeners, water meters, and the setting of same.

3. All cold, hot and circulating water lines, piping for house pumps, cellar drainers, ejectors, house tanks, pressure tanks, swimming pools, ornamental pools, display fountains, drinking fountains, aquariums, plumbing fixtures and appliances, and the handling and setting of the above mentioned equipment.

4. All water services from mains to buildings, including water meters and water meter foundations.

5. All water mains from whatever source, including branches and fire hydrants, etc.

6. All down spouts and drainage areas, soil pipe, catch basins, manholes, drains, gravel

basins, storm water sewers, septic tanks, cesspools, water storage tanks, etc.

7. All liquid soap piping, liquid soap tanks, soap valves and equipment in bath and washrooms, shower stalls, etc.

8. All bathroom toilet room and shower room accessories, i.e., towel racks, paper holders, glass shelves, hooks, mirrors, cabinets, etc.

9. All lawn sprinkler work, including piping, fittings and lawn sprinkler heads.

10. All sheet lead lining for x-ray rooms, fountains, swimming pools or shower stalls, tanks for vats for all purposes and for roof flashings in connection with pipe fitting industry.

11. All fire stand pipes, fire pumps, pressure and storage tanks, valves, hose racks, fire hose, cabinets and accessories, and all piping for sprinkler work of every description.

12. All block tin coils, carbonic gas piping, for soda fountains and bars, etc.

13. All piping for railing work, and racks of every description, whether screwed or welded.

14. All piping for pneumatic vacuum cleaning

52

53

systems of every description.

**15.** All piping for hydraulic, vacuum, pneumatic, air, water, steam, oil, or gas, used in connection with railway cars, railway motor cars, and railway locomotives.

**16.** All marine piping, and all piping used in connection with ship building and ship yards.

**17.** All power plant piping of every description.

**18.** The handling, assembling and erecting of all economizers, superheaters, regardless of the mode or method of making joints, hangers, and erection of same.

**19.** All internal and external piping on boilers, heaters, tanks and evaporators, water legs, water backs, and water grates, boiler compound equipment, etc.

**20.** All sootblowers and soot collecting piping systems.

**21.** The setting, erecting and piping for all smoke consuming and smoke washing and regulating devices.

**22.** The setting, erecting and piping of instruments, measuring devices, thermostatic con-

54

trols, gauge boards, and other controls used in connection with power, heating, refrigerating, air conditioning, manufacturing, mining and industrial work.

**23.** The setting and erecting of all boiler feeders, water heaters, filters, water softeners, purifiers, condensate equipment, pumps, condensers, coolers and all piping for same in power houses, distributing and boosting stations, refrigeration, bottling distilling and brewing plants, heating, ventilating and air conditioning systems.

**24.** The setting and erecting of all underfeed stokers, fuel burners, and piping, including gas, oil, power fuel, hot and cold air piping; and all accessories and parts of burners and stokers, etc.

**25.** All ash collecting and conveyor piping systems, including all air washing and dust collecting piping and equipment, accessories and appurtenances and regulating devices, etc.

**26.** The setting and erection of all oil heaters, oil coolers, storage and distribution tanks, transfer pumps and mixing devices, and piping thereto of every description.

55

27. The setting, erecting and piping of all cooling units, pumps, reclaiming systems and appurtenances, in connection with transformers, and piping to switches of every description.

28. All fire extinguishing systems, and piping, whether by water, steam, gas or chemical, fire alarm piping, and control tubing, etc.

29. All piping for sterilizing, chemical treatment, deodorizing, all cleaning systems of every description, and laundries for all purposes.

30. All piping for oil, or gasoline tanks, gravity and pressure lubricating and greasing systems, air and hydraulic lifts, etc.

31. All piping for power or heating purposes, either by water, air, steam, gas, oil, chemicals, or any other method.

32. All piping, setting and hanging of all units and fixtures for air conditioning, cooling, heating, roof cooling, refrigerating, ice making, humidifying, de-humidifying, dehydrating, by any method, and the charging and testing, servicing of all work after completion.

33. All pneumatic tube work, and all piping for carrying systems by vacuum, compressed air,

56

steam, water, or any other method.

34. All piping to stoves, fire grates, blast and heating furnaces, ovens, driers, heaters, oil burners, stokers and boilers and cooking utensils, etc., of every description.

35. All piping in connection with central distributing filtration treatment stations, boosting stations, waste and sewage disposal plants, central chlorination and chemical treatment work, and all underground supply lines to cooling wells, suction basins, filter basins, settling basins, and aeration basins.

36. All process piping for refining, manufacturing industrial, and shipping purposes, of every character and description.

37. All air piping of every description.

38. All temporary piping of every description in connection with building and construction work, excavating and underground construction.

39. The laying out and cutting of all holes, chases and channels, the setting and erection of bolts, inserts, stands, brackets, supports, sleeves, thimbles, hangers, conduit and boxes,

57

used in connection with pipe fitting industry.

**40.** The handling and setting of boilers, setting of fronts, setting of soot blowers, and attaching of all boiler trimmings.

**41.** All pipe transportation lines for gas, oil, gasoline, fluids and liquids, water aqueducts, and water lines, and booster stations of every description.

**42.** All acetylene and arc welding, brazing, lead burning, soldered and wiped joints, caulked joints, expanded joints, rolled joints, or any other mode or method of making joints in connection with the pipe fitting industry.

**43.** Laying out, cutting, bending and fabricating of all pipe work of every description, by whatever mode or method.

**44.** All methods of stress relieving of all pipe joints made by every mode or method.

**45.** The assembling and erection of tanks, used for mechanical, manufacturing or industrial purposes, to be assembled with bolts, packed or welded joints.

**46.** The handling and using of all tools and

equipment that may be necessary for the erection and installation of all work and materials used in the pipe fitting industry.

**47.** The operation, maintenance, repairing, servicing and dismanting of all work installed by journeymen members of the United Association.

**48.** All piping for cataracts, cascades, (i.e. artificial water falls), make-up water fountain, captured waters, water towers, cooling towers and spray ponds used for industrial, manufacturing, commercial or for any other purposes.

**49.** Piping herein specified means pipe made from metals, tile, glass, rubber, plastics, wood, or any other kind of materials, or product manufactured into pipe, usable in the pipe fitting industry, regardless of size or shapes.

**50.** All piping for artificial gases, natural gases, and holders and equipment for same, chemicals, minerals, and by-products and refining of same, for any and all purposes.

**Section 18.2.    Hoisting.**    The Employer hereby assigns the operation of (1) hoisting and portable engine on building and construction

work including, but not limited to, fork lifts, end loaders and hoists, to Employees covered by this collective Bargaining Agreement, providing these engines are used in conjunction with the work of the trade as a time saving installing device to hoist or haul material and equipment to a holding position for permanent attachment to said building or construction, and (2) operation of pumps and welding machines in conjunction with the work of the trade.

**Section 18.3.   Work Inspection.**   Primary visual inspection that is part of a systematic quality control program that governs the fabrication, installation, renovation, maintenance or repair of work that is under the jurisdiction of the U.A. shall be performed by properly certified inspectors who are United Association members.

## ARTICLE XIX

## TERM & EFFECTIVE DATE

**Section 19.1.   Term of Agreement.**   Term of this Agreement will be from June 1,2002 through May 31,2007 , but in the event of any unforeseen economic conditions that may arise

or any provision or agreements that its enforcement created undue hardships on parties to this Agreement, the recognized representatives of Negotiating Committee of the respective parties to the Agreement may by sixty (60) days written notice, request review of such portions of Agreement for recommendations for such actions as may be approved by the Negotiating Committee.

**Section 19.2.   Effective Date.**   This Agreement entered into this

1st day of June, 2002 and shall become effective June 1, 2002

## JOINT LABOR-MANAGEMENT UNIFORM SUBSTANCE ABUSE PROGRAM

I.   POLICY STATEMENT

The parties recognize the problems created by drug abuse and the need to develop prevention and treatment programs. The Employer and the Union seek to protect people and property, and to provide a safe working environment.

The purpose of the following program is to establish and maintain an alcohol and drug-free, safe, healthy work environment for all employees.

## II. DEFINITIONS

a.    Employer Premises: The term "Employer Premises" as used in this policy includes all property, facilities, land, buildings, structures, automobiles trucks and other vehicles owned, leased or used by the employer. Construction job sites for which the employer has responsibility are included.

b.    Controlled Substances: The following term "Controlled Substances" means the following substances: alcohol, marijuana, cocaine, opiates, amphetamines and phencyclidine (PCP), (including look-alike drugs and designer drugs) and drug paraphernalia in the possession of or being used by an employee on the job.

c.    Employee: An "employee" is any individual who performs work for the Employer under the terms of a collective bargaining agreement.

d.    Reasonable Cause: Reasonable cause shall be defined as aberrant or erratic behavior

62

such as noticeable imbalance, incoherence, or disorientation.

## III. BASIS FOR DRUG TESTING

Random drug testing of employees is prohibited. The Employer may conduct drug testing under the following circumstances:

a.    A pre-employment drug test may be administered to all applicants for employment.

b.    A test may be administered in the event a supervisor has a reasonable cause to believe that the employee has reported to work under the influence, or is or has been under the influence while on the job; or has violated this drug policy. The decision to test must be based on a reasonable and articulate belief that the employee is using a prohibited drug on the basis of specific and contemporaneous physical behavioral or performance indications of probable drug uses. At least two of the contractors' supervisors, one of whom is trained in the detection of possible symptoms of drug use, shall substantiate and concur in the decision to test an employee. Only one trained supervisor is required to substantiate the decision to test for contractors with 20 or fewer employees. A writ-

63

ten report describing the employee's condition shall be completed, dated, and signed by the observer(s) and copies made available to the employee and the Union. In such cases, the employee's immediate supervisor(s) may, in a confidential manner, order the employee to submit to a substance abuse testing. During the process of establishing reasonable cause for testing, the employee has the right to request his on-site representative to be present. Third-party reports that an employee is impaired in his duties through the use of prohibited drugs shall not constitute cause, but may because for the observation of the employee.

c.    Testing may be required if an employee is involved in an accident which results in injury to any person requiring medical treatment other than minimal first aid, or property damage in excess of $100.00, where there is a reasonable basis to believe that the accident was caused by an act or omission on the part of the employee.

d.    Testing may be required as part of a follow-up to counseling or rehabilitation for substance abuse, for up to a one (1) year period.

IV.    **TESTING PROCEDURES**

a.    Drug testing will be conducted by an independent accredited laboratory (National Institute on Drug Abuse [NIDA] and/or College of American Pathology). The Employer will bear the cost of all testing procedures.

b.    Urine samples shall be collected using the split sample method. At the time of donation one portion of the original urine sample shall be kept secure and chemically stable and made available for verification of laboratory testing results.

c.    The handling and transportation of each specimen will be done in a manner to insure that strict chain of custody procedures are maintained and properly documented.

d.    Any employee testing positive shall have the right to have the secured portion of his/her urine sample independently examined by a certified laboratory of the employee's choice at the employee's expense, within thirty (30) days of the notice of a positive confirmation test.

e.　All drug testing shall be conducted by an initial process incorporating an enzymoimmunoassay technique or radio-enzymoimmunoassay technique and must be confirmed by gas chromatography/mass spectrometry (GS/MS) or some equally sensitive confirmatory technique as certified by NIDA. A positive drug test result shall mean test levels, on both the screening test and the confirmatory test, which are recognized as positive by the U.S Department of Health & Human Services in its Mandatory Guidelines for Federal Workplace Drug Testing Programs.

f.　All alcohol testing must be performed using approved evidential breath testing devices ("EBTs") administered by qualified technicians. If the screening test for alcohol is positive, a confirmation test must be performed. A positive alcohol test shall mean .04 blood alcohol content.

g.　The results of an employee's drug or alcohol test are confidential and will be disclosed only to the employee and the Employer. Further disclosure of the test results will only occur when the employee has provided written consent to such disclosure.

## V.　PRESCRIPTION DRUGS

Employees using prescription medication which may impair the performance of job duties, either mental or motor functions, must immediately inform their supervisors of such prescription drug use. For the safety of all employees, the Employer will consult with the employee and his/her physician to determine if re-assignment of duties is necessary. The employer will attempt to accommodate the employee's needs by making an appropriate re-assignment. However, if a re-assignment is not possible, the employee will be placed on temporary medical leave until released as fit for duty by the prescribing physician.

## VI.　RULES/DISCIPLINARY ACTIONS

a.　Rules: All employees must report to work in a physical condition that will enable them to perform their jobs in a safe and efficient manner. Employees shall not:

1.　Use, possess, dispense or receive prohibited substances on or at the job site; or

2.　Report to work under the influence of alcohol or controlled substances.

b.    _Discipline:_  When the employer has reasonable cause to believe an employee is under the influence of a prohibited substance, for reasons of safety, the employee may be suspended until test results are available. If the employee has been suspended and no test results are received after three (3) working days, the employee, if available, shall be returned to work with back pay. If the test results are negative, the employee shall be reinstated with back pay. In all other cases:

1.    Employees who have not voluntarily come forward, and who test positive for prohibited substances will be subject to discipline up to and including discharge.

2.    Employees who refuse to cooperate with a request that they submit to a drug/alcohol test will be subject to discipline up to and including discharge provided that the request for the drug/alcohol test is proper under this policy.

3.    Employees found in possession of prohibited substances or paraphernalia will be subject to discipline up to and including discharge.

4.    Employees found selling or distributing

prohibited substances will be subject to discipline up to and including discharge.

5.    Employees found under the influence of prohibited substances while on duty, and/or operating an Employer vehicle will be subject to discipline up to and including discharge.

VII.    **REHABILITATION AND EMPLOYEE ASSISTANCE PROGRAM**

Employees are encouraged to seek help for a drug problem before it deteriorates into a disciplinary matter. If an employee voluntarily notifies supervision that he or she may have a substance abuse problem, the employer will assist in locating a suitable employee assistance program for treatment, and will counsel the employee regarding medical benefits that may be available under a health and welfare insurance program. If treatment necessitates time away from work, the Employer shall provide for the employee to take an unpaid leave of absence for purpose of participation in an agreed upon treatment program. An employee who successfully completes a rehabilitation program shall be reinstated to hrs/her former employment status, if work for which he/she is qualified

exists.

Employees returning to work after suc-
cessfully completing the rehabilitation program
can be subject to drug tests without prior notice
for a period of one (1) year. A positive test will
then result in disciplinary action as previously
outlined in the policy and program.

This joint labor/management uniform
substance abuse program will not take effect for
pre-hire testing until September 1, 1997 at
which time the employers signatory to this
agreement will be allowed thirty (30) days to
test current employees under the collective bar-
gaining agreement.

For Union:

Plumbers & Pipefitters
Local Union 23
Rockford, Illinois

*Darryll Russell*

Darryll Russell, Business Manager

*Bob B. Hastings Jr.*

Bob Hastings Jr., Business Agent

*[signature]*

Bob Wooden

*Ryan Marshall*

Ryan Marshall

*Jay Fiorello*

Jay Fiorello

70

71

For Employer

Piping Industry Council
Rockford Area

*Gary Statdfield*

Gary Statdfield, Chairman

*Jim Zweep*

Jim Zweep

*Lenny Hill*

Lenny Hill

*Gene Mead*

Gene Mead

*Kent J. Logan*

Kent Logan

*Greg Smeltzer*

Greg Smeltzer

72

# INDEX

| Subject | Page |
|---|---|
| **A** | |
| Apprentice Placement | 29 |
| Apprentice Rates | 18 |
| Apprentice Ratios | 30 |
| **B** | |
| Bond Requirements | 42 |
| Breaks | 11 |
| Building Trades Deduction | 45 |
| **C** | |
| Change Notice | 49 |
| Codes | 36 |
| Compliance | 47 |
| Continuity of Employment | 7 |
| Continuing Education | 36 |
| **D** | |
| Date of Agreement | 1 |
| Delinquencies | 39 |
| Double Time | 9 |
| Dues Check Off | 44 |
| **E** | |
| Effective Date | 60 |
| **F** | |
| Foreman | 16 |
| **G** | |
| Grievances | 32 |
| **H** | |
| Hours of Work | 5 |
| **I** | |
| Installation Standards | 36 |
| Insurance | 28 |
| **J** | |
| Joint Conference Committee | 31 |
| – Disputes | 32 |
| – Grievances | 32 |
| – Powers & Duties | 32 |
| – Umpire | 35 |
| – Vacancies | 34 |
| **L** | |
| Legal Conformity | 27 |
| Lockouts | 49 |
| **M** | |
| Management Rights | 50 |
| Mileage | 25 |
| Moonlighting | 51 |
| **O** | |
| Overtime | 9 |
| – Holidays & Sundays | 5 |
| – Regular Work Day | 5 |
| – Saturdays | 7 |
| – Service | 7 |
| Out of Jurisdiction Work | 14 |
| **P** | |
| Pay Day | 25 |
| Pay Scales | 18 |
| – Apprentices | 15 |
| – Journeyman | 15 |
| – Supervision | 16 |

73

## AMENDMENT # 1 TO THE LABOR AGREEMENT

The United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada Local 23 and the Piping Industry Council Rockford Area hereby adopt the following amendments to the Labor Agreement in effect through May 31, 2007 effective July 1, 2004:

1)   *Section 14.6(a) and (b)* are amended in their entirety to state as follows:

    (a)   Each delinquent Employer shall pay to the Fund involved: 1) liquidated damages in the amount of five percent (5%) of delinquent contributions, and 2) interest on unpaid contributions at the rate of Prime + (2%) per annum from the first day of the month following the month in which they are due until paid.

    (b)   A delinquent Employer shall pay all reasonable costs incurred by the Trust Funds in collection of any unpaid contributions, liquidated damages or interest charges. Reasonable costs include but are not limited to attorney's fees, court costs, accounting fees and any other litigation expenses.

2)   *Section 14.7* is amended in its entirety to state as follows:

**Section 14.7. Bond Requirement**.

    (a)   Each Employer employing employees covered by this Agreement shall furnish a surety bond in the following amounts.

        One (1) to six (6) employees $20,000.00; Seven (7) to twenty (20) employees $60,000; Twenty-Once (21) employees and over $100,000.

    This surety bond will guarantee payment of wages, union dues payable pursuant to a valid dues check-off and contributions due to the Trust Funds. In the event the surety bond is insufficient to pay for all unpaid amounts, the bond proceeds will be used to first pay wages. Once wages are paid, any remaining proceeds shall be paid pro-rata to the Union and the Trust Funds.

    (b)   The surety bond shall be on bond forms approved by the parties hereto.

    (c)   There shall be no men referred by the Union to an Employer who has not furnished an approved bond. Further, the Union may, in its discretion, remove employees covered by this Agreement from employment with the an Employer who has not furnished a bond pursuant to the procedure in Sections 14.6(e), (f) and (g).

**PIPING INDUSTRY COUNCIL, ROCKFORD AREA**

By: *Gary Stuttfield*                    6-21-04
                                          Date
Title: *Negotiating Committee Chairman*

**UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE
PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND
CANADA**

By: *Darryl Russell*                      6-21-04
                                          Date
    Darryl Russell
Title:  Business Manager

## AMENDMENT # 2 TO THE LABOR AGREEMENT

The United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada Local 23 and the Piping Industry Council Rockford Area hereby adopt the following amendment to the Labor Agreement in effect through May 31, 2007 effective June 1, 2005:

Section 14.4 is amended to read as follows:

**Section 14.4.  Education Fund.**  As of June 1, 2005, any contractor working under any National Agreement that does not allow for contributions to be paid to the Education Fund shall pay monies allotted to that Education Fund into the Apprentice Training Fund.

**PIPING INDUSTRY COUNCIL, ROCKFORD AREA**

By:     Gary Statdfield

Title:  PICRA Negotiating Committee

5/24/05
Date

**UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA**

By:     Darryll Russell

Title:  Business Manager

5/24/05
Date