# Exhibit A

# (Part II – Article XI to end)

# ARTICLE X - ENGINEERING MAINTENANCE

# ARTICLE X - ENGINEERING MAINTENANCE

### Section 1—Engineering Maintenance

(a)     Employees in the Engineering Maintenance are placed in classifications as follows: Electrician, Instrument Repair, Millwright, Machinist, Pipefitter Oiler, Painter, Tool Crib Attendant, Truck Mechanic, Utility Person, Heating, Ventilating and Air Conditioning Repair, Powerhouse Operator and Maintenance Labor Trainer. The principle of maintenance men working within their classification is agreed to, however, work in other classifications will be assigned for efficient utilization of labor.

(b)     Because of the nature of maintenance work, the need to assign individuals to certain jobs because of experience, and situations of emergency, maintenance employees may be assigned accordingly, providing the opportunity for regular work and daily overtime are reasonably in balance by classification at the end of the calendar year.

The preceding paragraph will not be construed so as to allow the Company to move any employee to a shift other than his own, but will conform to Article VIII, Section 5. However, when training employees for the purpose of operating or maintaining equipment, the Company will provide the training. Employees may be moved, with their approval, to the shift on which the training is to be done for the duration of such training.

(c)     Maintenance job vacancies will be posted in the same manner as all jobs which are subject to the bidding procedure; however, maintenance job vacancies (excluding Utility Person) will not be subject to the job bid procedure as stipulated in Article VIII, Section 6. Maintenance job vacancies will first be offered to qualified apprentices in the classification. If there are no qualified apprentices, other employees in the plant will be considered if they have a URW or USW journeyman card or equivalent, or if they have successfully completed a properly approved apprenticeship program in the appropriate craft, or if they have four or more years of experience in the classification, or if they have qualifications comparable to a new hire applicant. Qualified employees will be considered by seniority.

Employees desiring to be considered for job openings must submit records of qualifications, experience and/or schooling to the Employment Office, verified and furnished by former employers, agencies, schools, etc. Such documentation must be on file prior to the job posting withdrawal date before the employee can be considered for the vacancy.

Vacancies in the Oiler classification will be filled in the following order:

## ARTICLE X - ENGINEERING MAINTENANCE

(1)    The senior active applicant judged to be qualified as the result of an interview.

(2)    The senior employee on layoff judged to be qualified as a result of an interview who submitted records of qualifications, experience and/or schooling to the Employment Office prior to the posting coming down.

(3)    New hire of a qualified candidate, if found within 60 days from date of first ad appearing.

(4)    The senior of the plant candidates. Award of an Oiler position to an unqualified person will not prevent management from seeking qualified candidates under this procedure in the future.

(d)    Employees filing vacancies in the maintenance department will use plant-wide seniority for all items relative to seniority and in obtaining a production job in case of being surplus labor.

(e)    When there are employees from maintenance classifications on layoff, posted vacancies in those classifications will be awarded to the senior of:

(1)    Senior bidder in the plant with surplus rights to the vacancy classification.

(2)    Senior employee on regular layoff from the vacancy classification.

(3)    Senior employee on regular layoff with surplus rights to the vacancy classification.

If the above procedure does not result in the vacancy being filled, the low senior employee on optional layoff from the vacancy classification will be recalled.

The bidding procedure in Article X, Section 1(c) will be used once all employees from layoff have been recalled.

In case of permanent surplus of labor, the least senior employees of each classification where surplus exists will be declared surplus. Such employees will be referred to the Employment Office and be placed in accordance with Article VIII, Section 10.

(f)    Maintenance employees are expected to furnish standard hand tools required to perform their daily tasks. The Company will repair or replace broken tools, or tools worn out as a result of normal work performed for the Company, provided they are not broken due to carelessness and that the employee has been employed as a craftsman for at least one year. Such repair or replacement must be approved by the Area Manager (or person designated) or the equivalent.

## ARTICLE X - ENGINEERING MAINTENANCE

(g)    The Powerhouse must be operated on a seven-day-a-week basis. Powerhouse employees will be scheduled so as to equalize work opportunities as near as practicable. The Powerhouse schedule discussed during negotiations will be put into effect and a copy given to the Union. This schedule may be changed by mutual agreement between the Union President and the Manager of Engineering.

(h)    Employees called in for emergency maintenance work on a holiday shall be guaranteed four (4) hours at their regular rate plus any premium benefits. If he is able to resolve the emergency prior to the four (4) hours, he will be permitted to go home and shall receive the guaranteed four (4) hours pay.

    If the employee works four (4) hours or more, they may within the following week, with management's approval, be allowed to take an optional day off from work without pay.

(i)    Maintenance employees shall be allowed ten (10) minutes at the end of the shift to clean up their tools and the work area assigned.

(j)    When job assignments are changed within the Maintenance Division, the change will be for reasons relating to production or maintenance requirements.

    An employee's ability and seniority will be considered when it is appropriate to recognize an employee's request for a job change.

    Employees that have a preference for a job assignment may place a card on file in the Maintenance Department indicating their preferred job assignment, which will be considered by management in making assignments. On-shift employee's job preference will be considered before the seniority of off-shift employees is recognized.

(k)    Maintenance contracts will not be let for work of a type normally performed by employees of the employer's maintenance department, provided the work can be done with available equipment, within the necessary time and at no greater expense. These provisions do not apply to building expansion programs. When expansion programs involving installations, modernization or relocation of equipment is planned, the Company will review with the Engineering Maintenance Division Committeeman the portion of the work that could be performed by local craft personnel.

    The Engineering Maintenance Division Committeeman will be notified in writing at least five (5) days in advance of letting contracts to utilize outside contractors. The notification will provide an explanation of the decision.

    In case of emergency, the advance written notification will not apply, with the committeeman being notified as soon as possible.

## ARTICLE X - ENGINEERING MAINTENANCE

(l)     The Skilled Trades Committee has compiled a list of work which would not require advanced notification.  The work which would still require advanced notification will be described in more detail on the notification form.

(m)     For weekend overtime scheduling, Maintenance employees can cancel up to 11:00 a.m. on Friday without being charged for an absence and Management has until 3:00 p.m. Friday to schedule employees to work.

(n)     The duties of pipe covering and insulation shall be included in the classification of Pipefitter,

**Section 2—Outside Contracting**

(a)     Before the decision is made to use an outside contractor the Company will be assured that all skilled trades personnel in the affected classification(s) are not working less than the standard work day or standard work week, provided we have the proper equipment and skilled persons who can accomplish the work within the allotted time at no greater expense.  Operating procedures will be generated by the Manager of Engineering to improve adherence to this commitment.

The Company does not intend to violate or evade any specific provisions of the Agreement, or to violate any spirit, intent, or purpose of the Agreement when using outside contractors.  The Company will not alter past practices as far as offering Freeport Plant skilled trades employees Saturday, Sunday and Holiday work opportunities before utilizing outside contractors on those days.

The intent of this letter is to reaffirm to the Union Negotiating Committee the Company's intent to utilize outside contractors only when necessary and justified.

(b)     The parties established the following parameters for conducting Quarterly and Annual Review of outside contracting work performed in the plant that is specified in this Article:

(1)     The Quarterly meetings will be held during the second, third and fourth quarters of each calendar year.

(2)     The Annual meeting(s), which will also serve as the first quarter meeting, will be held before March 1st of each calendar year.

(3)     Standard information that will be provided by the Company to the Contracting Out Committee for the review meetings is as follows:

a)     Listing of all contracts that were let in the previous quarter, by date, to perform maintenance work that is traditionally performed by plant bargaining unit employees.

b)     Name of contracting company awarded each contract.

70

## ARTICLE X - ENGINEERING MAINTENANCE

c)      Nature of the work contracted and location, by Area or Department.

d)      Labor hours worked for each contract, actual hours if available, estimated hours if actual not available, total labor cost of contract if available.

e)      Total contracts let and total contractor hours worked for the previous calendar quarter and year.

(4)     In addition to discussing outside contracting, during the annual meeting the parties will discuss any events that have contributed to accomplishing the intent of Article X, Section 4, as well as future plans relative to fulfilling the obligations set forth in this Article.


**Section 3**

(a)     All maintenance bargaining-unit work will be performed by employees from within the bargaining unit.  Such work will be contracted out only when necessary to assure efficient plant operations.  Criteria for considering such decisions are availability of manpower with the necessary training, ability and skills, availability of necessary equipment, reasonably competitive cost, and purchase and performance guarantees at no additional cost to the Company.

(b)     Contracting Out Committee

The company agrees to make every reasonable effort to utilize personnel for maintenance work necessary for the plant's manufacturing process.  The parties agree to establish person Contracting Out Committee at the local level, half of whom shall be members of the bargaining unit and designated by the Union President, and half will be management.  This group should include where applicable the maintenance division chairman, and the appropriate management counterpart.  The Committee shall consist of six (6) people and shall meet as required but not less than monthly to attempt to resolve problems in connection with contracting out at the plant.

(c)     Notice and Information

(1)     Prior to the Company entering into any agreement or arrangement to use outside contractors to perform maintenance bargaining unit work, the Company will, upon contemplating the use of an outside contractor, provide written Notice to the Contracting Out Committee.  Such Notice to be given not less than five (5) days in advance of letting the contract.  In the case of an emergency which prevents such advance Notice, the Union will be notified immediately upon the Company becoming aware of the emergency.

## ARTICLE X - ENGINEERING MAINTENANCE

(2)     Should the Union believe a meeting to be necessary, a written request shall be made within three (3) days (excluding Saturdays, Sundays and holidays) after receipt of such Notice. The meeting shall be held within two (2) days (excluding Saturdays, Sundays and holidays) thereafter. At such meeting, the parties shall review in detail the plans for the work to be performed and the reasons for using outside contractors. The Company will give good faith consideration to any suggestions by the Union members of the committee and to any alternate plan proposed by the Union members for the possible performance of the work by bargaining unit personnel.

(3)     Should the Company fail to give Notice as provided above, then not later than thirty (30) days from the later of the date of the commencement of the work or when the Union becomes aware of the work, a grievance relating to such matter may be filed.

(d)    Mutual Agreement

(1)     In the event the Contracting Out Committee resolves a matter in a fashion which in any way permits the use of outside contractors, such resolution shall be final and binding only as to the matter under consideration and shall not affect future determinations under this provision.

(2)     No agreement, whether or not reached pursuant to this provision, which directly or indirectly permits the use of outside contractors on an ongoing basis shall be valid or enforceable unless it is in writing and signed by the President of the affected Local Union.

(e)    Expedited Procedure

(1)     In the event either party requests an expedited resolution of any dispute arising under this Section, it shall be submitted to the Expedited Procedure in accordance with the following:

a)     In the event the parties cannot reach an agreement regarding the contracting out dispute, the Company may let the contract. Within three (3) days (excluding Saturdays, Sundays and holidays) either party may advise the other in writing they are invoking this Expedited Procedure.

b)     Procedures for expedited arbitration will be developed by the parties. At such hearing a Union member and a Company member of the Contracting Out Committee shall represent the respective parties.

## ARTICLE X - ENGINEERING MAINTENANCE

c)      The arbitrator shall render a decision within forty-eight (48) hours (excluding Saturdays, Sundays and holidays) of the conclusion of the hearing.

d)      Notwithstanding any other provision of this Agreement, any case heard in the Expedited Procedure before the work in dispute was performed may be reopened by the Union if such work, as actually performed, varied in any substantial respect from the description presented in arbitration.

(f)     Commitment

In addition to the other understandings described herein, the Company agrees that where total hours worked by employees of outside contractors in the plant on bargaining unit work reach or exceed the equivalent of one (1) full time employee, in a particular craft or classification, defined as forty (40) hours per week over a period of time sufficient to indicate that the work is full time, the work performed by outside contractors will be assigned to employees and the number of bargaining unit employees will be appropriately increased if necessary, unless the work cannot be performed by the addition of an employee(s), or that assignment of the work to employees would not be economically feasible.

(g)     Quarterly Review

(1)     Quarterly reviews will be held based on the provisions of Article X, Section 2(b) as appropriately revised.

(2)     During the quarterly review, the parties shall review the Company's compliance with the Commitment set forth above, including providing the Union all information necessary to evaluate said compliance. In the event the Union believes that the Company is not in compliance with the Commitment, the Union may enforce the Commitment through the grievance and arbitration provisions of the Agreement, irrespective of the Company's compliance with any other obligation in this provision or any other part of the Agreement. The arbitrator shall remedy the situation, which may include adding labor.

(h)     General Provisions

(1)     Special Remedies

a)      Where it is found that the Company (a) engaged in conduct which constitutes willful or repeated violations of this provision or  (b) violated a cease and desist order previously issued by an arbitrator, the arbitrator shall fashion a remedy or penalty specifically designed to deter the Company's behavior.

73

## ARTICLE X - ENGINEERING MAINTENANCE

b) With respect to any instance of the use of an outside contractor, where it is found that Notice or information was not provided as required under this provision, and that such failure was willful or repeated or deprived the Union of a reasonable opportunity to suggest and discuss practicable alternatives to the use of an outside contractor, the arbitrator shall fashion a remedy which includes earnings and benefits to bargaining unit employees who otherwise may have performed the work.

(i) Outside Individuals Testifying in Arbitration

No testimony offered by an individual associated with an outside contractor may be considered in any proceeding unless the party calling the outsider provides the other party with a copy of each outside contractor document to be offered in connection with such testimony at least forty-eight (48) hours (excluding Saturdays, Sundays and holidays) before commencement of that hearing.

**Section 4**

The Skilled Trades Representative at the Freeport plant will take on the role of advisor regarding the development and improvement of the programs and processes implemented to improve our competitive advantage. These activities include, but are not limited to, technical skills enhancement, education of safe work practices and procedures, project review, new employee indoctrination and productivity improvement.

Annually, during interim meetings, a joint review of the plant's plan will be made. Components of this review may include:

(a) review of management's staffing analysis information including rates of attrition and future needs;

(b) review entry requirements preferencing current employees who meet defined criteria; and

(c) address upgrading skills, access for production associates, performance based training and basic skills remediation opportunities.

Whereas it is the desire of the parties to establish additional programs consistent with the above to further the skills and effectiveness of the skilled trades organization, the parties recognize the objectives stated herein are of mutual interest and can be accomplished through a joint cooperative effort.

# ARTICLE XI - MISCELLANEOUS CLAUSES

## ARTICLE XI - MISCELLANEOUS CLAUSES

### Section 1—Copies To Employees

(a)     A copy of this Agreement shall be printed by a union printer and given, by the Company, as soon as they can be printed, to each employee working in and to new employees hiring into the bargaining unit.  Sufficient copies shall be furnished to the Union.

(b)     Copies of the Supplemental Unemployment Benefit Agreement and the Benefits Agreement will be given the employees and the Local Union.

### Section 2—Training Groups

(a)     The Company may maintain a production, engineering, and staff training group for the purpose of training and preparing employees for more responsible positions.

(b)     Trainees may be assigned to fill in on temporary vacancies only after all qualified bargaining unit employees have been offered the available work.

(c)     No regular employee will be laid off or transferred because of trainee assignments.

(d)     Trainees will not balance work opportunities with regular employees.

(e)     No time studies will be made on any trainee.

### Section 3—Bulletin Boards

(a)     Space on or adjacent to the factory bulletin boards shall be available to the Union for the purpose of posting notices throughout the plant.

(b)     Notices shall be restricted to the following types:
    (1)     Notices of the Union's recreational, educational, and social affairs.
    (2)     Notices of Union elections, appointments, and results of Union elections.
    (3)     Notices of Union meetings.
    (4)     Other informational notices.

(c)     The Union shall deliver all notices to the Human Resources Office for approval and prompt posting.  It will be the responsibility of the Human Resources office to remove such postings on a date mutually agreed to at the time the postings are delivered.

## ARTICLE XI - MISCELLANEOUS CLAUSES

### Section 4—Management Working

No supervisory personnel shall perform any work which would ordinarily be done by employees in the Bargaining Unit except for emergencies, inventory, trouble-shooting, and demonstrating methods or operations.

### Section 5—Address And Telephone

It is each employee's responsibility to keep his current address and telephone number (if any), on record with the Company. Notice of change must be made on proper form available for that purpose and may be made with the employee's Supervisor or at the Human Resources Office. Listed telephone numbers should be in the residence of the employee. When the occasion arises, an attempt will be made to call those who have listed other than a residence number, but the Company will not be responsible for failure to reach such employees.

### Section 6—Employee Payroll And Production Records

Whenever possible employees' payroll or production records will not be changed without first consulting the employee. Employees will be furnished with a copy of any adjustment or correction made by the Company to any payroll document which affects their earnings. When the change affects only the performance reported, the employee will be notified of the change that was made at the earliest practical opportunity.

### Section 7—Effect Of Agreement

The parties have entered into this Collective Bargaining Agreement, a Benefits Agreement and a Supplemental Unemployment Benefits Plan ("Agreements"). Those Agreements shall constitute the sole and entire Agreement between the parties and supersedes all prior Agreements. The language of these Agreements will prevail over any oral agreements, unless specifically adopted by the Company in writing after the effective date of these Agreements.

For any past Freeport arbitration decisions, Goodyear arbitration decisions on relevant Benefits Agreement or Supplemental Unemployment Benefits Plan language or under the SUB agreement, precedent setting grievance settlements, memorandums of agreement, administrative letters or Standard Practice Letters ("Claimed Precedent") to be considered as applicable, they must be presented by either party before the Company issues a final response at Step 3 or they will not be relevant or admissible in any subsequent step, including, but not limited to arbitration. The parties agree that either party has up to ten (10) days after the close of the third step meeting to present to the other side any relevant "Claimed Precedent" for consideration. If any "Claimed Precedent" is presented, the other party will have until the case is certified for arbitration to provide any countervailing "Claimed Precedent" for consideration. Nothing herein will prevent the parties from arguing why the "Claimed Precedent" is not controlling before an arbitrator.

# ARTICLE XI - MISCELLANEOUS CLAUSES

For any past arbitration decision at the facility, not disclosed as set forth above, the decision shall not be controlling, but may be introduced for argument in any subsequent arbitration. Nothing herein shall be deemed to limit submission of arbitration cases as argument in accordance with the arbitration protocol.

No oral modifications to the Agreements or oral representations with Goodyear regarding: (a) the Agreements, (b) grievance settlements or (c) past practices that occurred prior to the effective date of these Agreements will be binding on the Company, nor will they be admissible in arbitration proceedings, unless specifically adopted by the Company in writing after the effective date of these Agreements.    By "specifically adopted by the Company in writing" includes items in this Agreement as well as those adopted by the following procedure:

(1)    Within 60 days of the effective date, the Union must present a list of all oral modifications, grievance settlements or past practices to the Company for review.

(2)    Within 30 days of the date of presentation of the list, the Company will investigate all oral modifications, grievance settlements or past practices at the facility.  The Company will then meet with the union and either accepts the oral modifications, grievance settlements or past practices or ask that the items disputed be specially set before an arbitrator for resolution.  The standard for the arbitrator will be whether the oral agreement existed at least one day prior to the effective date of the this Agreement.

(3)    To the extent either party intends to introduce as evidence, refer to or discuss any oral modifications to the Agreements, oral grievance settlements or past practices that are attributed to Goodyear that are not established by this provision, the following will apply.  Written notice of said intent must be given no later than 30 days before the arbitration. With said notice must be given the name of the persons who were parties to the agreement, the terms of the agreement and the approximate date of the agreement.  Nothing herein prevents either party from arguing any other legal basis from preventing this evidence to be received or considered.

(4)    In no event may either party introduce evidence of either Goodyear's "intent" or the Union's "intent" at the bargaining table prior to the 1997 negotiations.  If either party intends to introduce evidence of "intent" the following will apply.  Written notice of said intent must be given no later than 30 days before the arbitration.  With said notice must be given the name of the person expressing the intent, the approximate date of the statements, copies of all notes regarding the statements.  Nothing herein prevents either party from arguing any other legal basis from preventing this evidence to be received or considered.

77

## ARTICLE XI - MISCELLANEOUS CLAUSES

(5)     Nothing in this provision will prohibit either party from introducing either parties' intent or any oral modifications, grievance settlements or past practices attributed to Titan Tire.

**Section 8—Gloves**

Gloves will be furnished in the first instance by the Company to employees who are regularly assigned to jobs which require usage of gloves, as determined by departmental management.

Replacements will be given only when the old gloves are unusable and turned in to the Company for exchange. Otherwise, the employees must sign a charge slip and have the price of the gloves deducted from his pay. An employee who has been furnished gloves by the Company and subsequently transfers to another job where gloves are not furnished, or who terminates his employment, must turn in his gloves to the Company or pay the price of the gloves.

**Section 9—Adoption Expenses**

It was agreed that an employee who, while accumulating continuous service during the term of this Agreement, wishes to adopt such a child (a child under age 18 not related to the employee by blood or marriage), will, at the time of court finalization of the adoption, be reimbursed for the following covered expenses:

(1)     Expenses for court costs and investigative, counseling and supervision fees charged by a recognized adoption agency which is licensed by appropriate State or County government authorities, not to exceed one thousand five hundred dollars ($1,500.00).

(2)     Legal fees associated with the adoption procedure, not to exceed five hundred dollars ($500.00).

**Section 10—Lubrication**

The responsibility for lubrication of all plant non-powered rolling equipment would be placed under the responsibility of production, the clean machinery and equipment classification.

**Section 11—Qualified Guidelines For Overtime And Short Work Week Scheduling**

The term "qualified" as it applies to overtime opportunities and Short Work Week scheduling shall be determined by the following guidelines.

(1)     A list will be maintained for each employee of the jobs they are qualified to perform.

## ARTICLE XI - MISCELLANEOUS CLAUSES

(2)     The list will be used for daily, Saturday, Sunday, Holiday overtime and for Short Work Weeks.

(3)     The employee and the Supervisor will be responsible for adding to and removing jobs from the list and recording the proper date of addition or deletion.

(4)     If there is question of "qualified" in a particular classification, the employee must demonstrate to that department their ability to perform the job prior to adding the job to the list.

(5)     Jobs added to the qualified list will be maintained until the employee removes the job from the list, unless removed through job disqualification. An employee removing their name may not reapply for a one (1) year period.

(6)     It is understood that the employee's current job classification will automatically be added to the list once they have satisfactorily completed the learning time.

(7)     In cases of job disqualification, the involved classification will be removed from the employee's list.

(8)     In cases where summer labor is involved, the qualified list for these employees will start over at the beginning of each summer. All jobs trained on will be added to the list. No jobs other than those trained on each summer will be added.

The above guidelines do not restrict the Company's right to use employees as available labor when needed. When making temporary assignments, the low senior employee in the identified available labor classification with the required classification on the qualified list will be moved prior to other qualified labor.


**Section 12—Lead Hands**

(a)     Lead Hands:

Lead Hands will be utilized at the Freeport Plant in accordance with the attached Letter 6.

(b)     Implementation Guidelines:

(1)     The selection criteria will be established jointly with minimum standards set for attendance and work history. The application of bargaining unit service will be the determining factor only when all other selection criteria are considered equal.

(2)     In addition to a Lead Hand's regularly assigned job, specific job duties will be determined jointly at the local level and may include but not limited to such duties as the direction of work as required, alignment of labor, canvassing for overtime, various administrative duties including payroll

# ARTICLE XI - MISCELLANEOUS CLAUSES

within their respective work areas, ordering stock and requisitioning items from stores.

(3)    The rate of the job will be established at the local level and will be no less than an additional ten (10) percent above the rate of the job of their assigned job classification.

(4)    The lead hand will not be permitted to administer discipline.

(c)    The parties agreed that while ultimate authority for certain tasks and duties reside with departmental management, Lead Hands may perform these tasks administratively without conflict with the following CBA provisions:

Article V, Section 4(c) – daily overtime scheduling
Article VII, Section 16(a) – jury duty notification
Article VII, Section 18(c) – funeral leave pay
Article VIII, Section 4(a) – reporting absences
Article IX, Section 4(e) – day-at-a-time vacation
Article XI, Section 5 – address and telephone change notification
Article XI, Section 11 – Qualified list, with the exception of certifying additions to
                the list
Article XI, Section 15 – home base assignments
Article XI, Section 16 – job preference

The above list may not cover all areas of potential conflicts and may be modified by the parties with mutual agreement.

(d)    The parties agree that a joint oversight committee will be established to monitor implementation of this concept and periodically discuss any issues that may arise out of this process.


**Section 13–PAC**
In accordance with Federal Election Commission guidelines, the Company will agree to weekly PAC deductions from earnings for each active union member, provided they sign a USW/PAC authorization form.

In consideration, the Union agrees to:

(1)    Provide to the Company a duly executed authorization form signed by the individual employees who wish to have contributions deducted from their earnings.

(2)    Indemnify, defend and save harmless the Company from any claims, suits, judgments, fines, penalties, attachments and from any other form of liability as a result of implementation of this Agreement.

80

# ARTICLE XI - MISCELLANEOUS CLAUSES

The pay from which the deduction and the date on which the remittance check is to be delivered to the Union shall be determined by the parties once the deduction system is available.

### Section 14—Combining Jobs For Scheduling

For combining jobs for reduced schedule, daily overtime, Saturday, Sunday, Holiday and startup and shut down, the following is a guideline for all departments to follow.

When the sign-up sheets are posted and there are known jobs that will be combined, the sign-up sheets for the combined jobs will be posted on one sheet.

It is recognized there may be cases where the combined jobs are not known until after the normal posting of sign-up sheets.

In either case above, the most senior qualified employee will be scheduled to perform the work on the combined job.

### Section 15—Home Base Assignments

(a)    In Department 320 for "Home Base machine assignment." Each Banbury Operator will be assigned a home base Banbury. Reassignment will be done only when a vacancy occurs or due to a machine breakdown or production requirement changes. As a vacancy occurs, preference will be given to the most senior operator on the shift which the vacancy occurred.

Only two machine moves per opening will be permitted for each Banbury opening.

Department 320 – Overtime with respect to Home Base Machine

Banbury operators working overtime in Department 320 will be assigned to their home base machine, if open, without regard to seniority. After home base machine assignments were made, further openings would be filled by seniority choice. The intent of this provision is that this principle be applied on-shift before offering the preferred machine assignment to an off-shift employee.

(b)    The following guidelines will be implemented in Departments 511 and 531 for "Home base tire machine assignment." Each builder will be assigned a home base machine and reassignment will be done only as is required by ticket changes. These changes will be made for ticket requirements that are for periods of time of more than one week, and most often will be for a long-range time span.

## ARTICLE XI - MISCELLANEOUS CLAUSES

GUIDELINES TO BE FOLLOWED

Whenever a preferenced tire machine is needed on a shift and that machine is not manned, the following guidelines will be used:

(1)　　Production Control will identify which machine is least preferenced and that builder will be reassigned to the preferenced machine. If there are two or more moves to be made, the offering of preferenced machines will be made in seniority order of the individuals to be moved.

(2)　　If a builder's former home base again becomes a preferenced machine he will be offered the opportunity to return to that machine or retain his current home base. These moves will be recorded on the "machine assignment" sheet, which will be retained in the builder's personnel folder. Any errors made in reassignment will be corrected at the earliest opportunity.

(3)　　A new employee or an employee coming to a different shift because of a shift preference opening will be assigned to a home base as is described in paragraph No. I. above. However, builders on the shift where the open machine is located may request to be reassigned to that position. These requests should be in writing and given to the responsible Supervisor. Requests will be considered on a seniority basis and only two machine moves per opening will be allowed. Notification of a preferenced machine opening will be posted on the department bulletin board one week in advance of the machine assignment being made. This will allow the on-shift builders to know which machine is being preferenced and give them an opportunity to request a machine change, if so desired.

(4)　　Requests by two builders on the same shift to trade home base machines will be considered only after both builders have been on their assigned machines for three (3) months.

(5)　　If realignment of shifts becomes necessary because of a surplus, the following criteria will be followed:

　　　　a)　　A builder reassigned to another shift may retain his/her home base tire machine if his/her seniority is greater than the person already assigned on that shift.

　　　　b)　　If a reassigned builder does not have seniority to claim their home base, he/she will be assigned to a new home base using the language in paragraph No. 3 of this provision.

　　　　c)　　If there are two or more builders being reassigned at a time, seniority among those involved will be used in allowing a selection of their new home base.

## ARTICLE XI - MISCELLANEOUS CLAUSES

(6)   When multiple units go down, the senior builder will be given the option to build tires or be reassigned.

### Section 16—Openings Or Preferences Within Job Classifications

A preference within a job classification will be filled by one (1) senior employee on the shift where the opening exists prior to allowing an employee to move to that shift from another shift, classification or department.  Only two preferences will be allowed for each vacancy filled within the production organization.  This system would not apply to maintenance vacancies.

### Section 17—New Hire Orientation

Involvement of both management and the Union is of value to the orientation process for new employees. The parties recognize the importance of proper new employee orientation and that it is imperative that new employees receive necessary information about the Company and the Union. The Company will pay up to a maximum of eight (8) hours of time lost during the employee's regular shift for this orientation. The logistics of the meeting(s) will be handled by the parties at each plant.

The parties agreed that employees who are hired as part of the bargaining unit will be allowed to meet with local union leadership during their orientation period.

The Company will reimburse employees, who successfully complete their probationary period, for the cost of prescription safety glasses and a vision exam if required.  This reimbursement will equal the amount(s) stated in the employee's benefit package.

### Section 18–Dental Plan

The current Dental Expense Benefit Plan will continue until notice is issued by the Union to discontinue the Plan.  Any increase in the premium for such Dental Expense Benefit Plan shall be borne out of the Cost-of-Living Allowance adjustments and future general wage increases which arise out of the 2006 labor agreement.  If the increase in contribution rate for the Plan exceeds the amount of Cost-of-Living Allowance adjustment or general wage increase payable at the time of the increase, the amount which exceeds the increase will be borne by a reduction in basis wage rates.

In the event, however, that the Dental Expense Benefits Plan is discontinued at any time, the amount previously deducted from Cost-of-Living Allowances and general wage increases otherwise payable will be restored to all pay rates effective immediately upon discontinuance of the Plan, or in the event of a deficit in the Plan fund, when the deficit has been repaid.  In the event of a surplus in the fund at the time of discontinuance of the Plan, the parties will meet to agree to the method of returning the surplus to the employees.

The roll up on the Cost-of-Living Allowances or general wage increases arising out of the Basic Labor Agreement which is withheld to provide for the Dental Expense Benefit Plan

## ARTICLE XI - MISCELLANEOUS CLAUSES

will be applied as a credit to reduce the Cost-of-Living Allowance or general wage increase that would otherwise be withheld.

The Company also agrees to reduce the amount of the Cost-of-Living Allowances or general wage increases that will be withheld during the term of the Dental Agreement effective November 1, 2004, and any subsequent Dental Agreement, to provide for the Dental Expense Benefit Plan, by the amount of roll up. Roll up for the term of the 2004 dental renewal will be based on roll up for the year of 2003. Roll up for the term of any dental renewal beyond the term of the 2004 Dental Agreement will be based on the actual roll up for the year previous to the beginning of the new Dental Agreement period.

The Company will maintain a record of all hours for which employees receive pay and multiply that number by the credit based on roll up. The resulting number will be accounted for on the Company's books as set forth in the "agreed to" administrative letters concerning the Dental Expense Benefit Plan. A report of this information will be provided to the Union on a monthly basis.

Prior to the scheduled expiration of any implemented Dental Agreement, the Company commits to facilitate the solicitation of interested vendors capable of providing the administrative services necessary to accomplish the objectives of the Plan for the renewal period. Contract discussions will be held with invited firms and appropriate Company and Union representatives for the purpose of negotiating the terms of a renewal agreement. The Company further commits to provide any necessary information and pay the reasonable costs associated with these renewal activities.

### Section 19—Notice On Labor Placements

The Company will give notice to the Union when labor placements are to be made under Article VIII, Sections 8 (Disqualifications), 9 (Medically Restricted Placements) and 10 (Surplus Labor and Layoffs). With such notice, the Union may participate in such placements when they are scheduled to occur.

### Section 20—Temporary Assignments Outside Bargaining Unit

To facilitate communication on such assignments:

(1)    All temporary assignments outside the bargaining unit must receive written pre-approval from the Human Resources Manager.

(2)    The Human Resources Manager will forward a copy of such written pre-approval to the Union President.

(3)    The pre-approval will include the starting time/date and the ending time/date of the assignment. This will be posted in the department as notice.

## ARTICLE XI - MISCELLANEOUS CLAUSES

(4)     The Company will make management aware of this requirement.

(5)     The Union will make bargaining unit employees aware of this requirement.

(6)     The Company will notify the Union and the employee when the employee has reached 75 cumulative days outside the bargaining unit.

# ARTICLE XII - SAFETY AND HEALTH

# ARTICLE XII - SAFETY AND HEALTH

**Section 1**

(a)     The Freeport plant health and safety program will continue to be of equal importance with product quality and production. The Company shall continue to make reasonable provisions for the safety and health of its employees during the hours of their employment and will provide competent first aid personnel and furnish protective devices and protective equipment where necessary, and protective clothing on work which is recognized to be abnormally hazardous. When needed, the employer shall provide transportation for injured employees to the hospital. The plant medical personnel, plant safety management or their designee shall determine the best available mode of transportation. The Employer shall provide necessary shower baths, lockers and other facilities for maintaining sanitary conditions throughout the plant. Unique personal protective equipment requirements for documented needs beyond standard and customary shall be addressed on a case-by-case basis.

Boots will be made available to employees required to perform assignments that involve standing in water. Rainwear will be made available when employees are assigned to outside work in inclement weather.

(b)     A Joint Safety and Health Committee ("JSHC") shall be appointed consisting of not more than four representatives of the Company and not more than four representatives of the Union to facilitate the promotion of safe working practices, including ergonomic considerations, and the elimination of unsanitary or unhealthful working conditions within the plant. The JSHC shall be furnished passes for the purpose of entering the plant and investigating safety conditions within the plant. Members of the safety committee shall perform a comprehensive safety and health audit of the entire plant not less than annually. The audit is intended to augment the existing health and safety inspections and tours already in place. The audit process shall be developed at the local plant level, and shall include a process by which priorities are set and action plans developed. When entering the plant for this purpose, the Committee shall notify the Safety Manager on day shift, and appropriate Supervisor on later shifts, of reason for the visit and their destination.

Effective January 1, 2006, the employer shall provide the union safety committee with a weekly allocation of hours to be utilized for committee business based on the following. The allocation will not be accumulated from week to week. These representatives shall work with the employer safety and health department, but under the direction of the union co-chair of the safety committee and the local union president. The employer may agree to the appointment of additional full or part-time union safety reps in addition to those provided by the hours below, to be compensated by the employer. These representatives shall be chosen exclusively by the union.

## ARTICLE XII - SAFETY AND HEALTH

| | |
|---|---|
| - 1-50 active bargaining unit employees | 10-hours/week |
| - 51-200 active bargaining unit employees | 20-hours/week |
| - 201-750 active bargaining unit employees | 40-hours/week |
| - 751-1500 active bargaining unit employees | 60-hours/week |
| - 1501-2000 active bargaining unit employees | 80-hours/week |
| - 2001+ active bargaining unit employees | 120-hours/week |

The preceding provision is inclusive of the existing hours paid currently at each facility. If a facility is currently exceeding the above allocation it will not be reduced below their current level.

(c)     No employee shall be disciplined or discriminated against in any way for suffering an injury or illness, or for reporting an accident in a timely manner. The employer shall not establish any incentive program that discourages employees from reporting accidents, injuries, or illnesses in the plant. Any existing incentive programs shall be evaluated by the plant safety committee with the assistance of the corporate health and safety department and the international union health, safety and environment department.

(d)     Right to Refuse Unsafe Work:

(1)     No employee shall be required or permitted to work under conditions which may be or tend to be unsafe or injurious to his health or safety and the safety of others.

(2)     No employee who in good faith exercises his or her rights under this Article shall be disciplined, or suffer any loss of pay or benefits, even if it is later determined that the alleged unsafe condition did not exist.

(3)     If an employee is concerned about the safety of a specific job or task, the employee will notify a member of management immediately. The member of management will then request a risk assessment to be conducted utilizing the local plant's existing risk assessment procedures.

(4)     No employee or group of employees shall be required to work on a job or machine while it is considered unsafe by a representative of the joint labor management safety committee. During such time the employee or group of employees shall receive their normal hourly rate.

(e)     The JSHC shall meet not less than once per month for the purpose of discussing safety problems, and will tour the plant periodically to verify that adopted safety recommendations have been complied with. The JSHC may make investigations following serious accidents to determine causes and to explore preventive measures against recurrence. The members shall secure approval from their Supervisor before leaving their jobs for this purpose.

87

## ARTICLE XII - SAFETY AND HEALTH

Union members of the JSHC shall be paid in accordance with Article VII, Section 13.

(f)    Data concerning disabling injuries will be made available to the JSHC upon their request. An employee who signs an accident report will be given a copy of the report at that time.

(g)    When an employee supplies satisfactory evidence that he sustained damage to his eye glasses, hearing aid, or artificial limb while performing the duties of his assigned work with due caution and without interference by other employees, the Company will reimburse the employee for the cost of necessary repairs or replacement. The cost of an examination or prescription will be borne by the employee. The employee must supply evidence that the breakage was done on the job and in the line of duty.

(h)    The Company Chairman of the JSHC shall notify the Committee of recommendations resulting from plant inspections by State or Federal Safety Inspectors. A copy of such recommendations will be provided upon request.

An employee who is requested by a safety inspector from the Office of Occupational Safety and Health administration and is designated by the Union President to accompany the inspector on an inspection tour, will be paid his current hourly rate for the time lost from his regular shift as a result of such plant inspection.

(i)    The Company will pay full travel and hotel expenses, within the limits of established Company policy, for four Union members of the JSHC to attend an annual State Safety Conference. If the State does not have a suitable conference, arrangements will be made to attend the National Safety Conference or the parties may mutually agree to an alternate safety conference.

(j)    In any area where raw materials of known toxicity are being used, the Company will make available to qualified professional testing representatives the formulation of the material in question upon the request of a physician. In all such cases, where the Company has caused blood tests or skin tests to be made of employees, the result of such tests will be furnished to the employee upon his request. Upon request of the Joint Safety and Health Committee, the Company will make skin or blood tests on any employee exposed to toxic material, subject to the employee's approval. The employer shall maintain an Industrial Hygiene monitoring program in each plant. Upon request, representatives from the Joint Safety Committee may be present when such monitoring takes place and such representative will be entitled to copies of such test or monitoring results. All Industrial Hygiene samples will be analyzed by a laboratory meeting the standards of the current laboratory to be selected in accordance with Titan's Insurance carriers.

88

# ARTICLE XII - SAFETY AND HEALTH

(k)     When evidence exists that indicates an employee's illness may have been caused by the materials to which he is exposed while working, the Company will make tests in an effort to determine the cause and nature of the illness. A copy of the results of such tests shall be furnished the employee upon request.

An employee who must lose time from his regular shift because of such tests will be paid his current hourly rate for the time lost from that shift.

(l)     No employee shall be required to work on any job in the plant with which he is unfamiliar until he has received adequate safety instructions in the performance of the operation.

(m)     An employee who is injured in the factory must promptly report each injury that occurs with the facts and one who suffers from an occupational illness must report promptly upon becoming aware of the existence of such illness. Should the employee require surgery or hospital confinement or require treatment over an extended period for the occupational injury or illness, may receive treatment by the Company's physician, or such other physician chosen by the employee. In the event any dispute arises concerning any treatment or disability of the employee, the employee may be examined by a physician designated by the employer. If the dispute is not resolved by this examination such dispute will be resolved through the State Industrial Commission.

(n)     The employer will furnish safety prescription lenses and frames to employees that must wear prescription glasses when such employees are permanently assigned to operations where mandatory eye protection is continuously required. This clause does not apply where special or extra eye protection is required and where regular frame safety glasses are not sufficient to meet protection requirements.

Glasses furnished by the company will have side shields permanently affixed so as to provide adequate protection to the employee.

(o)     It is the intention of the Company to continue every effort to improve the safety performance of the plant and improve the safety environment for each employee.

The Company will continue the practice of having weekly meetings with the JSHC. In addition, hygiene monitoring test data will be reviewed in these meetings.

Training of JSHC members will continue to be an important aspect of enhanced safety performance. The Company will continue to review training opportunities that will expand current safety expertise of JSHC members.

The Company will commit to sending at least 2 members, 1 hourly and 1 salary, to the Union/Management Safety Symposium annually throughout the Agreement.

## ARTICLE XII - SAFETY AND HEALTH

(p)     Two (2) members of the Safety Committee shall be named to the Ergonomics Steering Committee; one hourly and one salary associate. The additional hourly member will be selected by the Union President and approval by the Human Resource Manager. The Human Resource Manager and Union President will be members of the Ergonomics Steering Committee.

(q)     Personal Protective Equipment

    (1)     The Company will provide $65.00 credit for safety shoes purchased as a result the mandatory PPE shoe requirement. Additional $65.00 credit for replacement safety shoes is limited to a minimum 18-month interval between purchases during the life of this Agreement.

    (2)     Employees moved out of classification as available labor would be provided coveralls and shoe coverings, if requested.

90

# ARTICLE XIII - COOPERATIVE EFFORTS

# ARTICLE XIII - COOPERATIVE EFFORTS

## Section 1

The parties recognize that the intent of cooperative efforts is to provide value for employees, customers and shareholders.

The parties acknowledge that this Memorandum will evolve throughout the life of the contract as business and competitive conditions change. However, the principles outlined in this memorandum should remain constant into the future.

Principles

This memorandum reflects the mutual commitment of the Company and Union and is based on the following principles:

1. Cooperative efforts are long term processes and require ongoing efforts to maintain

2. The parties recognize that these processes are built on a foundation of trust and respect that must exist between all parties, the Company, the Union and the employees.

3. It is not the intent of these cooperative processes to undermine the strength of either party nor compromise the legal collective bargaining process

4. It is recognized that these cooperative processes are not an end in themselves, but rather a means to increase Company and Union viability by providing heightened value to our customers, and an improved quality of working life for our employees.

5. Employees, the Union and the Company should be provided with appropriate information in a timely manner to support effective decision making.

6. The Company and the Union will work together and participate in various community forums where it is appropriate for both parties.

Cooperative Structure

The parties recognize that a cooperative process requires the establishment of an appropriate organizational structure. Such a structure must include defined roles for the parties at each level of the organization.

The parties recognize that the plant has the flexibility to design a cooperative structure that fits the organization's needs and circumstances. Further, where such a structure currently exists, it may be in the best interest of the Company and Union to retain such a structure so long as it meets the objectives and principles of this Memorandum.

91

# ARTICLE XIII - COOPERATIVE EFFORTS

The Freeport plant is committed either to maintaining its current cooperative structure or entering into a new cooperative process which promotes the principles of this Memorandum.

The parties will establish a plant steering committee for the purpose of promoting and developing cooperative processes at the plant level. This core group must include top management representatives, as well as top Union officials. This committee will have a minimum of four members. This committee will review the plant's business plan and discuss opportunities under the cooperative process to address business issues and needs and appropriate employee concerns.

The steering committee will meet as often as necessary, but no less than twice a year in order to ensure that this memorandum is effectively implemented and consistently administered.

It is recognized that in order for this committee to function effectively, information must be shared in a timely manner. This information will be focused on the Manufacturing Business Plans for the plant. In conjunction with the business plan review process the parties will discuss staffing requirements for bargaining unit employees. Where a substantial number of layoffs are anticipated, the parties will discuss options that could potentially minimize the impact of layoffs on employees.

The plant cooperative structures will be compatible with the plant's existing or future organizational needs and structure.

Process Components

The parties recognize that the following process components are necessary in order to achieve a successful cooperative process:

Skills Assessment

The parties are committed to developing and maintaining a highly skilled workforce needed to meet the demands of the ever-changing competitive environment. To that end, the local parties will:

1. Identify skills needed to effectively operate the plant;

2. Assess current skills;

3. Develop training programs to close gaps between required skills and current skill levels;

## ARTICLE XIII - COOPERATIVE EFFORTS

4. Assess future skill level requirements

Education/Training

The parties are committed to upgrading employee training and educational programs with the objectives of enhancing occupational skills, communication skills, and providing opportunities for personal development.

Toward this end, during the term of this Agreement, the steering committee will be charged with the responsibility of developing and determining the resources necessary to meet the cooperative education and training needs of the organization.

It is appropriate for the parties to evaluate and determine the need for, and the structure of, a joint educational process.

A review of the status of the cooperative education and training process will be discussed at the Interim Meetings.

Technological Change

The parties recognize the importance of technological change if the Company is to remain competitive and viable in world markets.

It is further recognized that a competitive and viable manufacturing environment provides meaningful, substantial job opportunities for present and future employees.

For this reason, the local Union will be notified of projected technological changes that will have an impact on employees. The parties will continue to work together to minimize that impact.

In addition, the parties will discuss technological change in advance of its implementation at the plant. It is recognized that the involvement and input of the appropriate management and union personnel can result in more informed decisions, as well as the effective and efficient implementation of technological changes at the plant floor level.

Problem Solving Process

The parties recognize and support the utilization of a systematic problem solving process for the purpose of identifying and resolving issues. It is understood that in order to effectively utilize this problem solving process employees and management need to receive appropriate education and training.

Interim meetings will be a forum to review and discuss problems arising out of this provision as well as the other Agreements.

Work Redesign

# ARTICLE XIII - COOPERATIVE EFFORTS

The Plant Steering Committee may investigate and implement work redesign consistent with the principles of this Agreement. Work redesign may include the establishment of operating work teams or self-directed work teams and/or the implementation of other new and improved ways of performing work. Additionally, any work redesign will be aimed at increasing employee responsibility, more effective utilization of people, materials and equipment along with a heightened level of job satisfaction and security resulting from increased employee contributions to the decisions and initiatives that have an impact on the workplace.

Safeguards and Resources

    (1)    The selection of a consultant, if required, to assist in the development and implementation of the cooperative process will be mutual.

    (2)    The cooperative process will not conflict with the traditional role of the Union, such as processing grievances.

    (3)    Problems arising out of this provision can be referred to the steering committee for review and are not subject to work interruptions or the grievance procedure, unless they were previously under the jurisdiction of the grievance procedure prior to the effective date of this Agreement.

    (4)    The Company and the Union are committed to no employee being laid off as a result of improvements made under this cooperative processes.

    (5)    The Company and Union leadership are committed to entering into a cooperative process which promotes the principles outlined in this provision. Employee participation in this process is voluntary and employees will not be disciplined as a result of their decision.

    (6)    Information shared under administration of this provision will be provided subject to the execution of an appropriate confidentiality agreement between the parties.

In summary, the Company and the Union are strongly committed to this provision as a means of developing the labor management relationship and union/management leadership necessary for creating a workplace environment that will benefit the employee, the Union and the Company

# ARTICLE XIII - COOPERATIVE EFFORTS

**Section 2—Capital Investments**

The extent of the Company's future capital investments in the Freeport plant will depend on the competitive position of the plant in areas such as productivity, quality, company profitability and costs as well as the availability of capital funds.

The Company agrees to meet and discuss with the Union, no less than annually, its allocations for future capital projects.

**Section 3—Workforce Training**

(1)     Commitments

        The parties are committed to:

        (a)    the Company's workforce being sufficiently skilled so that all bargaining unit work can be performed in accordance with this Agreement by employees; and

        (b)    Employees receiving sufficient training to allow for all reasonable opportunities to progress within the Bargaining Unit where practical and maximize their skills to the greatest extent possible.

(2)     Plant Training Committees

        (a)    Appointment and Composition

                The parties shall establish a Plant Training Committee. The Committee shall be composed of not less than four (4) and not more than six (6) representatives, half of whom shall be Union representatives and half of whom shall be Company representatives. The Company members of the Committee shall be selected and serve at the pleasure of the Company. The Union members of the Committee shall be selected and serve at the pleasure of the Local Union President.

        (b)    Staff

                Effective January 1, 2006, the Plant Training Committee shall have one (1) full time Training Coordinator who will be responsible for coordination and oversight of the Training Program for bargaining unit employees. The Training Coordinator will be an employee selected by and serving at the pleasure of the Chair of the Union Negotiating Committee, in consultation with the Local Union President, subject to the reasonable approval of the Company. The Training Coordinator shall be compensated in accordance with standard local plant understandings his currently hourly rate for all hours.

(3)     Study of Workforce Training Needs

## ARTICLE XIII - COOPERATIVE EFFORTS

Within six (6) months of the Effective Date, the Plant Training Committee shall complete a report (Report) of the expected training needs of the workforce over the term of the Agreement, given the Commitments outlined in Paragraph 1 above.  Such Report shall include Findings and Recommendations as described below.

(a)    Findings

    (1)    an age and service profile and the anticipated attrition rates of the workforce over the short term and long term future, it being understood that the study is performed solely for the purpose of determining attrition rates.

    (2)    an assessment of the current skill requirements (both competencies and force levels) of the plant, the availability of such skill requirements within the existing workforce and any training necessary to bring the competencies and/or force levels of the current workforce into prompt conformity with the plant's current skill requirements;

    (3)    an evaluation of the appropriateness of existing training and the necessity of developing additional training, giving due consideration to emerging and changing patterns and trends in technology and future skill needs;

    (4)    an examination of current overtime levels and an assessment of whether employees in certain positions are working excessive overtime;

    (5)    an examination of methods by which productivity can be improved through additional training of employees;

    (6)    an examination of the plant's business plan, including projected capital spending, planned or potential new technology or technological change and other relevant factors over the term of the Agreement; and

    (7)    an assessment of the work practices and the training practices at the plant.

(b)    Recommendations

Based on its Findings, the Plant Training Committee shall develop a comprehensive training program, including a detailed implementation plan and all necessary resources for administration, implementation, delivery

## ARTICLE XIII - COOPERATIVE EFFORTS

and evaluation (Training Program) designed to, on a practical and timely basis, meet the commitments outlined in Paragraph 1 above.

(c)     Update

Each year the Plant Training Committee shall prepare an Update that reviews the Findings and modifies them based on changed circumstances, measures the success of the Training Program against its objectives and modifies the Training Program accordingly.

(d)     Separate Statements

The Report and each Update will include separate statements by the parties with respect to any Finding or Recommendation as to which they disagree.

(4)     Action by the Union President

(a)     Within thirty (30) days of receipt of the Report or an Update, the Union President and the Plant Manager shall approve a Training Program or Update (including modifications upon which they can agree) or submit those matters on which they do not agree to Arbitration, pursuant to procedures to be agreed upon by the parties.

(b)     The dispute will be resolved expeditiously on the basis of a final offer submission by the parties at a hearing. The arbitrator will determine which of the submissions best meets the Commitments outlined in Paragraph 1 above, in light of the Findings referred to in Paragraph 3(a) above. The arbitrator shall have the power to determine the procedures pursuant to which the hearing is conducted.

(5)     Administration and Union Role

The Plant Training Committee shall jointly oversee the administration and delivery of its Training Program, the expenditure of training funds necessary for its operation, and an annual audit of such activity.

(a)     With respect to any aspect of the administration, delivery or implementation of the Plant Training Program, the Union members of the Plant Training Committee shall be free to propose that the Union or its designee take any or all responsibility for such administration, delivery or implementation, subject to the approval of the Company members.

(b)     In the event the Union does take such approved responsibility, the Company shall fully cooperate with the Union or its designee with the

## ARTICLE XIII - COOPERATIVE EFFORTS

resources required for any administration, implementation or delivery for which the Union receives approved responsibility.

(6)    Safeguards and Resources

    (a)    The Company shall provide the members of the Plant Training Committee and the Training Coordinator with such training as is necessary to enable them to perform their responsibilities under this Section. Employee participation in the Plant Training Committee shall normally occur during normal work hours.  All meeting time and necessary and reasonable expenses of the Plant Training Committee shall be paid for by the Company and Employees attending such meetings shall be compensated in accordance with standard local plant understandings.

    (b)    Union members of the Plant Training Committee shall be entitled to reasonable opportunity on Company time to caucus for purposes of study, preparation, consultation and review, and shall be compensated in the same manner as set forth in Paragraph (a) above.  Requests for caucus time shall be made to the appropriate Company representative and shall be held within two working days of the request, unless mutually agreed otherwise.

    (c)    To the extent that Company facilities are available and appropriate for Training Program activities, they will be made available.

(7)    Dispute Resolution

In addition to the matters covered by the dispute resolution procedure described in Paragraph 4 above, in the event that the Plant Training Committee is unable to reach agreement on any matter involving the Training Program, the Plant Training Committee shall appoint the arbitrator referred to in Paragraph 4(a) to resolve such dispute. Further details of this procedure shall be as agreed to by the Plant Training Committee unless they are unable to reach such agreement, in which case they shall be determined by the arbitrator.

### Section 4—Employment Security

(1)    Layoff Minimization Plan

The Company agrees that, prior to implementing any layoffs, it shall review and discuss with the Union:

    (a)    documentation of the business need for the layoffs (Need);

## ARTICLE XIII - COOPERATIVE EFFORTS

(b)     the impact of the layoffs on the bargaining unit, including the number of employees to be laid off and the duration of the layoffs (Impact); and ,

(c)     a plan designed to reduce the need for and level of layoffs in the affected classifications (a Layoff Minimization Plan) which shall contain at least the following elements:

   (1)     a substantial reduction in the use of outside contractors in the affected classifications;

   (2)     the absolute minimal use of daily overtime in the affected classifications;

   (3)     any strategy to purchase products or services that would normally be provided by bargaining unit employees;

   (4)     a program of optional layoffs as provided in Article VIII, Section 10(b);

   (5)     the use of alternate work assignments for affected individuals;

   (6)     a meaningful program of shared sacrifice by management.

(2)     Employee Protections

Reference to the elements of a Layoff Minimization Plan in Paragraph 1 above shall not be construed to impair in any way any protection afforded to Employees under other provisions of this Agreement.

(3)     Union Response

The Union shall be provided with sufficient information to reach its own judgment on whether there is a Need, the appropriate Impact and to develop its own proposed Layoff Minimization Plan.

(4)     Dispute Resolution

(a)     In the event the Parties cannot reach agreement on whether there is a Need, the appropriate Impact and the terms of a Layoff Minimization Plan, the Company may implement its plan and the Union may submit their dispute to an expedited final offer arbitration under the procedures to be developed by the Parties.  If the Company lays off Employees in violation of this Article, such Employees shall be made whole.

(b)     The arbitrator's ruling shall address whether the Company demonstrated a Need, and if it did, whose proposed Impact and Layoff Minimization Plan

## ARTICLE XIII - COOPERATIVE EFFORTS

was more reasonable, given all the circumstances and the objectives of the Parties.

**Section 5—Plant Closing**
In the event a full plant closure occurs during the life of this Agreement:

(1)     The Company will notify the Local and International Union at least six months prior to the cessation of production operations.

(2)     Following such notification, the Local and International Union will have the right to discuss and explore with the Company any possible means of averting the closure.

(3)     If attempts to avert the plant closure are not successful, Company and Union representatives will meet to negotiate the manner in which the closure is carried out.

**Section 6—Executive Compensation**
The Company agrees that:

(1)     The average base salaries of the executive officers as a group will not exceed the average salaries of similarly situated executives at comparably sized industrial companies.

(2)     All future (including the amendment of existing plans) stock purchase, stock option, stock appreciation or other similar programs (Stock Programs) shall:

      (a)     reward only long-term appreciation in the value of the Company's stock and

      (b)     not, once granted, directly or indirectly be "re-priced" or similarly adjusted, subject to the New York Stock Exchange definition of "re-pricing".

**Section 7—Wellness**
A cooperative Titan Tire/Local USW Wellness Program will be maintained at the Freeport plant.

This voluntary program will consist of periodic health screening examinations, seat belt usage campaigns, smoking cessation clinics, and stress reduction programs to encourage employees to establish home and work habits that will help them lead healthier, more fulfilling lives. The cost of these programs will be supported by the Company.

## ARTICLE XIII - COOPERATIVE EFFORTS

In addition to the above, a weight management program, approved by management, will be sponsored by the Company as follows. Upon completing a program with at least 75% attendance, the Company will reimburse the employee 50% of the program cost.

The continuance of these programs will be reviewed by an Advisory Committee consisting of two (2) representatives from the Local Union and two (2) representatives from the Company. The medical portion of the program will be administered by the plant Medical Director including the type and frequency of screening tests.

Active employees will be eligible to participate in the program. At the beginning of the program, eligible employees will be scheduled for an initial health screening examination. After the initial examination, employees will be scheduled for periodic examinations on or about their birthday anniversary. During the course of the 1998 negotiations, it was agreed that a prostate screen (PSA) be added to the Wellness program screening examination.

To the extent possible, the examinations will be scheduled in the plant dispensary during the regular dispensary hours. Employees will be scheduled for examination prior to their regular work shift; however, some employees may have to be scheduled at other times. Other local medical service resources may be utilized when necessary.

The results of the examination will be reviewed by the local plant physician. The participant will be informed of the results and the recommendations, if any, for further medical evaluation. A copy of the examination will be provided the participant if requested in writing by the participant.

On written request of the Local President, available statistical summaries of examination data, with identifiers removed, regarding health problems in the work force will be provided.

All examination results will be considered as privileged and confidential information and will not be released to anyone except on written authorization of the employee and, no information received by the Company pursuant to this program shall be used to discriminate or retaliate against any employee for any purpose.

Such information shall not be used in making employment-related decisions unless the health of the employee so requires. Individual test results, health history profiles, risk analysis profiles, and physical recommendations transmitted to the plant physician shall be treated as confidential medical records and filed only within the plant medical department.

The Company may use its health insurance carrier to implement the terms of this provision.

### Section 8—USW/Titan Tire Institute For Career Development

(1)     Establishment

101

## ARTICLE XIII - COOPERATIVE EFFORTS

Effective July 1, 2007 the Union and the Company hereby establish the USW/Titan Tire Institute for Career Development (the Institute) which, in conjunction with similar programs negotiated by the Union with various other employers, will be administered under the rules and procedures of the Institute for Career Development (ICD).

(2)    Purpose

The purpose of the Institute is to provide resources and support services for the education, training and personal development of the Employees of the Company, including upgrading their basic skills and educational levels.

(3)    Guiding Principles

The Institute and ICD shall be administered in a manner consistent with the following principles:

(a)    workers must play a significant role in the design and development of their jobs, their training and education and their working environment;

(b)    workers should be capable of reacting to change, challenge and opportunity and this requires ongoing training, education and growth; and

(c)    worker growth and development can only succeed in an atmosphere of voluntary participation in self-designed and self-directed training and education.

(4)    Financing

The Institute will be financed by a contribution of $.10 (ten cents) for each hour worked in the Freeport plant.

The parties will also seek and use funds from federal, state and local governmental agencies.

(5)    Administration

(a)    The Institute will be administered jointly by the Company and the Union in accordance with procedures, rules, regulations and policies agreed to by the parties.

(b)    Training is separately provided for in the Agreement. The Company may, however, contract with the Institute to provide services and resources in support of such training.

## ARTICLE XIII - COOPERATIVE EFFORTS

(c)    The Company agrees to participate fully as a member of ICD in accordance with policies, rules and regulations established by the ICD. The Company's financial contributions to the Institute will continue to be separately tracked. ICD will continue to be under the joint supervision of the Union and participating employers with a Governing Board consisting of an equal number of Union and employer appointees.

(6)    Reporting, Auditing, Accountability and Oversight

The following minimum requirements shall govern reporting, auditing, accountability and oversight of the funds provided for in Paragraph 4.

(a)    Reporting

(1)    For each calendar year quarter, and within thirty (30) days of the close of such quarter, the Company shall account to the Institute, the ICD, the International Union President and the Chair of the Union Negotiating Committee for all changes in the financial condition of the Institute.    Such reports shall be on form(s) developed by the Institute broken down by plant and shall include at least the following information:

(a)    The Company's contribution, an explanation thereof and the cumulative balance; and

(b)    a detailed breakdown of actual expenditures related to approved program activities during said quarter.

(2)    The Union Co-Chairs of each of the Local Joint Committees shall receive a report with the same information for their plant or Local Union, as the case may be.

(b)    Auditing

The Company or the Union may, for good reason, request an audit of the Company reports described in Paragraph 6(a) above and of the underlying Institute activities made in accordance with the following: (1) the Company and the Union shall jointly select an independent outside auditor; (2) the reasonable fees and expenses of the auditor shall be paid from ICD funds and (3) the scope of audits may be Company-wide, plant-specific, or on any other reasonable basis.

(c)    Approval and Oversight

Each year, the Local Joint ICD Committees shall submit a proposed training/education plan to the Chairs of the Union and Company Negotiating Committees or their designees.    Upon their approval, said

103

## ARTICLE XIII - COOPERATIVE EFFORTS

plans shall be submitted to the Institute. The Institute must approve the plan before any expenditure in connection with any activities may be charged against the funds provided for in this Agreement. An expenditure shall not be charged against such funds until such expenditure is actually made.

(7)    Dispute Resolution Mechanism

Any dispute regarding the administration of the Institute at the Company or plant level shall be subject to expedited resolution by the Chairs of the Union and Company Negotiating Committees and the Executive Director of ICD who shall apply the policies, rules and regulations of the Governing Board and the provisions of this Section in ruling on any such dispute. Rulings of the Executive Director may be appealed to the Governing Board, but shall become and remain effective unless stayed or reversed by the Governing Board.

# ARTICLE XIV - COST OF LIVING

## ARTICLE XIV - COST OF LIVING

**Cost-Of-Living Allowance**

(1)     The Cost-of-Living Allowance, if any, will be determined in accordance with changes in the Consumer Price Index--United States City Average, for Urban Wage Earners and Clerical Workers (1967 = 100) Revised Series as amended for the month of January, 1987 and subsequent months published by the Bureau of Labor Statistics, hereinafter referred to as the CPI-W.

(2)     Cost-of-Living Allowances will be the average CPI-W for the months of March, April, and May 2005.

Cost-Of-Living Allowances will be made at the following times:

| | |
|---|---|
| January 1, 2006 | September, October, November 2005 |
| April 3, 2006 | December 2005, January, February 2006 |
| July 3, 2006 | March, April, May 2006 |

The April 3, 2006 adjustment will be increased $.23 for restoration of previously deferred COLA adjustments.

Effective January 1, 2006, current Cost-of-Living Allowance will be considered to have been rolled into the Job Grade wage rates detailed in Schedule B. The amount of the Cost-of Living Allowance payable on each Effective Date of Adjustment will be determined by comparing the three-month average CPI-W for the adjustment period to the Base. $.01 per hour for each full .26 of a point change that the three-month average CPI-W for the adjustment period exceeds the Base will be added to Job Grade wage rates effective January 1, 2006.

(3)     In determining the Base and the three-month average of the CPI-W for a specified period, the computed average shall be rounded to the nearest 0.1 Index Point using the Engineering Method of Rounding.

(4)     In the event the Bureau of Labor Statistics does not issue the appropriate CPI-W on or before the Effective Date of Adjustment, the Cost-of-Living Allowance required by such appropriate Index shall be effective at the beginning of the first pay period after receipt of the Index and paid retroactively to the Effective Date of Adjustment.

(5)     No adjustment, retroactive or otherwise, shall be made in pay or benefits as a result of any revision which later may be made in the published figures for the Index for any month on the basis of which the cost-of-living calculation shall have been determined.

# ARTICLE XIV - COST OF LIVING

(6)    In no event will a decline in the CPI-W be cause to reduce any Cost-of-Living Allowances that have been made prior to such decline.

(7)    The Cost-of-Living Allowances are dependent upon the availability of the BLS CPI-W in its present form and calculated on the same basis as the Index for February 1991. In the event the Bureau of Labor Statistics changes the form or the basis of calculating the CPI-W or is unable or fails to make said CPI-W available, the parties shall negotiate on the adoption of an appropriate substitute CPI-W that most accurately reflects the spending habits of the affected employees.

In the event the BLS discontinues the publication of the CPI-W on the 1967 = 100 base, the parties shall change the Cost-of-Living Allowance (COLA) calculation set forth above to maintain the same cents-per-hour COLA payment as would result by using the 1967=100 base and $.01/.26 point formula.

Failing agreement in such negotiations, the parties shall submit the issue of what shall constitute an appropriate substitute CPI-W to final and binding arbitration.

This Cost-of-Living Allowance Agreement shall become effective under the same terms as those upon which the Collective Bargaining Agreement becomes effective as outlined in Article XV, Effective Date, Amendment and Termination.

The final Cost-of-Living allowance adjustment will be made July 3, 2006 and no further Cost-of-Living Allowance adjustments will be made. Thereafter, wages will be set as set forth in Schedule B and Letter 2 and will be posted annually by the Company.

## ARTICLE XV - EFFECTIVE DATE AND TERMINATION

## ARTICLE XV - EFFECTIVE DATE AND TERMINATION

(1)    This Agreement shall become effective at the time the local Agreement is completed, by ratification of the Local Union and approval of the International Union.   Except as provided in the No Strike, No Lockout Provision, it shall continue in effect until and including November 19, 2010 at 11:00 P.M. Central Time and thereafter it shall renew itself for yearly periods unless written notice is given by either party not less than sixty (60) days, but not more than seventy-five (75) days prior to the expiration date, that it is desired to amend or terminate this agreement. In the event notice of a desire to amend or terminate this agreement is given, the representatives of the Local Union and the representatives of the Company shall meet as soon as possible but in no event later than thirty days (30) prior to expiration to begin negotiations. Such negotiations shall have duration of at least thirty (30) days, unless otherwise mutually agreed. At the opening of such negotiations, both parties shall present to each other in writing their proposed changes in said Agreement.   If negotiations are not completed prior to the expiration date of this Agreement, said Agreement shall terminate unless extended by mutual agreement.

(2)    Amendments to this Agreement may be made by mutual consent.

(3)    The effective date of this Agreement is dependent on ratification by the Local Union and approval of the International Union.

(4)    In Witness Hereof, the duly chosen representatives of the parties hereto affix their hand this 1st day of January 2006.

### LOCAL UNION #745L, UNITED STEELWORKERS

(Sgd.) Steve Vanderheyden    _____

(Sgd.) Dan Kreeger    _____

(Sgd.) Jim Jamison    _____

(Sgd.) John Fuller    _____

(Sgd.) Frank Wool    _____

(Sgd.) Kevin Kirk    _____

(Sgd.) Ed Bell (USW Staff Representative)    _____

## ARTICLE XV - EFFECTIVE DATE AND TERMINATION

**TITAN TIRE CORPORATION OF FREEPORT**

(Sgd.)  William Campbell, President　　　　_____

# SCHEDULE A

## SCHEDULE A – JOB DEPARTMENTS, CLASSIFICATIONS AND GRADES

This schedule A identifies the job classifications and corresponding Pay Grades established during the contract negotiations between the parties for the 2006 Agreement. It is understood that the standard job evaluation practice referred to in Article VII, Section 1 (a) will apply to any changes in job content of any classification.

For a period of six months from the effective date of the Agreement, the Company will not change the job descriptions or combine jobs of any current job classification without agreement of the union.

(1)      Six months from the effective date, prior to making any changes in current job descriptions the parties will discuss the reason for the changes and proposals for implementing the change in job descriptions. If the parties do not agree on the change the Company may make the change only: (a) if it is the result of, and only to the extent necessary to implement a capital investment and/or process of improved automation directly affecting the involved classification, or (b) if it is the result of and only to the extent necessary to implement a process change necessary for manufacturing.

(2)      Six months from the effective date, any Company proposal to combine current job classifications will be discussed with the Union.   The Company will discuss the reasons for the change and proposal for implementing the proposed change. Should the parties be unable to reach mutual agreement on the change and its implementation, the Company's sole remaining option will be to surplus the necessary members of the affected classifications and establish a new classification to be filled through the filling of vacancy procedures of article VIII, Section 6.

Minor changes of job duties that do not result in a change in the assessment of the job will not result in a change in job grade, even if the numeric total would ordinarily result in a different job grade.

This is not intended to restrict overtime distribution properly scheduled under the terms of Article XI, Section 14.

### Grade and Classification

| Dept | Code | Job | Grade |
|------|------|-----|-------|
| 119 | 359 | Tool Crib Attendant | 2 |
| 119 | 479 | Utility Person | 1 |
| 119 | 570 | Painter | 4 |
| 200 | 701 | Waste & Scrap Pickup | 1 |
| 200 | 723 | Trucker & Checker - Receiving | 2 |
| 210 | 402 | Store Attendant | 2 |
| 320 | 396 | Operate Pigment Blender | 2 |

| Dept | Code | Job | Grade |
|------|------|-----|-------|
| 320 | 459 | Lay Down Stock - Wig Wag | 1 |
| 320 | 512 | Clean machinery & Equipment | 1 |
| 320 | 553 | Clean Shakers & Misc Service | 1 |
| 320 | 559 | Resample & Process Control | 2 |
| 410 | 441 | Reroll & Repair Liners - Misc Service | 1 |
| 410 | 577 | Service Back End | 2 |
| 410 | 707 | Truck Stock & Place in Tire Room | 2 |
| 412 | 500 | Production Service | 2 |
| 412 | 569 | Roll Changer - 60" Gum Calender | 2 |
| 412 | 598 | Truck Stock - Misc Service | 2 |
| 420 | 555 | Wrap Beads and Service | 1 |
| 430 | 500 | Production Service | 2 |
| 430 | 508 | Cement Tread Ends - 10-10 tuber | 1 |
| 430 | 512 | Clean machinery & Equipment | 1 |
| 430 | 561 | Cushion Mill & Tread Check | 3 |
| 440 | 621 | Truck and Stock Farm Tires | 1 |
| 441 | 461 | Assemble, Prepare & Truck Orders | 1 |
| 441 | 607 | S&L Tube-In-Case, Truck & Load Farm Tires | 1 |
| 442 | 431 | Sort and label | 2 |
| 511 | 422 | Repair tires/stock & clean equip | 2 |
| 511 | 500 | Production Service | 2 |
| 514 | 512 | Clean Machinery & Equipment | 1 |
| 514 | 620 | Service, Spray and Truck Green Tires | 2 |
| 531 | 512 | Clean machinery & Equipment | 1 |
| 531 | 518 | Service - Helper | 2 |
| 534 | 500 | Production Service | 2 |
| 534 | 512 | Clean machinery & Equipment | 1 |
| 535 | 576 | Buff and Repair - Farm Tires | 3 |
| 535 | 622 | LRF Runout Inspection | 3 |
| 911 | 491 | Janitor | 1 |
| 021 | 421 | Section and Step Down tires | 3 |
| 330 | 397 | Operate Windup - 66" Calender | 3 |
| 330 | 575 | Operate Let-Off - 66" Calender | 3 |
| 410 | 451 | Roll changer - Plain Ply Units | 2 |
| 410 | 524 | Roll Changer - 4-Roll Calender | 2 |
| 420 | 550 | Flap, Apex and Service | 2 |
| 430 | 412 | Book Treads - 10-10 Tubers | 2 |
| 514 | 438 | Paint and Line Green Tires | 2 |
| 515 | 500 | Production Service | 2 |
| 119 | 548 | Oiler | 3 |
| 320 | 389 | Attend Banburys - Roller Die | 3 |
| 320 | 395 | Banbury Operator | 4 |
| 320 | 462 | Batch-Off Millman | 3 |
| 320 | 514 | Banbury Operator Helper - Batch builder | 3 |
| 320 | 544 | Truck Gondolas - Pellets | 3 |
| 330 | 386 | Millman - 66" & 4-Roll Calender | 3 |
| 410 | 386 | Millman - 66" and 4-Roll Calender | 3 |

110

| Dept | Code | Job | Grade |
|------|------|-----|-------|
| 410 | 394 | Banner Bias Oper - Splicer | 3 |
| 412 | 530 | Cut, Pick, Splice, Squeegee and Back End | 4 |
| 412 | 532 | Build Bands - RJS Unit | 4 |
| 412 | 666 | Low-Angle Bias Cutter Operator | 3 |
| 420 | 399 | Build and Wrap Beads | 3 |
| 430 | 388 | Millman - 10-10 Tuber | 3 |
| 511 | 734 | Build Tires - Passenger | 4 |
| 514 | 725 | Cure Tires - Service BOM Presses | 3 |
| 514 | 726 | Chg Molds & Bladders - Clean Molds | 3 |
| 515 | 406 | Inspect & Vent Tires - Trim Beads & Vents | 3 |
| 515 | 415 | Classify & Disposition Passenger Tires | 4 |
| 515 | 526 | Trim Tires - Attend Paint Machine | 3 |
| 530 | 519 | Laminator Operator | 3 |
| 531 | 464 | Build Tires - Farm | 4 |
| 534 | 471 | Inspect, Repair, Jam and Paint & Line | 3 |
| 534 | 509 | Tend Presses - Farm | 3 |
| 534 | 568 | Chg Molds & Bladders - Clean Molds | 3 |
| 535 | 571 | Trim and Final Inspect - Farm Tires | 3 |
| 535 | 578 | Farm Tire Press Operator/Inspector (A row) | 3 |
| 054 | 485 | Labor Trainer - RSP | 4 |
| 054 | 495 | Labor Trainer - RFS | 4 |
| 119 | 301 | Machinist | 5 |
| 119 | 307 | Pipefitter | 5 |
| 119 | 310 | Millwright | 5 |
| 119 | 345 | Heating, Vent and Air Cond Repair | 5 |
| 119 | 350 | Maintenance Labor Trainer | 5 |
| 119 | 588 | Truck Mechanic | 5 |
| 330 | 370 | Calender Operator - 66" Calender | 4 |
| 410 | 496 | Calender Operator - 4-Roll Calender | 4 |
| 412 | 521 | Calender Operator - 60" Gum Calender | 4 |
| 430 | 385 | Tuber Operator | 4 |
| 530 | 671 | Service & Operate FMSL | 4 |
| 532 | 669 | Service & Operate RFSL | 4 |
| 119 | 323 | Instrument Repairman | 5 |
| 053 | 534 | RSP Balance Production | 4 |
| 053 | 536 | RFS Balance Production | 4 |
| 053 | 546 | Warehouse Balance Production | 3 |
| 119 | 304 | Electrician | 5 |
| 160 | 330 | Powerhouse Operator | 5 |

## SCHEDULE B – PAY GRADES

A.    Titan Tire Wage Scale

     1.    Effective January 1, 2006, for those employees hired before January 1, 2006, Wage Rates shall be as follows:

| Date | Grade 1 | Grade 2 | Grade 3 | Grade 4 | Grade 5 |
|------|---------|---------|---------|---------|---------|
| 1/01/06 | $21.93 | $22.03 | $ 22.29 | $23.06 | $23.81 |

     2.    Employees Hired after January 1, 2006, the Wage Rates shall be as follows:

| Date | Grade 1 | Grade 2 | Grade 3 | Grade 4 | Grade 5 |
|------|---------|---------|---------|---------|---------|
| 1/01/06 | $13.50 | $15.00 | $ 22.29 | $23.06 | $23.81 |

For employees in Grades 1 & 2, the new hire starting wage rates will be $1.50 below the above wage rate. Each employee in Grade 1 & 2 will get a $.50 increase at 12 months, 18 months and 30 months of employment.

For Employees in Grades 3 and Grade 4, their new hire starting wage rate will be 70% of the above wage rate. Increases shall based upon the following chart.

|  | Start Rate | 1st Year | 2nd Year | 3rd Year | 4th Year | 5th Year |
|--|-----------|----------|----------|----------|----------|----------|
| % of Pay Grade of Classification | 70% | 76% | 82% | 88% | 94% | 100% |

For maintenance employees in Grade 5 (except Electricians and Powerhouse Employees), their new hire starting wage rate will be 85% of the above wage rate. Increases shall be based upon the following chart.

| Date | Start Rate | 1st Year Anniversary | 2nd Year Anniversary | 3rd Year Anniversary |
|------|-----------|----------------------|----------------------|----------------------|
| % of Pay Grade of Classification | 85% | 90% | 95% | 100% |

The company may, on a non-discriminatory basis, move employees upward through the wage scale irrespective of service time based upon performance and company needs.

COLA adjustments made between January 2, 2006 and July 3, 2006 (inclusive) will be applied to all wage rates. Each year Titan will post the current wage rate and progressions.

Letter #1



January 1, 2006

Mr. Ron Hoover, Executive Vice-President (R/PIC)
United Steelworkers
Five Gateway Center
Pittsburgh, PA 15222

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Hoover and Mr. Vanderheyden:

     This letter is to confirm our agreement that in the event of a default by Titan Tire of Freeport of its financial obligations under the 2006 Agreement between Titan Tire of Freeport and the USW on behalf of itself and its Local No. 745, Titan Tire Corporation will guarantee the financial obligations of said 2006 Agreement. If Titan Tire Corporation should default under its guarantee of financial obligations to the 2006 Agreement, then Titan International Inc. will guarantee the financial obligations of Titan Tire Corporation under the 2006 Agreement referenced above.

     The parties further agree that this letter does not make Titan International a party to the 2006 Agreement. On behalf of Titan International Inc., the undersigned represents that he has the authority to bind Titan International to this letter.

Sincerely Yours,

Maurice M. Taylor<br>Chairman and CEO, Titan International

_____

Steve Vanderheyden, President
USW Local 745L

_____

Ron Hoover, Executive Vice President

114

Letter #2



January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

In accordance with the agreement between the parties, COLA increases will be added to the wage rate set forth in the Collective Bargaining Agreement through the COLA increase on July 3, 2006.  After that date, with the end of future COLA adjustments, the following General Wage Increases will be added to the existing hourly wage rates.

For all employees hired on or before January 1, 2006:

| Date | Grade 1 | Grade 2 | Grade 3 | Grade 4 | Grade 5 |
|------|---------|---------|---------|---------|---------|
| 7/23/07 | $0.25 | $0.25 | $0.40 | $0.42 | $0.49 |
| 7/21/08 | $0.25 | $0.25 | $0.40 | $0.43 | $0.50 |
| 7/20/09 | $0.25 | $0.25 | $0.45 | $0.44 | $0.51 |
| 7/19/10 | $0.25 | $0.25 | $0.45 | $0.45 | $0.53 |

**For all employees hired after January 1, 2006:**

| Date | Grade 1 | Grade 2 | Grade 3 | Grade 4 | Grade 5 |
|------|---------|---------|---------|---------|---------|
| 7/23/07 | $0.40 | $0.40 | $0.40 | $0.42 | $0.49 |
| 7/21/08 | $0.40 | $0.40 | $0.40 | $0.43 | $0.50 |
| 7/20/09 | $0.40 | $0.40 | $0.45 | $0.44 | $0.51 |

| 7/19/10 | $0.40 | $0.40 | $0.45 | $0.45 | $0.53 |

Annually, upon application of these wage increases, Titan will post the current wage for each  pay grade as well as a chart showing starting wages for those employees on a progression.

Sincerely,


William Campbell, President
Titan Tire Corporation

Agreed:


_____

Steve Vanderheyden, President
USW Local 745L

Letter #3

# ⦿TITAN™

January 1, 2006

Mr. Ron Hoover
Executive Vice President, R/PIC
United Steelworkers
Five Gateway Center
Pittsburgh, PA  15222

      RE:   Neutrality

Dear Mr. Hoover:

The following will confirm our understanding on the above captioned matter.

    1.     Introduction

The Company and the Union are attempting to develop a constructive relationship built on trust, integrity and mutual respect and the parties place a high value on development of that relationship.

    2.     Neutrality

        a.     To underscore the Company's commitment in this matter, it agrees to adopt a position of Neutrality regarding the unionization of its employees at any and all of its factories involved in producing or distributing tire or rubber products  ("Covered Employees").

        b.     Neutrality means that, except as explicitly provided herein, the Company will not in any way, directly or indirectly, involve itself in any matter which involves the unionization of its Covered Employees, including but not limited to efforts by the Union to represent the Company's employees or efforts by its employees to investigate or pursue unionization.

c.    The Company's commitment to remain neutral as defined above may only cease upon the Company demonstrating to the arbitrator under Paragraph 6 below that in connection with an Organizing Campaign (as defined in Paragraphs 3(a) through 3(c) below) the Union is: materially misrepresenting to the employees the facts surrounding their employment; is unfairly demeaning the integrity or character of the Company or its representatives; or is threatening, intimidating, coercing or harassing any person to secure signed authorization cards.

3.    Organizing Procedures

a.    Prior to the Union distributing authorization cards to non-represented employees, the Union shall provide the Company with written notification (Written Notification) that an organizing campaign (Organizing Campaign) will begin. The Written Notification will include a description of the proposed bargaining unit.

b.    The Organizing Campaign shall begin immediately upon provision of Written Notification and continue until the earliest of: (1) the Union gaining recognition under Paragraph 3(d)(5) below; (2) written notification by the Union that it wishes to discontinue the Organizing Campaign; or (3) ninety (90) days from provision of Written Notification to the Company.

c.    There shall be no more than one (1) Organizing Campaign in any particular factory in any twelve (12) month period.

d.    Upon Written Notification the following shall occur:

(1)    Notice Posting

The Company shall post a notice on all bulletin boards of the facility where notices are customarily posted as soon as the Unit Determination Procedure in Paragraph 3(d)(3) below is completed. This notice shall read as follows:

"NOTICE TO EMPLOYEES

We have been formally advised that the United Steelworkers is conducting an organizing campaign among certain of our employees. This is to advise you that:

1.    The Company does not oppose collective bargaining or the unionization of our employees.

2.    The choice of whether or not to be represented by a union is yours alone to make.

118

3.     We will not interfere in any way with your exercise of that choice.

4.     The Union will conduct its organizing effort over the next ninety (90) days.

5.     In their conduct of the organizing effort, the Union and its representatives are prohibited from: misrepresenting the facts surrounding your employment; unfairly demeaning the integrity or character of the Company or its representatives; and threatening, intimidating, coercing or harassing any person to secure signed authorization cards.

6.     If the Union secures a simple majority of individual authorization cards of the employees in [insert description of bargaining unit provided by the Union] the Company shall recognize the Union as the exclusive representative of such employees without a secret ballot election conducted by the National Labor Relations Board.

7.     Each authorization card must unambiguously state that the signing employee desires to designate the Union as his/her exclusive representative.

8.     Employee signatures on the authorization cards will be confidentially verified by a neutral third party chosen by the Company and the Union."

Following receipt of Written Notification, the Company may only communicate to its employees on subjects which directly or indirectly concern unionization on the issues covered in the Notice set forth above or raised by other terms of this Neutrality Section and consistent with this Section and its spirit and intent.

(2)    Employee Lists

Within five (5) days following Written Notification, the Company shall provide the Union with a complete list of all of its employees in the proposed bargaining unit who are eligible for Union representation. Such list shall include each employee's full name, home address, job title and work location. Upon the completion of the Unit Determination Procedure described in Paragraph 3(d)(3) below, an amended list will be provided if the proposed unit is changed as a result of such Unit Determination Procedure. Thereafter during the Organizing Campaign, the Company will provide the Union with updated lists monthly.

119

(3)    Determination of Appropriate Unit

As soon as practicable following Written Notification, the parties will meet to attempt to reach an agreement on the unit appropriate for bargaining. In the event that the parties are unable to agree on an appropriate unit, either party may refer the matter to the Dispute Resolution Procedure contained in Paragraph 6 below. In resolving any dispute over the scope of the unit, the arbitrator shall apply the principles used by the National Labor Relations Board.

(4)    Access to Company Facilities

During the Organizing Campaign the Company, upon written request, shall grant reasonable access to a well-traveled non-work location to the Union for the purpose of distributing literature and meeting with unrepresented Company employees. The exact times and location shall be determined in joint discussions between the parties. Distribution of Union literature shall not compromise safety or production or unreasonably disrupt ingress or egress or the normal business of the facility. Distribution of Union literature and meetings with employees shall be limited to non-work areas during non-work time.

(5)    Card Check/Union Recognition

    (a)    If, at any time during an Organizing Campaign which follows the existence of a substantial and representative complement of employees in any unit appropriate for collective bargaining, the Union demands recognition, the parties will request that a mutually acceptable neutral (or an arbitrator from the American Arbitration Association if no agreement on a mutually acceptable neutral can be reached) conduct a card check within five (5) days of the making of the request.

    (b)    The neutral shall confidentially compare the authorization cards submitted by the Union against original handwriting exemplars of the entire bargaining unit furnished by the Company. If the neutral determines that a simple majority of eligible employees has signed cards which unambiguously state that the signing employees desire to designate the Union as their exclusive representative for collective bargaining purposes, and that cards were signed and dated during the Organizing Campaign, then the Company shall recognize the Union as the exclusive representative of such employees without a secret ballot election conducted by the National Labor Relations Board.

    (c)    The list of eligible employees submitted to the neutral shall be jointly prepared by the Union and the Company.

4.    Hiring

    a.    Laid-off employees described in Article VIII of the Agreement may apply for employment at plants not covered by the Agreement. A laid-off employee must make written application for employment at a specific plant of interest. Upon such request, the laid-off employee will receive priority consideration in the plant's hiring selection process and will be required to satisfy the normal selection process requirements at the respective plant in order to attain status.

    b.    In determining whether to hire any applicant (whether or not such applicant is an Employee covered by the Agreement), the Company shall refrain from using any selection procedure which, directly or indirectly, evaluates applicants based on their attitudes or behavior toward unions or collective bargaining.

5.    Definitions and Scope of this Agreement

    a.    Rules with Respect to Affiliates

        (1)    For purposes of this Section, the Company includes (in addition to the Company) any entity which is an Affiliate of the Company.

        (2)    An Affiliate shall mean any business enterprise that Controls, is under the Control of, or is under common Control with Titan Tire.

            Control of a business enterprise shall mean possession, directly or indirectly, of either:

            (a)    fifty percent (50%) of the equity of the enterprise; or

            (b)    the power to direct the management and policies of said enterprise.

    b.    Rules With Respect to Existing Affiliates

        The Company agrees to cause all of its existing Affiliates to become a party to this Section and to achieve compliance with its provisions.

121

c.    Rules with Respect to New Affiliates

The Company agrees that it will not consummate a transaction which would result in the Company having or creating an Affiliate without ensuring that the New Affiliate agrees to and becomes bound by this Section.

6.    Dispute Resolution

a.    Any alleged violation or dispute involving the terms of this Section may be brought to a joint committee of one (1) representative each from the Company and the Union. If the alleged violation or dispute cannot be satisfactorily resolved by the parties, either party may submit such dispute to the arbitrator. A hearing shall be held within ten (10) days following such submission and the arbitrator shall issue a decision within five (5) days thereafter. Such decision shall be in writing and need only succinctly explain the basis for the findings. All decisions by the arbitrator pursuant to this article shall be based on the terms of this Section and the applicable provisions of the law. The arbitrator's remedial authority shall include the power to issue an order requiring the Company to recognize the Union where, in all the circumstances, such an order would be appropriate.

b.    The arbitrator's award shall be final and binding on the parties and all employees covered by this Section. Each party expressly waives the right to seek judicial review of said award; however, each party retains the right to seek judicial enforcement of said award.

c.    For any dispute under this Section and the interest arbitration procedure described in Paragraph 6 above, the parties shall choose the arbitrator from the list of arbitrators described in the grievance procedure of the Collective Bargaining Agreement, contacting them in the order listed, and retaining the first to indicate an ability to honor the time table set forth above for the hearing and the decision.

7.    Nothing in this Section shall be construed so as to include as "Covered Employees" Titan Wheel employees working at a plant that does not manufacture tires or rubber products, provided that the Company does not transfer work to Titan Wheel employees that is performed, as of the date of Titan's acquisition of Freeport, by either Des Moines or Freeport employees.

Sincerely yours,

Maurice M. Taylor, Jr.
Chairman and Chief Executive Officer
Titan Tire Corporation
Titan International, Inc.


Agreed:


_____
Ron Hoover
Executive Vice President, R/PIC
United Steelworkers

Letter #4



January 1, 2006

Mr. Leo W. Gerard,
President United
Steelworkers
Five Gateway Center
Pittsburgh, PA 15222

Re: Job Security

Dear Mr. Gerard:

The following will confirm our understanding on the above-captioned matter.

1.  The Company agrees that the Freeport and Des Moines facilities shall be designated as Protected Facilities and that the commitments below shall apply to them.

2.  The Company agrees that no plant closure will occur at either of the Protected Facilities during the life of the 2006 Agreements.

3.  The Company agrees that the Freeport facility shall for two years following the Effective Date, maintain 100% of the regular full-time bargaining unit enrollment as of the effective date. It is understood that the 100% of the regular full-time bargaining unit enrollment as of the effective date shall mean the total Freeport active enrollment as of the effective date less the number of individuals who have taken the Goodyear "buyout." Thereafter, the company shall at all times maintain a minimum of 90% of the regular full-time bargaining unit enrollment and 95% of the total maintenance workforce, as of the effective date; it being understood that the base from which the 90% and 95% is measured may be adjusted to reflect efficiency improvements.

4.  In the event work provided to Goodyear is terminated or reduced, the Company will be permitted to reduce the obligation under #3 above accordingly, provided that Titan has made every effort to retain that work.

5.  The Company agrees that the Des Moines facility shall at all times maintain a minimum of 425 regular full-time bargaining unit jobs.

124

6.    The Company agrees that it shall not directly or indirectly produce, distribute, market, or sell any product, which currently is or historically was made at a Protected Facility unless that product is produced at a Protected Facility. For the Freeport facility, "historically" is limited to the past five years.

7.    The Company agrees to make the necessary capital expenditures required to maintain and improve the competitive status of the Protected Facilities.

8.    The Commitments set forth in this letter shall remain in effect for the life of the 2006 Agreements, unless compliance in part or in whole becomes no longer feasible due to an act of God. Otherwise, these provisions shall remain applicable regardless of any reported business loss by the Company or any division or subsidiary or plant thereof.

9.    For purposes of this letter of agreement and its accompanying clarification, "the Company" shall be understood to mean Titan Tire International and its present and future affiliates.

Upon request, the Company shall provide the Union with a report documenting its compliance with this job security agreement and shall, upon request, provide the Union with any information reasonably requested that allows the Union to monitor such compliance with this job security agreement. The requests will be made no more often than semi-annually. The parties further agree that this letter does not make Titan International a party to the 2006 Agreement. On behalf of Titan International Inc., the undersigned represents that he has the authority to bind Titan International to the this letter.

Sincerely Yours,


Maurice M. Taylor
Chairman and CEO, Titan International



Agreed:


_____
Leo W. Gerard, President United Steelworkers

125

Letter #5

# ☣TITAN™

January 1, 2006

Mr. Ron Hoover
Executive Vice President, R/PIC
United Steelworkers
Five Gateway Center
Pittsburgh, PA  15222

      RE: Successorship

Dear Mr. Hoover:

1.  The Company agrees that it will not sell, convey, assign or otherwise transfer (any of the foregoing, a Sale) any plant, operation or significant part thereof covered by a collective bargaining agreement between the Company and the United Steelworkers to any other party (Buyer) unless the following conditions have been satisfied prior to the closing date of the Sale:

    (a) the Buyer shall have entered into an agreement with the Union recognizing it as the bargaining representative for the employees within the existing bargaining unit.

    (b) the Buyer shall have entered into an agreement with the Union establishing the terms and conditions of employment to be effective as of the closing date.

2.  This provision is not intended to apply to any transactions solely between the Company and any of its Affiliates.

3.  For the purpose of this agreement the Company shall be defined as it is in our agreement regarding Neutrality.

      Sincerely yours,

      /s/Maurice M. Taylor, Jr.
    Chairman and Chief Executive Officer
      Titan International

Agreed:

---

Ron Hoover
Executive Vice President, R/PIC
United Steelworkers

Letter #6



January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

During the course of negotiations for the 2006 Agreement the parties discussed the Lead Hands program in place. Because of Titan's uncertainty over use of Lead Hands, the parties have agreed to certain assurances from Titan regarding the Lead Hand program.

Titan agrees that it will not change any position designated as a Lead Hand for six (6) months from the effective date of the Agreement without mutual agreement of the parties. After six (6) months, other than mutual agreement, Titan may reduce the number of process or scheduling Lead Hands if Titan can demonstrate that a decrease in the number is necessary in order to increase production efficiency and reduce overall costs, because an increase in supervision is deemed necessary to address a lack of management oversight in the area or because of an overall reduction in manning in the facility. Before any changes can be made in the number of process or scheduling Lead Hands, Management will sit down with the Lead Hand Driver Committee and express its concerns and permit the Committee a thirty (30) day period to address those concerns. Any work performed by Lead Hands where the position was eliminated, the work can be performed by supervisors.

Further, after six (6) months if any General Lead Hand resigns as a Lead Hand or leaves the area for any reason, Titan will determine whether or not to replace the General Lead Hand. Should the decision be made that the General Lead Hand Position be eliminated, all Lead Hands of any type will be eliminated and the Administrative work of the Lead Hand will be performed by supervision.

Sincerely yours

William Campbell, President
Titan Tire Corporation

128

Agreed:

_____

Steve Vanderheyden, President
USW Local 745L

Letter #7



January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

Titan will increase general wages by $.12 on November 1, 2010.

Sincerely yours

William Campbell, President
Titan Tire Corporation

Agreed:

_____

Steve Vanderheyden, President
USW Local 745L

Letter #8



January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

For interpreting the provisions of the CBA, Benefits Agreement and SUB Agreement, the parties agree that wherever necessary and appropriate, the parties utilize the language of Article VIII, Section 1 for determination of length of service.

Sincerely yours

William Campbell, President<br>Titan Tire Corporation

Agreed:

_____

Steve Vanderheyden, President
USW Local 745L

Letter #9

# ✪TITAN™

January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

During the bargaining for the 2006 Agreement, the parties discussed the fact that the vacation canvas would take place prior to the effective date of the Agreement and one change in the Agreement is the manner in which vacation is scheduled. Goodyear has announced that it will post a one-week shutdown around the July 4th Weekend. Titan will honor that commitment and will further commit that under the terms of the Agreement, it will also have a shutdown during Christmas.

Titan will honor the vacation requests made during the Goodyear Canvas in December of 2005 based upon the language in the 2003 Agreement. Further, in the event of individuals who have made plans for vacations, Titan will adhere to the language in Article IX, Section 3(b) and permit those affected employees to take vacations as planned.

Employees who have scheduled all of their eligible vacation will be asked to take two days from their scheduled vacation for use during the Christmas shutdown. For those who have not scheduled all of their eligible vacation, they will be asked to take two days from either their scheduled vacation or their vacation eligibility for use during the Christmas shutdown. Should employees take the days without pay, they will be covered by Article IX, Section 3(b).

Titan also understands that there will be weeks of vacation that will be "available" as people retire from the Freeport facility. Those weeks will be posted in accordance with Article IX, Section 3(f).

Finally, for purposes of the vacation payment set forth in Article IX, Section 2(a), Titan will recognize the pay at Goodyear for determining the basis of the payment.

132

Sincerely yours

William Campbell, President
Titan Tire Corporation

Agreed:

_____
Steve Vanderheyden, President
USW Local 745L

Letter #10

# ⊕*TITAN*™

January 1, 2006

Mr Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

Titan will establish on its books a Special Account for accumulating contributions once the SUB Plan reaches the $1,000 funding level. The Special Account shall be operated as follows:

(a)     Once the SUB fund achieves a funding level of $1,000 (as calculated in a manner consistent with Article VI of the SUB plan) Titan shall accrue on its books and monthly transfer to a Special Bank Account during the term of the current Collective Bargaining Agreement between Titan and the USW $.05 for each hour worked. Said contributions to the Special Bank Account shall only continue when the SUB fund maintains a funding level of $1,000. Said Special Bank Account shall bear the same interest rate as the SUB plan with said interest inuring to the benefit of the employees.

(b)     As of the first pay period ending in November in any year during the term of the current Collective Bargaining Agreement there shall be determined an amount per Employee (and a pro rata share thereof for eligible Retirees) which shall be calculated by dividing the balance in the Special Bank Account at the end of such pay period by the total number of eligible Employees and the appropriate number of pro rata shares for eligible Retirees.

(c)     An eligible Employee is one who, during the pay period for which the calculation in paragraph (b) is made, has at least two years of seniority in the plant and the Employee is currently covered by the SUB Agreement, and who is actively at work or on sick leave or leave of absence which has not exceeded 90 days or leave of absence as an officer, representative or employee of the local union.

134

(d)    An eligible Retiree is one who was an Employee hereunder but who, prior to the pay period for which the calculation in paragraph (b) is made but after the pay period for the immediately preceding annual calculation, retires form the employ of the Company is eligible for a monthly Pension under the Steelworkers Pension Trust. (For purposes of determining the pro rata share of the distribution to which an eligible Retiree shall be entitled, the Company shall divide the one year between annual calculations into 12 equal periods (approximately corresponding with calendar months) and shall award twelfths of a full distribution on the basis of the number of periods worked prior to retirement of the nearest full period).

(e)    If the per employee distribution for each eligible Employee determined for any year as provided in paragraph (b) is $25 or more, payment of such amount up to a maximum of $100 to the nearest lower dollar shall be paid to each eligible Employee and the appropriate pro rata share thereof to each eligible Retiree on the first pay day in December in that year or on the last pay before June 1 of the following year.

(f)    If the per employee amount determined as provided in paragraph (b) is less than $25, no distribution of the Special Account shall be made in the current year and the amount in the Special Bank Account shall be carried over and taken into account in determining the distribution, if any, to be made in the succeeding year or years.

(g)    Any amount in excess of $100 for each eligible Employee shall also be carried over and taken into account in determining the distribution, if any, to be made in the following year or years.

(h)    No distribution shall be made prior to receipt by Titan of:  (1) a ruling satisfactory to it from the Administrator, Wage and Hour and Public Contracts Division, Department of Labor, holding that the payments are not to be included in the regular rate of the Employee for purposes of the Fair Labor Standards Act of 1938, as Amended, and (2) a ruling satisfactory to Titan from the Internal Revenue Service that the payment shall constitute currently deductible expense to the Company under the Internal Revenue Code for the taxable year in which the distribution is made.

(i)    If such rulings are not obtained by December 31, 2007, other disposition of the balance in the Special Account shall be negotiated promptly.

(j)    In the event an employee or retiree entitled to a distribution (or pro rata share thereof) hereunder shall be deceased or cannot be located with reasonable ease by the Company, then the Company at its option may

135

make payment of such distribution or pro rata share thereof to the estate, spouse, surviving spouse, children or surviving children of such Employee or Retiree as the Company shall determine to be appropriate. If, for any reason, payment of the distribution cannot be conveniently effected by the Company within 18 months following the date upon which the distribution was to be made, the net amount thereof remaining after appropriate deductions shall be added to the Special Bank Account by the Company and shall be taken into account in determining distributions for later years.

(k)     Grievances concerning these arrangements shall be subject to the grievance procedure of the Basic Labor Agreement.


Sincerely yours


William Campbell, President
Titan Tire Corporation


Agreed: _____
        (sgd)Steve Vanderheyden

136

Insert 2007 calendar

Insert 2008 Calendar

Insert 2009 calendar

Insert 2010 calendar



**Unions at Titan Tire**