# Exhibit B

| | |
|---|---|
| In the Matter of Arbitration Between: ) | ARBITRATION AWARD |
| ) | |
| TITAN TIRE CORPORATION OF FREEPORT ) | GRIEVANCE CONCERNING |
| ) | |
| And ) | FIRE BRIGADE AND |
| ) | EMT TRAINING |
| UNITED STEELWORKERS OF AMERICA ) | |
| LOCAL NO. 745 ) | |
| ) | |
| ARBITRATION CASE NO. 07-11 ) | |
| ) | |

**ALAN J. COOK**
**IMPARTIAL ARBITRATOR**

APPEARANCES

   For the Employer ("Titan")

      Gene R. La Suer, Attorney At Law

   For the Union

      Dale Sandell, Vice President of Local No. 745

## STATEMENT

The parties were not able to reach a mutually satisfactory settlement of certain grievances and therefore submitted the matters to arbitration in accordance with the terms of their Collective Bargaining Agreement. Alan J. Cook was selected to serve as Impartial Arbitrator. The parties agreed these grievances are properly before the Arbitrator for resolution. They also agree there are no issues of arbitrability for these grievances.

A hearing was held in Freeport, Illinois on February 14, 2008. At this hearing the parties were afforded an opportunity to present oral and written evidence, to examine and cross-examine witnesses, and to make such arguments as were deemed pertinent. The hearing was closed on February 14, 2008 upon the conclusion of oral testimony and arguments.

## BACKGROUND STATEMENT

Titan purchased the Freeport facility from the Goodyear Tire and Rubber Company ("Goodyear") on January 1, 2006. The purchase was preceded by many months of negotiation between Titan and Goodyear. In addition, Titan negotiated a Collective Bargaining Agreement ("Agreement" or "Contract") with the Union which expires in November of 2010. This Contract contains many provisions that are very similar to terms in the earlier 2004 Agreement between Goodyear and the Union ("Goodyear Agreement"). New language was negotiated to establish certain provisions that did not appear in the Goodyear contract. In addition, the parties agreed to the terms of the document labeled "Understandings Outside the Agreement" ("Understandings"). At the Freeport plant, the Company manufactures tires for construction, farming and off the road purposes.

The evidence shows since the 1970's there has been an emergency response team at the plant that was called the fire brigade. Over time, its duties have included providing emergency responses, giving first aid services and responding to fire calls. Volunteer fire brigade members have been given extensive amounts of training, and the fire brigade has accumulated various pieces of equipment, including two electric fire trucks. The fire truck equipment included self contained breathing apparatus ("SCBA") units. Up to three members have been provided annual training to maintain qualifications as emergency medical technicians ("EMT"). Other fire brigade members are trained by the EMTs and maintain a qualified First Responder status. Fire brigade members attend monthly meetings and participate in periodic training sessions. The fire brigade operation has been in existence at the plant for almost thirty years.

During negotiations for the 2006 Collective Bargaining Agreement, Titan and the Union agreed to a provision to preserve important oral agreements and past practices that had been

2

established during Goodyear's operation of the plant. This agreement was included in the language of Article XI, Section 7 of the Contract. This term provided a process for oral agreements and past practices to be "specifically adopted by the Company in writing." The Union was to provide a list of these items within 60 days, and the Company was to accept them or designate them for arbitration within 30 days. The Union timely submitted its list of oral agreements/past practices, and ten of the items referred to matters associated with the fire brigade. These items were numbers 32 and 64-72 which read as follows:

32. The Company will continue to send plant Fire Brigade Emergency Medical Technician personnel to a qualifying annual training session at company expense.
64. The Company will provide the equipment and resources for monthly training sessions for Fire Brigade members.
65. The Company will conduct annual CPR training and re-certification for Fire Brigade members.
66. The Company will provide for an annual medical physical examination for Fire Brigade members.
67. The Company will provide a Spill Response Team as part of the Fire Brigade, and will provide the necessary resources for regular, scheduled training sessions (not less than quarterly) for Spill Response Team members.
68. The Company will provide "First Responder" re-certification for Fire Brigade every 3 years.
69. Fire Brigade members will be considered to be previously released from other regular duties as a result of notice of any plant emergency.
70. The Company will replace at its expense, damaged clothing for Fire Brigade members including footwear, if damaged while performing Fire Brigade duties.
71 The Company to supply emergency response equipment and supplies, including plant ambulance with gurney, defibrillator and all appropriate medical supplies.
72. The Company to supply turnout gear, SCBA, fire fighting equipment and supplies, and spill containment equipment and supplies.

On March 28, 2006, the Company submitted its reply and agreed to item 32. Later, the Company failed to follow through with item 32, and the Union responded by filing grievance number G 06-103 on May 5, 2006 to protest the Company's position. Titan also agreed to continue items 65, 66 and 69, but it rejected the remaining items: No. 64, 67, 68, 70, 71, and 72.

In May 2007, the Union discussed SCBA equipment on fire trucks with management. Titan informed the Union it would remove SCBAs from service. On May 18, 2007, the Union

3

filed grievance number G 07-228 to protest the Company's decision to remove SCBAs from the fire brigade. At this time, OSHA conducted an inspection of the Company's operations. Titan reported to OSHA that the fire brigade had been disbanded by management so there was no longer any need to provide SCBAs on fire trucks. On June 28, 2007 Titan posted a notice that the fire brigade had been disbanded. This decision also discontinued the matters in items 65, 66 and 69. The Union responded by filing grievance number G 07-143 on June 28, 2007 to protest the Company's decision to eliminate the fire brigade.

Thereafter, Titan gave notice to fire brigade members that it would discontinue providing uniform service. The requirement to pay for uniforms was contained in the Understandings agreement between the parties. On September 7, 2007 the Union filed grievance number G 07-200 to protest the Company's decision to stop paying for uniforms.

The four grievances were processed through the grievance procedure without reaching agreement, and they are before the Arbitrator for resolution.

## ISSUES

Did the Company violate the Contract when it disbanded the plant's fire brigade (Grievance No. G 07-143)?

2. Did the Company violate the Contract when it stopped paying for uniforms for fire brigade members (Grievance No. G 07-200)?

3. Did the Company violate the Contract when it removed SCBAs from use by the fire brigade (Grievance No. 07-228)?

4. Did the Company violate the Contract when it stopped providing annual training to the plant's EMTs (Grievance No. 06-103)?

# RELEVANT CONTRACTUAL PROVISIONS

## ARTICLE II

Section 1 – Management Clause

The management of the business and the operation of the plant and the authority to execute all its various duties, functions and responsibilities incident thereto is vested in the Company, except as such authority is limited by the conditions of this Agreement.

## ARTICLE XI

Section 7 – Effect of Agreement

No oral modification to the Agreements or oral representations with Goodyear regarding:
(a) the Agreements …(c) past practices that occurred prior to the effective date of the Agreements will be binding on the Company, nor will they be admissible in arbitration proceedings, unless specifically adopted by the Company in writing after the effective date of these Agreements. By "specifically adopted by the Company in writing" includes items in this Agreement as well as those adopted by the following procedure:

(1) Within 60 days of the effective date, the Union must present a list of all oral modifications, grievance settlements or past practices to the Company for review.
(2) Within 30 days of the date of presentation of the list, the Company will investigate all oral modifications, grievance settlements or past practices at the facility. The Company will then meet with the Union and either accept the oral modifications, grievance settlements or past practices or ask that the items disputed be specifically set before an arbitrator for resolution. The standard for the arbitrator will be whether the oral agreement existed at least one day prior to the effective date of this Agreement.

## ARTICLE XII

Section 1

(a) The Freeport plant health and safety program will continue to be of equal importance with product quality and production. The Company shall continue to make reasonable provisions for the safety and health of its employees during the hours of their employment and will provide competent first aid personnel and furnish protective devices and protective equipment where necessary, and protective clothing on work which is recognized to be abnormally hazardous. When needed, the employer shall provide transportation for injured employees to the hospital. The plant medical personnel, plant safety management or their designee shall determine the best

5

    available mode of transportation...

  (o) It is the intention of the Company to continue every effort to improve the safety performance of the plant and improve the safety environment for each employee.

### UNDERSTANDINGS OUTSIDE THE AGREEMENT

  In addition to the provisions of the Collective Bargaining Agreement, the parties have agreed to the following items. The terms of the following items shall have the same force and affect as provisions that are included in the Collective Bargaining Agreement.

**Fire Brigade Uniforms**

  The Company will pay for a uniform service to provide a distinctive uniform for the fire brigade. The Company would pay for five (5) changes per week of 100% cotton uniform. This plan will cover up to fifty (50) fire brigade members for the life of this agreement only.

### **POSITIONS OF THE PARTIES**

**Union:**

  The Union believes a fundamental issue is the Company's decision to discontinue using SCBAs This action led to management's decision to disband the fire brigade around the time of OSHA's inspection. The elimination of the fire brigade led to the dispute over supplying uniforms to members of the fire brigade The other main issue concerns the training provided to EMTs and First Responders

  The Union argues its position is supported by relevant contractual language. It claims it has complied with the provisions of Article XI, Section 7, and it points out the sustaining of an oral agreement or past practice is dependent upon proof the oral agreement or past practice existed at least one day prior to the effective date of the agreement, January 1, 2006. The Union believes decisions in Arbitration cases 07-05 and 07-08 support its position. In No. 07-05, the Company was directed to continue paying the Union's Vice-President four hours of pay each

working day. In No. 07-08, the Company was directed to continue the United Way campaign that had previously existed at the plant.

The Union also points to the language in Article XII, Section 1 (a) of the Contract that provides "The Company shall continue to make reasonable provisions for the safety and health of its employees…" The Union contends the words "shall continue" means the Company must maintain the fire brigade in providing for the safety and health of the employees. Likewise, the Union refers to the language of paragraph (o) of this Article and Section which refers to continuing efforts to "improve the safety environment for each employee." In addition, the Union believes the reference in the Understandings to the Company providing uniform service to fire brigade members supports its position that there should continue to be a fire brigade.

As a final point, the Union notes OSHA declared there is no requirement to have a fire brigade. However, the Union emphasizes its position that there is a contractual and past practice requirement for the Company to maintain the fire brigade.

## Company:

The Company believes its decision to eliminate the fire brigade is authorized by the rights it possesses under the Management Rights Clause (Article II, Section I) of the Contract. Titan argues this decision is a change in method of operations and direction of the work force. It contends these areas are prerogatives of management, and Titan maintains it possesses the unilateral right to make changes in the way it conducts its business.

The Company claims it has the right to disband the fire brigade. Titan points out there is no contract term that requires it to have a fire brigade, and it contends no past practice obliges it to maintain a fire brigade. Titan explains it made the decision to eliminate the fire brigade for two reasons. First, it wants to enhance employee safety by not exposing employees to the

hazards of fighting fires. It wants employees to evacuate the premises whenever there are fires and let professional fire fighters from the Freeport Rural and City Fire Departments contend with the fires. The only exception to this policy is that employees can use fire extinguishers to fight incipient, beginning stage fires.

Titan points out it has developed an Emergency Action Plan ("EAP") which contains a detailed evacuation procedure that is to be followed during a fire emergency. The Company asserts it provides training to its workers on evacuation procedures for the EAP. Titan emphasizes it does not want employees to fight fires even though this policy could result in significant damage to its property and equipment.

Titan acknowledges that its change in firefighting policy occurred in May/June 2007 when the certification of its SCBA equipment expired. At that time, it decided to no longer have SCBAs or the fire brigade. It was also at that time that OSHA was conducting an inspection of the facility, and Titan points out OSHA did not find SCBAs were required. The Company further claims SCBAs are not needed for confined space rescue operations because it has either eliminated these hazards, or when that is not possible, it has given this work to outside contractors.

The second reason for Titan's decision to eliminate the fire brigade is its effect on the Company's insurance program. The Company's corporate risk manager testified the existence of a fire brigade would not reduce Titan's property insurance premium. Therefore, the training and equipment expense of a fire brigade would not be offset by a reduction in insurance premiums. The manager also expressed concern over whether all actions by fire brigade members in fighting fires would be covered by its insurance company. The manager further suggested a fire brigade program could cause an increase in workers' compensation costs.

In the same vein, Titan believes it engaged in an exercise of management rights when it

decided to change the way EMTs and First Responders are trained. It believes it had the right to not maintain the system whereby three individuals were provided EMT training and then these individuals were responsible for training First Responders. Titan contends it made the appropriate managerial decision to provide state certified training to all First Responders and not pay for EMT training.

## DISCUSSION AND DECISION

The central issue in this case involves the existence of the fire brigade. The evidence shows the parties have cooperated in the maintenance of a fire brigade program for almost thirty years. After Titan purchased the facility, the fire brigade continued to operate from January 1, 2006 to at least June 28, 2007. This was a program that operated outside the scope of the Collective Bargaining Agreement. However, the record shows both parties participated in the successful operation of the fire brigade program. The Union maintains the fire brigade operation was a past practice that was continued by the parties in their contractual relationship.

Elkouri and Elkouri in their excellent volume, How Arbitration Works (6th ed., 2003) at 608 list the parameters of a past practice as the following:

> (1) unequivocal; (2) clearly enunciated and acted upon; (3) readily ascertainable over a reasonable period of time as a fixed, and established practice accepted by both parties. (Citations omitted).

The fire brigade program meets these criteria and qualifies as a past practice between the parties. As a past practice, it is subject to change through negotiations or failure to reach agreement on its continued application.

However, Titan takes the position that the subject matter of this practice intrudes on management's unbridled discretion to make decisions about its operating methods. Titan is

9

correct that it has wide authority to make decisions regarding operation methods and matters essential to the functions of management. In these matters management can make unilateral decisions on how the facility should operate. Management must have freedom of action to ensure progressive operation of the business for the best interest of employees and the Company. Management needs to determine the elements of production, equipment, material and prices. It has to keep up with technological change and modern innovations in order to remain competitive in the market place.

However, in this case the central issue involves the safety program. The parties agreed on a way for fighting fires that involved Union and management participation. This program was by design and deliberation over several decades. It was not in defiance of technological change or efficiency since it incorporated changes promoted in periodic training programs. parties implemented and operated the fire brigade over the course of several Collective Bargaining Agreements. This program did not intrude on the Company's exercise of essential management functions as described above or operate in derogation of a specific power reserved to management.

There was mutual agreement on the operation of a fire brigade program. It qualifies as a past practice and is not in conflict with any contractual term. It is noteworthy that the Understandings agreement provides for uniforms for fire brigade members, and the preamble to this document states its terms have the same force and effect as Contractual terms. provision recognizes the operation of the fire brigade program.

Arbitrators recognize that past practices can be terminated when conditions giving rise to the practice are no longer present. This principle was acknowledged by Arbitrator Ellen Alexander in the case of <u>United Steelworkers Local 745L and Titan Tire Corporation of Freeport</u>. However, in the present case there is no evidence that conditions which led to the

10

creation and implementation of the fire brigade have changed to the extent that merits the disbanding of the fire brigade. The Company has expressed proper concern for the safety of its employees. This is a concern that can be voiced at the bargaining table if Titan wants to change or end the fire brigade program. The Company also refers to concerns about its property and workers' compensation premiums. However, the record contains little credible evidence that the fire brigade program negatively affects the premiums for these coverages.

The fire brigade program is a working condition that is part of the "whole" agreement between the Company and the Union. It qualifies as a past practice since the fire brigade program is an understood and accepted way of fighting fires that existed over an extended period of time. It was established through a bilateral meeting of the minds and should not be changed by unilateral action of management.

The record shows the Union took appropriate action to comply with the requirements of Article XI, Section 7 to show this past practice was "specifically adopted by the Company in writing." The evidence shows the Union gave proper notice to the Company. The Arbitrator finds the evidence in the record meets the contractual standard for the Arbitrator of "whether the oral agreement existed at least one day prior to the effective date of this Agreement." The Arbitrator finds this past practice is controlling on the parties.

This decision upholds grievance No. G 07-143. The remedy is to reinstate the operation of the fire brigade. This decision grants grievance No. G 07-200. The remedy is to pay for uniforms for fire brigade members as stated in the Understandings. This decision upholds grievance G 07-228. The remedy is to provide SCBAs on fire truck equipment as required by OSHA. However, this decision has no application to the Company's confined space entry or rescue program which is a matter outside the purview of this grievance.

This decision grants grievance No. G 06-103. The issue of EMT training is part of the

fire brigade program EMT training is part of the past practice and is not subject to unilateral change. The Company can pursue changes in the training of EMTs and First Responders through negotiations with the Union. The remedy is to reinstate the EMT and First Responder training that was in place prior to May, 2006.

## AWARD

Grievances G 07-143, G 07-200, G 07-228 and G 06-103 are granted. The Company is directed to provide the remedies for these grievances as stated above. This Award applies to the parties for the duration of the current Collective Bargaining Agreement.

_____
ALAN J. COOK
Impartial Arbitrator

Dated at Chicago, Illinois

This 22nd day of April, 2008.