**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **ESTATE OF HASSIBA BELBACHIR,** | ) | |
| **Deceased, by ABDELKADER** | ) | |
| **RACHID BELBACHIR,** | ) | |
| **Administrator,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.** |
| **vs.** | ) | |
| | ) | **Judge** |
| **UNITED STATES,** | ) | |
| **Department of Homeland Security's** | ) | |
| **Immigration and Customs Enforcement** | ) | |
| **[ICE] Office of Detention and** | ) | **Magistrate Judge** |
| **Removal Operations [DRO],** | ) | |
| | ) | **Jury Demand** |
| **Defendant.** | ) | |

# COMPLAINT

Hassiba Belbachir was a young woman, a foreign national of Algerian descent who was never charged with any crime, and died at the McHenry County Jail on March 17, 2005. This is an FTCA action seeking monetary damages on behalf of the Estate of Hassiba Belbachir and her heirs. Department of Homeland Security, Detention and Removal Operations and Immigration and Customs Enforcement officials maintained legal custody, oversight and supervision of immigration detainees, including Hassiba Belbachir. Defendant United States had a duty of care toward Ms. Belbachir that it breached, causing damage to her and her estate.

## JURISDICTION AND VENUE

1. The jurisdiction of the Court is invoked pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671, et seq. Venue is appropriate in this district pursuant to 28 U.S.C. §1391 and 28

1

U.S.C. §1402(b) because Administrator Abdelkader Rachid Belbachir resides in this district and the acts and omissions at issue herein took place within this district.

## PARTIES AND OFFICIALS

2.  Plaintiff Abdelkader Rachid Belbachir is a cousin of Hassiba Belbachir and resident of the State of Illinois and the City of Chicago and has been duly appointed, by the Circuit Court of Cook County, independent administrator and representative of the Estate of Hassiba Belbachir, deceased.

3.  Defendant United States of America has as constituent agencies the Department of Homeland Security [DHS], Immigration and Customs Enforcement [ICE- formerly known as Immigration and Naturalization Service (INS)]; and the Office of Detention and Removal [DRO]. At all times relevant to this Complaint, the United States of America employed agents of the DHS, ICE, and DRO who occasioned the acts and omissions which caused Ms. Belbachir's death, while acting within the scope of their office or employment.

## FACTS

4.  Hassiba Belbachir, a 27 year old Muslim woman of Algerian descent, was residing in the Chicago area when she traveled to England, was taken into custody from Heathrow Airport and detained by British immigration authorities on or about March 1, 2005.

5.  Hassiba Belbachir was subsequently released from British detention and put on an airplane to O'Hare International Airport to be returned to her point of origin and last residency in Chicago, Illinois.

6.  When she arrived at O'Hare, on or about March 8, 2005, U.S. Immigration & Customs Enforcement (ICE) took Hassiba Belbachir into custody, accepted her application for relief from

immigration detention and transferred her to the Stone Park Police Department at approximately midnight.

7.   While in ICE custody at the Stone Park Police Department, Ms. Belbachir became tremulous, shaking, restless, anxious, nauseous and began vomiting. She was rushed to a local emergency room, where she was diagnosed with acute anxiety reaction, vomiting and acute gastritis.

8.   On March 9, 2005, at approximately 7:00 a.m. ICE officials picked up Ms. Belbachir and her medical records from the Stone Park Police Department and delivered her to Broadview Service Staging Area where she remained until approximately 4:00 p.m. when she was taken to the McHenry County Jail, where she was detained when she subsequently died, despite authorities having notice of her suicidal tendencies and risk of suicide..

9.   In March of 2005, and for several years prior thereto, ICE had a contract with McHenry County Jail to house foreign nationals detained by ICE during the time their immigration status could be adjudicated.

10.   Detention Standards for ICE detainees, in effect at the time of Ms. Belbachir's detention at McHenry County Jail, required that all facilities have a suicide prevention policy including provisions for training, assessment, prevention and intervention.

11.   Federal officials were aware of and/or should have been aware of to the foregoing standards and their obligation to comply with same and negligently inspected McHenry County Jail, including its policies and procedures, failed to have proper procedures and compliance enforcement of same at the Bridgeview Service Staging Area and negligently failed to enforce compliance with detention standards and other standards of care.

12. An October 2002 INS headquarters Annual Review of the McHenry County Jail resulted in a "Deficient" rating in the area of suicide prevention and intervention, with the Reviewer in Charge noting in a memorandum dated November 11, 2002: "The facility does not have a written suicide prevention policy. A written procedure should be established and implemented."

13. McHenry County Jail and Centegra officials were notified more than two years prior to Ms. Belbachir's death that this 2002 INS Headquarters Annual Review resulted in a final rating of "Deficient," with several standards noted as "Deficient" or "At Risk," including with regard to the specific concerns of suicide prevention and intervention, yet they failed or refused to remedy the "Deficient" and "At Risk" areas, including in the area of suicide prevention and intervention.

14. United States officials were aware or should have been aware of the October 2002 Annual Review ratings, and responsible for overseeing the implementation of McHenry County's plan of action for remedying the "Deficient" and "At Risk" areas, including in the area of suicide prevention and intervention, failed or refused to ensure the safekeeping of detainees at risk for suicide detained at McHenry County Jail, and continued to send detainees at risk for suicide to McHenry County Jail.

15. United States officials were also aware or should have been aware of the October 2002 Annual Review ratings, yet took no action to remedy the problem areas, including in the area of suicide prevention and intervention, failed or refused to ensure the safekeeping of detainees at risk for suicide detained at McHenry County Jail, and continued to send detainees at risk for suicide to McHenry County Jail.

4

16.  By the time ICE conducted its Annual Detention Review of McHenry County Jail on July 14-15, 2004, health care services were still "At Risk," and there were still no final, implemented written standards on suicide prevention and intervention, and no such policy to integrate facility standards with Centegra policy and  ICE Detention Management Control Program [DMCP] standards.

17.  This July, 2004 Annual Detention Review noted that McHenry County Jail's suicide prevention and intervention training and policies were inadequate, in that there was no standardized training of employees to recognize signs of suicidal intent, and no policy to ensure that detainees identified as being at risk would be immediately segregated and put on a documented 10-minute watch.

18.  United States officials, agents and employees were aware or should have been aware of the July 2004 Annual Review ratings,and responsible for overseeing the implementation of McHenry County's plan of action for remedying the "Deficient" and "At Risk" areas, including in the area of suicide prevention and intervention, failed or refused to ensure the safekeeping of detainees at risk for suicide detained at McHenry County Jail.

19. United States officials, agents and employees were aware or should have been aware that the July 2004 Annual Review, with respect to the "At Risk" standard concerning health care services, noted that Centegra personnel "were at best misleading in their presentation of policy at McHenry County Jail," that, in spite of previous Annual Reviews, written policies were either non-existent or insufficient.

20. United States officials, agents and employees involved in conducting reviews were required to conduct thorough and penetrating inspections, including requesting sources and

5

identifying evidence of a facility's claims and not merely accept oral representations of those interviewed during inspections. Inspection reports and related documents were submitted to United States officials, agents and employees both in the field office and at headquarters for review, enforcement and compliance.

21.  United States officials, agents and employees were aware or should have been aware of the July 2004 Annual Review ratings, yet failed or refused to rectify the problem areas and continued  to send  to McHenry County Jail detainees at risk for suicide.

22.  It was only after Hassiba Belbachir's suicide, following a March 29, 2005, Special Assessment Review of McHenry County Jail conducted by the ICE Office of Detention and Removal Headquarters, that ICE finally instructed that the Chicago Field Office "will not use the facility to house detainees deemed to be 'At Risk' for suicide," and such detainees would not be held at McHenry County Jail.

23.  At the time Ms. Belbachir reported being at risk for suicide, many ongoing deficiencies existed in terms of suicide prevention and intervention, many of which had been previously reported and were subsequently reported in this March 29, 2005, Special Assessment Review of McHenry County Jail, finding all four medical standards to be "At Risk", and again rating the jail "Deficient."  These ongoing deficiencies included: no annual or roll call training in regards to suicide prevention and interventions; Centegra staff were not required to complete formalized suicide prevention training; no formal training was given to McHenry County Jail staff performing intake screenings to identify potential at risk suicide referrals; McHenry County Jail booking officers were not trained in the completion of medical screening forms; there was no policy addressing the referral process for at-risk for suicide detainees; mental health intake

6

screenings were incomplete, including no documentation that health care providers reviewed intake screening forms; there was no written procedure to define the process to place an at-risk detainee on suicide watch and remove him/her from suicide watch; there were no procedures to define the level of watch indicated (i.e. when to use paper gown, suicide blanket, etc); there was no consistent method to perform 10 minute checks; those that were performed were done inadequately (for example through the intercom and not visually); there were no written procedures to address how 10 minute checks should be performed; ICE detainees were not properly medically screened and, while McHenry County detainees received mental health screening, the majority of ICE detainees received no mental health screening.

24.    As a direct and proximate result of the failures and breaches of duty committed by United States federal officials, agents and employees, Hassiba Belbachir was pronounced dead on March 17, 2005, and the cause of death was determined to be asphyxia due to ligature strangulation.

25.    The facts preceding and leading up to Ms. Belbachir's death are evidence of the lack of care, oversight and other negligence on the part of the United States government.

26.    Keith Seegers and John Bebauer, employees of McHenry County, transported Ms. Belbachir from Broadview to the McHenry County Jail on March 9, 2005, as an immigration detainee, not charged with any criminal offense and awaiting resolution of her application for immigration relief. McHenry County Jail accepted custody of Hassiba Belbachir pursuant to a contract with ICE to hold immigration detainees pending resolution of their immigration status.

27.    Hassiba Belbachir suffered from pre-existing medical problems, including physical concerns as well as pre-existing mental health issues exacerbated by her continued and ongoing

detention.

28.  Seegers and Bebauer failed to obtain her complete medical records and/or failed to deliver to McHenry County her complete medical records; and/or federal officials failed to provide or arrange for the provision to Seegers and Bebauer or any other representative of McHenry County her complete medical records and/or failed to fully inform or arrange to so inform anyone at McHenry County Jail of her emergency room diagnosis and treatment.

29.  Hassiba Belbachir was not properly examined or screened prior to placing her in a cell in the immigration unit at the McHenry County Jail, complete medical information was not obtained and she was not properly screened for her risk of suicide.

30. Hassiba Belbachir had physical medical problems, including problems with her kidney, that federal officials and/or their contracting agents were aware of or should have been aware of or their policies should have lead to the discovery of these issues.

31.  Hassiba Belbachir struggled with mental health medical issues, including having previously attempted suicide and federal officials and/or their contracting agents were aware of or should have been aware of or their policies should have lead to the discovery of these issues.

32.  Women detained with Hassiba Belbachir notified Defendant McHenry County Jail staff that Hassiba Belbachir expressed intense frustration, anxiety and distress from the time she first arrived at McHenry County Jail.

33.  Hassiba Belbachir notified McHenry County Jail staff of her need for medical intervention, including by exhibiting outward signs of mental and/or physical distress, including crying loudly, violently and continuously while in her cell, moaning, shaking and experiencing difficulty breathing.

34.  On or about March 12, 2005, Hassiba Belbachir informed McHenry County Jail staff in writing that she required immediate medical attention, specifically that she was experiencing anxiety and panic.

35.  Hassiba Belbachir eventually met with Centegra Health System employee Marcia Middleton Kaplan, who determined her to be a suicide risk and ordered her placement in the medical unit of the jail.

36.  Also on or about March 12, 2005, Dr. Vedak, without ever examining, speaking with or even personally observing Hassiba Belbachir, prescribed the medication, Klonopin, be given three times a day to Ms. Belbachir.

37.  On March 13, 2005, McHenry County Jail staff reported in writing that Hassiba Belbachir again complained of immediate and serious medical problems. They placed her in a wheelchair and took her to the booking area, where she again saw Nurse Middleton Kaplan.

38.  McHenry County Jail officials transferred Hassiba Belbachir to the women's medical unit, called the Medical Pod, and placed her in one of the two glass-enclosed cells which comprise the small unit, where officers in the nearby glass-enclosed office see directly into each cell, and where officers in the control room observe the small unit on video monitors.

39.  Ms. Belbachir's physical and mental health medical issues exacerbated, and on or about March 14, 2005, Belbachir was seen by a licensed clinical social worker, Vicki Frederick. Ms. Belbachir reported to Frederick about her ongoing physical and mental health medical problems; specifically stating that she was suicidal, and detailing to Frederick at least one previous suicide attempt. Ms. Belbachir was then diagnosed with major depression but not given an appointment until March 18 to see a psychiatrist, Dr. Vedak.

40.  Finally, on March 17, 2005, McHenry County Jail employee Ford entered the Medical Pod at 3:40 p.m. and observed Ms. Belbachir lying on the cement floor of her cell with her head face down in the corner near the doorway and her legs laid out toward the middle of the cell. Ford could not observe her face or any movement of her body and yet refused to make any attempt to communicate with her.

41.  More than forty minutes later, at or around 4:20 p.m., Ford again entered the Medical Pod, not to monitor Ms. Belbachir, but to deliver to her one of the regularly scheduled bags of dinner for detainees.  Ford again observed Ms. Belbachir lying in the same position on her cell floor, but this time called a medical emergency.

42.  Upon opening her cell door, McHenry County and Centegra employees found Ms. Belbachir unresponsive, without a pulse, her face purple and her body still, with jail-issued knee socks knotted together and wrapped around her neck.

43.  Although United States officials, agents and employees knew or should have known of the foregoing deficiencies well in advance of Ms. Belbachir's death, they failed or refused to require McHenry County, Defendant Nygren, Defendant Svoboda or McHenry County Jail to terminate the contract with Centegra and/or to engage any alternative health care for ICE detainees in its custody, all the while continuing to place at McHenry County Jail detainees at risk for suicide.

44.  No one ever notified the embassy of Hassiba Belbachir's home country of Algeria that she was in custody until after she died.

45.  United States officials, agents and employees caused, and are responsible for, the unlawful conduct described herein, and resulting injuries by, among other things, personally

10

participating in the unlawful conduct, acts or omissions, or acting jointly or conspiring with others who did so; by authorizing, acquiescing in or setting into motion, policies, practices, plans or actions that led to the unlawful conduct: by failing and refusing with deliberate indifference to Ms. Belbachir's rights, to initiate and maintain adequate training and supervision; and by ratifying the unlawful conduct that occurred by agents and officers under their direction and control, including failing to take remedial or disciplinary action.

46.  United States officials, agents and employees, acting jointly and with other unsued persons, together and within the scope of their employment, reached an understanding, engaged in a course of conduct, engaged in joint action, and otherwise conspired among and between themselves to fail to exercise their duties of care to Ms. Belbachir, breaching those duties and resulting in Ms. Belbachir's suffering and death.

47. In furtherance of this conspiracy or conspiracies, the United States officials, agents and employees, together with their co-conspirators, each committed one or more of the overt acts set forth above, including, but not limited to, failing to recognize and remedy the problems and deficiencies of the McHenry County Jail, the policies and procedures of transferring custody, the communication and responsibilities for the welfare of detainees regarding the circumstances leading to the death of Hassiba Belbachir; and the cover up of the true circumstances leading to her death; and the other acts set forth above.

48.  Said conspiracy or conspiracies, joint actions and overt acts continue to this date, caused Ms. Belbachir's suffering and the injuries resulting from her death.

49. United States officials, agents and employees were negligent in carrying out their duties of care to Hassiba Belbachir and failed and/or refused to protect her or prevent harm to

her.

50. No United States official, agent or employee has been disciplined in any way as a result of the conduct, acts or omissions described in this Complaint.

51. Hassiba Belbachir was and is survived by her father, Boumediene Belbachir, and siblings Zahia Belbachir, Houaria Belbachir, Yamina Belbachir, Djamel Belbachir, Madjid Belbachir and Mohammed Belbachir, who constitute her heirs under Illinois law.

52. As a direct and proximate result of these actions on United States officials, agents and employees, as detailed above and below, Hassiba Belbachir and her heirs suffered, inter alia, injury, pain, distress, loss of love, affection, society, companionship and consortium as well as other injuries as a result of her death and the continuing loss of her life.

## COUNT I
### [28 U.S.C. §2671(FTCA) Claim - United States of America ]

53. Plaintiff realleges paragraphs 1 through 52.

54. On March 13, 2007, Plaintiff submitted an administrative Claim for Damage Injury or Death to the Washington, D.C. offices of the Office of the General Counsel of the Department of Homeland Security; to the Office of the Principal Legal Advisor to Immigration and Customs Enforcement; and to the Director of Office of Detention and Removal, which agencies of the Department of Homeland Security received Plaintiff's administrative Claim on March 14, 2007, which is within two years of the accrual of the claim.

55. On March 4, 2008, the agency postmarked and mailed a letter denying the administrative tort claim. Pursuant to 28 U.S.C. §2675(a), suit may be instituted within six months of the denial of the claim.

56.  At all times commencing with and including March 8, 2005 when ICE took Hassiba Belbachir into custody, through and including March 17, 2005, the identified agencies of the United States of America had legal custody of her and were under duties, responsibilities and obligations to provide fair and humane treatment, safeguard her well being and protect her from harm.

57. ICE detention standards, in existence at the time of Ms. Belbachir's death, and unaltered since at least 2000, applied to Service Processing Centers (Broadview Service Staging Area) and IGSAs (McHenry County Jail).

58.  Wesley Lee, Anthony Tangeman, Michael Caltabiano, Tim Perry, Christine Davis, Victor Cerda and others, were, at all times relevant to this Fourth Amended Complaint, the director, acting director, deputy director or assistant director of the U.S. Department of Homeland Security's Immigration and Customs Enforcement [ICE] Office of Detention and Removal Operations [DRO], and as such were ultimately responsible for the safe, secure and humane housing of  immigration detainees, including Hassiba Belbachir, in ICE custody. ICE DRO headquarters staff under their direction conducted inspections of contract facilities such as McHenry County Jail. These officials were responsible for setting the policy for the detention of ICE detainees and for the administration and operation of DRO, and for maintaining oversight and supervision of the implementation of the policies, procedures, practices, and customs, including enforcement and compliance with Detention Standards as well as the acts and omissions, challenged by this suit. The primary responsibility of DRO is to provide adequate and appropriate custody management of immigration detainees until a decision is rendered regarding their removal. These officials oversaw the DRO workforce, including detention facilities, and were

13

responsible for setting DRO policy with respect to the detention of foreign nationals, and for the administration and operation of DRO. At all relevant times, these officials were acting under color of law and in the course and scope of their employment.

59.   Mary Yvonne Evans and others were, Chief or other responsible official for the Detention Standards Compliance Unit (DSCU) of the DRO, providing oversight and monitoring of staff measuring compliance with ICE's Detention Standards across the country, and as such were ultimately responsible for the safe, secure and humane housing of  immigration detainees, including Hassiba Belbachir, in ICE custody. ICE officials under their direction conducted inspections of contract facilities such as McHenry County Jail. Evans and others were responsible for setting the policy for the detention of ICE detainees and for the administration and operation of DSCU and were also responsible for maintaining oversight and supervision of the implementation of the policies, procedures, practices, and customs, including enforcement and compliance with Detention Standards  as well as the acts and omissions, challenged by this suit. At all relevant times, Evans and others were acting under color of law and in the course and scope of their employment.

60.   Deborah Achim, Glenn J. Triveline and others were, at all times relevant to this Fourth Amended Complaint, the director and acting director of the U.S. Immigration and Customs Enforcement [ICE] Chicago Field Office, and as such were responsible for immigration detainees, including Hassiba Belbachir, in the care of the McHenry County Jail, and were also responsible for maintaining oversight and supervision of the implementation of the policies, procedures, practices, and customs, including enforcement and compliance with Detention Standards, as well as the acts and omissions, challenged by this suit.  At all relevant times, these officials were acting

14

under color of law and in the course and scope of their employment.

61.  Jail Liason Chris McDaniels, Juan Cruz, John Koren, Deborah Walton and others were, at all times relevant to this Fourth Amended Complaint generally charged with communication, oversight, inspection of contract jails, including, McHenry County, and as such were responsible for immigration detainees, including Hassiba Belbachir, in the care of the McHenry County Jail, and were also responsible for maintaining oversight and supervision of the implementation of the policies, procedures, practices, and customs,  including enforcement and compliance with Detention Standards, as well as the acts and omissions, challenged by this suit. At all relevant times, these officials were acting under color of law and in the course and scope of their employment.

62.  William Wennberg, Chief of the Broadview Service Staging Area(BSSA) and others were, at all times relevant to this Fourth Amended Complaint, responsible for the BSSA, which is a part of the Chicago Field Office of ICE, a division of DHS. Chief Wennberg and others, by and through their deputies, and others, were generally charged with assigning, transporting and maintaining the welfare of ICE detainees between different county jails, including McHenry County, and as such were responsible for immigration detainees, including Hassiba Belbachir, in the care of the McHenry County Jail, and were also responsible for maintaining oversight and supervision of the implementation of the policies, procedures, practices and customs, including enforcement and compliance with Detention Standards, as well as the acts and omissions, challenged by this suit. At all relevant times, these officials were acting under color of law and in the course and scope of their employment.

63.  Jose Zamora, Sean Nagel, Dan Bobak, Brent Kriehn and others were, at all times

relevant to this Fourth Amended Complaint assigned to the ICE Chicago Field Office and were

generally charged with responsibilities for immigration detainees held in detention, including at

McHenry County Jail, and as such were responsible for immigration detainees, including Hassiba

Belbachir, in the care of the McHenry County Jail, and were also responsible for maintaining

oversight and supervision of the implementation of the policies, procedures, practices and

customs, including enforcement and compliance with Detention Standards, as well as the acts and

omissions, challenged by this suit.  At all relevant times, these officials were acting under color of

law and in the course and scope of their employment.

64. The above named officials and others were responsible for the implementation of the

policies, procedures, practices, and customs, including compliance with and enforcement of

Detention Standards as well as the acts and omissions, challenged by this suit.

65. The enforcement of Detention Standards and ensuring of compliance with said

Standards by all contract facilities, including the McHenry County Jail, was not a discretionary

function of any responsible official.

66.  ICE agents who had contact with Ms. Belbachir failed to properly assess her, failed to

communicate necessary information and documentation for her care, inadequately screened her,

and failed to provide her necessary information.

67. ICE agents compiled and provided a list of facilities, including McHenry County Jail,

where ICE detainees were to be detained. ICE agents selected facilities based on ICE Annual

Reviews, and thus ICE agents were aware of ratings of Deficient and At Risk, and were also

aware of reported suicide attempts. They were further aware, or should have been aware, of the

deficiencies and noncompliance through ongoing monitoring of the McHenry County Jail, and

16

various other means, including meetings with attorneys and organizations representing detainees; staff presence at the jail; personal visits to the jail, meeting with administrators and detainees, and speaking regularly over the telephone with those in contact with ICE detainees.

68. ICE agents sent Ms. Belbachir to McHenry County Jail and allowed her to remain there until her death on March 17, 2005, all the while knowing that McHenry County Jail was not in compliance with ICE Detention Standards governing suicide prevention and other health care issues as well as other applicable standards of care, thereby breaching their duties to Hassiba Belbachir.

69. ICE agents failed or refused to require McHenry County Jail to remedy the "Deficient" and "At Risk" areas, including in the area of suicide prevention and intervention. Instead, ICE agents took no action to remedy the problem areas, failed or refused to ensure the safekeeping of detainees detained at McHenry County Jail, and continued to send detainees, including Hassiba Belbachir, to McHenry County Jail.

70. In 2002 ICE official reviews of McHenry County Jail rated the Jail "Deficient" concerning the detention standard regarding suicide prevention and intervention, finding that no written policy existed.

71. The ICE Annual Detention Review of McHenry County Jail on September 25-26, 2003, found two Repeat Deficiencies in the areas of emergency plans and security inspections; one At Risk rating in the area of post orders, erroneously found that written standards concerning suicide prevention existed, failed to adequately inspect, confirm, review, or corroborate the alleged compliance, resulting in an erroneous rating of Acceptable in the area of suicide prevention and intervention; despite the report of four attempted suicides during 2003 at McHenry

17

County Jail.

72. Yet, ICE agents took no action to remedy the problem areas, failed or refused to ensure the safekeeping of detainees detained at McHenry County Jail, and continued to send detainees, including Hassiba Belbachir, to McHenry County Jail.

73. In the year preceding Ms. Belbachir's death, at the very least, four detainees in ICE custody had committed suicide in other county jails and detention facilities throughout the United States. ICE agents were thus on notice of the increased risk of suicide by detained people, and of the life and death importance of enforcing the ICE Detention Standards governing suicide prevention.

74. ICE agents knew that McHenry County Jail agents, including the officer who screened Ms. Belbachir, were not trained to perform medical or mental health screening. This officer, Brad Drach, who inadequately screened her, was the only person at the McHenry County Jail to screen Ms. Belbachir for suicide risk or any other medical or mental health condition.

75. ICE agents knew that, contrary to ICE Detention Standards, Centegra staff were not required to complete formalized suicide prevention training. No health care provider ever screened Ms. Belbachir for suicide risk or conducted any other mental or medical screening, and no health care provider ever reviewed her intake screening form.

76. ICE agents were aware that, contrary to ICE Detention Standards, there was no policy in place at McHenry County Jail to require review of intake screening forms by any healthcare provider, no policy in place to establish a referral process for at-risk detainees and no procedures to define the process for placing an at-risk detainee on suicide watch.

77. ICE agents knew that, in fact, while non-ICE detainees from McHenry County

received a mental health screening within 72 hours of arrival, the majority of ICE detainees never received mental health screening, and that they received inadequate medical screening.

78. ICE agents also knew there were no adequate policies governing mental health screening at facilities including Stone Park Police Department and Bridgeview Staging Center; and no adequate policies to ensure that when a detainee was transferred from one facility, such as Stone Park Police Department or Bridgeview Staging Center, to another, information about her physical and mental health would be communicated by the sending facility to the receiving facility.

79. Ms. Belbachir's death was a foreseeable consequence of ICE agents' knowledge of the lack of adequate suicide prevention policy at McHenry County Jail; of ICE agents' failure to enforce the ICE Detention Standards governing suicide prevention and health care; and of ICE agents' nevertheless housing Ms. Belbachir at McHenry County Jail.

80. Although ICE agents knew of the foregoing deficiencies and other failures to meet the standard of care well in advance of Ms. Belbachir's death, they breached their duties to her, inter alia, when they failed or refused to require McHenry County, Nygren, Svoboda or McHenry County Jail to properly train correctional officers and require compliance by Centegra; or to terminate the contract with Centegra and/or to engage any alternative health care for ICE detainees in its custody, all the while continuing to place at McHenry County Jail detainee at risk for suicide, including Hassiba Belbachir.

81. No ICE agent ever notified the embassy of Hassiba Belbachir's home country of Algeria that she was in custody until after she died; and no ICE agent instructed any other person to make such notification.

82.  ICE agents caused, and are responsible for, the unlawful conduct described herein, and resulting injuries by, among other things, personally participating in the unlawful conduct, acts or omissions, or acting jointly or conspiring with others who did so; authorizing, acquiescing in or setting into motion, policies, practices, plans or actions that led to the unlawful conduct; failing and refusing to initiate and maintain adequate training and supervision; and ratifying the unlawful conduct that occurred by agents and officers under their direction and control, including failing to take remedial or disciplinary action.

83.  The wrongful death of Hassiba Belbachir was proximately caused by the neglect, default, and/or willful and wanton conduct of ICE agents, as described above; and, if the United States were a private person, it would be liable to Plaintiff in accordance with the laws of the State of Illinois, including for violation of 740 ILCS § 180/1.

84.  As a direct and proximate result of the actions of ICE agents, as detailed above, Hassiba Belbachir and her heirs suffered, inter alia, injury, pain, distress, loss of love, affection, society, companionship and consortium as well as other injuries as a result of her death and the continuing loss of her life.

85.  Hassiba Belbachir was and is survived by her father, Boumediène Belbachir, and siblings Zahia Belbachir, Houaria Belbachir, Yamina Belbachir, Djamel Belbachir, Madjid Belbachir, and Mohammed Belbachir, who constitute her heirs under Illinois law.

86.  As next of kin, the heirs of Hassiba Belbachir have lost and will continue to lose, pecuniary support, consortium, society, companionship as well as the love and affection of their cherished daughter and sister and have incurred funeral and burial experiences as a proximate result of her wrongful death.

WHEREFORE, Plaintiff demands compensatory damages in a total amount of $5 million against the United States, and such other and further relief as this Court deems equitable and just.

Dated: September 3, 2008

Respectfully submitted,

 /s/ Janine L. Hoft
JANINE L. HOFT
JAN SUSLER
People's Law Office
1180 N. Milwaukee Avenue
Chicago, Illinois 60622
773/235-0070

Attorneys for Plaintiff


**Plaintiff demands a jury trial on each and every count of this Complaint.**