IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| FPC SERVICES, INC. and GSG 6, LLC, | ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| OUTLAND RENEWABLE ENERGY, LLC, | ) ) ) |
| Defendant. | ) ) |

**COMPLAINT FOR DECLARATORY JUDGMENT**

This case concerns ownership of a wind energy project in Lee County, Illinois (the "Wind Project"). Plaintiffs FPC Services, Inc. and GSG 6, LLC ("GSG 6") seek a declaration that defendant Outland Renewable Energy, LLC ("Outland") has no ownership interest in the Wind Project and has no right to interfere with an approaching transaction in which plaintiffs will transfer rights in the Wind Project to a large energy company. In support of their complaint, plaintiffs state as follows:

**JURISDICTION AND VENUE**

1. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiffs FPC and GSG 6 are both citizens of Illinois. On information and belief, defendant Outland is a citizen of Minnesota. The amount in controversy exceeds $75,000.

2. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this district and a substantial part of the property that is the subject to this action is situated within this district.

**PARTIES**

3. FPC is an Illinois corporation with its principal place of business in Lee County, Illinois.

4.      GSG 6 is an Illinois limited liability company. The sole member of GSG 6 is FPC, which is an Illinois citizen.

5.      Outland is a Minnesota limited liability company. On information and belief, no member of Outland is a citizen of Illinois.

## FACTUAL BACKGROUND

### A. Initial Development of the Wind Project.

6.      More than five years ago, plaintiffs began development of the Wind Project.

7.      Among other things, plaintiffs acquired necessary leases on land in Lee County, commissioned wind studies, and began work on the interconnection process which ultimately will result in wind turbines being connected to an electric grid serviced by the local utility, Commonwealth Edison ("ComEd").

8.      In June 2007, plaintiffs' representatives met with representatives of Outland to discuss the possibility of Outland providing turbines and capital for the Wind Project. The parties exchanged information and negotiated the terms of a memorandum of understanding.

### B. The Memorandum of Understanding.

9.      FPC, Outland and a third party finance provider, Riverstone Holdings, LLC, proceeded under a memorandum of understanding dated August 21, 2007 ("MOU"). A true and correct copy of the MOU is Exhibit 1 hereto.

10.     The MOU is divided into two parts. Part One contains non-binding provisions that discuss the desire of the parties "to commence negotiating definitive agreements regarding the Project" and that outline possible terms to be included in the definitive agreements. *See* Ex. 1, ¶ 1-5. Part Two contains binding provisions regarding a fee to be paid by Outland, exclusivity obligations and other terms. *See* Ex. 1, ¶¶ 6-15.

11. Paragraph 15 of the MOU specifically provides that "[t]he paragraphs and provisions of Part One of this letter do not constitute and will not give rise to any legally binding obligation on the part of any of the Parties." *See* Ex. 1, ¶ 15.

12. The parties to the MOU recognized the possibility that they might not execute definitive agreements to jointly develop the Wind Project. This is reflected in several sections of the MOU.

13. The introductory paragraph to Part One makes clear that "[t]he execution of . . . definitive agreements is subject to . . . the approval of the Parties." *See* Ex. 1, Part One.

14. Paragraph 2 of the MOU states that the "MOU is subject to the complete and timely due diligence review by [Outland]." *See* Ex. 1, ¶ 2. That paragraph goes on to state that "[each] party shall rely solely on its own due diligence to determine whether to proceed with the transaction." *Id.*

15. In paragraph 2, the parties recognize that the due diligence process will involve analysis of Wind Project items and "potentially contracting with consultants to assess the viability of the Project [and] financial modeling to substantiate the requirements to successfully complete a wind project." *See* Ex. 1, ¶ 2. Paragraph 11 provides that "[e]ach Party will be responsible for and bear all of its own costs and expenses (including any broker's or finders fees and the expenses of its representatives) incurred at any time in connection with pursuing or consummating the possible transaction [except certain fees incurred by the lender]." *See* Ex. 1, ¶ 11.

16. Thus, the parties anticipated that they would be incurring costs to investigate the possibility of jointly developing the Wind Project, that each party would bear its own costs and that the definitive agreements might not be executed depending on the results of the due diligence process.

17.     Pursuant to paragraph 6 of the MOU, Outland paid to FPC a fee of $200,000. In the event the definitive agreements were not signed, the $200,000 was to be refunded to Outland by FPC or GSG 6. This provision expressly recognizes the possibility that no definitive agreement would be executed and sets forth Outland's remedy in that event, *i.e.*, reimbursement of the $200,000 fee.

    **C.**    **Outland's Delays And Misrepresentations; Expiration of the MOU.**

18.     At the time the parties signed the MOU, Outland represented to plaintiffs that it had made arrangements to obtain turbines necessary for the Wind Project from a manufacturer called Vestas. In September 2007, however, Outland informed plaintiffs that it had not yet been able to secure the turbines. Outland asked FPC to extend the expiration date of the MOU from November 4, 2007 (*see* Ex. 1, ¶ 8) until January 1, 2008. Outland represented that this extension was needed for it to obtain the turbines.

19.     On September 14, 2007, FPC signed an amendment to the MOU, which (a) extended the MOU termination date to January 1, 2008, as requested by Outland, and (b) required Outland to pay FPC an additional fee of $300,000, which FPC agreed to reimburse if the definitive agreements were not executed. A true and correct copy of the September 2007 Amendment is Exhibit 2, hereto.

20.     In December 2007, FPC arranged for a conference with ComEd to finalize the interconnection plan. The interconnection plan was in good order, except that ComEd needed technical information from Outland regarding the turbines. Under the MOU, Outland was to have responsibility for the turbines, so FPC looked to Outland to gather and present the technical information requested by ComEd.

21.     Outland was unable to provide the information requested by ComEd in a timely manner. Due to this delay, the ComEd team assigned to evaluate the Wind Project was

disbanded. The Wind Project was delayed for months as a result at significant cost to plaintiffs, who were incurring all carrying costs.

22. In January 2008, FPC's counsel prepared an initial draft of the Equity Capital Contribution Agreement and forwarded it to Outland. Outland did not respond to or comment upon the draft, except to say that it did not want to incur legal fees by having its counsel review the draft.

23. In February 2008, Outland represented to FPC that it had finally obtained turbines for the Wind Project, which would allow FPC to complete the interconnection plan with ComEd. Outland asked for another extension of the MOU, which Outland said was necessary for it to secure financing to acquire the turbines. FPC agreed, and, in March 2008, the parties entered into a second amendment to the MOU, which extended the term of the MOU through July 1, 2008. A true and correct copy of the March 2008 Amendment is Exhibit 3 hereto.

24. In the summer of 2008, FPC discovered that Outland's representations regarding its acquisition of the turbines were false. FPC learned that Outland and Vestas had finalized negotiations over acquisition of the turbines, but Outland had withdrawn from the deal claiming it could not obtain financing. Vestas then committed to sell the turbines to a different buyer. FPC was told that replacement turbines would not be available until 2010, at the earliest.

25. By this time, it was clear to FPC that Outland would not be able to perform its end of the bargain were the parties to enter into a definite agreement. Already Outland had significantly delayed the Wind Project by failing to provide technical information required by ComEd and by stringing FPC along with repeated misrepresentations that it was on the verge of acquiring the turbines.

26. FPC made the decision to not go forward with the definitive agreements. The MOU expired by its own terms on July 1, 2008.

### D. Outland's Illegal Interference With The Sale of the Wind Project.

27. After expiration of the MOU on July 1, 2008, FPC entered into negotiations with a third-party energy company ("Buyer") regarding the sale of the Wind Project.

28. Those negotiations resulted in an agreement in principal between plaintiffs and Buyer, whereby Buyer will acquire the Wind Project and, in return, pay FPC a purchase price in installments and grant FPC the right to share in revenue from the Wind Project for a period of 45 years.

29. FPC and Buyer anticipated memorializing their agreement in a formal, written contract by mid-September.

30. On September 3, 2008, however, Outland's counsel sent FPC a letter, claiming that Outland has rights in the Wind Project under the MOU and as a "joint venture partner" and threatening to sue if FPC were to sell assets of the Wind Project. A true and correct copy of this letter is Exhibit 4 hereto.

31. Outland has absolutely no basis to assert that it was in a joint venture with FPC or that it has rights to the Wind Project under the MOU. The parties were mutually engaged in evaluation of the Wind Project in anticipation that they might eventually sign definitive agreements giving Outland and FPC rights in GSG 6, which in turn would own the Wind Project assets. All of these activities, however, were undertaken pursuant to the terms of the MOU, which makes absolutely clear that the provisions in Part One regarding joint development and ownership of the Wind Project are not binding and do not create any legal liability. *See* Ex. 1, ¶ 15. The MOU also plainly contemplates that the parties might decide not to proceed with the transaction, and sets forth Outland's remedy in that event, *i.e.*, reimbursement of the $200,000 and $300,000 fees. *See* Ex. 2, ¶ 6. The MOU does not provide Outland with any rights in the Wind Project in the event the definitive agreements are not signed.

32.     Although Outland's claim that it holds rights in the Wind Project is entirely without merit, its threats of litigation have raised concerns with Buyer and threaten to derail FPC's deal with Buyer. Indeed, absent a declaration by this Court that Outland does not hold rights in the Wind Project, it is likely the Buyer deal will not be consummated, which will put in jeopardy the entire Wind Project, rendering a multi-million dollar asset essentially worthless.

## Count I -- Declaratory Judgment (28 U.S.C. § 2201)

33.     Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as if fully set forth herein.

34.     A present case and controversy exists between plaintiffs and defendant regarding ownership rights in the Wind Project.

35.     At all times relevant, FPC and/or GSG 6 have owned all rights in the Wind Project, including leases, studies, permits and authorizations.

36.     Outland owned, and owns, no rights in the Wind Project or any of its assets.

37.     The rights and obligations of the parties are set forth in the MOU and the September 2007 and March 2008 amendments thereto. *See* Exs. 1-3. Under the MOU, Outland has the right to be reimbursed the $200,000 and $300,000 fees it paid to FPC in the event the parties do not execute definitive agreements. It does not, however, have any rights in Wind Project assets.

38.     Nevertheless, Outland now claims that it has an ownership interest in the Wind Project. This claim is interfering with plaintiffs' ability to sell or transfer the Wind Project to Buyer.

39.     A declaration by this Court regarding ownership of the Wind Project will settle this dispute.

WHEREFORE, plaintiffs seek a declaration under 28 U.S.C. § 2201 that (a) Outland has no ownership interests in, or title to, the Wind Project or assets of the Wind Project and (b) Outland has no legal right to prevent plaintiffs from selling or otherwise disposing of the Wind Project or Wind Project assets. Plaintiffs also request fees, costs and any other relief the Court deems just.

Dated: September 12, 2008

Respectfully submitted,

FPC Services, Inc. and GSG 6, LLC,

By: ___/s/ Gary M. Miller_____
One of Their Attorneys

Gary M. Miller
Matthew A. Bills
Grippo & Elden, LLC
111 South Wacker Drive
Chicago, Illinois 60606
(312) 704-7700 (phone)
(312) 558-1195 (fax)