# EXHIBIT 1



August 21, 2007

FPC Services, Inc
ATTN:   Joyce Papiech
        Bruce Papiech
1771 Sublette Road
Sublette, IL 61367

Steven Schaefer
Riverstone Holdings, LLC
3050 Post Oak Blvd
Suite 1500
Houston, TX 77056

Ladies and Gentlemen:

This letter will serve as the Memorandum of Understanding ("MOU") among Outland Renewable Energy, LLC ("ORE"), FPC Services, Inc. ("Developer") and Riverstone Holdings, LLC ("Riverstone") with respect to the potential exclusive development among Developer, ORE (or ORE's designee) and Riverstone of a wind energy project not to exceed 118.8MW, known as the GSG 6, LLC Wind Project located in Lee County, Illinois ("Project"). ORE, Developer and Riverstone are each referred to in this Agreement individually as a "Party" and collectively as the "Parties."

## PART ONE

GSG 6, LLC, an Illinois limited liability company (the "Project LLC") has been formed for the Project. The Parties wish to commence negotiating definitive agreements regarding the Project. To facilitate the negotiation of the definitive agreements, ORE's counsel will prepare an initial draft of the Project LLC Operating Agreement and FPC's counsel will prepare the initial draft of the Equity Capital Contribution Agreements whereby the current Project Items (defined below) are transferred to the Project LLC. The execution of any such definitive agreements is subject to the satisfactory completion by ORE of its due diligence and is also subject to the approval of the Parties. The definitive agreements would contain representations, warranties, covenants, indemnities and other protections acceptable to the Parties and to the lender for the Project (the "Lender") for the benefit of ORE and/or the Project LLC. The Project LLC would have four Governors, one ORE representative, one a Lender representative, one a Riverstone representative and the other a representative of Developer. There will be supermajority provisions regarding certain actions of the Project LLC. Based upon the information currently known to ORE, it is proposed that the definitive agreements include the following:

LA1 - 1115970 7

1. **Intent of the Parties** Developer and ORE desire to co-develop the Project whereby the Project LLC will be reviewed and approved by ORE and the Project LLC would obtain all of the wind rights, assets, filings, applications, data, information, land lease and wind easement rights, and materials, and all other items pertaining to or necessary for the Project (collectively the "Project Items").

2. **Due Diligence.** This MOU is subject to the complete and timely due diligence review by ORE, Riverstone and Lender This review will include analyzing all relevant Project Items, interviewing Developer, and landowners, contacting experts and consultants used in any way by Developer on the Project, potentially contracting with consultants to assess the viability of the Project, contacting governmental officials, financial modeling to substantiate the requirements to successfully complete a wind project, and any other activities that would help ORE, Riverstone and Lender evaluate the Project Each party shall rely solely on its own due diligence to determine whether to proceed with the transaction. Except for those corporate representations and warranties acceptable to the Parties set forth in the definitive agreements, the transfer of the Project Assets by Developer shall be without representation or warranty and on an "AS IS" "WHERE IS" basis

3. **Cooperation.** The Parties agree to fully cooperate with each other in evaluating the possibility of the development of the Project. Developer agrees to provide all reasonable and customary assistance in helping ORE, Riverstone and Lender complete its due diligence review in a timely fashion, including, without limitation, the sharing of all Project Items

4. **Parties' Duties and Responsibilities.** It is currently anticipated by the Parties in general terms that Developer would have primary responsibility in finalizing the development of the Project and ORE would have primary responsibility in procuring turbines from Vestas, finalizing the financing, construction and operation for all aspects of the Project. More specifically, it is contemplated that:

    a   ORE and Developer will work collectively to satisfy all of the conditions of financial close established by ORE including, without limitation, the completion of the due diligence checklist specific to wind projects, as well as any conditions established by the Board of the Directors of ORE.

    b   Developer shall be responsible for securing the land lease footprint for the Project, which would include signing up landowners to land lease and wind easements under terms acceptable to ORE in its reasonable discretion

    c.  Developer shall be responsible for securing all of the necessary permits and approvals for the Project including but not limited to building, FAA determination of no hazard, environmental, avian, endangered species, QF and any other permits and approvals specific to the Project or to Lee County, Illinois

LAI - 1115970?

d. Developer shall assist ORE, at ORE's discretion, in all other development capacities, including but not limited to regulatory issues, if any, the interconnection process, and off-take arrangements. Developer and ORE shall jointly agree upon siting and the location of transmission lines  The Parties acknowledge that they have been advised that existing agreements affecting the Project contain a requirement that the Project cannot diminish the wind production of the GSG I project by more than 0.3%

e. ORE shall be responsible for securing turbines through Vestas and arranging financing for the Project through the Project LLC, including financial structuring and placement of debt and equity, and selection of the contractor to build the Project  It is currently contemplated that the turbines likely will be Vestas 1.65MW turbines. Also, Signal Wind Energy, LLC shall be the Balance of Plant contractor, subject to a construction agreement reasonably acceptable to ORE, Lender and Developer  The Parties consent to Chadbourne & Parke acting as project counsel for the financing agreements and BOP contract and other project contracts and will execute appropriate waivers of potential conflicts regarding such representation, provided that such waivers are acceptable to all Parties.

f. All Parties shall use commercially reasonable efforts to cause the Project to be completed and reach commercial operation on or before December 1, 2008

g. The Parties will use commercially reasonable efforts to complete a repowering of the Project between year 20 and 25 following the date the Project reaches commercial operation (the "Repowering") with the goal, if economically feasible, of utilizing a structure that will help Developer, ORE, Riverstone, Allco Finance Group, Ltd. and Lender to achieve a substantially similar economic return to the return contemplated hereunder prior to Repowering including, without limitation, payment of development fees and management fees in at least the amounts set forth herein (adjusted for inflation)

5. **Financial Terms.** Subject to ORE's due diligence review and its determination of a favorable (i) wind regime, (ii) comfort with locational marginal pricing in ComEd's (CE_NI) market area for the delivery of electricity and capacity, (iii) cost of completion of the Project, (iv) refinement of the financial model (including without limitation, final bids, quotes, exchange rate fluctuations and open items), and (v) financial viability of the Project supporting the financial terms set forth in 5 a through 5.m, the financial terms of the Project will be as follows.

a. The landowner for the land lease with the Project LLC (which land lease shall be in the form acceptable to ORE) shall receive each year, subject to the terms of the lease, $6,000 00 per turbine, for the first 25 years;

b. The land lease will provide (i) for a 50-year term, and (ii) the right to repower;

c. Developer shall receive a development fee of 3.0% of the total costs of the turbines and balance of plant for the Project to be paid an estimated 1/3 at closing (subject to

and reduced by the MOU execution credit of $200,000 set forth in below Section 6), an estimated 1/3 at commencement of construction and the balance at commissioning of at least 90% of the nameplate capacity of the turbines comprising the Project; any expenses incurred by Developer shall be covered via the development fee above;

d. Developer shall receive up to $1,100,000, payable at Closing, to cover past expenses and a portion of the value of the Project Items;

e. ORE shall receive a development fee of 2.4% of the total costs of the turbines and balance of plant for the Project to be paid an estimated 1/3 at closing, an estimated 1/3 at commencement of construction and the balance at commissioning of at least 90% of the nameplate capacity of the turbines comprising the Project; any expenses incurred by ORE shall be covered via the development fee above;

f. The Project LLC would pay to ORE quarterly $67,500.00, as management fees, subject to the terms of a management services agreement for a term that is commensurate with the continued operation of the Project as a facility for the generation and sale of wind energy; ORE will also receive $3,500.00 per turbine for asset management services including billing, invoicing, accounts payable and accounting for all Parties,

g. The Project LLC would pay to Developer quarterly $67,500.00 as management fees, subject to the terms of a management services agreement for a term that is commensurate with the continued operation of the Project as a facility for the generation and sale of wind energy;

h. The Project LLC would pay to Riverstone quarterly $27,000.00 as co-sponsor fees for a term that is commensurate with the continued operation of the Project as a facility for the generation and sale of wind energy,

i. Developer shall contribute to the Project LLC at closing .03% of the capital necessary as determined by ORE;

j. ORE shall contribute to the Project LLC at closing .04% the capital necessary as it determines,

k. Riverstone shall contribute to the Project LLC at closing .03% of the capital necessary as determined by ORE;

l. Lender shall contribute to the Project LLC at closing 99.9% the capital necessary as determined by ORE;

m. Until Lender has earned a 9.0% rate of return, the financial ownership interest of the Project LLC shall be 99.9% Lender, .03% Developer, .04% ORE, .03% Riverstone, subject to the terms of the operating agreement;

LA1 - 11159707

    n    After Lender has earned an 9.0% rate of return, the financial ownership interests of the Project LLC shall be 10% by Riverstone, 30% by ORE, 30% by Developer, 5% by Lender and 25% by Allco Finance Group, Ltd , subject to the terms of the operating agreement; and

The financial terms set forth in the definitive agreement shall be contingent upon the entire Project being completed and in commercial operation. The financial terms assume:

o.    The turbine costs of the Project will not exceed $2,430,525.00 per turbine, which includes a cold weather package, LVRT, SCADA, 80 meter tower, commissioning, as well as an estimate for shipping the turbines from a port in Texas to the Project site;

p.    The total cost of the Project is not expected to exceed $260,000,000 00, which includes the balance of plant cost with no contingencies, as well as infrastructure upgrades totaling $4,000,000 00, allowing Signal to earn an agreed upon margin by the parties on the EPC work, which balance of plant work is estimated to be approximately $58,000,000.00;

q.    The construction interest financing rate will be tied to Libor plus 230 basis points, and is modeled at 8.1% right now. The permanent interest financing rate will also be tied to Libor plus 130 basis points, and is modeled at 7 1% with the permanent financing loan being amortized over 17 years initially but refinanced at the end of 10 years for an additional 10 years;

r    The total cost of the Project assumes 2% financing fees of approximately $4,653,000.00;

s.    The Project LLC may acquire a swap to establish a pricing floor; the project is currently modeled using Global Energy Decision, Inc.'s Spring 2007 Pricing Forecast for the ComEd market area for the full twenty year Project term, split between peak, estimated to be 47% of the time, and off-peak, 53% of the time, to correlate the wind pattern for this site;

t    RECs are priced at $10/MWh for a ten year strip; $2.50 per MWh thereafter

u.    Net capacity factor of approximately 39 2% for the turbines, which assumes a 9.8% loss factor consistent with PB Power's Wind Resource Assessment, Layout, and Energy Analysis issued June 24, 2005.

## PART TWO

The following paragraphs 6 through 15 of this letter (the "Binding Provisions") are the legally binding and enforceable agreements of the Parties hereto.

LAI - 11139707

6. <u>Development Fee, Non-Refundability</u>. Upon the signing of this MOU, ORE shall pay to Developer the non-refundable sum of $200,000 which shall be credited to and will decrease the development fee of Developer to be set forth in the definitive agreements and which shall be reimbursed to ORE by the Project LLC upon the signing of the definitive agreements If the definitive agreements are not executed by the Parties or if the Project is not completed for reasons other than ORE being unable to obtain project financing or turbines for the Project, such $200,000 shall be timely refunded by Developer to ORE or the Project LLC as the case may be The Parties shall work together in good faith to negotiate and execute the definitive agreements between Developer and ORE.

7. <u>Access</u>. During the period from the date this letter is signed by the Parties (the "Signing Date") until the date set forth in 8 below (the "Termination Date"), Developer, Joyce and Bruce will give and cause ORE, Riverstone and Lender to have full and free access to the Project, their personnel, properties, contracts, books and records, the Project Items and all other documents and data pertaining to the Project.

8. <u>Term</u> This MOU will have a term of seventy-five (75) days from the latest date this MOU was signed by all Parties as noted on the last page of this MOU. The parties acknowledge that the BOP Contract will need to be executed or substantially negotiated during such time period.

9. <u>Exclusivity</u> The Parties agree by signing this MOU to work exclusively with each other until the Termination Date in evaluating the potential development of the Project by the respective Parties The Parties will not until the Termination Date, directly or indirectly, through any representative or otherwise, solicit or entertain offers from, negotiate with or in any manner encourage, discuss, accept, or consider any proposal of any other person or entity relating to the Project.

10. <u>Disclosure</u>. Except as and to the extent required by law, without the prior written consent of all Parties, no Party will, and each will direct their representatives not to make, directly or indirectly, any public comment, statement, or communication with respect to, or otherwise to disclose or to permit the disclosure of the existence of discussions regarding, a possible transaction between the Parties or any of the terms, conditions, or other aspects of the transaction proposed in this letter. If a Party is required by law to make any such disclosure, it must first provide to the other Party the content of the proposed disclosure, the reasons that such disclosure is required by law, and the time and place that the disclosure will be made.

11. <u>Costs</u> Each Party will be responsible for and bear all of its own costs and expenses (including any broker's or finder's fees and the expenses of its representatives) incurred at any time in connection with pursuing or consummating the possible transaction except for fees incurred by Lender which will be reimbursed and costs of negotiations by the Project LLC incurred after the execution of this MOU for the documents with Lender, the BOP Contract and other project contracts shall be an expense of the project company and shared equally among Developer, ORE and Riverstone, regardless of whether negotiated

LAJ 11159707

before or after the Closing

12. **Entire Agreement.** The Binding Provisions constitute the entire agreement between the Parties, and supersede all prior oral or written agreements, understandings, representations and warranties, and courses of conduct and dealing between the Parties on the subject matter hereof. Except as otherwise provided herein, the Binding Provisions may be amended or modified only by a writing executed by the Parties.

13. **Governing Law.** The Binding Provisions will be governed by and construed under the laws of the State of Minnesota without regard to conflicts of laws principles.

14. **Counterparts.** This Letter may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Letter and all of which, when taken together, will be deemed to constitute one and the same agreement. Facsimile signatures shall have the same effect as original signatures.

15. **No Liability.** The paragraphs and provisions of Part One of this letter do not constitute and will not give rise to any legally binding obligation on the part of any of the Parties

If you are in agreement with the foregoing, please sign and return one copy of this letter agreement, which thereupon will constitute our agreement with respect to its subject matter.

We look forward to working with you to successfully complete the Project.

Sincerely,

OUTLAND RENEWABLE ENERGY, LLC

By_____
    Daniel E. Rustowicz
    Chief Development Officer

Duly executed and agreed on August _21_, 2007

RIVERSTONE HOLDINGS, LLC          FPC SERVICES, INC

By _____        By _[signature]_____
Its _____       Its _[signature]_____
Date _____        Date ___8-21-07_____

LA1 - 111597.07

# EXHIBIT 2



September 14, 2007

FPC Services, Inc.
ATTN:   Joyce Papiech
        Bruce Papiech
1771 Sublette Road
Sublette, IL 61367

Ladies and Gentlemen

This letter will serve as an Amendment to the Memorandum of Understanding ("MOU") dated August 21, 2007 entered into among Outland Renewable Energy, LLC ("ORE") and FPC Services, Inc ("Developer") with respect to potential exclusive development among Developer and ORE (or ORE's designee) of a wind energy project not to exceed 122 1MW (formerly 118.8MW), known as the GSG 6, LLC Wind Project located in Lee County, Illinois.

A   The Parties shall be defined as ORE and Developer, and each individually is a Party. The MOU is between ORE and Developer.

B   Paragraph 5 c of Part One of the MOU is deleted and the following inserted therefor.

   c   Developer shall receive a development fee of 3.0% of the total costs of the turbines and balance of plant for the Project to be paid 1/2 at closing (subject to and reduced by the MOU execution credit of $500,000 set forth below in Section 6), and the balance at commissioning of at least 90% of the nameplate capacity of the turbines comprising the Project; any expenses incurred by Developer shall be covered via the development fee above.

C   Paragraph 6 of Part Two of the MOU is deleted and the following inserted therefor.

   6   **Development Fee, Non-Refundability**  ORE has already paid $200,000 (non-refundable subject to the terms hereof) to Developer and upon the signing of this amendment ORE shall pay to Developer an additional sum of $300,000 (refundable) which shall be credited to and will decrease the development fee of Developer to be set forth in the definitive agreements and which shall be reimbursed to ORE by the Project LLC upon the signing of the definitive agreements. If the definitive

agreements are not executed by the Parties or if the Project is not completed for any reason other than ORE being unable to obtain project financing or turbines for the Project, the $200,000 shall be timely refunded by Developer to ORE or the Project LLC as the case may be. If the definitive agreements are not executed by the Parties or if the Project is not completed for any reason whatsoever, the $300,000 shall be timely refunded by Developer to ORE or the Project LLC as the case may be  The Parties shall work together in good faith to negotiate and execute the definitive agreements between Developer and ORE

D. Paragraph 8 of Part Two of the MOU is deleted in its entirety and the following inserted therefor:

8. <u>Term</u>. This MOU will have a term until January 1, 2008.

E   Except as hereinabove stated, the MOU is ratified and confirmed.

If you are in agreement with the foregoing, please sign and return one copy of this letter agreement, which thereon will constitute our agreement with respect to its subject matter

Sincerely,

OUTLAND RENEWABLE ENERGY, LLC

By _____
    Daniel E  Rustowicz
    Chief Development Officer

Duly executed and agreed on September __, 2007

FPC SERVICES, INC

By _<i>Bruce</i>_____
   Its _<i>Vice President</i>___
   Date _9-14-07_

# EXHIBIT 3





March 19, 2008

FPC Services, Inc.
ATTN: Joyce Papiech
       Bruce Papiech
1771 Sublette Road
Sublette, IL 61367

Ladies and Gentlemen:

This letter will serve as the Second Amendment to the Memorandum of Understanding dated August 21, 2007 as amended on September 14, 2007 (collectively the "MOU") entered into between Outland Renewable Energy, LLC ("ORE") and FPC Services, Inc. ("Developer") with respect to the potential exclusive development among Developer and ORE (or ORE's designee) of a wind energy project not to exceed 122.1MW, known as GSG 6, LLC Wind Project located in Lee County, Illinois.

A.  Paragraph 8 of Part 2 of the MOU is deleted in its entirety and the following inserted therefor:

    8. <u>Term</u>. This MOU will have a term through and including July 1, 2008.

B.  Except as hereinabove stated, the MOU is ratified and confirmed.

If you are in agreement with the foregoing, please sign and return one copy of this letter agreement, which thereon will constitute our agreement with respect to its subject matter. Upon receiving this signed amendment Outland will share the latest financial model with the Papiechs as soon as possible. Both parties acknowledge that this model should not be construed as final given the fact that several opportunities for both off-take and potentially a sale are being evaluated currently by Outland.

Sincerely,

OUTLAND RENEWABLE ENERGY, LLC

By: _____
    Daniel E. Rustowicz
    Chief Development Officer

Duly executed and agreed on March 19, 2008

FPC SERVICES, INC.

By _[signature]_

Its _VP_

Date _3/20/08_

# EXHIBIT 4

09/03/2008 15:26 FAX 6123713207  LINDQUIST & VENNUM  ☒001/005

# LINDQUIST & VENNUM P.L.L.P.

4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
Telephone: (612) 371-3211
FAX: (612) 371-3207

## FACSIMILE COVER LETTER

*The information contained in this fax message is privileged and confidential information intended only for the use of the individual or entity named below. If the reader of this fax message is not the intended recipient, you are hereby on notice that you are in possession of confidential and privileged information. Any dissemination, distribution or copying of this communication is strictly prohibited. Please notify the sender by telephone of your inadvertent receipt and return the original fax message to the sender at the address above via the United States Postal Service.*

Date: September 3, 2008

**PLEASE DELIVER THE FOLLOWING PAGES TO:**

| Name | Company | Fax/Phone Numbers | |
|---|---|---|---|
| Joyce Papiech  Bruce Papiech | FPC Services, Inc. | (Fax)  (Direct)  (Company) | 815-849-9055 |

From: Wallace G. Hilke
Direct Dial: (612) 371-3298
E-Mail: whilke@lindquist.com
Client/Matter#: 513598.0029

We are transmitting _____ pages, including this cover letter.
If transmission is incomplete for any reason, please call 612-752-1011.

**NOTES:**

Original sent via U.S. mail.

# LINDQUIST & VENNUM P.L.L.P.

4200 IDS CENTER
80 SOUTH EIGHTH STREET
MINNEAPOLIS, MN 55402-2274
TELEPHONE: 612-371-3211
FAX: 612-371-3207

IN DENVER:
600 17TH STREET, SUITE 1800 SOUTH
DENVER, CO 80202-5441
TELEPHONE: 303-573-5900
FAX: 303-573-1956

ATTORNEYS AT LAW                                                        www.lindquist.com

WALLACE G. HILKE
(612) 371-3298
whilke@lindquist.com

## PRIVILEGED SETTLEMENT COMMUNICATION

Via Fax and U.S. Mail

September 3, 2008

FPC Services, Inc.
ATTN: Joyce Papiech
      Bruce Papiech
1771 Sublette Road
Sublette, IL 61367

  Re: Outland GSG 6 Project

Dear Mr. & Mrs. Papiech:

  Lindquist & Vennum, PLLP has been engaged to represent Outland Renewable Energy, LLC ("Outland") in connection with the protection of its rights with respect to the GSG 6 project that Outland has been jointly developing with FPC Services, Inc. ("FPC"). I am writing to briefly review these development activities and to suggest a resolution of the current situation that should help Outland, FPC, and GSG 6, LLC avoid unnecessary litigation.

### BACKGROUND FACTS

**Initial Development Activities**

  In the spring of 2007, FPC was looking for a development partner to work on the GSG 6, LLC Wind Project (the "Project") that you had started in Lee County, Illinois. When you first began communicating with Outland regarding the Project, you had gathered some wind studies, had taken the first steps in the interconnection process, and had secured rights for much of the land that appeared to be necessary for the development of the Project, although the leases had a number of technical deficiencies and some of the leases had lapsed.

  You sought a development partner for the Project because you lacked access to sources of financing and the turbines necessary to bring the Project to fruition and wanted the expertise, contacts and technical support that Outland could bring to bear.

# LINDQUIST & VENNUM P.L.L.P.

FPC Services, Inc.
September 3, 2008
Page 2

**Memorandum of Understanding**

On August 21, 2007, FPC entered into a Memorandum of Understanding with Outland (the "MOU") concerning the development of the Project. FPC and Outland both assumed a number of responsibilities under the MOU. FPC's responsibilities included the preparation of an Equity Capital Contribution Agreement and joint responsibility for satisfying conditions for a financial close as well as completing the interconnection process. Under Section 6 of the MOU, both parties assumed a good faith obligation to negotiate and execute definitive agreements.

The MOU was first amended on August 21, 2007 and was amended again on March 19, 2008. Despite these extensions, FPC never delivered a draft Equity Capital Contribution Agreement as required under the MOU.

**Joint Development Activities**

FPC and Outland proceeded as joint venture partners following the signing of the MOU. You individually invested a significant amount of time and effort. Outland staff invested even more. Additionally, Outland advanced significant funds to FPC and incurred expenses on behalf of the Project, totaling well in excess of $700,000, including:

- $200,000 in connection with the signing of the MOU;

- $300,000 in connection with the execution of the August 21, 2007 amendment to the MOU;

- $34,729.21 for the PB Power wind study and climatic conditions sheets;

- $1,500 for the Wind Logics wind resource analysis;

- $27,350 for the Global Energy Decision study;

- $140,648 on the geotechnical investigation and preconstruction services; and

- $34,942.48 on other project professional fees.

Outland made this investment with the understanding that it had a joint ownership interest in the Project and the related components that it funded.

## LINDQUIST & VENNUM P.L.L.P.

FPC Services, Inc.
September 3, 2008
Page 3

### Delays

As you know well from your prior development activities, there are a number of steps that must be completed before a wind energy project can secure financing and a firm allocation of turbines, including (1) completion of an independent wind regime study; (2) an interconnection agreement with solid estimated system upgrade costs; (3) verified leases; and (4) a firm offtake agreement unless merchant financing is used.

The wind regime study was FPC's responsibility and was not completed until early 2008. Even then, it was completed only with financing from Outland. I understand that the interconnection process had not proceeded as far as FPC represented to Outland at the time the MOU was signed. For example, the system impact study was not nearly as far along as Outland was led to believe. To the best of Outland's knowledge, the interconnection process is just now reaching a point where financers would be willing to commit to the project. Finally, the land leases were not as represented when Outland spent its first $200,000 on this project. Again, the inevitable result was that project financing and turbine commitment were delayed.

### Outland's Activities

Throughout the joint venture Outland has endeavored to procure turbines and financing despite the fact that key elements had not yet matured. Outland employees have invested many hundreds of hours in the GSG Project and, as detailed above, Outland has incurred more than $700,000 of expense to move it to a point where it is ready for financing and turbine commitment. In the past few months alone, Outland has brought forth opportunities for the Project to partner with Siemens, EverPower, First Energy, Constellation, and Naturener.

### LEGAL AND BUSINESS CONCERNS

Outland and FRC have significant mutual rights and obligations under the MOU, as modified, and the under the common law of joint ventures. Outland and FPC enjoy joint ownership of the Project assets that have been developed during their joint venture. This includes leases and similar rights, the PB Power wind study; financial models; and all other activities financed with the infusion of Outland's capital.

FPC has ceased communicating with Outland regarding the future of the Project. This raises the concern that you are attempting to sell Project assets, including those which jointly belong to Outland, to a third party without Outland's participation or consent. I am sure you appreciate that FPC cannot convert these assets to its sole benefit without breaching the MOU and its implied covenant of good faith and fair dealing; breaching fiduciary duties owed to Outland as a joint venture partner, and unjustly enriching itself. Outland's damages from such conduct would include its proportionate share of the Project value and proceeds. Alternatively, and at a minimum, Outland would be entitled to the return of its entire investment in the Project.

# LINDQUIST & VENNUM P.L.L.P.

FPC Services, Inc.
September 3, 2008
Page 4

Furthermore, given that the Project's assets include leasehold rights in real estate, Outland would be entitled to obtain injunctive relief.

## PROPOSED RESOLUTION

While Outland is willing to take all necessary steps to protect its assets and rights, it would prefer to continue to work with FPC to develop the GSG 6 Project under mutually agreeable terms.

Specifically, Outland is willing to reach a resolution that involves either the continued development of the project or the outright sale of the project to a third party, with the economic arrangements being either those contained in the MOU, or those proposed in Outland's letter of April 22, 2008 (which proposed arrangements would provide you with a better outcome than you would enjoy under the terms outlined in the MOU).

May I please have your response no later than September 10, 2008.

Very truly yours,

Wallace G. Hilke

WGH/lmg

Doc# 2730892\1