# EXHIBIT A - PART 1

# INDEX OF CLOSING DOCUMENTS

RELATING TO THE

MERGER AGREEMENT

dated as of

July 11, 2007

by and among

SCRIP HOLDING CORPORATION,

HESSCO HEALTH PRODUCTS, INC.,

THEREQUIP, INC.

AND

THE SHAREHOLDERS LISTED ON SCHEDULE A THERETO

Prepared by:
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, Illinois 60661

**Execution Copy**

MERGER AGREEMENT

DATED AS OF JULY 11, 2007

BY AND AMONG

SCRIP HOLDING CORPORATION

HESSCO HEALTH PRODUCTS, INC.

THEREQUIP, INC.

AND

THE SHAREHOLDERS LISTED ON SCHEDULE A HERETO

## MERGER AGREEMENT

**THIS MERGER AGREEMENT** (this "**Agreement**"), dated as of July 11, 2007, is by and among **SCRIP HOLDING CORPORATION**, a Delaware corporation ("**Holding**"), **THEREQUIP, INC.**, a Wisconsin corporation (the "**Company**"), Hessco Health Products, Inc., a Delaware corporation ("**Hessco**") and each of the Persons listed on <u>Schedule A</u> attached hereto (collectively "**Sellers**" and each individually a "**Seller**").

### RECITALS

A.    Holding is the sole owner of all of the outstanding capital stock of Hessco.

B.    The Company is engaged in the business of marketing, distributing and selling healthcare supplies and equipment (collectively, the "**Business**").

C.    Sellers collectively own all of the issued and outstanding capital stock of the Company and will derive substantial benefit from the consummation of the transactions contemplated by this Agreement, and each Seller has approved this Agreement and the Merger.

D.    There are currently 167 shares of common stock, $1.00 par value per share of the Company (the "**Company Stock**") outstanding.

E.    The Boards of Directors of the Company, Holding and Hessco deem it advisable and in the best interests of their respective shareholders to approve and consummate the business combination transaction provided for herein in which the Company will merge with and into Hessco, with Hessco being the surviving corporation in the merger (the "**Merger**");

F.    The parties intend that the Merger qualify as a "reorganization" under Section 368(a) of the Code.

### AGREEMENT

In consideration of the mutual promises and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows (capitalized terms used but not defined otherwise in this Agreement are defined in **Section 9.2**):

### ARTICLE 1
### THE MERGER

**Section 1.1.    Merger.**  Upon the terms and subject to the conditions set forth in this Agreement and in reliance upon the representations and warranties set forth herein, the Company shall be merged with and into Hessco.  As promptly as possible on the Closing Date, the parties shall cause the Merger to be completed by filing articles of merger and a certificate of merger, as applicable (the "**Merger Documents**"), with the Secretary of State of Delaware, as provided in the Delaware General Corporation Law, as amended, and with the Department of Financial Institutions of the State of Wisconsin, as provided in the Wisconsin Business Corporation Law. The Merger shall become effective (the "**Effective Time**") upon the filing of the Merger

Documents with the Secretary of State of Delaware and the Department of Financial Institutions of the State of Wisconsin or at such later time as agreed by Holding and the Company and specified in the Merger Documents.

**Section 1.2.    Effects of the Merger**.  At the Effective Time (i) the separate existence of the Company shall cease and the Company shall be merged with and into Hessco, with Hessco being the surviving corporation in the Merger (Hessco is referred to herein as the "**Surviving Corporation**" with respect to periods starting on or after the Effective Time), (ii) the Articles of Incorporation and By-laws of the Surviving Corporation shall be the same as in effect immediately prior to the Effective Time, (iii) the Merger shall have all effects provided by applicable law, and (iv) the Surviving Corporation shall remain a wholly-owned subsidiary of Holding.

**Section 1.3.    Directors and Officers of the Surviving Corporation**.  From and after the Effective Time, the directors and officers of Hessco shall remain the directors and officers of the Surviving Corporation until their death, resignation, removal or replacement.

## ARTICLE 2
## MERGER CONSIDERATION AND MANNER OF PAYMENT

**Section 2.1.    Merger Consideration**.  At the Closing, by virtue of the Merger and without any action on the part of the holders thereof, the outstanding shares of Company Stock shall be converted into the right to receive: (a) 1,077 strips of ten (10) shares of common stock, par value $0.0001 per share in Holding  ("**Holding Common Stock**") and one (1) share of Series A Preferred Stock, par value $0.0001 per share (the "**Series A Preferred Stock**") in Holding (the "**Strip**"), for a total of 10,770 shares of Holding Common Stock and 1,077 shares of Series A Preferred Stock, with a deemed value of $1,300 per Strip (the "**Stock Consideration**"), (b) an amount of cash equal to the Cash Consideration and (c) the right to receive distributions to the Sellers from the Escrow Account (the "**Escrow Consideration**").  The "**Cash Consideration**" shall mean $3,099,900, minus the Escrow Amount, and minus the Indebtedness Payments, if any.  The sum of the Cash Consideration, the Stock Consideration, the Indebtedness Payments and the Escrow Consideration is herein referred to as "**Merger Consideration.**"  Each of the Sellers had the opportunity to make, and did make, an election to determine the allocation of the Merger Consideration for such Seller between the Stock Consideration for such Seller and the Cash Consideration for such Seller, and such allocation is set forth on Schedule A.  Each of the Sellers hereby agrees to the distribution of the Merger Consideration in the proportions set forth on Schedule A and agrees that such apportionment between the Stock Consideration and the Cash Consideration as set forth on Schedule A represents a fair valuation of the Stock Consideration relative to the Cash Consideration.

**Section 2.2.    Treasury Stock**.  Each share of capital stock of the Company held in treasury of the Company shall be canceled and retired and no payment shall be made in respect thereof.

**Section 2.3.    Additional Action**.  The Surviving Corporation may, at any time after the Effective Time, take any action, including executing and delivering any document, in the name

2

and on behalf of the Company, in order to consummate the transactions contemplated by this Agreement.

**Section 2.4.** **Exchange of Certificates**. At the Closing, the Sellers shall deliver to Holding the original Company Stock certificates, duly endorsed in blank by the Sellers or accompanied by blank stock powers, in exchange for the allocated share of (a) certificates issued by Holding representing the Stock Consideration and (b) payment of the Cash Consideration by wire transfer of immediately available funds to a bank account or bank accounts in the amounts and manner which have been specified by the Seller Representative in a writing previously delivered to Holding. The shares represented by certificates for Company Stock so delivered shall be canceled. Until surrendered as contemplated by this **Section 2.4**, each certificate representing shares of Company Stock represents only the right to receive Merger Consideration, as adjusted in accordance with this **Article 2**.

**Section 2.5.** **Indebtedness Payments**. On or prior to the Closing Date, Sellers or the Company shall either: (i) pay off all Indebtedness, other than the Buyer Assumed Indebtedness, as of the the Closing Date or (ii) direct Holding, by delivering to Holding a written notice at least one (1) business day prior to the Closing Date, to deliver to the creditors of the Company on the Closing Date, on behalf of Sellers or the Company, as the case may be, and for their accounts, any amounts necessary to pay off all Indebtedness (other than the Buyer Assumed Indebtedness and other than $9,652.65 due to U.S. Bank to be paid by Michael Peterson in exchange for the transfer to him of the related vehicle (a 2002 Suburban) and $17,413.27 due to GMAC to be paid by David Schultz in exchange for the transfer to him of the related vehicle (a 2005 Suburban)), as of the Closing Date (the aggregate amount of such payments under this clause (ii), the **"Indebtedness Payments"**). In either case, for each instrument of Indebtedness fully repaid, Sellers shall cause all creditors thereof to surrender at Closing and cancel all instruments evidencing such Indebtedness and, promptly following the Closing, but in any event no later than ten (10) days after the Closing Date, obtain the release or termination of all Guarantees or security interests relating thereto and termination of all UCC financing statements filed in connection therewith.

**Section 2.6.** **Escrow**. On the Closing Date, in addition to the delivery of the Cash Consideration, Holding shall deliver, by wire transfer of immediately available funds, Three Hundred Thirty-Seven Thousand Five Hundred Dollars ($337,500) (the **"Escrow Amount"**) to Charter One, N.A. (the **"Escrow Agent"**) for purposes of securing Sellers' post-Closing obligations pursuant to **Article 6**, to be held in an escrow account (the **"Escrow Account"**) and disbursed in the manner set forth in the Escrow Agreement.


# ARTICLE 3
# REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Each Seller hereby represents and warrants to Holding, solely with respect to itself, himself or herself, that:

**Section 3.1.** **Authorization.** Such Seller has all requisite power and authority to execute, deliver and perform its, his or her obligations under this Agreement and each

agreement, document, certificate or instrument executed or to be executed in connection with this Agreement, including, without limitation, the Certificate of Interim Financial Statements (collectively the "**Transaction Documents**"), to which it, he or she is a party. The execution and delivery by such Seller of this Agreement and the Transaction Documents to which such Seller is party, the performance by such Seller of its, his or her obligations hereunder and thereunder and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly authorized, and no other proceeding on the part of such Seller is necessary. This Agreement and the Transaction Documents to which such Seller is party have been duly executed and delivered by such Seller and assuming the due authorization, execution and delivery hereof by Holding and Hessco constitute the legal, valid and binding obligation of such Seller, enforceable against it, him or her in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the rights of creditors generally, and the availability of equitable remedies.

Section 3.2.    **Title to Stock.**  Such Seller has sole voting power and sole power of disposition, in each case with respect to all of the Company Stock listed on Schedule A opposite his, her or its name with no limitations, qualifications or restrictions on such rights and powers. The Company Stock listed on Schedule A opposite such Seller's name will be transferred to Holding pursuant to this Agreement, free and clear of any Liens and any other limitation or restriction (including any restriction on the right to vote or otherwise dispose of such Company Stock), other than restrictions under the Securities Act of 1933, as amended (the "**Securities Act**"). Other than the Company Stock listed on Schedule A, such Seller does not own any equity interest in the Company, or any right to acquire any (i) securities directly or indirectly convertible into or exchangeable for equity interests of the Company, (ii) options, warrants or other rights to acquire any equity interests of the Company or securities directly or indirectly convertible into or exchangeable for equity interests of the Company or (iii) equity appreciation rights, phantom equity interests or similar equity rights with respect to the Company. Except as set forth on **Schedule 3.2**, such Seller is not subject to any agreements, arrangements, options, warrants, calls, rights, commitments or other restrictions relating to the sale, transfer, purchase, redemption or voting of its, his or her equity interests of the Company. Such Seller has not granted to any Person any right of first refusal, preemptive right, subscription right or similar right with respect to such Seller's Company Stock.

Section 3.3.    **Consents and Approvals.**  No consent, approval, order or authorization of, or registration, declaration or filing with, or notice of, any multi-national, national, state, provincial, local, governmental, judicial, public, quasi-public, administrative or self-regulatory authority, agency, commission, organization or any arbitrator or arbitrators (collectively, "**Governmental Authority**") or other Person is required to be made or obtained by such Seller in connection with the authorization, execution, delivery and performance of this Agreement and the Transaction Documents, or the consummation by such Seller of the transactions contemplated hereby and thereby.

Section 3.4.    **No Violation.**  The execution, delivery and performance by such Seller of this Agreement and the Transaction Documents and the consummation by such Seller of the transactions contemplated hereby and thereby will not:

4

(a) result in the breach of any of the terms or conditions of, or constitute a default under, or accelerate any rights or obligations under, or in any manner release any party thereto from any obligation under, or otherwise affect any rights of such Seller under, any mortgage, note, bond, indenture, contract, agreement, license or other instrument or obligation of any kind or nature, in any case whether written or oral, by which such Seller may be bound or affected;

(b) violate or conflict with any law, order, permit, writ, injunction, judgment, rule, regulation, statute, ordinance, treaty, constitution, directive, code, order, decree or other decision of any court, administrative agency, or Governmental Authority (collectively, "**Laws**");

(c) violate any provision of the charter or governing documents of such Seller, as applicable; or

(d) result in the creation or imposition of any Lien upon the Company Stock listed on <u>Schedule A</u> opposite such Seller's name.

**Section 3.5.**   <u>**No Brokers or Finders**</u>.  Except for any amounts due Anderson/Roethle, Inc., all of which will be included in the Company Closing Costs, neither such Seller nor any Affiliate thereof has retained any broker or finder, or made any statement or representation to any Person that would entitle such Person to, or agreed to pay, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement.

**Section 3.6.**   <u>**Securities Law Representations**</u>.   Each Seller understands that the Holding Common Stock and Series A Preferred Stock (the "**Securities**") have not been registered under the Securities Act, on the ground that the offer and sale of the Securities hereunder are exempt from registration under the Securities Act pursuant to Section 4(2) thereof and rules and regulations issued thereunder, and that Holding's reliance on such exemption is predicated on such Seller's representations and warranties set forth herein.  Each Seller thus hereby represents and warrants as follows:

(a) Such Seller is acquiring the Securities for investment for the Seller's own account, not as a nominee or agent and not with a view to the resale or distribution of any part thereof, and such Seller has no present intention of selling, granting any participation in, or otherwise distributing the same.

(b) Such Seller has received all the information it considers necessary or appropriate for deciding whether to obtain the Securities as consideration in this Merger.  Such Seller has had an opportunity to ask questions and receive answers from Holding regarding the rights, preferences and privileges under the Securities and the business, management, properties, prospects and financial condition of Holding.  Such Seller also has had the opportunity to ask questions of and receive answers from Holding and its management regarding the terms and conditions of this investment in the Securities.

(c)    Such Seller acknowledges that it, he or she is able to fend for itself, himself or herself, can bear the economic risk of owning the Securities indefinitely unless the Securities are registered pursuant to the Securities Act, or an exemption from registration is available, and has such knowledge and experience in financial or business matters that it, he or she is capable of evaluating the merits and risks of owning the Securities.

(d)    Such Seller has such knowledge and experience in financial and business matters and investing in private placement transactions of securities in companies similar to Holding so that he, she or it is capable of evaluating the merits and risks of his, her or its investment in Holding and has the capacity to protect his, her or its own interests.

(e)    Such Seller acknowledges that his or her ownership of the Securities involves a high degree of risk and that such Seller is able, without materially impairing his or her financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of his or her investment.

(f)    Such Seller is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act, as presently in effect. Such Seller resides in the state or province identified in the address of such Seller set forth in **Schedule 3.6** of this Agreement.

(g)    Such Seller understands that the Securities are characterized as "restricted securities" under the federal securities laws in that they are being acquired from Holding in a transaction not involving a public offering and that under such laws and applicable regulations the Securities may be resold without registration under the Securities Act only in certain limited circumstances. In this connection, such Seller is familiar with Rule 144 promulgated under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act. SUCH SELLER UNDERSTANDS AND ACKNOWLEDGES HEREIN THAT AN INVESTMENT IN THE SECURITIES INVOLVES AN EXTREMELY HIGH DEGREE OF RISK AND MAY RESULT IN A COMPLETE LOSS OF HIS OR HER INVESTMENT. Such Seller understands that the Securities have not been and may never be registered under the Securities Act and have not been and will not be registered or qualified in any state in which they are offered, and thus such Seller will not be able to resell or otherwise transfer the Securities unless they are registered under the Securities Act and registered or qualified under applicable state or provincial securities laws, or an exemption from such registration or qualification is available, and that, even if available, such exemption may not allow such Seller to transfer all or any portion of the Securities under the circumstances, in the amounts or at the times such Seller might propose. Such Seller has no immediate need for liquidity in

connection with this investment, and does not anticipate that such Seller will be required to sell the Securities in the foreseeable future.

(h)    It is understood that the certificates evidencing the Securities may bear one or all of the following legends or substantially similar legends:

(i)    "THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED."

(ii)    Any other legend required by the Bylaws of Holding or by law, including, without limitation, applicable state or provincial securities laws.

(i)    Such Seller understands that the representations, warranties, covenants and acknowledgements set forth in this Section 3.6 constitute a material inducement to Holding to enter into this Agreement.

(j)    Such Seller acknowledges that it, he or she is not relying upon any other Person in making its, his or her investment or decision to acquire the Securities.

## ARTICLE 4
## ADDITIONAL REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby jointly and severally represent and warrant to Holding as set forth in this Article 4.

**Section 4.1.    Organization; Good Standing.**    The Company is a Wisconsin corporation, and is duly organized, validly existing and in good standing under the laws of Wisconsin and has all requisite power and authority to own, lease and operate its assets, properties and business and to carry on its business as now being conducted. The Company is duly qualified or otherwise authorized as a foreign entity to transact business in each jurisdiction listed on **Schedule 4.1**, which are all of the jurisdictions in which the nature of the Business or the location of the Assets requires the Company to so qualify where the failure to be so qualified or authorized would have an adverse effect upon the business, properties, financial condition or prospects of the Company or any material contract of the Company.

**Section 4.2.    Authorization.**    The Company has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and the Transaction Documents to which it is a party. The execution and delivery by the Company of this Agreement and the Transaction Documents to which the Company is party, the performance by the Company of its obligations hereunder and thereunder and the consummation by the Company of

7

the transactions contemplated hereby and thereby have been duly authorized by the governing body and equityholders of the Company, and no other proceeding on the part of the Company is necessary. This Agreement and the Transaction Documents to which the Company is party have been duly executed and delivered by the Company and assuming the due authorization, execution and delivery by Holding and Hessco hereof constitute the legal, valid and binding obligation of the Company, enforceable against it in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the rights of creditors generally, and the availability of equitable remedies.

Section 4.3. **Capitalization.** Schedule 4.3 sets forth the entire capitalization (including the identity of each equityholder and the amount of shares or other equity interests held by each such equityholder) of the Company. All of the outstanding equity interests of the Company are validly issued, fully paid and non-assessable and owned of record in the amounts listed on **Schedule 4.3** and no equity interests of the Company are subject to, nor have been issued in violation of any preemptive or similar rights. All issuances, sales and repurchases by the Company of its equity interests have been effected in compliance with all applicable Laws, including, but not limited to, applicable federal, state and provincial securities Laws. The Company has not, at any time during the past five (5) years, redeemed, repurchased or otherwise acquired any equity interests of the Company. Except as set forth on **Schedule 4.3**, no Person has, or during the past five years has had, the right to acquire any equity securities of the Company or any security directly or indirectly exercisable for, or convertible into, equity securities of the Company. The Company does not own an equity interest in any other Person. Except as set forth on **Schedule 4.3**, there are no outstanding (i) securities directly or indirectly convertible into or exchangeable for equity interests of the Company, (ii) options or other rights to acquire, or other obligation to issue, any equity interests or securities directly or indirectly convertible into or exchangeable for equity interests of the Company, or (iii) equity appreciation rights, phantom equity interests, or similar equity rights with respect to the Company. The Company has not granted any Person any right of first refusal, preemptive right, subscription right or similar right with respect to any equity interests of the Company.

Section 4.4. **Consents and Approvals.** Except as set forth on **Schedule 4.4** (the "**Required Consents**"), no consent, approval, order or authorization of, or registration, declaration or filing with, or notice of, any Governmental Authority or other Person is required to be made or obtained by the Company in connection with the authorization, execution, delivery and performance of this Agreement and the Transaction Documents, or the consummation by the Company of the transactions contemplated hereby and thereby.

Section 4.5. **No Violation.** Except as set forth on **Schedule 4.5**, the execution, delivery and performance by the Company of this Agreement and the Transaction Documents and the consummation by the Company of the transactions contemplated hereby and thereby will not:

(a)      result in the breach of any of the terms or conditions of, or constitute a default under, or accelerate any rights or obligations under, or accelerate any rights or obligations under, or in any manner release any party thereto from any obligation under, or otherwise affect any rights of the Company

8

under, any mortgage, note, bond, indenture, contract, agreement, license or other instrument or obligation of any kind or nature, in any case whether written or oral, by which the Company may be bound or affected;

(b)    violate or conflict with any Laws;

(c)    violate any provision of the articles of incorporation or by-laws of the Company; or

(d)    result in the creation or imposition of any Lien upon any Company Stock or Asset.

    Section 4.6.    **No Brokers or Finders.**   Except for any amounts due Anderson/Roethle, Inc., all of which will be included in the Company Closing Costs, neither the Company nor any Affiliate thereof has retained any broker or finder, or made any statement or representation to any Person that would entitle such Person to, or agreed to pay, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement.

    Section 4.7.    **Financial Statements and Financial Data.**

(a)    Schedule 4.7(a)(i) contains the unaudited balance sheet, statement of operations and accumulated deficit, and statement of cash flows as of, and for the annual period ended, December 31, 2006 (the "**Financial Statements**"). The Financial Statements were taken from the books and records of the Company (which, in turn, fairly reflect in all respects all the transactions of, acquisitions and dispositions of assets by, and incurrence of liabilities by, the Company), and except as set forth on **Schedule 4.7(a)(ii)**, fairly present in all material respects the Company's financial condition, assets and liabilities as of such date and the results of operations, retained earnings, cash flows and changes in financial position as of such date and for the periods covered thereby, and except as set forth on **Schedule 4.7(a)(ii)**, have been prepared in accordance with GAAP consistently applied throughout the period covered thereby. All historic financial data provided or made available to Holding and its agents and representatives in connection with their due diligence investigation of the Company has been correct in all material respects; provided, however, that no representation is made with respect to projections, budgets or other forward-looking financial data that have been provided or made available to Holding or its agents or representatives other than that such information was prepared and provided by the Company in good faith.

(b)    The accounts and notes receivable of the Company (collectively, the "**Accounts Receivable**") (i) arose from bona fide transactions in the ordinary course of business and are payable on ordinary trade terms, (ii) are legal, valid and binding obligations of the respective debtors enforceable in accordance with their terms, (iii) are not subject to any set-off, counterclaim or other defense, (iv) except as set forth on **Schedule**

**4.7(b)(i)**, are to Sellers' knowledge collectible in the ordinary course of business of the Company, consistent with past practice, in the aggregate recorded amounts thereof, (v) are not the subject of any Proceedings brought by or on behalf of the Company and (vi) do not represent obligations which are conditional on an occurrence or event, or the absence of an occurrence or event.  **Schedule 4.7(b)(ii)** sets forth a description of historical write-off experiences of the Company with respect to its Accounts Receivable during each of the years ended December 31, 2004, 2005 and 2006 and the five month period ended May 31, 2007.

(c)     The accounts payable and accruals of the Company have arisen in bona fide arm's-length transactions in the ordinary course of business, and, prior to the Closing, the Company has been paying its accounts payable in the ordinary course of business.  There are no unpaid invoices or bills representing amounts alleged to be owed by the Company, or other alleged obligations of the Company, which the Company has disputed or determined to dispute or refuse to pay.

**Section 4.8.    Absence of Undisclosed Liabilities.**  To the Sellers' knowledge, the Company does not have any debts, liabilities or obligations of any nature affecting the Business or the Assets (whether accrued or unaccrued, absolute or contingent, direct or indirect, asserted or unasserted, known or unknown, choate or inchoate, perfected or unperfected, liquidated or unliquidated, or otherwise, and whether due or to become due) arising out of any transaction, series of transactions, action or inaction entered into or occurring on or prior to the date hereof, or any state of facts or condition existing on or prior to the date hereof, except (a) as and to the extent clearly and accurately reflected and accrued for or reserved against in the balance sheet as of December 31, 2006 included in the Financial Statements; (b) for liabilities and obligations which have arisen in connection with the Business after December 31, 2006 in the ordinary course of business consistent with past custom and practice (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement or violation of law by the Company and none of which is, individually or in the aggregate, material); (c) for liabilities specifically delineated on **Schedule 4.8**, and (d) for any executory obligations arising under any contract of the Company that do not arise from or relate to a pre-Closing breach of such contract.

**Section 4.9.    Absence of Changes or Events.**  Except as set forth on **Schedule 4.9**, since December 31, 2006, the Company has conducted the Business in the ordinary course of business.  Without limiting the generality of the foregoing, since December 31, 2006, except as disclosed on **Schedule 4.9**, there has not been:

(a)     one or more events, occurrences, developments or states of circumstances or facts which, individually or in the aggregate, has had, or could reasonably be expected to result in, a material adverse effect on the Company, the Assets or the Business;

10

(b)     any declaration, setting aside or payment of any dividend, or other distribution with respect to any equity securities of the Company (whether in cash or in kind);

(c)     any write-off as uncollectible of any notes or accounts receivable or other cash obligations owed to the Company, other than in the ordinary course of business consistent with past practices;

(d)     any transaction with any officer or employee of the Company, except in the ordinary course of business consistent with past practice;

(e)     any acquisition or disposition by the Company of any business or line of business or the disposition of a significant amount of assets, whether by merger, purchase or sale of stock, purchase or sale of assets or otherwise;

(f)     any damage, destruction or other casualty loss (whether or not covered by insurance) materially affecting the Business, the Assets or the Company;

(g)     any Tax election or amendment of any Tax Return by the Company;

(h)     any delay or postponement of any payment of any accounts payable or any other liability or obligation relating to the Business, or any extension or agreement to extend the payment date of any such accounts payable or other liability or obligation relating to the Business, in any case, other than in the ordinary course of business consistent with past practices;

(i)     any acceleration of the collection of any accounts receivables or any other amounts owed to the Company;

(j)     any change by the Company in its method of accounting or accounting practice, other than changes required under applicable Law, or any failure by the Company to maintain its books, accounts and records in the ordinary course of business consistent with past practices in all material respects; or

(k)     any commitment by the Company to do any of the foregoing.

**Section 4.10.  Assets.**

(a)     Except as set forth on **Schedule 4.10(a)**, the Company owns good and marketable title to all of the assets used or held in connection with the Business (the "**Assets**"), free and clear of any and all Liens.

(b)     Except as set forth on **Schedule 4.10(b)(i)**, the Assets are sufficient to enable the Business to be conducted immediately after the Closing in substantially the same manner as the Company presently conducts it. All items of tangible personal property owned or leased by the Company are in good operating condition and repair, ordinary wear and tear excepted,

11

taken as a whole, and are suitable for the purposes for which they are presently being used.  Except as set forth on **Schedule 4.10(b)(ii)** and except for laptops and cell phones used by employees and inventory in transit in the ordinary course, none of the personal or movable property owned or leased by the Company is located other than at the Leased Real Property.

**Section 4.11.**   **Proprietary Rights.**

(a)   **Schedule 4.11(a)(i)** contains a complete list (specifying the owner thereof and the patent, registration or application number and issuance, registration or filing date if applicable) of all patented or registered Intellectual Property owned by the Company and all applications therefor, all material unregistered Trademarks owned by the Company, and all proprietary Software.   Except as otherwise set forth on **Schedule 4.11(a)(ii)**, no Person other than the Company has any right, title or interest in or to, including any right to use, any of such Intellectual Property owned by the Company.

(b)   **Schedule 4.11(b)** contains a complete list (including the owner thereof, the patent, registration or application number if applicable, the termination or expiration dates thereof and any license or other agreement relating thereto), of all Intellectual Property licensed to the Company (excluding generally commercially available, off the shelf software programs licensed pursuant to shrink-wrap or "click to accept" agreements with a replacement cost and/or annual license fee of less than Ten Thousand Dollars ($10,000)), and internet domain names registered to or used by the Company.

(c)   The Company owns the entire right, title and interest in and to, free and clear of Liens, or has the right to use pursuant to a valid and enforceable license set forth on **Schedule 4.11(b)**, all Intellectual Property necessary for or used in the operation of the business of the Company as currently conducted (together with all Intellectual Property owned by the Company, collectively, the "**Company Intellectual Property**").  Except as set forth on **Schedule 4.11(c)**, none of the Intellectual Property owned by the Company is invalid or unenforceable in whole or in part.  No loss or expiration of any of the Company Intellectual Property is pending, or, to the knowledge of Sellers, threatened.   In Sellers' reasonable business judgment, the Company has taken all action necessary, performed all customary acts, and paid all fees and taxes (to the extent applicable), required to protect and maintain in full force and effect the Company Intellectual Property.

(d)   Except as set forth on **Schedule 4.11(d)**, (i) there are no claims against the Company that were either pending during the previous three (3) years or are presently pending contesting the validity, use, ownership or

12

enforceability of any of the Company Intellectual Property, and, to the knowledge of Sellers, no such action is threatened, (ii) the operation of the Company's business as currently conducted, is not infringing, misappropriating or otherwise conflicting with the Intellectual Property of any other Person, and has not done so, and no notices have been received by the Company regarding any of the foregoing (including any cease-and-desist letters or demands or offers to license any Intellectual Property from any other Person), and (iii) to the knowledge of Sellers, no other Person is infringing, misappropriating or otherwise conflicting with the Intellectual Property owned by the Company.

(e)    Except as set forth on **Schedule 4.11(e)**, all current employees of the Company have entered into agreements pursuant to which such employees agree to maintain and protect the confidential information of the Company and assign to the Company all Intellectual Property authored, developed, reduced to practice or otherwise created by such employee in the course of his or her relationship with such Company, without any restrictions or obligations on the use of such Intellectual Property whatsoever.

(f)    The computer systems, including the Software, hardware and networks (collectively, the "**Systems**") currently used in the conduct of the Company's business are sufficient for the current needs of the Company, including as to capacity and ability to process current peak volumes in a timely manner. Except as set forth in **Schedule 4.11(f)**, all Systems, other than Software, used in the business are owned and operated by and are under the control of the Company and are not wholly or partly dependent on any facilities which are not under the ownership, operation or control of the Company. In the past twelve (12) months, there have been no bugs in, or failures, breakdowns, or continued substandard performance of, any such Systems that has caused the substantial disruption or interruption in or to the use of such Systems by the Company or the conduct of the Company's business.

(g)    The Company is in compliance with all privacy policies or similar policies, programs or notices concerning the Company's collection, use, disclosure, retention or protection of personal information, except for any noncompliance the cost to the Company for which, individually or in the aggregate, would not be material.

**Section 4.12. <u>Contracts</u>.** **Schedule 4.12(i)** is a true, correct and complete list of all material contracts, agreements, licenses, commitments, obligations and understandings, in any case whether written or oral (a "**Contract**"), to which the Company is party or by which any Asset is bound, including, but not limited to any such item that:

(a)    provides for future receipt of, or payment by, the Company of more than Twenty Thousand Dollars ($20,000), including, without limitation, all

13

such Contracts that are (i) Contracts for capital expenditures and (ii) employment, consulting or severance Contracts;

(b)  is with one or more of the Company's customers (other than standard purchase orders issued in the ordinary course);

(c)  prohibits the Company from freely engaging in any business or competing anywhere in the world, including any contract containing any nondisclosure or confidentiality provision, any non-competition, settlement, co-existence or similar provision that restricts the geographic or operational scope of the Company's business or the ability of the Company to enter into any new line of business, any right of first offer or first refusal with respect to the sale, license or other disposition of any asset, any division or any business of the Company, or any provision prohibiting the Company from granting any rights or conducting any business or that otherwise restricts the Company's activities or the use of any Intellectual Property;

(d)  relates to Indebtedness, including a Guarantee;

(e)  is a license (whether as a licensor or licensee) or similar agreement permitting the use of any Intellectual Property (other than off-the-shelf software);

(f)  involves the sharing of profits, losses, costs or liabilities by the Company with any other Person in a joint venture, partnership or similar agreement;

(g)  involves hedging or similar transactions;

(h)  grants a power of attorney on behalf of the Company;

(i)  involves any investment or capital contribution in any Person or advance or loan to any Person by the Company or requires or obligates the Company to make any investment in, or advance, loan or capital contribution to, any Person;

(j)  is an agreement pursuant to which the Company leases (either as lessor or lessee), subleases (either as sublessor or sublessee), occupies or otherwise uses any real property (the "**Real Property Leases**");

(k)  is an agreement pursuant to which (i) the Company leases, holds or otherwise uses any machinery, equipment, vehicle or other tangible personal property owned by any third Person or (ii) the Company is the lessor of, or makes available for use by any third Person, any tangible personal property owned by it;

(l)  provides for the supply of goods or services to a Governmental Authority;

(m)    is a sales representative, distributor, dealer, advertising, consultant, independent contractor, lobbying, manufacturer's representative, franchise, agency or similar agreement;

(n)    relates to the employment of any officer, individual employee or other Person on a full-time, part-time, consulting or other basis;

(o)    relates to the acquisition or disposition of any business (whether by merger, sale of membership interests, sale of assets or otherwise); or

(p)    is not of the foregoing type and is material to the conduct of the Business

(the Contracts enumerated in clauses (a) through (p) being referred to collectively as the "**Material Contracts**"). Sellers have provided Holding with true and correct copies of all Material Contracts that are in writing and an accurate description of all Material Contracts that are oral, including all amendments, waivers and other modifications thereof. The Company is not in default, nor has any event occurred which with the giving of notice or passage of time or both would constitute a default by the Company, under any Material Contract or any other obligation owed by the Company thereunder. To Sellers' knowledge, no other party to any Material Contract is in default thereunder nor, to the knowledge of Sellers, has any event occurred which with the giving of notice or the passage of time or both would constitute a default by any other party to any such Material Contract. Except as set forth on **Schedule 4.12(ii)**, each Material Contract is in full force and effect, is valid and enforceable against the Company in accordance with its terms and, to the Sellers' knowledge, is not subject to any existing claims, charges or set-offs or defenses.

Section 4.13. **Litigation**. Except as set forth on **Schedule 4.13**, since January 1, 2005 there has been no, and there is currently no, suit, action, proceeding, investigation, grievance, claim or order (collectively, "**Proceedings**") pending or, to the knowledge of Sellers, threatened against the Company, Sellers or any of the current or former officers, directors or employees of the Company with respect to the Business or the Assets, before any court, or before any Governmental Authority; nor, to the knowledge of Sellers, is there any reasonable basis for any such action, proceeding or investigation. None of the Company, Sellers or any Affiliate thereof (a) is subject to any judgment, order or decree of any court or Governmental Authority; (b) has received any opinion or memorandum or legal advice from legal counsel to the effect that it is exposed from a legal standpoint, to any liability that may be material to its business; or (c) is engaged in any legal action to recover monies due it or for damages sustained by it or to cause a third party to act or refrain from acting in a certain manner.

Section 4.14. **Compliance with Applicable Laws**. Except as set forth on **Schedule 4.14**, the Company and Sellers are, and have been since January 1, 2005, in compliance in all respects with all Laws in connection with the conduct, ownership, use, occupancy or operation of the Business and the Assets, and none of the Company or any Seller has received notice (written or oral) at any time since January 1, 2005 of any violation of any Law in connection with the conduct, ownership, use, occupancy or operation of the Business or the Assets.

**Section 4.15.   Licenses and Permits**.  The Company holds and at all times since January 1, 2005 has held, and immediately as of the Effective Time, will hold, all Permits necessary for the conduct, ownership, use, occupancy or operation of the Business or the Assets, all such Permits being identified on **Schedule 4.15**.  The Company is, and at all times since January 1, 2005 has been, in compliance with such Permits, all of which are in full force and effect, and neither the Company nor Sellers have received any notices (written or oral) to the contrary.

**Section 4.16.   Health, Safety and Environment**.

(a)     Except as set forth on **Schedule 4.16(a)**, since January 1, 2005, the Company has complied with, and is currently in compliance with, all Environmental and Safety Requirements.

(b)     Since January 1, 2005, the Company has not been subject to, or received any written notice of, any private, administrative, or judicial action, or written notice of any intended private, administrative, or judicial action related to the presence or alleged presence of Hazardous Materials in, under, or upon any real property currently or formerly owned, leased, or used by (i) the Company or any of its predecessors, or (ii) any Person that has, at any time, transported, treated, or disposed of Hazardous Material on behalf of the Company or any of its predecessors; and there are no pending or, to the knowledge of Sellers, threatened actions or proceedings (or notices of potential actions or proceedings) from any Governmental Authority or any other Person regarding any matter relating to Environmental and Safety Requirements.

(c)     Except as set forth on **Schedule 4.16(c)**, there (i) are no present events, conditions, circumstances, activities, practices, incidents, or actions, and (ii) with respect to any period of time during which the Company owned or occupied any real property used in the conduct of the Company's business, have been no past events, conditions, circumstances, activities, practices, incidents, or actions, and (iii) to the knowledge of Sellers, with respect to any period of time during which neither the Company nor Sellers owned or occupied any real property used in the conduct of the Company's business, have been no past events, conditions, circumstances, activities, practices, incidents, or actions, that might be expected to interfere with or prevent continued compliance with any Environmental and Safety Requirements, give rise to any legal obligation or liability, or otherwise form the basis of any Proceeding against or involving the Company, Sellers or any real property presently or previously owned or used by the Company, Sellers or any of their predecessors, or any off-site disposal or treatment site used by the Company, Sellers or any of their predecessors under any Environmental and Safety Requirements or related common law theories.

**Section 4.17.   Taxes**.  All Taxes due and payable by the Company have been timely paid in full.  The Company has timely filed all federal, state, county, local and foreign Tax Returns

that it is required to have filed, and such returns are complete and correct in all material respects. Any deficiencies proposed as a result of any audits of the Company by any Governmental Authority have been paid or settled, and there are no present disputes as to Taxes payable by the Company. There are no unexpired waivers or extensions of any statute of limitations with respect to any Taxes of the Company and the Company is not a party to any action or proceedings by any Governmental Authority for the collection or assessment of Taxes against it. No claim has ever been made by an authority in a jurisdiction where the Company does not file Tax Returns that the Company may be subject to taxation by that jurisdiction. There are no Liens on any of the Assets that arose in connection with any failure (or alleged failure) to pay any Tax. The Company has timely withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, shareholder, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed. The Company does not have any liability for Taxes of another Person under Treasury Regulation Section 1.1502-6, as a transferee or successor, by contract, or otherwise. The Company is not party to any agreement, contract, arrangement, or plan that has resulted or could result, separately, or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Section 280G of the Code. The Company has not been a member of an Affiliated Group. The Company has not been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code. The unpaid Taxes of the Company (i) did not, as of the December 31, 2006, exceed the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the balance sheet as of such date included in the Financial Statements and (ii) do not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Company in filing its Tax Returns. The Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for a taxable period ending on or prior to the Closing Date, (ii) "closing agreement" described in Section 7212 of the Code (or any corresponding or similar provision of state, local or foreign Tax law) executed on or prior to the Closing Date, (iii) installment sale or open transaction disposition made on or prior to the Closing Date, (iv) prepaid amount received on or prior to the Closing Date, (v) intercompany transaction or excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local, or foreign Tax law), or (vi) pursuant to Section 951 of the Code with respect to amounts earned on or before the Closing Date. The Company has not distributed stock of another Person, or had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or 361 of the Code. The Company has not engaged in any reportable transaction within the meaning of Treasury Regulation 1.6011-4(g). The Company has not requested or received a ruling from any Governmental Authority or signed any binding agreement with any Governmental Authority that might impact any tax attribute of or the amount of Tax due from the Company after the Closing Date.

     **Section 4.18.  Insurance Policies.**    Schedule 4.18 sets forth a description of all insurance policies of the Company (including the insurer, the type of policy and the policy limits). The Company has not received any notice of cancellation or intent to cancel with respect to any of its insurance policies. All premiums on all such policies have been paid to date and the

Company has complied in all material respects with all conditions of its policies. The Company is not in default with respect to its obligations under any insurance policy maintained by it.

**Section 4.19.   Employee Benefit Plans.**

(a)     Except as is described on **Schedule 4.19(a)**, the Company has never maintained or made contributions to any Employee Benefit Plan at any time. Except with respect to the Employee Benefit Plans of the Company, the Company has no liability for any Employee Benefit Plan maintained or contributed to by any current or former ERISA Affiliate.

(b)     The Company has delivered complete copies to Holding of (i) each written Employee Benefit Plan of the Company, as amended to the Closing, together with all required audited or unaudited financial statements, as applicable, and actuarial reports for the three (3) most recent plan years, if any; (ii) each funding vehicle and any amendments thereto with respect to each such plan; (iii) the most recent and any other material determination letter, ruling or notice issued by any Governmental Authority with respect to such plan; (iv) the Form 5500 Annual Report and all schedules and attachments (or evidence of any applicable exemption) and any PBGC Form 1 and all schedules and attachments for the three (3) most recent plan years to the extent such forms are required for any Employee Benefit Plan; (v) the most recent summary plan description and any summary of material modifications thereto which relates to any such plan; and (vi) each other document, explanation or communication which describes any relevant aspect of any such plan that is not disclosed in previously delivered materials. A description of any unwritten Employee Benefit Plans of the Company, including a description of any material terms of such plan, is set forth on **Schedule 4.19(b)**.

(c)     Each Employee Benefit Plan of the Company (i) has been in material compliance and currently complies in form, and in operation in all material respects, with all applicable requirements of ERISA, the Code or any other applicable Law, and has been and is operated in accordance with its terms; and (ii) has been and is operated and funded in such a manner as to qualify, where appropriate, for both federal and state purposes, for income tax exclusions to its participants, tax-exempt income for its funding vehicle, and the allowance of deductions and credits with respect to contributions thereto.

(d)     Except as set forth on **Schedule 4.19(d)**, neither the Company nor any ERISA Affiliate has at any time participated in or made contributions to or had any other liability with respect to, a plan that is a "multiemployer plan" as defined in Section 4001 of ERISA, a "multiemployer plan" within the meaning of Section 3(37) of ERISA, a "multiple employer plan" within the meaning of Code Section 413(c) or a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

18

(e) There are no Proceedings pending or, to the knowledge of the Sellers, threatened with respect to any Employee Benefit Plan of the Company, or the assets thereof (other than routine claims for benefits), and there are no facts known to Sellers that could reasonably give rise to any liability, or Proceeding against any Employee Benefit Plan of the Company, any fiduciary or plan administrator or other Person dealing with any Employee Benefit Plan of the Company or the assets thereof.

(f) No Person has: (i) entered into any nonexempt "prohibited transaction," as such term is defined in ERISA and the Code, with respect to any Employee Benefit Plan of the Company; (ii) breached a fiduciary obligation with respect to any Employee Benefit Plan of the Company; or (iii) any liability for any failure to act or comply in connection with the administration or investment of the assets of any such plan.

(g) Except as set forth on **Schedule 4.19(g)**, each Employee Benefit Plan of the Company may be amended, terminated, modified or otherwise revised on a prospective basis by the Company to the extent permitted by Law, on and after the Closing, without further liability to the Company.

(h) No Employee Benefit Plan of the Company provides medical, health, life insurance or other welfare-type benefits to retirees or former employees or individuals who terminate (or have terminated) employment with any of the Company or any ERISA Affiliate, or the spouses or dependents of any of the foregoing (except for limited continued medical benefit coverage for former employees, their spouses and other dependents as required to be provided under Section 4980B of the Code or Part 6 of Subtitle B of Title I of ERISA ("**COBRA**") or applicable similar state law).

(i) No Employee Benefit Plan of the Company has incurred an "accumulated funding deficiency" as such term is defined in Section 302 of ERISA or Section 412 of the Code, whether or not waived, or has posted or is required to provide security under Code Section 401(a)(29) or Section 307 of ERISA; no event has occurred that has or could result in the imposition of a Lien under Code Section 412 or Section 302 of ERISA, and no liability to the Pension Benefit Guaranty Corporation (the "**PBGC**") (except for payment of premiums) has been incurred or is reasonably expected to be incurred with respect to any such plan; no reportable event within the meaning of Section 4043 of ERISA has occurred with respect to any such plan; the transactions contemplated herein will not result in a reportable event within the meaning of Section 4043 of ERISA with respect to any such plan; and the PBGC has not threatened or taken steps to institute the termination of any such plan.

(j) With respect to all periods prior to the Effective Time, the requirements of COBRA and the Health Insurance Portability and Accountability Act and

any similar applicable state laws have been satisfied with respect to each Employee Benefit Plan of the Company.

(k)    As of the Effective Time, the fair market value of the assets of each Employee Benefit Plan of the Company that is subject to Title IV of ERISA will equal or exceed the present value of all vested and non-vested liabilities of each such plan determined in accordance with applicable PBGC methods, factors and assumptions applicable to a defined benefit pension plan terminating on such date; and with respect to each other Employee Benefit Plan of the Company, all contributions, payments, premiums, expenses, reimbursements or accruals for all periods ending prior to or as of the Effective Time (including periods from the first day of the then current plan year to the Effective Time) shall have been made or accrued on the appropriate Financial Statements and each such plan has no unfunded liability that is not reflected on the appropriate Financial Statements.

(l)    To the knowledge of Sellers, no communication or disclosure has been made that, at the time made, did not accurately reflect in all material respects the terms and operations of any Employee Benefit Plan of the Company.

(m)    No Employee Benefit Plan of the Company or any other agreement, program, policy or other arrangement by or to which either the Company or any ERISA Affiliate is bound or otherwise liable, by its terms or in effect, could reasonably be expected to require any payment or transfer of money, property or other consideration on account of or in connection with the transactions contemplated by this Agreement or any subsequent termination of employment, which payment could constitute an "excess parachute payment" within the meaning of Section 280G of the Code.

(n)    With respect to the multiemployer plans listed on **Schedule 4.19(a)**, there is currently no, and no potential for, withdrawal liability under Section 4201 of ERISA.

(o)    Each Employee Benefit Plan of the Company that is a "non-qualified deferred compensation plan" (as such term is defined in Section 409A(d)(1) of the Code) (i) has, at all times, since the adoption of Section 409A of the Code, been administered in compliance with the requirements of Section 409A of the Code and applicable guidance issued thereunder, and (ii) either (A) is in a form that complies with the requirements of Section 409A of the Code, or (B) has been amended in good-faith, under guidance issued pursuant to Section 409A of the Code, so that its terms and provisions comply with the requirements of Section 409A of the Code; in all cases so that the additional tax described in Section 409A(a)(1)(B) of the Code will not be assessed against the individuals

participating in any such non-qualified deferred compensation plan with respect to benefits due or accruing thereunder.

Section 4.20.  **Labor Relations.**  Set forth on **Schedule 4.20(i)** is a list of each of the Company's employees and consultants whose compensation with respect to the year ended December 31, 2006 was greater than $40,000 or whose current annual base rate of pay is greater than $40,000, setting forth each such person's name, title, employment (or consultant, as the case may be) commencement date, current annual rate of compensation and total compensation (including bonuses) for the year ended December 31, 2006. The Company has not agreed in writing to increase the current compensation level of any of its officers, directors or employees. The Company is not a party to or obligated with respect to any collective bargaining agreements or contracts with any labor union or other representative of employees or any employee benefits provided for by any such agreement.  No strike or union organizational activity has occurred at any time since January 1, 2005 or is pending or, to the knowledge of the Sellers, threatened against the Company.  Except as set forth on **Schedule 4.20(ii)**, there is not currently pending against the Company, nor has there been pending against the Company at any time since January 1, 2005, any unfair labor practice charge, allegation or complaint or any allegation, charge or complaint of employment discrimination or any form of harassment nor, to the knowledge of Sellers, is there any basis for any such charge, allegation or complaint.  To the knowledge of Sellers, since January 1, 2005, no employee or consultant has, in connection with his or her performance of services on behalf of the Company, breached any restrictive covenant or any other obligation that he or she owes to any third party.  No employee of the Company is currently on short- term disability or long-term disability or on any other leave of absence.

Section 4.21.  **Transactions With Affiliates.**  Except as set forth on **Schedule 4.21**, since January 1, 2005, the Company has not engaged in any Affiliate Transactions.  An "**Affiliate Transaction**" is any contract, agreement, arrangement, commitment or transaction between the Company, on the one hand, and any Seller Party, on the other hand.  "**Seller Party**" includes (i) Sellers, (ii) any Affiliate of any Seller, (iii) any family members of any Seller or any trust for the benefit of any Seller or any family members thereof and (iv) any entity controlled by any such Person or Persons or any entity in which any such Person or Persons own, collectively, ten percent (10%) or more.  All obligations of the Company with respect to all Affiliate Transactions, including but not limited to any outstanding accounts payable, have been satisfied, discharged and terminated and the Company has no further liability in respect on any Affiliate Transaction.

Section 4.22.  **Real Property.**  The Company does not own, has not agreed to own, does not have an option to purchase or sell, and is not obligated to purchase or sell, any real property. **Schedule 4.22** lists all real property occupied by the Company.  The Company does not have any past due obligation as lessee under any Real Property Lease.  The real property and improvements leased by the Company shall be referred to herein as the "**Leased Real Property.**" The Leased Real Property is in good order and repair in all respects, except for such items, the cost to repair or replace for which, individually or in the aggregate, would not be material.  All build-out work and other improvements to be made under any of the Real Property Leases have been completed in a manner acceptable to the Company.  None of the Company or Sellers have received any notice from any insurance company, board of fire underwriters or Governmental Authority of any defects or inadequacies that could adversely affect the

21

insurability of any Leased Real Property or requesting the performance of any material work or alteration with respect to any Leased Real Property that could adversely affect insurability that has not been complied with. To the knowledge of Sellers, there is no pending or threatened condemnation or other governmental taking of any Leased Real Property or any part thereof. To the knowledge of Sellers, the Leased Real Property is in compliance with all zoning requirements. To the knowledge of Sellers, no fact or condition exists that could result in the termination or impairment of presently available access to any portion of any Leased Real Property from adjoining public or private streets or ways or in the discontinuation of presently available and otherwise necessary sewer, water, electric, gas, telephone or other utilities or services. To the knowledge of Sellers, there are no special, general or other assessments pending or threatened against the Company or affecting any Leased Real Property that would be payable by the lessee thereof. None of the Company or Sellers have entered into any brokerage arrangement with respect to any Real Property Lease. No security deposit or portion thereof deposited with respect to any Real Property Lease has been applied in respect of a breach or default under such Real Property Lease which has not been redeposited in full.

Section 4.23. **Warranties.** Except as listed on **Schedule 4.23(i)**, (i) the Company has not provided any product or service warranties or guaranties with respect to goods or services sold or provided by the Company, except those provided by the manufacturer and (ii) since January 1, 2005, no claim or series of related claims in excess of $2,000 have been made or, to Sellers' knowledge, threatened, against the Company with respect to any product or service warranties or guarantees related to goods or services sold or provided by the Company. The Company has not incurred an individual warranty claim in excess of $500 during the previous three fiscal years or year to date.

Section 4.24. **Product Liability.** Except as listed on **Schedule 4.24**, since January 1, 2005, no product liability or other tort claims have been made, or to the Sellers' knowledge threatened, against the Company related to products sold by the Company. To the knowledge of Sellers, there are no defects in the design or manufacture of products sold by the Company that could form the basis for a cause of action for product liability against the Company.

Section 4.25. **Bank Accounts.** **Schedule 4.25** is a complete and correct list of each bank or financial institution in which the Company has an account, safe deposit box or lockbox, or maintains a banking, custodial, trading or similar relationship, the number of each such account or box, and the names of all persons authorized to draw thereon or to having signatory power or access thereto.

Section 4.26. **Books and Records.** The books of account, minute books, stock record books and other records of the Company, all of which have been made available to Holding, are correct in all material respects and have been maintained in accordance with reasonable business practices for a company the size of the Company.

Section 4.27. **Vendors.** **Schedule 4.27** is a complete and correct list of the twenty (20) largest vendors to the Business, in terms of aggregate dollar value of purchases from vendors to the Company during calendar year 2006. No such vendor has canceled or otherwise terminated or materially and adversely modified its relationship with the Company. The Company has not received any notice, nor do Sellers have knowledge, that any such vendor (i) intends to cancel or

22

otherwise terminate or materially and adversely modify its relationship with the Company, or (ii) is threatened with bankruptcy or insolvency. The Company has not received any premium or other benefit from any vendor not generally available to customers as a result of any financial accommodation provided by the Company, any Seller or any Affiliate of any of the foregoing, to such vendor.

Section 4.28. <u>Trade Names; Business Locations</u>. During the past five (5) years, (a) except as set forth on **Schedule 4.28**, the Company has not been known as or used any fictitious or trade names, and (b) the Company has not had offices or places of business other than as set forth in **Schedule 4.28**. The Company is not the surviving corporation of a merger or consolidation other than as set forth in **Schedule 4.28**.

Section 4.29. <u>Workers Compensation</u>. Schedule 4.29 sets forth a description of all claims against the Company by employees and former employees (including dependents and spouses) of the Company or any ERISA Affiliate made since January 1, 2005, and the extent of any specific accrual on or reserve therefor set forth on the Financial Statements, (a) under any workers compensation Laws or (b) for any other medical costs and expenses. To the knowledge of Sellers, except as set forth on **Schedule 4.29**, no claim, injury, fact, event or condition exists which would give rise to a material claim (individually or in the aggregate) against the Company by employees or former employees (including dependents and spouses) of the Company or ERISA Affiliate under any Laws or for any other medical costs and expenses.

Section 4.30. <u>Inventory</u>. The inventory of the Company reflected in the balance sheet as of December 31, 2006 is of merchantable quality in all material respects and is saleable in the ordinary course of the Company's business except to the extent written down or reserved against in the balance sheet of the Company as of December 31, 2006 and except for potentially slow-moving inventory not exceeding $50,000 in the aggregate. **Schedule 4.30** sets forth a listing of the Company's consignment inventory as of May 21, 2007 (the "**Consignment Inventory**"), and all of such Consignment Inventory is properly held by the Company and none of such Consignment Inventory has been paid for by the Company unless it has been sold by the Company.

Section 4.31. <u>Medical Professional Supply Company</u>. Except for that certain Agreement for Purchase and Sale of Assets, dated August 1, 2006 (the "**Arizona/New Mexico Purchase Agreement**"), that certain Asset Purchase Agreement, dated October 31, 2006 (the "**Colorado Purchase Agreement**"), and that certain Trademark License Agreement (the "**License Agreement**" and collectively with the Arizona/New Mexico Purchase Agreement and the Colorado Purchase Agreement, the "**MPSC Agreements**"), each entered into between the Company, Medical Professional Supply Company, LLC ("**MPSC LLC**"), and the other parties thereto, and as otherwise set forth on **Schedule 4.31(i)**, the Sellers and/or the Company, on the one hand, and MPSC LLC and its affiliates, on the other hand, are not party to any other agreements or arrangements with the other, whether written or oral. None of the Sellers, the Company and MPSC LLC are in breach, nor have any such parties taken any actions which with the giving of notice or the passage of time or both would constitute a breach, of any covenants, representations or other obligations of the respective parties under the MPSC Agreements. **Schedule 4.31(ii)** sets forth all of the Company's obligations pursuant to Section II(B)(3) of the Arizona/New Mexico Purchase Agreement.

Section 4.32. **Sellers' Distributions.**  Except as set forth on **Schedule 4.32**, since December 31, 2006, Sellers and their Affiliates have not received any distributions from the Company whether as employees, consultants, shareholders of the Company or otherwise.

Section 4.33. **Apportionment of Merger Consideration.**  The apportionment between the Stock Consideration and the Cash Consideration among the Sellers represents a fair valuation of the Stock Consideration relative to the Cash Consideration.

Section 4.34. **Indebtedness.**  Except as set forth on **Schedule 4.34**, the Company does not have any Indebtedness.  All Indebtedness set forth on **Schedule 4.34** will be paid off by the Sellers at or prior to Closing as Indebtedness Payments or treated as Buyer Assumed Indebtedness.

Section 4.35. **Disclosure.**  No representation, warranty or statement made by Sellers in this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein, in light of the circumstances under which they were made, not misleading.  There is no fact known to Sellers that has specific application to the Company (other than general economic or industry conditions) and that is reasonably expected to materially and adversely affect the Assets, the Company or the Business that has not been disclosed to Holding by Sellers or the Company in this Agreement or the disclosure schedules hereto.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF HOLDING

Holding hereby represents, warrants and covenants to the Sellers that:

Section 5.1. **Holding Organization.**  Each of Holding and Hessco is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Each of Holding and Hessco has the power and authority to own all of its properties and assets and to conduct its business, except where the failure to have such power or authority would not have a material adverse effect on its business.

Section 5.2. **Authorization.**  The execution and delivery of this Agreement and the Transaction Documents to which Holding or Hessco is a party, the performance by Holding or Hessco of its obligations hereunder and thereunder and the consummation by Holding or Hessco of the transactions contemplated hereby and thereby have been duly authorized by all necessary organizational action and no other act or proceeding on the part of Holding or Hessco is necessary.  Each of Holding and Hessco has all requisite power and authority to enter into, execute and deliver this Agreement and the Transaction Documents to which Holding or Hessco is a party and to perform its obligations hereunder and thereunder.  Assuming the due authorization, execution and delivery hereof by the Company and Sellers, this Agreement and the Transaction Documents to which it is a party constitute the valid and legally binding obligations of Holding or Hessco, enforceable in accordance with their terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium

24

and other similar laws affecting the rights of creditors generally, and the availability of equitable remedies.

**Section 5.3.    No Violation.**    Except as set forth on **Schedule 5.3**, the execution, delivery and performance by each of Holding and Hessco of this Agreement and the Transaction Documents to which it is a party and the consummation by it of the transactions contemplated herein and therein do not and will not:

(a)    result in the breach of any of the terms or conditions of, or constitute a default under, or accelerate any rights or obligations under, or in any manner release any party thereto from any obligation under, any mortgage, note, bond, indenture, contract, agreement, license or other instrument or obligation of any kind or nature by which Holding or Hessco may be bound or affected;

(b)    violate any Laws of any court, administrative agency, or Governmental Authority; or

(c)    violate any provision of the certificate of incorporation or bylaws of Holding or Hessco.

**Section 5.4.    Consents and Approvals.**    Except as set forth on **Schedule 5.4**, no consent, approval or authorization of, or declaration, filing or registration with, any Governmental Authority is required to be made or obtained by Holding or Hessco in connection with Holding's or Hessco's authorization, execution and delivery of this Agreement or the Transaction Documents to which Holding is a party, the performance by Holding or Hessco of its obligations hereunder and thereunder, and the consummation by Holding or Hessco of the transactions contemplated hereby and thereby.

**Section 5.5.    No Brokers or Finders.**    Neither of Holding or Hessco nor any Affiliate thereof has retained any broker or finder, made any statement or representation to any Person that would entitle such Person to, or agreed to pay, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement.

**Section 5.6.    Capitalization.**

(a)    The authorized capital stock of Holding consists of 4,000,000 shares of Holding Common Stock, of which 256,964 shares of Holding Common Stock are issued and outstanding as of the Closing Date prior to the issuance of the Stock Consideration and 50,000 shares of preferred stock, of which, 30,000 shares are designated as Series A Preferred Stock of which 23,307 shares of Series A Preferred Stock are issued and outstanding as of the Closing Date prior to the issuance of the Stock Consideration. All of the issued and outstanding shares of Holding Common Stock and Series A Preferred Stock are validly issued and are fully paid, nonassessable and free of preemptive rights. Hessco's authorized capital stock consists solely of 1,000 shares of common stock, par value $.01 per share, all of which are issued and outstanding and are

owned free and clear of any Liens by Holding, and are fully paid, nonassessable and free of preemptive rights.

    (b)    Except as set forth on **Schedule 5.6**, as of the date hereof, there are no outstanding subscriptions, options, calls, contracts, commitments, understandings, restrictions, arrangements, rights or warrants, including any right of conversion or exchange under any outstanding security, instrument or other agreement obligating Holding or Hessco to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of the capital stock of Holding or Hessco or obligating Holding or Hessco to grant, extend or enter into any such agreement or commitment. There are no voting trusts, proxies or other agreements or understandings to which Holding or Hessco is a party or is bound with respect to the voting of any shares of capital stock of Holding or Hessco. The shares of Holding Common Stock and Series A Preferred Stock issued to the Sellers pursuant to this Agreement will at the Closing Date be duly authorized, validly issued, fully paid and nonassessable and free of preemptive rights.

    **Section 5.7.**    **Financial Statements**.    Holding delivered to Sellers a draft audited consolidated balance sheet of Holding and its subsidiaries as at December 31, 2006, the related draft audited consolidated statements of operations and accumulated deficit, changes in stockholders' equity and cash flows for the period from March 6, 2006 through December 31, 2006. Such financial statements fairly present in all material respects the financial condition and the results of operations, changes in stockholders' equity, and cash flows of Holding and its subsidiaries as at December 31, 2006 and for the period from March 6, 2006 through December 31, 2006, and, except as set forth on **Schedule 5.7**, have been prepared in accordance with GAAP.

    **Section 5.8.**    **Litigation**.    Except as set forth on **Schedule 5.8**, since January 1, 2005 there has been no, and there currently are no, Proceedings pending or, to the knowledge of Holding, threatened against Holding or any of its subsidiaries or any of their current or former officers, directors or employees with respect to the business or the assets of Holding or any of its subsidiaries, before any court, or before any Governmental Authority; nor, to the knowledge of Holding, is there any reasonable basis for any such action, proceeding or investigation. None of Holding or any subsidiary (a) is subject to any judgment, order or decree of any court or Governmental Authority; (b) has received any opinion or memorandum or legal advice from legal counsel to the effect that it is exposed from a legal standpoint, to any liability that may be material to its business; or (c) is engaged in any legal action to recover monies due it or for damages sustained by it or to cause a third party to act or refrain from acting in a certain manner.

    **Section 5.9.**    **Reorganization**.

    (a)    Immediately prior to the Effective Time, Holding will own all of the issued and outstanding capital stock of Hessco.

    (b)    Hessco presently has no intention to issue additional shares of its stock.