# EXHIBIT A - PART 2

(c)     Holding has no present intention to, following the Merger, (i) liquidate Hessco, (ii) merge Hessco into another corporation, (iii) sell or dispose of any stock of Hessco or (iv) cause Hessco to sell or dispose of any of its assets acquired in the Merger except for dispositions in the ordinary course of business or transfers described in Section 368(a)(2)(C) of the Code.

(d)     As of the Effective Time, neither Holding nor Hessco will be an investment company as defined in Sections 368(a)(2)(F)(iii) and (iv) of the Code.

## ARTICLE 6
## INDEMNIFICATION

**Section 6.1.    Survival.** The representations and warranties made herein shall survive the Closing for a period of eighteen (18) months following the Closing Date; provided, however, that (a) the representations and warranties set forth in **Sections 3.1, 3.2, 3.3, 3.4, 3.5, 4.1, 4.2, 4.3, 4.4, 4.5, 4.6, 4.10(a), 4.32, 4.33, 4.34, 5.1, 5.2, 5.3, 5.4 and 5.5** shall survive indefinitely; and (b) the representations and warranties set forth in **Sections 4.16, 4.17 and 4.19** shall survive until sixty (60) days following the expiration of the period of limitations applicable to the liabilities in question (giving effect to any waiver, mitigation or extension thereof). Unless a specified period is set forth in this Agreement or in a Transaction Document (in which event such specified period will control), all agreements and covenants contained in this Agreement and in any Transaction Documents will survive the Closing and remain in effect indefinitely. If written notice of a claim has been given prior to the expiration of the applicable representations and warranties, the relevant representations and warranties shall survive as to such claim, until such claim is finally resolved.

**Section 6.2.    Indemnification by Sellers.** Notwithstanding any examination made by, for, or on behalf of, Holding, the knowledge of Holding's officers, directors, stockholders, employees or agents, or the acceptance of any certificate or opinion in connection with this Agreement, and regardless of whether such liability has been disclosed to or discovered by Holding in connection with its due diligence investigation of the Business or otherwise or is otherwise known by Holding or any of its officers, directors, employees or agents:

(a)     each Seller agrees, jointly and severally, to indemnify and save Holding, its stockholders and the officers, directors, employees, agents and representatives and the Affiliates (including the Company) of the foregoing (each, a "**Holding Indemnified Party**" and collectively, the "**Holding Indemnified Parties**") harmless from and against any and all liabilities, obligations, deficiencies, demands, claims, Proceedings, causes of action, assessments, losses, costs, expenses, interest, fines, penalties, diminution in value and damages (including reasonable fees and expenses of attorneys and accountants and reasonable costs of investigation) (individually and collectively, the "**Losses**") suffered, sustained or incurred by any Holding Indemnified Party arising out of:    (i) any

27

inaccuracy in any of the representations or warranties of Sellers contained in **Article 4** of this Agreement or in the Transaction Documents; (ii) the failure of the Company to perform any of its covenants or obligations contained in this Agreement or the Transaction Documents or in any exhibit or schedule hereto or thereto that are required to be performed at or prior to the Closing; (iii) the violation of any Law with respect to any Employee Benefit Plan of the Company (including, without limitation, the failure of any of the Sellers to timely repay loans to the Hessco 401(k) Profit Sharing Plan (the "**401(k) Plan**") and any deficiency in the fidelity bond posted for the 401(k) Plan), (iv) any Indebtedness, other than Buyer Assumed Indebtedness, which is not satisfied with the Indebtedness Payments, (v) any claim related to the Real Property or the ownership or transfer of the Real Property; (vi) all claims of MPSC LLC or any of its Affiliates against, and obligations owed to MPSC LLC and its Affiliates by, the Company or any Seller which arose, or which facts giving rise to such claims or obligations arose, at or prior to the Effective Time; (vii) any claim arising under, relating to the facts underlying, or the Company's failure to perform under, that certain Mediation Settlement Agreement entered into with Quad City X-Ray, Ltd.; (viii) any claim arising from the dispute with Hartford Insurance/Paychex regarding workers' compensation insurance; (ix) any Taxes imposed as a result of the Merger failing to qualify as a "reorganization" as defined in Section 368(a) of the Code or any of the Company, Hessco, or Holding not qualifying as a party to a "reorganization" within the meaning of Section 368(b) of the Code; and (x) any Sellers' Taxes.

(b)    each Seller agrees severally and not jointly to indemnify and save each Holding Indemnified Party harmless from and against any and all Losses suffered, sustained or incurred by any Holding Indemnified Party arising out of: (i) any inaccuracy in any of the representations or warranties of such Seller contained in **Article 3** of this Agreement or in the Transaction Documents; or (ii) the failure of such Seller to perform any of its, his or her covenants or obligations contained in this Agreement or any Transaction Document.

**Section 6.3.    <u>Indemnification by Holding</u>.**    Holding agrees to indemnify and save Sellers and the officers, directors, employees, agents and representatives and the Affiliates of the foregoing (each, a "**Seller Indemnified Party**" and collectively the "**Seller Indemnified Parties**") harmless from and against any and all Losses sustained or incurred by any Seller Indemnified Party arising out of: (a) any inaccuracy in any of the representations and warranties of Holding contained in **Article 5** of this Agreement or the Transaction Documents, (b) the failure of Holding to perform any of its covenants or obligations contained in this Agreement or the Transaction Documents, (c) the Buyer Assumed Indebtedness, and (d) all claims of MPSC LLC or any of its Affiliates against, and obligations owed to MPSC LLC and its Affiliates by, the Company or Sellers which arose, or which facts giving rise to such claims or obligations arose, after the Effective Time, which, for purposes of clarification, shall not include any liability or obligation relating to or arising from any breach by the Sellers or the Company, on or before

28

the Closing Date, or any act or omission of Sellers or the Company on or before the Closing Date which, with the giving of notice or the passage of time or both would constitute a breach by the Sellers or the Company.

Section 6.4.     **Indemnification Procedure**.

(a)     If a Holding Indemnified Party or a Seller Indemnified Party seeks indemnification under this **Article 6**, such party (the "**Indemnified Party**") shall give written notice to the other party (the "**Indemnifying Party**") of the facts and circumstances giving rise to the claim. In that regard, if any Proceeding, liability or obligation shall be brought or asserted by any third party which, if adversely determined, would entitle the Indemnified Party to indemnity pursuant to this **Article 6** (a "**Third Party Claim**"), the Indemnified Party shall promptly notify the Indemnifying Party of such Third Party Claim in writing, specifying the basis of such claim and the facts pertaining thereto and the Indemnifying Party, if the Indemnifying Party so elects, shall assume and control the defense thereof (and shall consult with the Indemnified Party with respect thereto), including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all necessary expenses; provided that, as a condition precedent to the Indemnifying Party's right to assume control of such defense, the Indemnifying Party must first enter into an agreement with the Indemnified Party (in form and substance reasonably satisfactory to the Indemnified Party) pursuant to which the Indemnifying Party agrees to be fully responsible for all Losses relating to such claim and unconditionally guarantees the payment and performance of any liability or obligation that may arise with respect to such claim or the facts giving rise to such claim for indemnification and provided further that the Indemnifying Party shall not have the right to assume control of such defense if the claim which the Indemnifying Party seeks to assume control of (i) seeks non-monetary relief, (ii) involves criminal or quasi-criminal allegations, or (iii) involves Taxes, which shall be governed exclusively by **Section 8.2(e)**. If the Indemnifying Party is permitted to assume and control the defense of a Third Party Claim elects to do so, the Indemnified Party shall have the right to employ counsel separate from counsel employed by the Indemnifying Party in any such action and to participate in the defense thereof, but the fees and expenses of such counsel employed by the Indemnified Party shall be at the expense of the Indemnified Party unless (A) the employment thereof has been specifically authorized by the Indemnifying Party in writing, or (B) the Indemnifying Party has failed to assume the defense and employ counsel; in which case the fees and expenses of the Indemnified Party's counsel shall be paid by the Indemnifying Party.

(b)     In no event shall the Indemnified Party pay or enter into any settlement of any claim or consent to any judgment with respect to any claim without the prior written consent of the Indemnifying Party, which consent shall

29

not be unreasonably withheld or delayed, if such settlement or judgment would require the Indemnifying Party to pay any amount. The Indemnifying Party may enter into a settlement or consent to any judgment without the consent of the Indemnified Party so long as (i) such settlement or judgment involves monetary damages only and (ii) a term of the settlement or judgment is that the Person or Persons asserting such claim unconditionally release all Indemnified Parties from all liability with respect to such claim; otherwise the consent of the Indemnified Party shall be required in order to enter into any settlement of, or consent to the entry of a judgment with respect to, any claim, which consent shall not be unreasonably withheld or delayed.

**Section 6.5.** **Failure to Give Timely Notice.** A failure by an Indemnified Party to promptly provide notice as provided in **Section 6.4** will not affect the rights or obligations of any party hereunder except and only to the extent that, as a result of such failure, any party entitled to receive such notice was deprived of its right to recover any payment under its applicable insurance coverage or was otherwise prejudiced or damaged as a result of such failure to give timely notice.

**Section 6.6.** **Certain Limitations.**

(a) **Threshold on Losses of Holding Indemnified Parties.** Notwithstanding anything to the contrary set forth in this Agreement (but subject to the proviso set forth in this sentence), Sellers shall not be liable to any Holding Indemnified Party under **Section 6.2(a)(i)** unless the aggregate Losses incurred by the Holding Indemnified Parties with respect to which indemnification is to be provided under **Section 6.2(a)(i)** exceeds Fifty Thousand Dollars ($50,000) (the "**Threshold**"); in which case Sellers shall be liable to Holding Indemnified Parties under **Section 6.2(a)(i)** only for the amount of Losses in excess of the Threshold; provided, however, that the limitations set forth in this **Section 6.6(a)** and application of the Threshold shall not apply to any Losses incurred by any Holding Indemnified Party arising out of or otherwise by virtue of (i) any inaccuracy in any of the representations and warranties contained in **Sections 4.1, 4.2, 4.3, 4.4, 4.5, 4.6, 4.10(a), 4.16, 4.17, 4.19, 4.32, 4.33** or **4.34** of this Agreement or (ii) any inaccuracy in any of the representations or warranties of the Company and Sellers of which a Seller had knowledge at any time prior to the date on which such representation or warranty was made.

(b) **Threshold on Losses of Seller Indemnified Parties.** Notwithstanding anything to the contrary set forth in this Agreement (but subject to the proviso set forth in this sentence), Holding shall not be liable to any Seller Indemnified Party under **Section 6.3(a)** unless the aggregate Losses incurred by the Seller Indemnified Parties with respect to which indemnification is to be provided under **Section 6.3(a)** exceeds the Threshold, in which case Holding shall be liable to the Seller Indemnified

30

Parties under **Section 6.3(a)** only for the amount of Losses in excess of the Threshold; provided, however, that the limitations set forth in this **Section 6.6(b)** and application of the Threshold shall not apply to any Losses incurred by any Seller Indemnified Party arising out of or otherwise by virtue of (i) any inaccuracy in any of the representations and warranties contained in **Sections 5.1, 5.2, 5.3, 5.4, 5.5** or **5.6** of this Agreement or (ii) any inaccuracy in any of the representations or warranties of Holding of which Holding had knowledge at any time prior to the date on which such representation or warranty was made.

(c)  Cap on Losses of Holding Indemnified Parties.  The aggregate amount required to be paid by Sellers under **Section 6.2(a)(i)** shall not exceed One Million Six Hundred Seventy-Five Thousand Dollars ($1,675,000) (the "**Cap**"); provided, however, that the Cap shall not apply to any Losses of the Holding Indemnified Parties arising out of or otherwise by virtue of any inaccuracy in any of the representations and warranties contained in **Sections 4.1, 4.2, 4.3, 4.4, 4.5, 4.6, 4.10(a), 4.16, 4.17, 4.19, 4.32, 4.33** or **4.34.**

(d)  Cap on Losses of Seller Indemnified Parties.  The aggregate amount required to be paid by Holding under **Section 6.3(a)** shall not exceed the Cap; provided, however, that the Cap shall not apply to any Losses of the Seller Indemnified Parties arising out of or otherwise by virtue of any inaccuracy in any of the representations and warranties contained in **Sections 5.1, 5.2, 5.3, 5.4, 5.5** or **5.6.**

**Section 6.7.**  **Indemnification as Sole Remedy.**  Subject to the provisions of **Section 6.8**, the indemnification provided for in this **Article 6** shall be the sole and exclusive remedy and recourse for any breach by any party of the representations and warranties contained in **Article 3, Article 4** and **Article 5** of this Agreement.

**Section 6.8.**  **Special Rule for Fraud.**  Notwithstanding anything in this **Article 6** to the contrary, in the event any breach of a representation or warranty by any party hereto is intentional or constitutes fraud, or the representation or warranty that has been breached will survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (regardless of any investigation made by any other party or on its behalf) and will continue in full force and effect for the period of the applicable statute of limitations; and the limitations set forth in **Section 6.6** shall not apply to any Losses that any Holding Indemnified Party or Seller Indemnified Party, respectively, may suffer, sustain or become subject to, as a result of or arising out of any such breach.

**Section 6.9.**  **Payments.**

(a)  Within five (5) business days after the resolution of any indemnification claim by any Holding Indemnified Party hereunder pursuant to which such Holding Indemnified Party is entitled to any payment, (i) if there are funds remaining in the Escrow Account, the Seller Representative and Holding

shall execute and cause a joint written direction to be delivered pursuant to the Escrow Agreement within five (5) days of such resolution, which joint written direction shall direct the Escrow Agent to make such payment out of the Escrow Account and (ii) if the Escrow Account contains insufficient funds to satisfy in full any claim or portion thereof to be paid to any Holding Indemnified Party, such payment shall be made by Sellers within five (5) business days of such resolution. Notwithstanding the foregoing, in the event that Sellers are required to make (i) any Tax payments required pursuant to **Section 8.2(a)**, or (ii) any other payments pursuant to **Sections 6.2(a)(iv), (v), and (x)**, Sellers shall be required to make such payment directly to Holding, and such amount shall not be made from the Escrow Account, unless Holding so elects should Sellers continue to fail to make such payment following thirty (30) days prior written notice from Holding.

(b)     Within five (5) business days after the resolution of any indemnification claim by any Seller Indemnified Party hereunder pursuant to which such Seller Indemnified Party is entitled to any payment, such payment shall be made by Holding.

(c)     Any indemnification payments not made within the time periods prescribed by **Sections 6.9(a)** and **6.9(b)** shall include interest at the lesser of (i) eight percent (8.0%) and (ii) the maximum rate permitted by applicable usury laws, from the date any such Loss is suffered or sustained to the date of payment. Interest on such unpaid amount shall be compounded quarterly and payable on demand.

(d)     The Indemnifying Party shall reimburse the Indemnified Party for its reasonable out-of-pocket costs or expenses of (including, but not limited to, reasonable attorneys' fees) incurred in seeking to collect any payments due under this **Section 6.9**, without regard to any limitations set forth in **Section 6.6**.

**Section 6.10.** <u>**Set-off**</u>.

(a)     To the extent that any Seller fails to satisfy an indemnification obligation pursuant to this **Article 6** within the time periods and pursuant to the procedures prescribed in **Section 6.9(a)**, Holding may in its sole discretion (i) set off the amount of such indemnification obligation (plus any interest payable under **Section 6.9(b)**) against any amounts (excluding wages and benefits) then due and payable to such Seller by Holding or (ii) in the event that such Seller owns shares of Holding Common Stock and/or Series A Preferred Stock, redeem that number of shares of Holding Common Stock and Series A Preferred Stock equal to the amount of indemnification to which Holding is entitled, at a price of One Thousand Three Hundred Dollars ($1,300) per Strip.

(b)    To the extent that Holding fails to satisfy an indemnification obligation pursuant to this **Article 6** within the time period prescribed in **Section 6.9(a)**, the Seller Indemnified Party may in his, her or its sole discretion set off the amount of such indemnification obligation against any amounts then due and payable by such Seller Indemnified Party to Holding.

(c)    Only after the entire Escrow Amount has been exhausted, each Seller may direct Holding to redeem Strips of ten (10) shares of Holding Common Stock and one (1) share of Series A Preferred Stock, at a price of One Thousand Three Hundred Dollars ($1,300) per Strip, in an amount equal to the product of (x) the total dollar amount of any indemnification to which Holding is entitled and (y) a fraction, the numerator of which is equal to such Seller's Stock Consideration, and the denominator of which is equal to such Seller's Merger Consideration. The remainder of such indemnification amount to which Holding is entitled from such Seller shall be paid by such Seller in cash.

**Section 6.11.    Purchase Price Adjustment.**    Any indemnification received under this Article 6 shall be treated by Holding, Sellers and their respective Affiliates, to the extent permitted by Law, as an adjustment to the Merger Consideration unless a Final Determination (defined below) causes any such amount not to constitute an adjustment to the Merger Consideration for Federal tax purposes. The term **"Final Determination"** shall mean (i) any final determination of liability in respect of a Tax that, under applicable Law, is not subject to further appeal, review or modification through proceedings or otherwise (including the expiration of a statute of limitations or a period for the filing of claims for refunds, amended returns or appeals from adverse determinations) or (ii) the payment of Tax by Holding or Sellers, whichever is responsible for payment of such Tax under applicable Law, with respect to any item disallowed or adjusted by a taxing authority, provided that such responsible party or parties determine(s) that no action should be taken to recoup such payment and the other party consents in writing (such consent not to be unreasonably withheld).


**ARTICLE 7**
**CLOSING**


**Section 7.1.    Closing.**    Subject to the terms and conditions set forth herein, the transactions that are the subject of this Agreement shall be consummated at a closing (the **"Closing"**), which shall take place at 10:00 a.m., Chicago time, at the offices of Katten Muchin Rosenman LLP, 525 West Monroe Street, Chicago, Illinois on the date of this Agreement or such other date as may be agreed to in writing by the parties hereto (the **"Closing Date"**). The Closing shall be deemed effective at the Effective Time.

**Section 7.2.    Deliveries by Sellers.**    At the Closing, Sellers shall deliver or cause to be delivered to Holding:

(a)    a certificate executed and delivered by the Secretary of the Company, attesting and certifying as to: (i) the organizational documents of the Company (as also certified as of a recent date by the Department of Financial Institutions of the State of Wisconsin); (ii) copies of resolutions of the board of directors and shareholders of the Company adopting and authorizing the transactions contemplated by this Agreement and the Transaction Documents to which the Company is a party; and (iii) incumbency and specimen signature certificates with respect to the officers of the Company;

(b)    certificate of good standing of the Company issued not earlier than fifteen (15) days prior to the Closing Date by the Department of Financial Institutions of the State of Wisconsin and each other jurisdiction where the Company is qualified to do business;

(c)    documentation setting forth the amount of and the procedures for making the Indebtedness Payments, if any, as well as the agreement of each creditor that, upon receipt of a specified amount, its Indebtedness shall be paid in full and the agreement of each applicable creditor to release all of its Liens upon the Assets upon such creditor's receipt of its portion of the Indebtedness Payments;

(d)    all Required Consents;

(e)    the legal opinion of Quarles & Brady LLP, dated as of the Closing Date and addressed to Holding, upon which Holding's financing sources may rely;

(f)    the stock record book and minute book of the Company;

(g)    certificates evidencing the Company Stock duly endorsed in blank or accompanied by duly executed stock powers;

(h)    Employment Agreements, with each of the Key Employees, executed by the Key Employees;

(i)    a Joinder to the Stockholders Agreement of Holding (the "**Stockholders Agreement**"), executed by each Seller;

(j)    an Escrow Agreement between Sellers, Holding and the Escrow Agent (the "**Escrow Agreement**"), executed by Sellers;

(k)    resignations of all officers and directors of the Company;

(l)    evidence of the transfer by the Company of the real estate located on Highway 33 in Saukville, Wisconsin to Hessco Real Estate LLC (the "**Real Property**");

(m)    a lease for the Company's existing facility (the "**Lease**"), executed by Hessco Real Estate LLC, the owner of the real estate;

(n)    a non-foreign affidavit dated as of the Closing Date from each Seller, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code stating that Seller is not a "foreign person" as defined in Section 1445 of the Code;

(o)    a document terminating the Stock Purchase Agreement dated as of June 1, 2004 among Sellers and the Company;

(p)    a release of all claims against the Company, executed by each of the Sellers;

(q)    evidence that the 2002 Suburban used by Michael Peterson and the 2005 Suburban used by David Schultz have been sold or otherwise distributed to the Sellers, and all Indebtedness with respect thereto, has been extinguished; and

(r)    such other documents and instruments as Holding may reasonably require in order to effectuate the transactions that are the subject of this Agreement.

All documents and instruments delivered to Holding shall be in form and substance reasonably satisfactory to Holding.

**Section 7.3.**   **Deliveries by Holding.**  At the Closing, Holding shall deliver or cause to be delivered to Sellers:

(a)    federal funds wire transfer(s) in accordance with **Section 2.4**;

(b)    a certificate, executed and delivered by the Secretary of Holding, attesting and certifying as to: (i) copies of resolutions of the Board of Directors of Holding adopting and authorizing the transactions contemplated by this Agreement and the Transaction Documents to which Holding is a party and (ii) incumbency and specimen signature certificates with respect to an officer of Holding;

(c)    stock certificates representing the Stock Consideration, in accordance with **Section 2.4**;

(d)    a certificate of good standing of Holding issued not earlier than ten (10) days prior to the Closing Date from the Secretary of State of Delaware;

35

(e)    the Escrow Agreement, executed by Holding;

(f)    the Stockholders Agreement, executed by Holding;

(g)    the Employment Agreements with each of the Key Employees, executed by Hessco;

(h)    the Lease, executed by Hessco; and

(i)    such other documents and instruments as Sellers may reasonably require in order to effectuate the transactions that are the subject of this Agreement.

All documents and instruments delivered to Sellers shall be in form and substance reasonably satisfactory to Sellers.

## ARTICLE 8
## COVENANTS AND OTHER AGREEMENTS

**Section 8.1.    Non-Competition; Confidentiality.**    The parties agree that Holding is relying on the covenants and agreements set forth in this section, that without such covenants Holding would not enter into this Agreement or the transactions contemplated hereby, and that the Merger Consideration is sufficient consideration to make the covenants and agreements set forth herein enforceable.

(a)    <u>Noncompetition</u>.    In furtherance of the acquisition of the Company Stock by Holding by virtue of the transactions contemplated hereby, to more effectively protect the value of the Business and the Company, and to induce Holding to consummate the transactions contemplated hereby, each Seller covenants and agrees that, during the Term (as defined below), such Seller will not, nor will such Seller permit any of its Affiliates to, invest, engage or participate, directly or indirectly, individually or as an investor, owner, securityholder, partner, member, director, manager, officer, employee, consultant, sales representative, manufacturer's representative, customer or agent of any other Person, in or receive any discount, revenue or other compensation or economic benefit in connection with, any business that is or may reasonably be considered to be competitive with the Business or any portion thereof (including any presently contemplated expansions or extensions thereof), anywhere in North America. Notwithstanding the foregoing, nothing contained in this **Section 8.1(a)** shall prohibit such Seller or any of his, her or its Affiliates from owning less than five percent (5%) of any class of stock listed on a national securities exchange or traded in the over-the-counter market. The **"Term"** shall mean the period beginning on the Closing Date and ending upon the fifth anniversary of the Closing Date; <u>provided</u>, <u>however</u>, that in the event of a breach or violation by such Seller of this **Section 8.1**, the Term with

respect to such Seller shall be tolled until such breach or violation has been duly cured.

(b) <u>Non-Solicitation</u>. Without limiting the generality of the provisions of **Section 8.1(a)** above, each Seller hereby agrees that during the Term such Seller will not, directly or indirectly, solicit, or participate as customer, employee, agent, independent contractor, owner, securityholder, director, manager, partner, member or in any other individual or representative capacity in any business which solicits business from any Person that is or was a supplier or customer of the Business during the one year period preceding the date of such solicitation, or from any successor in interest to any such Person, in any case for the purpose of securing business or contracts competitive with the Business.

(c) <u>Confidentiality</u>. Each Seller recognizes and acknowledges that as of the Closing, such Seller has knowledge of confidential and proprietary information concerning Holding, the Business and the Company (**"Confidential Information"**). In light of the foregoing, from and after the Closing, such Seller shall maintain the confidentiality of, and refrain from using or disclosing to any Person, all Confidential Information, except to the extent disclosure of any such information is required by Law or is in the public domain through no wrongful act on the part of such Seller, any of his, her or its Affiliates or any of his, her or its agents. In the event that any such party reasonably believes after consultation with counsel that it is required by Law to disclose any Confidential Information, such party will (A) provide Holding with prompt notice before such disclosure in order that Holding may attempt to obtain a protective order or other assurance that confidential treatment will be accorded to such Confidential Information and (B) cooperate with Holding in attempting to obtain such order or assurance.

(d) <u>Interference with Relationships</u>. During the Term, no Seller shall directly or indirectly, employ, engage or recruit, solicit, contact or approach for employment or engagement, or participate as customer, employee, agent, independent contractor, owner, securityholder, director, manager, partner, member or in any other individual or representative capacity in any business that employs, engages or recruits, solicits, contacts or approaches for employment or engagement, any Person that served as an employee or independent contractor to the Company within the one year immediately preceding the Closing Date, or otherwise seek or attempt to influence or alter any such Person's relationship with Holding.

(e) <u>Publicity</u>. During the Term, no Seller or any Affiliate of the Seller shall make any statement or any other expressions on television, radio, the internet or other media or to any third party, including, without limitation, in communications with any customers, vendors, prospects, sales representatives or distributors, which are in any way disparaging of

Holding, the Company, or any of their respective Affiliates, the products and services of the Company or the Business.

(f)    Blue-Pencil. If any court of competent jurisdiction shall at any time deem the term of any particular restrictive covenant contained in this **Section 8.1** too lengthy or the geographic area covered too extensive, the other provisions of this **Section 8.1** shall nevertheless stand, the Term shall be deemed to be the longest period permissible by Law under the circumstances and geographic area covered shall be deemed to comprise the largest territory permissible by Law under the circumstances. The court in each case shall reduce the Term and/or geographic area covered to permissible duration or size.

(g)    Property of the Business. All memoranda, notes, lists, records and other documentation or papers (and all copies thereof), including such items stored in computer files, or microfiche or by any other means that are included in the Assets are and shall be the Company's property and shall be delivered to the Company or destroyed promptly on the request of Holding.

(h)    Remedies. Each Seller acknowledges and agrees that the covenants set forth in this **Section 8.1** hereof are reasonable and necessary for the protection of Holding's business interests, that irreparable injury may result to Holding if such Seller breaches any of the terms of this **Section 8.1**, and that in the event of an actual or threatened breach by such Seller of any of the provisions contained in this **Section 8.1**, Holding may have no adequate remedy at Law. Each Seller acknowledges that then covenants set forth in this **Section 8.1** will not interfere with his or her ability to earn a living. Each Seller accordingly agrees that in the event of any actual or threatened breach by it, him or her of any of the provisions contained in this **Section 8.1**, Holding shall be entitled to seek such injunctive and other equitable relief, without (i) the posting of any bond or other security, (ii) the necessity of showing actual damages or (iii) the necessity of showing that monetary damages are an inadequate remedy. Nothing contained herein shall be construed as prohibiting Holding from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of any damages that it is able to prove.

**Section 8.2.    Agreements Regarding Tax Matters.**

(a)    Sellers Returns. The Seller Representative shall timely prepare or cause to be prepared all Tax Returns of the Company relating to Sellers' Taxes for all periods of the Company ending on or prior to the Closing Date with respect to which a Tax Return was not due on or before the Closing Date (**"Sellers Returns"**). All Sellers Returns shall be prepared and filed in a manner consistent with the past practice of the Company unless otherwise required by applicable Law. The Seller Representative shall submit each

of the Sellers Returns to Holding for review and signing at least fifteen (15) days prior to the due date for the filing of such Seller Return (taking into account any extensions). Holding shall have the right to review and comment on each Seller Return prior to the filing of such Seller Return; provided that if the Seller Representative shall fail to submit any Seller Return to Holding in accordance with this **Section 8.2(a)**, Holding shall have the right to prepare and file such Seller Return. The Seller Representative and Holding shall consult and resolve in good faith any issues and comments arising as a result of the review of each Seller Return, and shall mutually consent to filing as promptly as possible each Seller Return provided that if the Seller Representative and Holding are unable to resolve any such issue within fifteen (15) days after any Seller Return is submitted to Holding, the dispute shall be submitted to the independent certified accounting firm of Virchow, Krause & Co. LLP (the "**Accountants**") for resolution and final determination within forty-five (45) calendar days. The determination by the Accountants shall be based solely on presentations by Holding, on the one hand, and the Seller Representative, on the other hand, and shall not involve independent review. Any determination by the Accountants with respect to any dispute shall be final, binding and non-appealable upon the parties. Each of Holding on the one hand, and Sellers, on the other hand, shall bear that percentage of the fees and expenses of the Accountants equal to the proportion of the dollar value of the unresolved disputed issues determined in favor of the other party. Sellers shall timely pay or cause to be paid to Holding all Sellers' Taxes reflected on each Seller Return (as finally determined under this **Section 8.2(a)**) at least five (5) days prior to the due date for filing such Tax Return (taking into account extensions).

(b)    Holding's Returns. Holding shall include Surviving Corporation in Holding's federal consolidated income Tax Return (and in any state consolidated or combined income Tax Return, where permitted) commencing with the period beginning on the day after the Closing Date. Holding shall timely prepare or cause to be prepared and file or cause to be filed any Tax Returns of the Company required to be filed by the Company with respect to any period beginning before the Closing Date and ending after the Closing Date (a "**Straddle Period**") relating to Sellers' Taxes (the "**Holding's Returns**"). All such Holding's Returns shall be prepared and filed in a manner consistent with the past practice of the Company unless otherwise required by applicable Law. Holding shall deliver, at least thirty (30) days prior to the due date for the filing of each Holding's Return (taking into account extensions), to the Seller Representative a statement setting forth the amount of Sellers' Taxes for which Sellers are responsible pursuant to this **Section 8.2(b)** with respect to such Tax Return and copies of such Tax Return. The Seller Representative shall have the right to review and comment on such Tax Return and the statement prior to the filing of such Tax Return. The Seller Representative and Holding shall consult and resolve in good faith any

39

issue arising as a result of the review of such Tax Return and statement, and shall mutually consent to the filing as promptly as possible of such Tax Return, provided that if the Seller Representative and Holding are unable to resolve any such issue within fifteen (15) days after such Tax Return is submitted to the Seller Representative, the dispute shall be submitted to the Accountant for resolution in accordance with **Section 8.2(a)**. Sellers shall pay to Holding at least five (5) days prior to the date on which Taxes are due with respect to any Straddle Period (taking into account extensions) an amount equal to the portion of the Taxes for such Straddle Period (as finally determined under this **Section 8.2(b)**) that are allocable to the portion of such Straddle Period ending on the Closing Date pursuant to **Section 8.2(c)** that are Sellers' Taxes.

(c)    Allocation of Tax Liability.    If the Company is permitted under any applicable foreign, state or local income tax law to treat the Closing Date as the last day of a Taxable period, Sellers and Holding shall treat (and cause their respective Affiliates to treat) the Closing Date as the last day of a Taxable period. For all purposes under this Agreement, in the case of Taxes that are payable with respect to any Straddle Period, the portion of any such Tax that is allocable to the portion of the period ending on the close of the Closing Date shall be (i) in the case of Taxes that are (x) based upon or related to income or receipts, (y) imposed in connection with the sale or other transfer or assignment of property (real or personal, tangible or intangible), or (z) employment, social security or other similar taxes, deemed equal to the amount which would be payable if the taxable year ended on the end of the Closing Date; and (ii) in the case of Taxes imposed on a periodic basis with respect to any assets or otherwise measured by the level of any item, deemed to be the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period) multiplied by a fraction the numerator of which is the number of calendar days in the period ending on the end of the Closing Date and the denominator of which is the number of calendar days in the entire period.

(d)    Cooperation.    Sellers and Holding shall, upon written request of the other, (i) each provide the other, and Holding shall cause the Company to provide Sellers, with such assistance as may be reasonably requested by any of them in connection with the preparation of any Tax Return, audit, or other examination by any taxing authority or judicial or administrative proceedings relating to liability for Taxes, (ii) each retain and provide the other, and Holding shall cause the Company to retain and provide Sellers with, any records or other information that may be relevant to such Tax Return, audit or examination, proceeding, or determination, and (iii) each provide the other with any final determination of any such audit or examination, proceeding, or determination that affects any amount required to be shown on any Tax Return of the other or the Company for any period. Without limiting the generality of the foregoing, Holding

40

shall retain, and shall cause the Company to retain, and Sellers shall retain, until the applicable statutes of limitations (including any extensions) have expired, copies of all Tax Returns, supporting work schedules, and other records or information that may be relevant to such returns for all Tax periods or portions thereof ending before or including the Closing Date and shall not destroy or otherwise dispose of any such records without first providing the other party with a reasonable opportunity to review and copy the same. Each party shall bear its own expenses in complying with the foregoing provisions.

(e)   Tax Contests.  Holding shall promptly notify the Seller Representative in writing upon receipt by Holding or any of its Affiliates, and the Seller Representative shall promptly notify Holding in writing upon receipt by any Seller of any of their Affiliates, of notice of any audits, examinations, adjustments or assessments relating to Taxes for which Holding may be entitled to receive indemnity under this Agreement (each, a "**Tax Claim**"); provided, that failure to comply with this provision shall not affect Holding's right to indemnification hereunder, except to the extent such failure prejudices the Seller Representative's ability to contest such claim. The Seller Representative, in its sole discretion, may contest such Tax Claim in any permissible forum and shall otherwise have the sole right at the sole expense of Sellers to direct, control and settle any administrative or judicial proceedings relating to such Tax Claim, provided that the (i) the Tax Claim may be resolved separately from any other proceeding that does not involve a Tax Claim, (ii) the Seller Representative notifies Holding in writing within ten (10) days of Holding's notification to the Seller Representative of such Tax Claim (or, in the case of any Tax Claim where notice is provided by any governmental authority directly to any Seller or their Affiliates, upon the receipt by any Seller or any of their Affiliates of notice of such Tax Claim) of its intent to exercise its right to direct, control, and settle such Tax Claim, (iii) Holding shall be entitled to participate at its sole expense in such administrative or judicial proceedings and (iv) to the extent any settlement of any such proceeding is reasonably expected to increase any Tax or result in any Loss to Holding or the Company in respect of any Tax or other Loss not indemnified under this Agreement by Sellers at the time of such settlement, the Seller Representative may not settle any such proceeding without the prior written consent of Holding (such consent not to be unreasonably withheld).

(f)   Tax Allocation Agreements. All tax allocation and tax sharing agreements, arrangements, policies and guidelines, formal or informal, express or implied, that may exist between the Company, on one hand, and Sellers or any of their respective Affiliates (other than the Company), on the other hand, and all obligations and rights thereunder, shall terminate as of the Closing Date, will have no further effect for any taxable year (whether the current year, a future year or a past year), and the Company shall cease to

41

have any liability to make or rights to receive any payment thereunder for any amounts due in respect of periods ending prior to or on or after the Closing Date.

**Section 8.3.    Further Assurances.**  Each of the parties hereto agrees that subsequent to the Closing Date, upon the reasonable request of any other party hereto, it shall execute and deliver, or cause to be executed and delivered, such further reasonable instruments and take such other commercially reasonable actions as may be necessary to carry out the transactions contemplated by this Agreement and the Transaction Documents or to vest, perfect or confirm ownership of the Company in Holding and ownership of the Assets in Holding.

**Section 8.4.    Names.**  From and after the Effective Time, each Seller agrees that he, she or it will not use any of the names "Therequip, Inc", "Hessco", or any derivations or variations thereof except in connection with Hessco Real Estate LLC, which shall not conduct any business operations other than owning and leasing the Real Property.

**Section 8.5.    Tax Treatment.**  Following the Closing, each party will file all income and other Tax Returns consistent with the treatment of the Merger as a merger under Sections 368(a)(1)(A) and 368(a)(2)(D) of the Code, unless and until there is a Final Determination to the contrary.

**Section 8.6.    Financial Information.**  As long as any Seller owns any shares of capital stock of Holding received in the Merger, such Seller shall be provided with annual consolidated financial statements of Holding as they become available.

**Section 8.7.    Certificate of Interim Financial Statements.**  On or prior to the date that is thirty (30) days after the Closing Date, the Sellers shall deliver to Holding a certificate, in the form attached hereto as Exhibit A, and an unaudited balance sheet and statement of operations and accumulated deficit, and statement of cash flows of the Company for the period from January 1, 2007 through and including the Closing Date, certified by each of the Sellers (the "**Certificate of Interim Financial Statements**").

# ARTICLE 9
## MISCELLANEOUS

**Section 9.1.    Notices.**  All notices, reports, records or other communications that are required or permitted to be given to the parties under this Agreement shall be sufficient in all respects if given in writing and delivered in person, by facsimile, by overnight courier or by registered or certified mail, postage prepaid, return receipt requested, to the receiving party at the following address:

| If to the Seller Representative: | David Schultz |
| | 1012 13th Avenue |
| | Grafton WI 53024 |
| | Facsimile: (414) 978-8847 |

| with a copy to: | Thomas A. Simonis |
| | Quarles & Brady LLP |
| | 411 East Wisconsin Avenue |
| | Suite 2040 |
| | Milwaukee, Wisconsin 53202 |
| | Facsimile: (414) 978-8847 |

| If to Holding: | c/o Beecken Petty O'Keefe & Company |
| | 131 S. Dearborn |
| | Suite 2800 |
| | Chicago, Illinois 60603 |
| | Facsimile: (312) 435-0371 |
| | Attention: Thomas A. Schlesinger |

| with a copy to: | Katten Muchin Rosenman LLP |
| | 525 West Monroe Street |
| | Chicago, Illinois 60661-3693 |
| | Facsimile: (312) 902-1061 |
| | Attention: Brian F. Richards, Esq. |

or such other address as such party may have given to the other parties by notice pursuant to this Section 9.1. Notice shall be deemed given on (i) the date such notice is personally delivered, (ii) three (3) days after the mailing if sent by certified or registered mail, (iii) one (1) business day after the date of delivery to the overnight courier if sent by overnight courier, or (iv) the next succeeding business day after transmission by facsimile, with a copy to be sent by certified or registered mail or by overnight courier.

Section 9.2.    **General Definitions.**    For the purposes of this Agreement, the following terms have the meaning set forth below:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person, and any officer, director or executive employee of such Person and includes any past or present Affiliate of any such Person.

"**Affiliated Group**" means an affiliated group as defined in Section 1504 of the Code (or analogous combined, consolidated or unitary group defined under state, local or foreign income Tax law).

"**Buyer Assumed Indebtedness**" means Indebtedness in the amount of (i) $5,054.66 with respect to that certain loan by De Lage Landen Financial Services, Inc. to the Company, dated June 6, 2005, (ii) $2,418.06 with respect to that certain vehicle loan by Chase Automotive

Finance to the Company, dated April 30, 2004, and (iii) $16,439.79 with respect to that certain loan no. 34183 by Bankers Leasing Company to the Company, dated June 4, 2004.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company Closing Costs**" means all fees, costs and expenses (including all fees and expenses of Sellers' and the Company's legal, accounting, consulting, and other professional advisors, including, without limitation, Quarles & Brady LLP and Jannsen & Company S.C.) that are directly related to the transactions contemplated by this Agreement to the extent incurred by the Company, whether or not paid prior to the date hereof, including (a) all payments required to obtain third party consents and all expenses incurred by the Company in connection with transactions contemplated thereby and (b) all change of control payments due by the Company to any Person under any plan, agreement or arrangement of the Company, which liability, in each case, is payable or becomes due as a result of the consummation of the transactions contemplated hereby, including all Taxes which are payable by the Company in connection with the payment of such liability.

"**Employee Benefit Plan**" means any of the following (whether written, unwritten or terminated): (a) any "employee welfare benefit plan," as defined in Section 3(1) of ERISA, including, but not limited to, any medical plan, life insurance plan, short-term or long-term disability plan, dental plan, and sick leave; (b) any "employee pension benefit plan," as defined in Section 3(2) of ERISA, including, but not limited to, any excess benefit, top hat or deferred compensation plan or any nonqualified deferred compensation or retirement plan or arrangement or any qualified defined contribution or defined benefit plan; or (c) any other plan, policy, program, arrangement or agreement that provides employee benefits or benefits to any current or former employee, dependent, beneficiary, director, independent contractor or like person, including, but not limited to, any severance agreement or plan, personnel policy, vacation time, holiday pay, service award, moving expense reimbursement programs, tool allowance, safety equipment allowance, material fringe benefit plan or program, bonus or incentive plan, stock option, restricted stock, stock bonus or deferred bonus plan, salary reduction, change-of-control or employment agreement (or consulting agreement with a former employee).

"**Employee Benefit Plan of the Company**" shall mean any Employee Benefit Plan, whether or not listed on **Schedule 4.19** which the Company has maintained or, with respect to which the Company has made contributions or had any other liability or potential liability at any time.

"**Environmental and Safety Requirements**" means all multi-national, federal, state and local laws, rules, regulations, ordinances, orders, statutes, actions, policies and requirements relating to public health and safety, worker health and safety, pollution or protection of the environment, all as amended or hereafter amended.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means the Company, any subsidiary, and predecessor of any of them and any other Person who constitutes or has constituted all or part of a controlled group or had been or is under common control with, or whose employees were or are treated as employed by,

any of the Company, any subsidiary and/or any predecessor or any of them, under Section 414 of the Code.

"**GAAP**" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession that are applicable to the circumstances from time to time.

"**Guarantee**" means any obligation, contingent or otherwise, pursuant to which the Company has directly or indirectly guaranteed any obligation of any other Person (other than by reason of endorsement of checks in the ordinary course of collection) or pursuant to which the Company has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assumed a creditor's obligations under any agreement. The term "guarantee" used as a verb has a corresponding meaning.

"**Hazardous Materials**" means (a) hazardous materials, hazardous substances, extremely hazardous substances, hazardous wastes, infectious wastes, acute hazardous wastes, toxic substances, toxic contaminants or pollutants, as those terms are defined by the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, and any other Environmental and Safety Requirements; (b) petroleum, including crude oil or any fraction thereof that is liquid at standard conditions of temperature and pressure (60 degrees Fahrenheit and 14.7 pounds per square inch absolute); (c) any radioactive material, including any source, special nuclear, or by-product material as defined in 42 U.S.C. § 2011 *et seq.*; (d) asbestos in any form or condition; and (e) any substance that contains regulated levels of polychlorinated biphenyls.

"**Indebtedness**" means, without duplication (a) all indebtedness for borrowed money or funded debt (including any amounts owed on credit cards, provided however that for purposes of clarification, all unbilled amounts on such credit cards as of the Closing Date shall be excluded from Indebtedness) owed by the Company, (b) all Guarantees, (c) all liabilities of the Company evidenced by notes, bonds or debentures, (d) all liabilities of the Company secured by any Liens, (e) all obligations of the Company under leases which shall have been or should be, in accordance with GAAP, recorded as capital leases, (f) all liabilities of the Company arising from installment purchases of property or representing the deferred purchase price of property or services in respect of which the Company is liable, contingently or otherwise, as obligor or otherwise (other than trade payables and other current liabilities incurred in the ordinary course), (g) any Company Closing Costs, (h) any Severance Payments and (i) any interest, principal, prepayment penalty, fees, or expenses, to the extent due or owing in respect of those items listed in clauses (a) through (h) above; provided that Indebtedness shall not include any borrowings by Holding to finance the transactions contemplated hereby. For purposes of clarity Indebtedness includes advances to the Company for lease referral commissions and the amount of the Legal Settlement Liability.

"**Intellectual Property**" means, collectively, in the United States and all countries or jurisdictions foreign thereto, (i) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all Patents, (ii) all Trademarks, all

45

goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (iii) all moral rights and copyrights in any work of authorship (including but not limited to databases, software, and mask works) and all applications, registrations, and renewals in connection therewith, (iv) all trade secrets and confidential business information (including confidential ideas, research and development, know-how, methods, formulas, compositions, manufacturing and production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (v) computer software and firmware (including source code, executable code, data, databases, user interfaces and related documentation) (collectively, "**Software**"), (vi) all other proprietary and intellectual property rights, (vii) all copies and tangible embodiments of any of the foregoing (in whatever form or medium), and (viii) all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property), and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property.

"**Key Employees**" means David Schultz, Debra Schultz, Douglas Schultz and Michael Peterson.

"**Legal Settlement Liability**" means the Company's liability pursuant to that certain Settlement Agreement with Hill Laboratories Company dated March 23, 2005.

"**Letter of Intent**" means the letter of intent entered into by Scrip Products Corporation, the Company and the Sellers, dated March 12, 2007.

"**Patents**" means all letters patent and pending applications for patents of the United States and all countries and jurisdictions foreign thereto and all reissues, reexaminations, divisions, continuations, continuations-in-part, revisions, and extensions thereof.

"**Permits**" means all rights of the Company in and to permits, licenses, registrations, qualifications, approvals and authorizations by or of Governmental Authorities or third parties needed for or used in connection with its operation of the Business, including without limitation, those set forth on **Schedule 4.15**.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated association, corporation or other entity or any Governmental Authority.

"**Sellers' Taxes**" means all Taxes (i) due and payable from the Company at or prior to the Effective Time without regard to any extensions related thereto, (ii) related to income of the Company for all periods (or portions thereof) ending on or prior to the Closing Date and (iii) arising in connection with transactions, events or occurrences which are outside the ordinary course of business, including without limitation, (A) all transactions contemplated by this Agreement and (B) the distribution or transfer by the Company of any vehicles or real property, including the real property located on Highway 33 in Saukville, Wisconsin.

"**Severance Payments**" means all severance, stay bonus or change of control payments (whether payable prior to, on or after the Closing Date) that arise or arose under any Employee

Benefit Plan of the Company or contract either (i) at or prior to the Effective Time or (ii) in whole or in part as a result of the consummation of the transactions contemplated by this Agreement.

"**Tax**" means any multi-national, Federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, entertainment, amusement, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, *ad valorem*, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, or other tax, of any kind whatsoever, including any interest, penalties or additions to Tax or additional amounts in respect of the foregoing; the foregoing shall include any transferee or secondary liability for a Tax and any liability assumed by agreement or arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto).

"**Tax Returns**" means returns, declarations, reports, claims for refund, information returns or other documents (including any related or supporting schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax of any party or the administration of any laws, regulations or administrative requirements relating to any Tax.

"**Trademarks**" mean, in the United States and all countries and jurisdictions foreign thereto, registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, registered trade names and unregistered trade names, corporate names, fictitious names, trade dress, logos, slogans, Internet domain names, rights in telephone numbers, and other indicia of origin, together with all translations, adaptations, derivations, combinations and renewals thereof.

Section 9.3.    **Entire Agreement; Amendment.**    This Agreement, including the exhibits and schedules hereto, the Transactions Documents and the instruments and agreements executed in connection herewith and therewith contain all of the terms, conditions and representations and warranties agreed upon by the parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter, between Holding and the Company, and the Letter of Intent.    This Agreement shall not be amended or modified except by an agreement in writing duly executed by Holding and the Seller Representative.

Section 9.4.    **Counterparts; Deliveries.**    This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.    This Agreement, the Transaction Documents and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.    At the request of any party hereto or to any such

agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties, except that the failure of any party to comply with such a request shall not render this Agreement invalid or unenforceable. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 9.5.    **Third Parties.**    Nothing in this Agreement, express or implied, is intended to confer any right or remedy under or by reason of this Agreement on any Person other than the parties signatory hereto, the Holding Indemnified Parties, the Seller Indemnified Parties and their respective heirs, representatives, successors and assigns, nor is anything set forth herein intended to affect or discharge the obligation or liability of any third Persons to any party to this Agreement, nor shall any provision give any third party any right of subrogation or action over against any party to this Agreement.

Section 9.6.    **Expenses.**    Each of the parties shall pay all costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and all documents executed in connection herewith and in closing and carrying out the transactions contemplated hereunder and thereunder including, but not limited to, legal and accounting fees and expenses (collectively, the "Expenses"); provided, however, that Sellers shall be solely responsible for all Company Closing Costs. Sellers shall be solely responsible for any broker fees or finder's fees incurred by Sellers or the Company in connection with the transactions contemplated by this Agreement and the Transaction Documents. Each of Hessco, on the one hand, and Sellers, on the other hand, shall be responsible for fifty percent (50%) of all sales, transfer, documentary, stamp, recording and similar taxes due with regard to the transactions contemplated by this Agreement.

Section 9.7.    **Waiver.**    No failure of any party to exercise any right or remedy given to such party under this Agreement or otherwise available to such party or to insist upon strict compliance by any other party with its obligations hereunder, and no custom or practice of the parties in variance with the terms hereof, shall constitute a waiver of any party's right to demand exact compliance with the terms hereof, unless such waiver is set forth in writing and executed by such party. Any such written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations or other non-specified breaches or violations unless, and to the extent, set forth therein.

Section 9.8.    **Governing Law.**    This Agreement shall be construed and governed in accordance with the internal laws of the State of Delaware without regard to the principles of conflicting laws.

Section 9.9.    **Assignments.**    This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Notwithstanding the foregoing, nothing in this Agreement is intended to limit Holding's ability to assign its rights or delegate its responsibilities, liabilities and obligations under this Agreement to (a) any Affiliate of Holding, (b) any purchaser of all or substantially all of the assets of Holding or (c) to lenders to Holding or its Affiliates as security for borrowings, at any time

whether prior to or following the Closing Date without consent. Notwithstanding anything to the contrary contained herein, neither the Company nor any Seller may assign any of his, her or its rights or delegate any of its responsibilities, liabilities or obligations under this Agreement, without the written consent of Holding.

Section 9.10. **Headings.** The subject headings of articles and sections of this Agreement are included for purposes of convenience of reference only and shall not affect the construction or interpretation of any of its provisions.

Section 9.11. **Jurisdiction of Courts.** Except as set forth in **Section 8.2,** any Proceeding initiated over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby shall be initiated in any federal or state court located within the County of Cook, State of Illinois, and the parties further agree that venue for all such matters shall lie exclusively in those courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection that they may now or hereafter have, including, but not limited to, any claim of forum non conveniens, to venue in the courts located in Cook County, Illinois. The parties agree that a judgment in any such dispute may be enforced in other jurisdictions by Proceedings on the judgment or in any other manner provided by Law.

Section 9.12. **Waiver of Jury Trial. Each of the parties hereto hereby irrevocably waives any and all right to trial by jury of any claim or cause of action in any legal proceeding arising out of or related to this Agreement or the transactions or events contemplated hereby or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party hereto. The parties hereto each agree that any and all such claims and causes of action shall be tried by the court without a jury. Each of the parties hereto further waives any right to seek to consolidate any such legal proceeding in which a jury trial has been waived with any other legal proceeding in which a jury trial cannot or has not been waived.**

Section 9.13. **Construction.** Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates. The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

Section 9.14. **Sellers' Knowledge.** For purposes of this Agreement and the Transaction Documents, "knowledge of Sellers" and each phrase having equivalent meaning (*e.g.,* "known to the Sellers" or "to the Sellers' knowledge") shall mean any facts or other information or matter of which any Seller has knowledge. Each of the foregoing individuals shall be deemed to have "knowledge" of a particular fact or other information or other information or matter if such individual is actually aware of such fact or other information or matter or if it is reasonable to expect that an individual holding any such individual's position would, in the normal course of affairs, be aware of such fact or other information or matter.

49

**Section 9.15.  Disclosure Schedules.**    Notwithstanding anything to the contrary contained herein, nothing in any of the disclosure schedules to this Agreement (the "**Disclosure Schedules**") shall be deemed adequate to disclose an exception to a representation or warranty made by Sellers herein except to the extent such Disclosure Schedules identify the exception with reasonable particularity and in reasonable detail.

**Section 9.16.  Public Announcements.**    No party shall make any public announcement or filing with respect to the transactions provided for herein without the prior written consent of Holding and the Seller Representative, unless otherwise required by Law.  Any press release or other announcement or notice regarding the transactions contemplated by this Agreement shall be a joint press release mutually agreed to in writing by Holding and the Seller Representative.

**Section 9.17.  Seller Representative.**

(a)    Each of the Sellers, by the execution and delivery of this Agreement, hereby consents and agrees to the appointment of David Schultz as the initial "**Seller Representative**" for purposes of this Agreement.  The Seller Representative may be removed at any time upon the written election of Sellers representing at least 51% of the aggregate voting power of the Stock immediately prior to the Closing; provided that such Sellers concurrently elect a replacement Seller Representative and Holding is given prompt written notice of such replacement by the Seller Representative.  Each Seller hereby constitutes and appoints the Seller Representative, including any replacement of any such Seller Representative, as attorney-in-fact for such Seller with full power of substitution and authority to execute any amendment or waiver of this Agreement, any Transaction Document or any other document or instrument necessary or advisable in order to carry out the provisions of this Agreement, any Transaction Document or any other document or instrument executed in connection therewith, to give and receive notices and communications, to dispute, concede or settle any claim by any Holding Indemnified Party with respect to indemnification hereunder, to agree to, negotiate, enter into settlements and compromises of, and to comply with orders of courts with respect to any dispute or loss, to contest, negotiate, and settle all matters under **Section 8.2** and to take all actions necessary or appropriate in the judgment of the Seller Representative for the accomplishment of the foregoing.  Sellers shall, pro rata, be responsible for the payment of all fees and expenses reasonably incurred by the Seller Representative in performing its duties under this Agreement.  All decisions of the Seller Representative may be relied upon by Holding, the Company and any third Person, and shall be binding and conclusive upon each Seller.

(b)    The Seller Representative shall not be liable, responsible or accountable in damages or otherwise to Sellers for any loss or damage incurred by reason of any act or failure to act by such Seller Representative, and each Seller shall indemnify and hold harmless the Seller Representative against any

50

loss or damage except to the extent that such loss or damage shall have been the result of the individual gross negligence or willful misconduct of such Seller Representative..

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.**
**SIGNATURE PAGE FOLLOWS.]**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

THE COMPANY:

THEREQUIP INC.

By: _Dave Schulte_

Its: _Pres_

SELLERS:

_____
David Schultz

_____
Debra Schultz

_____
Douglas Schultz

_____
Michael Peterson

HOLDING:

SCRIP HOLDING CORPORATION

By:_____
Name: Thomas A. Schlesinger
Its:     Vice President

HESSCO:

HESSCO HEALTH PRODUCTS, INC.

By:_____
Name: Thomas A. Schlesinger
Its:     Vice President

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

THE COMPANY:

THEREQUIP INC.

By: _____

Its: _____

SELLERS:

_____
David Schultz

_____
Debra Schultz

_____
Douglas Schultz

_____
Michael Peterson

HOLDING:

SCRIP HOLDING CORPORATION

By: _____
Name:  Thomas A. Schlesinger
Its:      Vice President

HESSCO:

HESSCO HEALTH PRODUCTS, INC.

By: _____
Name:  Thomas A. Schlesinger
Its:      Vice President

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

THE COMPANY:

THEREQUIP INC.

By: _____

Its: _____

SELLERS:

_____
David Schultz

_____
Debra Schultz

_____
Douglas Schultz

_____
Michael Peterson

HOLDING:

SCRIP HOLDING CORPORATION

By: _____
Name: Thomas A. Schlesinger
Its:    Vice President

HESSCO:

HESSCO HEALTH PRODUCTS, INC.

By: _____
Name: Thomas A. Schlesinger
Its:    Vice President

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

THE COMPANY:

THEREQUIP INC.

By: _____

Its: _____

SELLERS:

_____
David Schultz

_____
Debra Schultz

_____
Douglas Schultz

_____
Michael Peterson

HOLDING:

SCRIP HOLDING CORPORATION

By: _____
Name: Thomas A. Schlesinger
Its:     Vice President

HESSCO:

HESSCO HEALTH PRODUCTS, INC.

By: _____
Name: Thomas A. Schlesinger
Its:     Vice President

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**THE COMPANY**:

**THEREQUIP INC.**

By: _____

Its: _____

**SELLERS**:

_____

David Schultz

_____

Debra Schultz

_____

Douglas Schultz

_____

Michael Peterson

**HOLDING**:

**SCRIP HOLDING CORPORATION**

By: _____
Name:  Thomas A. Schlesinger
Its:    Vice President

**HESSCO**:

**HESSCO HEALTH PRODUCTS, INC.**

By: _____
Name:  Thomas A. Schlesinger
Its:    Vice President

### SCHEDULE A

| Seller | Number of shares of Stock | Percentage of Company Ownership | Cash Consideration Payable to Such Seller | Percentage Interest in Escrow Amount | Dollar Value of Stock Consideration | Number of Strips of Stock Consideration |
|---|---|---|---|---|---|---|
| David Schultz | 63 | 37.72455% | $404,769.28 | 37.72455% | $525,200 | 404 |
| Debra Schultz | 25 | 14.97006% | $44,035.44 | 14.97006% | $325,000 | 250 |
| Douglas Schultz | 32 | 19.16168% | $122,665..44 | 19.16168% | $349,700 | 269 |
| Michael Peterson | 47 | 28.14371% | $493,586.56 | 28.14371% | $200,200 | 154 |
| Total | 167 | 100.00000% | $1,065,056.72 | 100% | $1,400,100 | 1,077 |

## EXHIBIT A

## CERTIFICATE REGARDING INTERIM FINANCIAL STATEMENTS

Pursuant to **Section 8.7** of that certain Merger Agreement, dated as of July 11, 2007 (the "**Agreement**"), between Scrip Holding Corporation, Hessco Health Products, Inc., Therequip, Inc. and each of the Persons listed on Schedule A thereto, each of the Sellers (as defined in the Agreement) desires to deliver this certificate to Holding. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

Each of the Sellers hereby jointly and severally represent, warrant and certify to Holding that:

Attached hereto are the unaudited balance sheet, statement of operations and accumulated deficit, and statement of cash flows for the period from January 1, 2007 through and including the Closing Date (the "**Interim Financial Statements**"). The Interim Financial Statements were prepared in good faith and were taken from the books and records of the Company (which, in turn, fairly reflect in all respects all the transactions of, acquisitions and dispositions of assets by, and incurrence of liabilities by, the Company), and except as set forth on **Schedule 4.7(a)(ii)**, fairly present in all material respects the Company's financial condition, assets and liabilities as of such date and the results of operations, retained earnings, cash flows and changes in financial position as of such date and for the period covered thereby, and except as set forth on **Schedule 4.7(a)(ii)** of the Agreement, has been prepared in accordance with GAAP consistently applied throughout the period covered thereby.

IN WITNESS WHEREOF, the undersigned have executed this certificate as of this [___] day of [_____], 2007.

_____
David Schultz

_____
Debra Schultz

_____
Douglas Schultz

_____
Michael Peterson

60575128