Beets worked in a light duty capacity for *at least* an additional 187 hours;

(c)   In 2000, Officer Beets was absent from work for a total of *at least* 1,451.25 of the 2,080 hours required of a full time police officer (equivalent to 181.4 eight hour work days).[3] While at work, Officer Beets worked in a light duty capacity for *at least* an additional 77.5 hours;

(d)   In 2001, Officer Beets was absent from work for a total of *at least* 510 of the 2,080 hours required of a full time police officer (equivalent to 63.75 eight hour work days).[4] While at work, Officer Beets worked in a light duty capacity for *at least* an additional 123 hours;

(e)   In 2002, Officer Beets was absent from work for a total of *at least* 476.5 of the 2,080 hours required of a full time police officer (equivalent to 59.56 eight hour work days). While at work, Officer Beets worked in a light duty capacity for *at least* an additional 675.7 hours;

(f)   In 2003, Officer Beets was absent from work for a total of *at least* 797 of the 2,080 hours required of a full time police officer (equivalent to 99.62 eight hour work days). While at work, Officer Beets worked in a light duty capacity for *at least* an additional 132 hours;

(g)   In 2004, Officer Beets was absent from work for a total of *at least* 920 of the 2,080 hours required of a full time police officer (equivalent to 115 eight hour work days). While at work, Officer Beets worked in a light duty capacity for *at least* an additional 813 hours;

(h)   In 2005, Officer Beets was absent from work for a total of *at least* 589.5 of the 2,080 hours required of a full time police officer

---

[3] As listed on Officer Beets' Exhibit 2000-1, 1,442.50 of the 1,451.25 total hours missed in 2000 were attributed to "pregnancy complications" or "pregnancy problems." The Board notes, however, that none of the time missed in 2000 is designated by either Officer Beets or the City as FMLA leave.

[4] As listed on Officer Beets' Exhibit 2001, 176 of her hours missed were listed as "maternity leave," while another 55 were listed as "workers comp. hours." Again, none of the time missed in 2001 is designated by either Officer Beets or the City as FMLA leave.

(equivalent to 73.68 eight hour work days).[5]  Officer Beets did not work at all in a in a light duty capacity during 2005;

(i)  In 2006, Officer Beets was absent from work for a total of **at least** 1,125 of the 2,080 hours required of a full time police officer (equivalent to 140.62 eight hour work days).[6]  Officer Beets did not work at all in a in a light duty capacity during 2006;

(j)  From January 1, 2007, until she was placed on administrative leave pending the outcome of these proceedings, Officer Beets was absent from work for a total of **at least** 917.75 of the 1,170.50 hours required of a full time police officer (equivalent to 114.72 eight hour work days).  While at work, Officer Beets worked in a light duty capacity for an additional 252.50 hours.  During 2007, prior to the filing of the complaint in this matter, Officer Beets did not work any hours in a "full duty" capacity.

24.    Officer Beets, testifying on her own behalf, explained that her use of sick time and her light duty assignments were attributable to, among other things, two high-risk pregnancies, two work-related injuries and a recent off-duty accident.  The Board accepts this testimony as true.

25.    In the findings set forth above regarding the number of hours Officer Beets has been absent or on light duty, the Board has not counted or considered any absences protected under

---

[5]According to Officer Beets' Exhibit 2005-1 and 2005-2, Officer Beets missed a total of 977 hours for "FMLA/Pregnancy."  In the detailed listing of the time missed on Exhibit 2005-1, the entries which include a reference to the FMLA total 512 hours.  As a full-time employee, Officer Beets was entitled to a total of 480 hours (twelve 40-hour weeks) of FMLA leave.  Accordingly, in calculating the total amount of time Officer Beets was absent from work during 2005, the Board subtracted 480 hours from the 977 hours Officer Beets attributed to "FMLA/Pregnancy" and then added the 53 hours of "sick time" and the 39.5 hours of missed time attributed to "workers comp." to reach the total of 589.5 hours missed from work in 2005.

[6]According to Officer Beets' Exhibit 2006, Officer Beets missed a total of 632 hours which were "Pregnancy Related."  In the detailed listing of the time missed on Exhibit 2006, there are seven (7) entries for 40-hour weeks which are designated as "Maternity Leave."  That designation appears to be in compliance with Section VI of the Department's General Order 72-6 (Chief's Exhibit 6), which states that "an employee is expected to return to work at the beginning of the seventh week following delivery."  Accordingly, in calculating the total amount of time Officer Beets was absent from work during 2006, the Board subtracted 280 (seven 40-hour weeks of "maternity leave") from the 632 hours Officer Beets attributed to "Pregnancy Related" absences and then added the 773 hours attributed to "wrist injury" to reach the total of 1,125 hours missed from work in 2006.

applicable law, such as the FMLA, against Officer Beets for purposes of these proceedings. In other words, the numbers set forth above reflect only absences and light duty assignments that are not protected by any applicable state or federal law.

26.    The Board also notes that both Deputy Chief Sweeney and the Department's payroll timekeeper, Janet Ottwell, testified that the Department had excluded properly earned and designated FMLA leave from its calculation of Officer Beets' use of "sick time" as set forth on Chief's Exhibits 1 and 2. In addition, Ms. Ottwell testified that the numbers reflected on Chief's Exhibits 1 and 2 were calculated after making allowances for all vacation time, holiday time and compensatory time to which full-time patrol officers are entitled. The Board finds these witnesses' testimony to be credible and notes that Officer Beets did not present any contradictory testimony.

27.    The City next called Deputy Chief Mike Booker as a witness. Deputy Chief Booker characterized the amount of time that Officer Beets was absent from work or working on light duty during her career as "excessive," and noted that when Officer Beets was absent from work, her unit "started every day down 20%." Deputy Chief Booker characterized Officer Beets' dependability as "poor" and testified that when Officer Beets missed work, other officers had to "pick up the slack." Deputy Chief Booker testified that when Officer Beets was absent from work, the Department was forced to "hire back" other officers "at considerable expense" and that officers who covered for Officer Beets are paid "time and a half." If Officer Beets' shifts were not covered, the Department was not able "to deliver the same level of service." See also Chief's Exhibit 7.

28.    The Board finds that Officer Beets was warned that her use of sick time had been, and continued to be, "excessive." Specifically, the Department sent Officer Beets a letter dated May 18, 2007 (Chief's Exhibit 7) which informed Officer Beets that she had used 1,405 hours of sick

time in 2006 (out of 2,080 hours an officer works annually) and an additional 494 hours of sick time in 2007 (of the 800 hours that could have been worked as of the date of the letter). The letter further noted that "the department's average use of sick time per officer a year is 32 hours." The letter concluded by informing Officer Beets that "[i]mmediate action is needed to improve your sick time usage because your position as an officer is in jeopardy" and warning that if her "sick leave usage continues to be excessive, progressive discipline will continue." Chief's Exhibit 7.

29.    The Board finds that Officer Beets use of sick time did not "improve" between May 18, 2007, and the date that the City filed its original complaint in this matter on August 8, 2007. See paragraph 23(j), above.

30.    Officer Beets, through her counsel, asserted at the hearing that the Department has a "past practice" of allowing "unlimited sick time" to any police officer who has suffered an injury or illness. In support of this assertion, Officer Beets called Lieutenant Doug Block as a witness.

31.    Lieutenant Block testified that, prior to his promotion to Lieutenant, he served for approximately ten years as the President of the Police Benevolent & Protective Association, Unit #6 ("PBPA #6"), the union that represents Rockford police officers. Lieutenant Block testified that, during his tenure as the President of PBPA #6, the union took the position that officers were entitled to unlimited sick time.

32.    On cross-examination, Lieutenant Block agreed that although the City and PBPA #6 had negotiated over the possibility of including a written "absenteeism" policy into the CBA, no such policy was ever agreed upon and the current CBA does not contain such a policy.

33.    Officer Beets also introduced in evidence a "City of Rockford Family Medical Leave Request Form" dated July 5, 2005, which was marked as Union Exhibit 2 and admitted in evidence.

Officer Beets identified the form as one that she completed, but testified that the handwriting on the document that reads "unlimited sick time" was not her handwriting and she could not identify whose handwriting it was.

34.    Copies of two pages of the collective bargaining agreement ("CBA") that is currently in effect between the City and PBPA #6 were introduced in evidence as Chief's Exhibits 4 and 5 without objection.

35.    Chief's Exhibit 4 is a copy of page 17 of the CBA and was introduced in evidence for the purpose of drawing the Board's attention to the following language:

> "7.5A. <u>Sick Leave</u>    Sick leave shall be administered pursuant to the past practice of the parties hereto, except as provided in Article 7.5B below."

36.    Lieutenant Block testified that, in his opinion, the union's position that PBPA #6 members could take "unlimited sick time" had been incorporated into the CBA as a "past practice" by the above-referenced language contained in the CBA.

37.    Chief's Exhibit 5 is a copy of the cover page and the first page of the CBA and was introduced for the purpose of drawing the Board's attention to the following language:

> "1.2    <u>Management Rights</u>    Except as expressly modified by this Agreement, the City retains the sole right and authority to operate and direct the affairs of the City, including the exclusive management, control and operations of the Police Department including, but not limited to, all rights and authority exercised by te City and the police Department prior to the execution of this Agreement.  Said rights include, but are not limited to the right to set standards of service and protection to be offered to the citizens; direct the work forces; prescribe overtime and the policies related thereto; select the managerial and supervisory employees; direct plan, control and determine the operations of the Police Department and the services to be delivered to the citizens; assign and reassign employees; hire and promote employees; demote, suspend, discipline or discharge for just cause; relieve employees due to lack of work or other legitimate reasons; make and enforce rules and regulations and make changes therein; change methods of operations, equipment or facilities, including contracting and subcontracting; provided, however, the

exercise of any of the above rights shall not conflict with any of the provisions of this Agreement."

38.     The Board finds that the City and the PBPA #6 have never reached an agreement, written or otherwise, to the effect that members of the PBPA #6 may use "unlimited sick time" throughout the course of their careers without placing their jobs at risk.

39.     Other than Lieutenant Block's testimony and argument regarding the proper interpretation of Chief's Exhibits 4 and 5, Officer Beets did not introduce any additional testimony or evidence to support the conclusion that the Department had an unwritten policy, incorporated into the CBA as a "past practice," of allowing all Rockford police officers to take "unlimited sick time" throughout the course of their careers without placing their jobs at risk.

40.     Without much more substantial evidence on this issue, the Board does not find credible the claim that an employer, such as the City, would have an express or implicit unwritten policy of allowing its employees to use virtually "unlimited sick time" for their entire careers. The Board accepts the possibility that the Department may have, in its discretion, allowed individual police officers to take substantial sick leave during particular years based on the circumstances facing those officers during those years. The Board does not, however, find credible the notion that the Department has always allowed all police officers to call in sick repeatedly over a period of many years, or to spend as much time as has been demonstrated in this case on "light duty" assignments, without placing their jobs in jeopardy. In summary, the Board concludes that much more extensive and credible evidence of the existence of such a broad, unwritten and apparently unrestricted "sick time" policy would be required to prove its existence.

41.     Officer Beets did not introduce any testimony or evidence on the issue of whether other Rockford police officers with attendance records that are substantially similar to her own

attendance record have been allowed to remain employed by the City. More specifically, the record before the Board does not include the names or attendance records of any other identified Rockford police officers or any testimony or evidence to support a finding that there are other, comparable Rockford police officers who have been allowed to remain employed by the City despite being absent from work for the same, or substantially the same, amount of time as Officer Beets over a multi-year period.

42.     Officer Beets' counsel also argued that the Chief's decision to bring the pending complaint against Officer Beets constituted retaliation for her previously filed workers' compensation claims.  The Board finds and concludes that Officer Beets did not present any testimony or other evidence at the hearing of a retaliatory motive by the Chief or anyone else who may have been involved in the decision to file the pending complaint with the Board.

43.     With respect to the retaliation issue, the Board further finds that there is no temporal connection between the workers' compensation claims that were referenced during the hearing (see Officer Beets' Exhibit 4) and the filing of these proceedings on August 8, 2007. Officer Beets' first workers' compensation claim went to arbitration in December, 2001 (resulting in an award in Officer Beets' favor), and her second claim was resolved by settlement in June, 2006. Both claims were therefore concluded more than a year before this case was filed.

44.     Officer Beets testified that the wrist and shoulder injuries to which she attributes much of her absenteeism during 2006 and 2007 were the result of an unusual non-work related accident that occurred when she attempted to pick up her luggage at an airport.

45.    When asked whether she had, as of the date of the hearing, been released to work full time without restrictions, Officer Beets testified that she had been released to return to work, but only in a "light duty" capacity.

46.    In summary, the Board finds that although Officer Beets is a dedicated and apparently capable police officer when she is able to work for the Department, a series of unfortunate, unusual and sometimes tragic events have made her substantially unable to perform in full capacity as a full time Rockford police officer for the entire time she has been employed by the City.

E.    APPLICABLE LAW AND BOARD'S CONCLUSIONS OF LAW

47.    Under Illinois law, "cause" for discharging a police officer is defined as "some substantial shortcoming which renders the employee's continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognizes as good cause for his no longer occupying the place." *Carrigan v. Board of Fire and Police Com'rs of Village of Glendale Heights*, 121 Ill.App.3d 303, 311 (2d Dist. 1984); *Fantozzi v. Board of Fire and Police Com'rs of Village of Villa Park*, 27 Ill.2d 357, 369 (1963).

48.    The Board "is afforded considerable latitude and discretion in determining what constitutes cause for discipline or discharge." *Petraitis v. Board of Fire and Police Com'rs of City of Palos Hills*, 31 Ill.App.3d 864, 868 (1st Dist. 1975).

49.    "An administrative tribunal's finding of cause for discharge commands respect, and it is to be overturned only if it is arbitrary and unreasonable or unrelated to the requirements of the service." *Carrigan*, 121 Ill.App.3d at 311; *Petraitis*, 31 Ill.App.3d at 868 (Board's decision will not be reversed so long as its findings are "not so trivial as to be arbitrary or unreasonable.").

50.    The Illinois Supreme Court has held that an employer is absolutely entitled to terminate an employee for excessive absenteeism, even if the absenteeism results directly from an occupational injury. *Hartlein v. Illinois Power Co.*, 151 Ill.2d 142, 160 (Ill. 1992); see also *Finnerty v. Personnel Bd. of City of Chicago*, 303 Ill.App.3d 1, 8 (1st Dist. 1999).

51.    Applicable Illinois law further provides that "[a]n employer is not proscribed from discharging an employee who is physically unable to perform his work" and "is not required to find a new job for an employee who is physically unable to do his original job." *Hess v. Clarcor, Inc.*, 237 Ill.App.3d 434, 449 (2d Dist. 1992).

52.    Though the record before the Board does not include the names or attendance records of any other identified Rockford police officers, the Board notes that even if such evidence had been introduced, cause for discipline and/or discharge can be found regardless of whether other employees have been disciplined differently. *Launius v. Board of Fire & Police Commissioners*, 151 Ill.2d 419, 442 (1992).

53.    Although the Board has found as a matter of fact that Officer Beets did not introduce sufficient evidence to support the conclusion that the Department has had an unwritten policy, incorporated into the collective bargaining agreement as a "past practice," of allowing Rockford police officers to take "unlimited sick time" without placing their jobs at risk, the Board concludes that such a practice, even if established, would be irrelevant to the Board's authority to discipline or terminate Officer Beets because the Board's authority in this matter derives from its authorizing statute and interpretive case law and not from any provision of the CBA. See *City of Markham v. State and Mun. Teamsters, Chauffeurs and Helpers, Local 726*, 299 Ill.App.3d 615, 617 (1st Dist.

1998)("The Code includes specific statutory procedures that a municipality must follow in disciplining and terminating its employees.").

F.    **DECISION OF THE BOARD**

54.    Based on the factual findings and conclusions of law set forth above, the Board finds that the City has established that Officer Beets engaged in actions that violate the following section of the Rules and Regulations of the Rockford Police Department:

> **Section III, Paragraph 9**: *"Incompetency or inefficiency in the performance of any assigned duty."*

55.    Without limiting the generality of the finding set forth in paragraph 54, above, the Board finds that Officer Beets' excessive absenteeism and the amount of time she has spent working in light duty assignments, as detailed in these Findings and Order, has prevented her from efficiently performing the duties and responsibilities of a full-time police officer with the Rockford Police Department.

56.    The Board also finds that Officer Beets' excessive absenteeism during 2006 and 2007, combined with her testimony that she had only been released to return to a "light duty" assignment as of the time of her hearing, is enough, standing alone, to conclude that she has not been efficiently performing the duties and responsibilities of a full-time police officer with the Rockford Police Department.

57.    The Board also finds and concludes that Officer Beets' excessive absenteeism, along with the total amount of time she has worked in light duty assignments, as detailed above, constitutes a substantial shortcoming in her performance as a full-time police officer with the Rockford Police Department which renders her continued employment as a police officer inappropriate and detrimental to the discipline and efficiency of, and against the best interests of,

the Rockford Police Department and the citizens of the City of Rockford. *Valio v. Board of Fire and Police Com'rs of Village of Itasca*, 311 Ill.App.3d 321, 330 (2d Dist. 2000); *Calomino v. Board of Fire & Police Commissioners,* 273 Ill.App.3d 494, 499 (1st Dist. 1995).

58.    Without limiting the generality of the finding set forth in paragraphs 55-57, above, the Board also finds and concludes that Officer Beets' excessive absenteeism during 2006 and 2007, along with the total amount of time she has worked in light duty assignments during those two years, combined with her testimony that she had only been released to return to a "light duty" assignment as of the time of her hearing, constitutes a substantial shortcoming in her performance as a full-time police officer with the Rockford Police Department which renders her continued employment as a police officer inappropriate and detrimental to the discipline and efficiency of, and against the best interests of, the Rockford Police Department and the citizens of the City of Rockford.

59.    The Board certainly understands that unexpected health conditions can alter a person's ability to perform his or her job duties, and concludes that the Department and the City have reacted compassionately to Officer Beets for more than a decade.

60.    The City and the Department rightfully expect that sworn, full-time police officers will regularly show up for work and be capable of performing the duties and responsibilities of a full-time police officer more than half of the time during their careers. This Board expects no less.

61.    Therefore, based on the foregoing and on the authority granted to the Board under 65 ILCS 5/10-2.1-17, we order that Officer Beets' employment with the Rockford Police Department be terminated effective immediately, this 1st day of December, 2007.

62.    This Order is the final order in this matter and terminates the proceedings before the Board in connection with the complaint filed by Police Chief Chet Epperson in his capacity as the

Chief of Police of the Rockford Police Department of the City of Rockford against Officer Tonya Beets. This Order is subject to administrative review under the Illinois Administrative Review Act, 735 ILCS 5/3-101 *et seq.*

BOARD OF FIRE AND POLICE COMMISSIONERS OF THE CITY OF ROCKFORD, ILLINOIS,

Dated: 12.01.07      By: *LoRayne Logan*

                                  LoRayne Logan, Commissioner

Dated: 12-01-07      By: _____

                                  Gary Caldana, Commissioner

**DISSENTING FROM THE "DECISION OF THE BOARD":**

Even though I agree with Section B (Pleadings and Procedural Background), Section C (Applicable Statutes / Burden of Proof), Section D (Board's Findings of Fact) and Section E (Applicable Law and Board's Conclusions of Law) of these Findings and Order, and even though I join in those four Sections without reservation, I disagree with Section F (Decision of the Board) because I would not vote to terminate Officer Beets at this time.

In my opinion, Officer Beets should not be penalized for the many health and pregnancy related problems (including on-the-job injuries) she has experienced over the past ten years. I reviewed the performance evaluations that were introduced in evidence at the hearing and it appeared to me that she was generally regarded as an excellent police officer when she was on the job. I believe that the evidence at the hearing showed that she has been released by her doctor to return to work in a light duty capacity which could result in her being assigned to the front desk until she is totally healthy.

Simply stated, regardless of her past history, I believe Officer Beets deserves a second chance. If she continues to be unable to work in full capacity as a full-time police officer over the next year now that she has been released to start working again on light duty, I would vote to terminate her employment.

Dated: _Dec 1, 2007_          By: _Henrietta Dotson-Williams_
                                          Henrietta Dotson-Williams, Commissioner

**Order Prepared By:**

Brendan A. Maher, Secretary & Hearing Officer
Board of Fire & Police Commissioners
P.O. Box 219
Rockford, IL 61105-0219
815-987-8980

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that at or before 5:00 o'clock p.m. on December 1, 2007,

he mailed (with postage fully prepaid) and/or hand-delivered a copy of the foregoing instrument to

the following:

Attorney Timothy O'Neill
28 North First Street, Suite 2
Geneva, IL 60134

Tonya Beets
3807 Cassandra Drive
Rockford, IL  61114

Attorney John P. Giliberti
City Attorney
425 East State Street
Rockford, IL  61104

Police Chief Chet Epperson
Rockford Police Department
Public Safety Building
420 West State Street
Rockford, IL  61101

Brendan A. Maher, Secretary & Hearing Officer
Board of Fire & Police Commissioners
P.O. Box 219
Rockford, IL 61105-0219
815-987-8980

# II. EXHIBITS

CITY OF ROCKFORD
BOARD OF FIRE AND POLICE COMMISSIONERS

*In Re Matter of:*                         )
                                           )        <u>Hearing Held</u>
                                           )        <u>November 5, 2007</u>
Officer Tonya Beets                        )

# **<u>Chief Epperson's Exhibits</u>**

# OFFICER TONYA BEETS
## ABSENTEEISM RECORD
### JANUARY 1, 1998-AUGUST 5, 2007

| Year | Sick Time Total Hours Off | Light Duty Hours | Total Hours Missed Due to Sick Time and/or Light Duty | Total Hours Worked in Full Capacity as a Police Officer | Unable to Work at Full Capacity % | FMLA Hours | Full Capacity Officer Work Hours Less FMLA | Annual Full Capacity Officer Work Hours |
|---|---|---|---|---|---|---|---|---|
| 1998 | 196.95 | 287.55 | 484.50 | 1595.50 | 23.3% | | | 2080.00 |
| 1999 | 309.50 | 187.00 | 496.50 | 1583.50 | 23.9% | | | 2080.00 |
| 2000 | 1451.25 | 77.50 | 1528.75 | 551.25 | 73.5% | | | 2080.00 |
| 2001 | 470.00 | 123.00 | 593.00 | 1487.00 | 28.5% | | | 2080.00 |
| 2002 | 548.50 | 675.70 | 1224.20 | 855.80 | 58.9% | | | 2080.00 |
| 2003 | 577.00 | 132.00 | 709.00 | 1101.00 | 39.2% | | | 2080.00 |
| 2004 | 611.50 | 813.00 | 1424.50 | 427.00 | 76.9% | 270.00 | 1810.00 | 2080.00 |
| 2005 | 628.50 | 0.00 | 628.50 | 971.50 | 39.3% | 228.50 | 1851.50 | 2080.00 |
| 2006 | 1405.00 | 0.00 | 1405.00 | 675.00 | 67.5% | 480.00 | 1600.00 | 2080.00 |
| 1/1-8/5/2007 | 918.00 | 252.50 | 1170.50 | 0.00 | 100.0% | | 1170.50 | 1170.50 |
| **TOTALS** | **7,116.20** | **2,548.25** | **9,664.45** | **9,247.55** | | **978.50** | **18912.00** | **19890.50** |
| PERCENTAGES | 51.10% | | | 48.90% | | | 100.00% | |

CHIEF'S EXHIBIT 1

SCANNED ON @ 02/29/2008

CHIEF'S
EXHIBIT
#2

## Officer Tonya Beets
## Absenteeism Record
## January 1, 1998 - August 5, 2007



Legend: ▨ Sick Time   ■ Light Duty   □ Total Hours Worked

| Year | Sick Time | Light Duty | Total Hours Worked |
|------|-----------|------------|--------------------|
| 1998 | 287.55 | 196.55 | 1595.50 |
| 1999 | 309.50 | 187.00 | 1583.50 |
| 2000 | 1451.25 | 77.50 | 551.25 |
| 2001 | 470.00 | 123.00 | 1487.00 |
| 2002 | 855.80 / 675.10 | 548.50 | (132.00) |
| 2003 | 577.00 | 132.00 | 1101.00 |
| 2004 | 813.00 | 611.50 | 427.00 |
| 2005 | 628.50 | 0.00 | 971.50 |
| 2006 | 1405.00 | 0.00 | 675.00 |
| 1/1-8/5/2007 | 918.00 | 252.50 | 0.00 |

SCANNED ON @:02/29/2008

TITLE:  Patrol Officer

DEFINITION:  Under general supervision, performs work of routine difficulty in patrolling City streets and enforcing laws, to protect the lives and property of the Citizens of Rockford and maintain order; may use moderate to heavy physical exertion such as walking, running, climbing, and fighting; performs related work as required.

EXAMPLES OF DUTIES:

1.  Patrols assigned areas on foot or in a motor vehicle, observing for suspicious or criminal activity;

2.  Responds to and conducts investigations at scenes;

3.  Responds to requests for citizens assistance, as directed;

4.  Provides first aid to injured persons;

5.  Enforces traffic laws, operates speed measuring devices, makes arrests and issues violation citations;

6.  Performs criminal investigations;

7.  Identifies and interviews witnesses, complaints and suspects;

8.  Protects scene of crime to guard against destruction of evidence and intrusion;

9.  Operates radio;

10. Prepares written reports to relay information concerning all activities to superiors;

11. Operates hand and shoulder weapons as needed and observes weapon safety at all times;

12. Investigates and resolves problems such as family fights or other disturbances;

13. Refers individuals to appropriate social agencies;

14. Protects property of residents on vacation and searches buildings, factories and vehicles;

15. Performs escort duties for such activities as parades and funerals;

16. May act as a bomb technician;

17. Testifies in court;

18. Serves on special weapons and tactics teams;

CHIEF'S
**EXHIBIT**
3

19. Does special studies and writes special reports;

20. Performs routine maintenance of motor vehicles;

21. Performs related work as required.

DESIRABLE KNOWLEDGE AND SKILLS:

Working knowledge of law enforcement principles and practices; of traffic and criminal law; of basic psychological and human behavior principles; and of interviewing techniques.

Working skill in detecting criminal activity; in responding quickly and appropriately to emergency situations; in administering first aid; in interviewing witnesses, suspects and complainants; in dealing effectively with the general public; in operating a motor vehicle; in safely operating hand and shoulder weapons; in identifying and collecting evidence; in investigating criminal, civil, and traffic incidents; in preparing written reports; and in following written and verbal instructions.

SUGGESTED TRAINING AND EXPERIENCE:

Completion of a basic law enforcement training course; completion of the curriculum requirements for a high school degree.

SPECIAL REQUIREMENTS:

Must meet applicable requirements set forth in City and State laws, ordinance and codes; possession of a valid Illinois Driver's License at time of appointment; passing score on examination(s) administered by the Fire and Police Commission.

CITY OF ROCKFORD _George Thuette_ 8/30/88 _____

2142

Employees shall not be required to use paid leave under this Agreement prior to invoking their right to FMLA Qualifying Leave.

### 7.5A.  Sick Leave

Sick leave shall be administered pursuant to the past practice of the parties hereto, except as provided in Article 7.5 B below.

### 7.5 B  Use Of Paid Leave For FMLA Purposes

Employees may use sick leave for the employee's own Family Medical Leave Act (FMLA) eligible conditions.  The use of paid sick leave for FMLA for the care of eligible persons other than the employee may also be used to a maximum of sixty (60) hours in a twelve-month period.  Paid sick leave shall only be used for serious health conditions as defined under FMLA, and therefore not used for the birth or adoption of a child.  The twelve-month period shall begin with the first hour of sick leave taken for FMLA.

## ARTICLE 8
## CONTRACT GRIEVANCE PROCEDURE

### 8.1    Grievance Procedure

As used herein, "Grievance" shall mean any dispute or complaint concerning the interpretation of, application of, or compliance with, the terms of this Agreement.

It is the intent and purpose of both parties to use their individual and collective best efforts to settle and resolve their differences on a prompt and informal basis.  Where such informal efforts are unsuccessful in resolving an issue which is believed to be a violation of this Agreement the following procedure shall be followed.

Either the Union or the City may initiate this Grievance Procedure by filing written notice of a grievance with the other not later than thirty (30) calendar days from the latter of the occurrence giving rise to the grievance or from the filing party's notice in fact of the occurrence giving rise to the grievance.  The Union shall file said written notice to the City by delivery thereof to the Police Chief, and the City shall serve said notice to the Union by delivery thereof to the President of the Union.  The aforesaid written notice shall include a full and detailed statement of all facts giving rise to the grievance, including names and dates, together with the portion or portions of the Agreement thereby placed in issue.

Within fourteen (14) calendar days of receipt of the notice of grievance, the designated representative of the City shall meet with the President of the Union, or his designated representative, for the purpose of resolving the grievance.  If the parties are unable to resolve the grievance at this meeting, the party against whom the grievance was filed will issue a written decision denying or granting the grievance within  fourteen (14) calendar days of the date of the meeting.  Within fourteen (14) calendar days of receipt of the written statement denying the grievance, the grieving party (City or Union) may take the grievance to Arbitration under the procedures

CHIEF'S
**EXHIBIT**

_44_

# COLLECTIVE BARGAINING AGREEMENT

## BETWEEN

## UNIT SIX OF THE POLICEMEN'S BENEVOLENT

## AND PROTECTIVE ASSOCIATION OF ILLINOIS

## AND

## CITY OF ROCKFORD

JANUARY 1, 2002

THROUGH

DECEMBER 31, 2004

CHIEF'S
EXHIBIT

#5

# PREAMBLE

This Agreement, made and entered into by the City of Rockford, a municipal corporation, hereinafter referred to as the "City", and Unit Six of the Policemen's Benevolent and Protective Association of Illinois, hereinafter referred to as the "Union", has as its general intent the promotion of a sound, harmonious, and mutually beneficial relationship between the parties hereto. In pursuant thereof, it is the specific purpose of this Agreement to establish an equitable and peaceful procedure for the resolution of differences between the parties on the interpretation and application of this Agreement and to set forth the rates of pay, hours of work, and conditions of employment. All references to the male gender apply equally to the female gender.

The parties recognize the interests of the entire community and its citizens are paramount and therefore the parties pledge to be governed by the highest ideals of honor and integrity in all public and personal conduct necessary or proper to safeguard the life, property, and interests of the entire community and its citizens.

## ARTICLE 1
## CITY RIGHTS

### 1.1    City Authority

Nothing in this Agreement shall be construed as delegating to others the authority vested in the City, a municipal corporation, in the State of Illinois, and its duly elected and appointed officers, or the Rockford Board of Fire and Police Commissioners, or in any way abridging or reducing the authority of the City, said Board, said elected or appointed officers, or infringing upon the responsibility thereof to the people of the City.

### 1.2    Management Rights

Except as expressly modified by this Agreement, the City retains the sole right and authority to operate and direct the affairs of the City, including the exclusive management, control, and operations of the Police Department including, but not limited to, all rights and authority exercised by the City and the Police Department prior to the execution of this Agreement. Said rights include, but are not limited to, the right to set standards of service and protection to be offered to the citizens; direct the work forces; prescribe overtime and the policies related thereto; select the managerial and supervisory employees, direct, plan, control, and determine the operations of the Police Department and the services to be delivered to the citizens; assign and reassign employees; hire and promote employees; demote, suspend, discipline, or discharge for just cause; relieve employees due to lack of work or other legitimate reasons; make and enforce rules and regulations and make changes therein; change methods of operations, equipment or facilities, including contracting and subcontracting; provided, however, the exercise of any of the above rights shall not conflict with any of the provisions of this Agreement.

CHIEF'S
EXHIBIT
#6

SCANNED ON @:@02/29/2008

GENERAL ORDER 72-6                                                A-4
ROCKFORD POLICE DEPARTMENT                        NOVEMBER 12, 1986

Index as:       Absentee Notice (Illness/Injury)
                Full Performance
                Maternity Leave Procedure
                Sick Leave/Light Duty Procedure
                Workman's Compensation Procedure

SUBJECT: SICK LEAVE

This General Order revises General Order 72-6 dated May 14, 1980.

The order outlines the procedure to use when absent from duty due
to illness, or injury. It does not include the use of funeral
leave, personal days, vacation time, or compensatory time-off.
Those procedures are covered in General Order D-1.

The Order establishes Criteria for determining an employee's
fitness for full performance. The Order also establishes Time
Lines which govern all Sick Leave/Light Duty use.

The procedures are to be used **by all** personnel of the Rockford
Police Department so that sick leave can be properly reported,
recorded, and monitored.

This Order is comprised of the following numbered sections:

    I.      SICK LEAVE/LIGHT DUTY POLICY

    II.     EMPLOYEE ABSENCE REPORTING PROCEDURES

    III.    MONITORING PROCEDURES FOR SICK LEAVE

    IV.     RESPONSIBILITIES OF THE SUPERVISOR/COMMANDER

    V.      RESPONSIBILITIES   OF   REPORT   REVIEW   AND   THE
            ADMINISTRATIVE BUREAU

    VI.     MATERNITY LEAVE POLICY

    VII.    EFFECTIVE DATE

            ANNEX A.   ABSENTEE NOTICE

            ANNEX B.   FORM 45   EMPLOYER'S FIRST REPORT OF INJURY OR
                       ILLNESS

            ANNEX C.   ACCIDENT   INVESTIGATION   FORM   (WORKMAN'S
                       COMPENSATION FORM)

GENERAL ORDER 72-6                                            A-4

I.   SICK LEAVE/LIGHT DUTY POLICY

    A.   When an employee is working he/she must be able to
fully perform all duties within his/her rank, pay
grade, or classification without medical restriction.

        1.   An employee not able to meet full performance
standards will be placed on sick leave or light
duty, whichever is appropriate.

        2.   Light duty is used only as it is available.

        3.   An employee <u>restricted for medical reasons</u> to
certain hours, types of assignment, etc. is on
LIGHT DUTY for purposes of this Order.

        4.   On a bi-weekly basis a Light Duty employee will be
monitored for possible return to full performance.

            a.   Additionally, light duty employees will
follow all other evaluation procedures and
time lines contained in this Order.

    B.   Definitions:

        1.   FULL PERFORMANCE (SWORN PERSONNEL)-
Ability to handle <u>all</u> duties normally assigned in
the officer's rank or pay grade.

        2.   FULL PERFORMANCE (NON-SWORN PERSONNEL)-
Ability to handle <u>all</u> duties normally assigned to
an employee's position based on the Personnel
Department's description of those duties.

            a.   Job descriptions are maintained by the
Personnel Department for every civilian
position on this department.

        3.   VALID IMPARTIAL MEDICAL EVALUATOR-
A physician who will render a medical opinion
about an employee's condition without malice,
bias, or prejudice for the employer, employee, or
other interested parties.

    C.   The ability to do the physical tasks below will be the
primary focus of a full performance fitness evaluation.
A less demanding job assignment does not lower the full
performance standard an employee must meet for his pay
grade, rank, or classification.

        1.   TASKS-SWORN:

            a.   The officer must be able to run enough to
pursue a person, or to assist himself,
another officer, or a citizen in reaching
safety.

            b.   The officer must be able to engage in a
physical struggle in order to effect or
attempt to effect an arrest.

            c.   The officer must be able to lift and carry a
moderate weight.

GENERAL ORDER 72-6                                           A-4

    I.   Termination will be considered for an employee on sick leave or light duty following the guidelines of this Order if:
       1.  He will not be able to return to full performance within a reasonable recovery period.

    J.   This Order's Maternity Leave Policy is consistent with current Federal and State Law.

II.  EMPLOYEE ABSENCE REPORTING PROCEDURES

    A.   An employee who will be absent shall:
       1.  Personally notify, or have another person notify, your supervisor at least one hour before your starting time, or, if your supervisor is off-duty:
          a.  Notify the on-duty patrol shift commander.
       2.  The notification shall include:
          a.  Nature of illness/injury and if job related.
          b.  Your anticipated date of return to duty.

    B.   An employee will follow the procedure in paragraph A if absent for less than seven (7) consecutive calendar days.

    C.   An employee absent for at least seven (7) consecutive calendar days, or who knows of an absence in advance will use the procedure below and not call in daily.
       1.  If possible give at least forty-eight (48) hours prior notice.
       2.  Submit a written medical evaluation covering your condition and anticipated date of return to duty.

    D.   An employee who cannot return to duty on the date anticipated will notify his Supervisor as soon as possible and:
       a.  Resume calling daily for periods less than seven (7) consecutive calendar days, or.
       b.  Not call in daily for continuing absences of at least seven (7) consecutive calendar days by providing a new evaluation that includes:
          1.  Reason for not returning and new anticipated date of return.

    D.   An employee unable to finish a shift due to illness or injury will, prior to leaving duty:
       1.  Report the injury or illness to his on-duty supervisor or the on-duty patrol commander, if his supervisor is not working.
          a.  Advise the supervisor if the injury or illness is job-related.

GENERAL ORDER 72-6                                                    A-4

   d. The officer must be able to operate a
    department vehicle for the duration of a
    shift, including:
    1) Driving, entering and exiting a vehicle,
     placing persons or property into and out
     of a vehicle, and/or riding in a
     vehicle.
   e. The officer must be able to work inside the
    PSB, remaining at a desk for the duration of
    a shift, with only reasonable and necessary
    breaks.
   f. Other measurements based on an employee's job
    description may be used to determine fitness,
    if deemed appropriate by the Chief of Police
    or competent medical authority.
  2. TASKS-NON-SWORN:
   a. Tasks for non-sworn employees will be based
    on the city personnel department job
    description for their position.

D. An employee on sick leave shall remain at home during
  his scheduled hours on all regular duty days except for
  medical treatment, therapy, or other necessary trips.

E. An employee on sick leave or light duty shall return to
  full performance as soon as his medical evaluation
  allows.

F. <u>Any employee</u> found to be abusing the department's sick
  leave policy is subject to disciplinary action.
  1. Failure to follow or participate in prescribed
   rehabilitation programs will be considered sick
   leave abuse.

G. The department may require an employee to undergo a
  medical evaluation. If an employee is required to have
  an evaluation he will be sent to a <u>Valid Impartial
  Medical Evaluator</u> of the City's choice, at the city's
  expense.
  1. Evaluations will be scheduled at reasonable times
   and consider an employee's ability to travel.
  2. The employee's condition and prognosis for return
   to full performance within a reasonable time
   period will be the subject of the evaluation.

H. All decisions regarding the length of an employee's
  sick leave or light duty will be based on medical
  evaluation.

GENERAL ORDER 72-6                                                    A-4

2. Complete an officer's report to the Administrative Services Commander for a job-related injury or illness. This report should be left prior to leaving duty if possible and <u>must</u> include:
   a. The nature of, cause of, and circumstances of the employee's illness or injury.
3. When an employee leaves work without completing the report, he will do the report within seven (7) consecutive calendar days either at the PSB or at home. Any extension of the time limit must be approved by the Administrative Services Commander.
   a. If done at home the report can be picked up by on-duty personnel, at the request of the injured employee, and brought to the PSB.

## III. MONITORING PROCEDURES FOR SICK LEAVE

A. An employee on sick leave or light duty of twenty-seven (27) consecutive calendar days or less MAY BE REQUIRED to submit a medical evaluation.
   1. The evaluation would be to certify his fitness for full performance.

B. An employee on sick leave or light duty for twenty-eight (28) consecutive calendar days or more WILL BE REQUIRED TO:
   1. Submit a written medical evaluation from his physician within five (5) consecutive calendar days after the 28th day and/or.
   2. Submit to an evaluation within the same time period by a Valid Impartial Medical Evaluator of the city's choice.
   3. The evaluation's purpose is to determine if the employee will return to full performance. This does not include an employee on maternity leave.

C. All employee medical evaluations will be submitted to the Administrative Services Commander for review.
   1. The Administrative Services Commander will advise and assist an employee, based on the available medical evidence, following these guidelines:
      a. Return an employee fit for full performance to duty.
      b. On a bi-weekly basis monitor the progress of an employee on light duty for return to full performance.

GENERAL ORDER 72-6                                                    A-4

   c.   Maintain an employee on sick leave or light duty if SUBSTANTIAL PROGRESS is shown in the medical evaluation report and:

      1)  Establish a new evaluation period not to exceed fifty-six (56) consecutive calendar days. The length of time being decided on a case by case basis.

      2)  Have the employee plan to submit a new medical evaluation within five (5) consecutive calendar days of the end of the new period.

   d.   Advise an employee who has been on extended sick leave or light duty his case is going to the Chief of Police for review.

D.   The Administrative Services Commander will if necessary prepare and forward to the Chief a report based on the medical evidence available.

   1.   The report will outline the facts in an employee's case and the need for the Chief to decide an appropriate course of action.

E.   Based on the available medical evidence and the evaluations submitted by an officer's physician and/or a Valid Impartial Medical Evaluator the Chief will:

   1.   Continue the employee on Sick Leave or Light Duty.

   2.   Move for the termination of the employee.

      a.   Job related injuries will be handled per the Illinois Workman's Compensation Act guidelines.

F.   An employee facing termination has several options.

   1.   A sworn officer may:

      a.   Apply to the Board of Fire and Police Commissioners for an UNPAID medical leave of absence.

      b.   Apply, if eligible, for a disability pension to the Police Pension Board.

      c.   Resign his position.

      d.   Participate in a hearing before the Fire and Police Commission concerning the Chief's recommendation for the board to terminate the officer.

   2.   A non-sworn employee may:

      a.   Follow the procedure in the AFSCME contract or Personnel Code, whichever is appropriate, covering termination and/or appeal.

      b.   Apply for a disability pension.

      c.   Resign.

GENERAL ORDER 72-6                                          A-4

IV.  RESPONSIBILITIES OF THE SUPERVISOR/COMMANDER

    A.  A supervisor or commander will immediately make out an absentee notice for all absences reported to him.

        1.  An absence occurring at a future date will be logged on the monthly work schedule prior to forwarding the absence report.

        2.  All absentee notices should include:

            a.  Nature of the injury or illness and if job related.

            b.  Date(s) of absence plus anticipated date of return, if available.

            c.  Annex A is an example of an absentee notice.

    B.  Route Absentee Notices for sworn personnel to Report Review and non-sworn to the Administrative Bureau.

    C.  Forward all illness or injury related Officer's Reports, and Medical Evaluations directly to the Administrative Services Commander.

    D.  When a job-related injury or illness is reported to a supervisor.

        1.  <u>That supervisor</u> is responsible for completing, signing, and forwarding the following reports to the Administrative Services Commander <u>within the listed time limits.</u>

            A.  A Form 45 Report <u>before leaving duty.</u>

                1.  Annex B is an example of a Form 45 Report.

            B.  An Accident Investigation Report <u>at the same time as the Form 45 or no later than forty eight (48) hours</u> after the Form 45 Report including:

                1.  A list of witnesses, complete description of the circumstances surrounding the incident, and any unsafe equipment or work habits turned up during the investigation.

                2.  Any corrective action the supervisor feels should be taken to prevent future recurrence of similar accidents.

                3.  Annex C is an example of this report.

        2.  By law, any work-related injury must be reported within 45 days of occurrence, or Workman's Compensation <u>will not</u> pay any bills arising out of the accident.