# III.  TRANSCRIPTS OF PROCEEDINGS IN OPEN SESSION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CITY OF ROCKFORD

BOARD OF FIRE AND POLICE COMMISSIONERS

**ORIGINAL**

IN RE THE MATTER OF:          )
                             )   **EVIDENTIARY HEARING**
POLICE OFFICER TONYA BEETS )

          Transcript of proceedings had in the above-
entitled action at the Rockford Fire Department.
Headquarters, 201 South First Street, Rockford,
Illinois, on November 5, 2007, at 6:00 p.m.

**BEFORE:**          **LORAYNE LOGAN**, Chairperson
                    **HENRIETTA DOTSON-WILLIAMS**, Commissioner
                    **GARY CARUANA**, Commissioner
                    **ATTORNEY BRENDAN A. MAHER**, Secretary

**APPEARANCES:**

                    CITY OF ROCKFORD DEPARTMENT OF LAW
                    By **ATTORNEY JOHN P. GILIBERTI**
                    425 East State Street
                    Seventh Floor
                    Rockford, Illinois  61104

                        appeared on behalf of the City
                        of Rockford and Police Chief Chet
                        Epperson;

                    FOOTE, MEYERS, MIELKE & FLOWERS, LLC
                    By **ATTORNEY TIMOTHY D. O'NEIL**
                    416 South Second Street
                    Geneva, Illinois   60134

                        appeared on behalf of PB&PA Unit 6
                        and Police Officer Tonya Beets.

REPORTED AND TRANSCRIBED BY:
Susan K. Ellis, CSR
Elite Reporting Services, Ltd.
5301 East State Street, Suite 315
Rockford, Illinois  61108

5301 EAST STATE STREET · SUITE 315
ROCKFORD, ILLINOIS 61108

Elite
REPORTING SERVICES, LTD.

PHONE 815.229.8787
FAX 815.229.8737

1

2

I N D E X

3

**WITNESS:  JANET OTWELL**

4

By Attorney Giliberti          Direct ..................... 15
By Attorney O'Neil             Cross ..................... 26

5

**WITNESS:  DEPUTY CHIEF MICHAEL BOOKER**

6

By Attorney Giliberti          Direct ................... 48
By Attorney O'Neil             Cross ................... 58
By Attorney Giliberti          Redirect ................ 62
By Attorney O'Neil             Recross ................. 65

7

8

9

**WITNESS:  LIEUTENANT DOUGLAS BLOCK**

10

By Attorney O'Neil             Direct ................... 89
By Attorney Giliberti          Cross ................... 99
By Attorney O'Neil             Redirect ................ 108
By Attorney Giliberti          Recross ................ 109
By Attorney O'Neil             Further Redirect .......... 109

11

12

13

**WITNESS:  DEPUTY CHIEF LORI SWEENEY**

14

By Attorney O'Neil             Direct ................... 110
By Attorney Giliberti          Cross ................... 115
By Attorney O'Neil             Redirect ................ 126
By Attorney Giliberti          Recross ................ 127

15

16

**WITNESS:  POLICE OFFICER TONYA YVETTE BEETS**

17

By Attorney O'Neil             Direct ................... 131
By Attorney Giliberti          Cross ................... 157
By Attorney O'Neil             Redirect ................ 185
By Attorney Giliberti          Recross ................ 188

18

19

20

**WITNESS:  DEPUTY CHIEF LORI SWEENEY**

By Attorney Giliberti          Rebuttal ................. 192
By Attorney O'Neil             Cross ................... 197

21

22

23

Reporter Certificate ................................... 217

24

1        COMMISSIONER LOGAN:  So we're ready to call the

2   meeting to order.  And the purpose of our meeting this

3   evening will be twofold, and I think on our first business

4   we would like to have a status hearing on Officer Bailey.

5        SECRETARY MAHER:  And before we get into the

6   Officer Beets' hearing, I guess, first of all, for purposes

7   of the record, if attorneys could identify themselves and

8   their witnesses for the record, and then we'll do a quick

9   status on Bailey before we commence the hearing on Officer

10  Beets' case.

11       ATTORNEY GILIBERTI:  And you would like the names

12  of the witnesses?

13       SECRETARY MAHER:  Right, just so that the court

14  reporter knows who all is going to be testifying this

15  evening.

16       ATTORNEY GILIBERTI:  Okay.  My name is John

17  Giliberti.  I'm a City attorney.  I'm here on behalf of

18  Chief Chet Epperson regarding the Tonya Beets' hearing.

19       Expected witnesses will be Deputy Chief Sweeney,

20  Lori Sweeney; Janet Otwell, O-t-w-e-l-l; and Deputy Chief

21  Michael Booker.

22       ATTORNEY O'NEIL:  Good evening.  My name is Tim

23  O'Neil.  I represent Tonya Beets and the PB&PA Local 6.

24  I anticipate calling the respondent, Tonya Beets, and

1    Lieutenant Doug Block, B-l-o-c-k.

2         SECRETARY MAHER:  And, Attorney Giliberti and

3    certainly Attorney O'Neil, if you've got comments, as well,

4    could you bring us up to speed on where things are at

5    currently with the Bailey matter before we get going?

6         ATTORNEY GILIBERTI:  Yes.  The Board ruled on a

7    motion to compel documents that Attorney O'Neil had filed

8    I believe it was sometime last month or it could have been

9    in September.

10         In any event, the chief is abiding by that order,

11    and we're in the process right now of collecting the

12    information pertinent to that order.  And then we have

13    a deadline, I believe, of November 12th or 13th to turn

14    that over to Attorney O'Neil; and that's what we will do.

15         SECRETARY MAHER:  Is that accurate as far as

16    you're concerned, Mr. O'Neil?

17         ATTORNEY O'NEIL:  I know what the order says.

18    I don't know what the City's doing.

19         SECRETARY MAHER:  Okay.

20         ATTORNEY O'NEIL:  To be honest with you, I know

21    of at least three cases personally where computers were

22    involved and discipline was issued.  I'm expecting to get

23    at least those three, and I understand there may be more.

24         So in the event certain things aren't turned over

1    to me that I know -- I believe exist, then I'll be back in

2    front of the Board asking for further compliance; but we'll

3    see what gets turned over.

4        SECRETARY MAHER:  What the Board would like to

5    do, if possible, this evening is set a hearing date.  And

6    part of that is due to a number of -- the ability to get

7    everybody together and get a hearing on everyone's calendars

8    that will work.

9        And what we'd like to do, I guess, is set a hearing

10   date with the understanding that if something comes up in

11   the interim where there's a further discovery dispute that

12   takes time away from the parties' ability to prepare, we'd

13   revisit that.  But the Commission has compared notes and

14   especially in light of the fact that both sides have

15   represented that the Bailey hearing may take some time given

16   computer evidence and given the type of witness testimony

17   that there may be, the Commissioners are looking at possibly

18   Saturday, December 1st, as a hearing so that we'd be able to

19   block off the day for that.

20       And I guess what we'd like to do -- unless there's

21   a schedule conflict out of the box from counsel for either

22   side, we'd like to set that day as the hearing date to be

23   working towards with the understanding, again, that if there

24   is a discovery dispute that can't be resolved or a discovery

1    dispute that eats into the time of the resolution or time

2    for preparation, the date could be looked at.  But at least

3    then we have an actual date to be targeting as the hearing

4    date as opposed to continuing to set status dates.

5              Attorney Giliberti, does that date work for you?

6              ATTORNEY GILIBERTI:  That date as far as I know

7    works for Chief Epperson.  I haven't checked with him yet

8    on that date; but if that's a problem, I will get back to

9    the Commission on that.

10             SECRETARY MAHER:  All right.  Mr. O'Neil?

11             ATTORNEY O'NEIL:  That date is fine.  I have

12   an interest arbitration, which is basically a contract

13   arbitration between the City of Aurora and the Aurora

14   Police Union set on that Thursday and Friday.

15             SECRETARY MAHER:  Okay.  Well, I guess let's have

16   the record reflect that with respect to the matter of Jason

17   Bailey, we will set Saturday, December 1st, starting at --

18   is 9 a.m. too early for you to make it out to Rockford?

19             ATTORNEY O'NEIL:  (Shakes head.)  I get up real

20   early.

21             SECRETARY MAHER:  Okay.  Well, we'll have the

22   record reflect that the hearing date for the Officer Bailey

23   case is scheduled for Saturday, December 1st, to begin at

24   9:00 a.m. here at the fire department.

1    If there's a problem with the date that is posed

2  by the discovery issues that we're aware of, we will

3  revisit that date on request or motion of either party;

4  but we'll have that set not for status but for hearing

5  on December 1st.

6    With that, I guess we'll turn to the hearing in the

7  matter of Officer Tonya Beets.  The parties have -- or the

8  attorneys have already identified themselves and their

9  clients for the record.

10    For the record, this will be the hearing in the

11  case of Chief Epperson and the Rockford Police Department

12  versus Officer Tonya Beets.  The hearing has been previously

13  commenced and continued several times by agreement of the

14  parties bringing us to this evening's hearing date.

15    The hearing is being conducted pursuant to

16  Chapter 5 of the Rules and Regulations of the City of

17  Rockford's Board of Fire and Police Commissioners and

18  pursuant to Section 2.1-17 of the State of Illinois Board

19  of Fire and Police Commissioners Act.

20    The complaint, having been filed by the City and

21  prosecuted by the City, the City will bear the burden of

22  proof in terms of the case.  And as the prosecuting

23  authority, the City will proceed first.

24    And with that, I would ask that, Attorney

1    Giliberti, call your first witness and identify them for

2    the record.

3          ATTORNEY GILIBERTI:  If I could just go over a

4    housekeeping matter before we start just so everybody is

5    aware of the amended complaint that was filed in this

6    matter.  Since that complaint was filed, there's been a few

7    revisions to that complaint.  I had sent an e-mail to the

8    Secretary and also Attorney O'Neil explaining the changes.

9    So I just want to make sure everybody's aware that we're

10    proceeding on that complaint.

11          SECRETARY MAHER:  Sure.

12          And for the record, the Commissioners have in

13    their possession both a copy of the amended complaint that

14    was filed with the Commission, and appended to the amended

15    complaint is a copy of Attorney Giliberti's e-mail

16    correcting or amending several of the paragraphs of that

17    amended complaint.  So the Commissioners have the complete

18    allegations that are being made at this point by the City.

19          ATTORNEY GILIBERTI:  I would like to make an

20    opening statement if I can.

21          SECRETARY MAHER:  Certainly.

22          ATTORNEY GILIBERTI:  Thank you, Secretary Maher,

23    Counsel, Commissioners.  I represent, as you know, Chief

24    Epperson in this case.  You're here because the chief has

1  charged Officer Tonya Beets with inefficiently performing

2  her duties.

3       The evidence you will hear tonight I believe will

4  show the following:  Officer Beets joined the force in 1997.

5  Her probation was extended in 1998 due to an injury for

6  approximately -- I'm sorry; strike that.  Her probation was

7  extended in 1998 due to an injury.  For approximately the

8  next ten years the evidence will show Officer Beets has been

9  absent from working full capacity more than 50 percent of

10 her regularly scheduled work hours.  The evidence will show

11 this is due to a repeated pattern of taking hundreds and

12 sometimes thousands of hours of sick time and a substantial

13 amount of light duty for every year beginning in 1998.

14      During 2000, 2004, 2006 and 2007, Officer Beets'

15 sick time was more than half the time she worked full

16 capacity.  This year Officer Beets has yet to work any

17 hours at full capacity.

18      You will hear testimony tonight that her

19 unreliability and lack of continuity for regular job

20 attendance for approximately the last decade negatively

21 impacts the department and the efficiency of the department

22 and as a result affects the public.

23      You'll hear evidence that her absenteeism pushes

24 off her workload on the backs of other police officers

1    making them less productive.  You'll also hear evidence that

2    it costs the department additional money to hire back other

3    officers at time and a half to cover her absenteeism.  Her

4    lack of dependability to do her job, you will hear, affects

5    the public, impacting manpower needs to respond to calls

6    for service.

7         You will hear testimony that throughout her career

8    since at least 2000 on her job evaluations attendance

9    has been an issue.  This isn't something that's coming up

10   right in the last few months or last year or so.  There's

11   an Attendance section on the evaluation, there's a

12   Dependability section on the evaluation; and we'll be

13   submitting all those evaluations to the Board.  But

14   especially those two areas Officer Beets has had some

15   problems.

16        Despite assertions to the contrary, there has never

17   been a past practice between Management and the Police Union

18   on excessive absenteeism as it pertains to job performance.

19        You'll hear this is a unique case stretching out

20   over ten years.  It's not a disability situation like some

21   other officers have been involved in, but this is unique.

22        The evidence will show the collective bargaining

23   agreement allows management to direct the work force by

24   controlling high absenteeism and requiring employees to do

1    what they were hired to do, their job.

2         The evidence will show that Officer Beets has been

3    off work for a multitude of reasons over the past ten years,

4    not just a couple of reasons.  The evidence will also show

5    that the department has been more than lenient with Officer

6    Beets over the past decade.

7         The evidence will show in no way is the complaint

8    against Officer Beets retaliatory in any manner.  This

9    is not a case where they're going after her due to her

10   pregnancies or workers' compensation for work-related

11   injuries.  This is a matter strictly affecting job

12   performance and her lack of attendance over the past

13   two years.

14        The evidence will show the action against Officer

15   Beets, as I said, is simply trying to hold someone

16   accountable for not working full duty half the time over

17   ten years.  It's not a complicated case.

18        That, Commissioners, is what I expect the

19   preponderance of the evidence to show.  We'll prove that

20   Officer Beets' pattern of highly excessive absenteeism for

21   every one of the last ten years has caused her not to be

22   dependable and to inefficiently perform her job duties.

23   I also expect the evidence to show her lack of continuity

24   to be on the job negatively impacts the department and the

1   public.

2          And at the close of all the evidence, I will ask

3   on behalf of Chief Epperson to find Officer Beets guilty of

4   inefficiently doing her job as charged and discharge her

5   employment with the Rockford Police Department.  Thank you.

6          SECRETARY MAHER:  Thank you, Attorney Giliberti.

7          Attorney O'Neil, opening statement?

8          ATTORNEY O'NEIL:  Yeah, I'll make a brief

9   statement.  What you're going to hear tonight is a City

10  denying that it has established a past practice concerning

11  sick leave.  However, you're going to hear a member of the

12  command staff testify tonight, Lieutenant Block, that it

13  has been a past practice for years and years that when an

14  officer is injured on the job or injured off the job or

15  has a debilitating illness, as long as that illness is

16  supplemented by medical records, that the officer can have

17  as much time as he or she needs.

18         Further, you're going to see a document dated July

19  of 2005 signed by former Chief Pugh agreeing to unlimited

20  sick time for Tonya Beets herself.

21         What you're going to hear is that on three

22  occasions in her career here she was hurt performing her

23  duties.  She had several surgeries on her left foot that

24  cost her most of the time.  You're also going to receive

1    this (indicating), which is a workers' comp settlement

2    signed by the City in June of 2006, which signs off and

3    agrees that all this illness time was compensable, was

4    in the line of duty.

5         You're also going to hear that she had two very

6    difficult problem pregnancies where her doctors made her

7    stay at home or in the hospital with a PICC inserted into

8    her chest, otherwise she would lose the baby.

9         You're also going to hear that this was fine with

10   the past administration under the past practice; that a year

11   ago in contract negotiations the City came to the Union and

12   said, Well, you know, we want to change this unlimited sick

13   time.  We want to start basing it on an accrual system.  In

14   other words, if you work 12 months, you get X number of sick

15   days.  The Union said, Fine, let's talk about that and made

16   a counterproposal.  The City then yanked that proposal from

17   the table.

18        You'll also hear that in June of this year the

19   Illinois Labor Relations Board voted a complaint against the

20   City of Rockford for changing the past practice, and six

21   weeks after the Labor Board filed the complaint against the

22   City of Rockford for violating past practices is when Chief

23   Epperson decided to take this action to try and terminate

24   Tonya Beets.

1     You're also going to hear the City trying to

2 terminate an officer for otherwise protected illnesses.

3 You cannot fire someone for taking workers' comp especially

4 when you sign off on it.  You cannot fire a female officer

5 for a problem pregnancy leave.

6     And you will see in the documents here that over

7 90 percent of the illness that she's accrued over the years

8 has either been from on-the-job injuries or her pregnancy

9 problems that the City signed off on and said, Fine.  It

10 wasn't until Chet Epperson became chief that he ordered

11 Lori Sweeney to look into it and begin the termination

12 proceedings against Tonya Beets.

13     At the end of the night, I'm hoping and praying

14 that you will find that the City has, like the Labor Board

15 has said, overstepped its bounds, unilaterally changed the

16 sick leave policy and are trying to take it out on Tonya

17 Beets.  Thank you.

18     SECRETARY MAHER:  Attorney Giliberti.

19     ATTORNEY GILIBERTI:  Yes.  I'll call Janet Otwell

20 as my first witness.

21     With your permission, if we could put these

22 exhibits in.  They'll be subject, of course, to Attorney

23 O'Neil's cross-examination.

24     SECRETARY MAHER:  Sure.

15

1     COMMISSIONER DOTSON-WILLIAMS:  I have a point of

2  order.  Do we decide whether or not we want to close the

3  meeting at this point or . . .

4     SECRETARY MAHER:  If somebody would like to make

5  a motion to that effect, certainly.  I mean, they're about

6  to, I guess, begin introducing testimony and witnesses.  And

7  if someone would like to make a motion to close the meeting,

8  you're certainly entitled to do that or the parties.

9                    (No response.)

10                    (Witness sworn.)

11     SECRETARY MAHER:  And would you state your name for

12  the record.

13     THE WITNESS:  Janet Otwell.

14     SECRETARY MAHER:  Spell your last name.

15     THE WITNESS:  O-t-w-e-l-l.

16     SECRETARY MAHER:  Thank you.

17                    JANET OTWELL,

18  called as a witness on behalf of the City of Rockford and

19  Police Chief Chet Epperson, having been first duly sworn,

20  testified as follows:

21                 DIRECT EXAMINATION

22              BY ATTORNEY GILIBERTI:

23     Q.   Please state your name.

24     A.   Janet Otwell.

1    Q.   And you've already spelled your name.  And how are

2    you employed, Janet?

3    A.   City of Rockford Police Department.

4    Q.   And how long have you worked for the police

5    department?

6    A.   Twenty-one years.

7    Q.   What does your job involve?

8    A.   Payroll timekeeper.

9    Q.   And does your job include keeping records of sick

10   time, light-duty hours and FMLA time for Rockford police

11   officers?

12   A.   Yes, it does.

13   Q.   Do you keep the records of sick time, light-duty

14   hours and FMLA hours for Rockford Police Officer Tonya

15   Beets?

16   A.   Yes.

17   Q.   Do you know when Officer Beets first joined the

18   police force?

19   A.   March 24th, 1997.

20   Q.   I have in front of you what -- they're not marked

21   yet, but I will mark them eventually.  I've given copies to

22   counsel, and those are marked.

23        Exhibit No. 1 is a summary chart of Officer

24   Beets' absenteeism record from January 1st, 1998, through

1    August 5th of 2007.  Exhibit No. 2 is a bar chart of

2    Officer Beets' absenteeism record January 1st, 1998,

3    through August 5th, 2007.

4         ATTORNEY GILIBERTI:  I'd ask, Secretary Maher, if

5    she needs to get up and explain something, would that be

6    okay if she needs to point something out?

7         SECRETARY MAHER:  Absolutely.

8    BY ATTORNEY GILIBERTI:

9         Q.   Okay.  Were any records, Janet, used in preparing

10   Chief's Exhibit No. 1, which is the summary chart?

11        A.   Yes.

12        Q.   What records were used in preparing Chief's Exhibit

13   No. 1?

14        A.   The original records for sick time and light-duty

15   hours, the calendars; and that's what was used.

16        Q.   And did you review each of those original records?

17        A.   Yes, I did.

18        Q.   Do you have the original records with you here

19   today?

20        A.   Yes, I do.

21        Q.   And can you tell us where they are located?

22        A.   Right down there (indicating).

23        Q.   Okay.  Near the wall near where Chief Sweeney is

24   sitting; correct?

1    A.    Correct.

2    Q.    Were the original records made by a person with

3 knowledge of or made from the information transmitted by a

4 person with knowledge of the absen- --

5         ATTORNEY O'NEIL:  Mr. Maher, no objection to

6 foundation.  If we're talking about the sick -- the sick

7 slips; right?  No objections.

8         ATTORNEY GILIBERTI:  Okay.

9         SECRETARY MAHER:  Okay.  Thank you.

10 BY ATTORNEY GILIBERTI:

11   Q.    Since at least January 1st, 1998, what is the total

12 amount of hours that a Rockford patrol officer is regularly

13 scheduled to work full capacity in a calendar year?

14   A.    2,080.

15   Q.    And when you use the term "working in full

16 capacity," what do you mean by that?

17   A.    In full capacity?

18   Q.    Right.

19   A.    Out on the streets, you know, doing their jobs.

20   Q.    Without any medical restrictions?

21   A.    Right.

22   Q.    Okay.  And directing your attention, Janet, to the

23 summary chart, Chief's Exhibit No. 1, can you tell us how

24 you prepared that chart?  If you need to, you can get up and

1    explain, whatever you feel comfortable doing.

2       A.   I pulled the sick slips and -- I pulled her

3    original records for the sick slips and the calendars and

4    then I added it up by year, sick hours, light-duty hours

5    and then total hours worked in the capacity of a full-time

6    police officer and then figured percentages off of that.

7       Q.   Okay.  And what percentages did you figure from

8    those numbers?

9       A.   Based on a year of 2,080 except for a few of the

10   years when there was FMLA.

11      Q.   Did you figure out the percentage she was unable to

12   work at full capacity?

13      A.   Uh-huh.

14      Q.   And you figured, did you not, the total hours

15   missed due to sick time and/or light duty?

16      A.   Correct.

17      Q.   And total hours worked in full capacity as a police

18   officer?

19      A.   Correct.

20      Q.   Was any of Officer Beets' FMLA hours factored into

21   any of the percentages regarding total hours missed due to

22   sick time or light duty or time unable to work at full

23   capacity?

24      A.   No.

20

1      Q.   Regarding the yearly percentages that Officer Beets

2   was unable to work at full capacity, how did you calculate

3   those percentages?

4      A.   The total hours missed due to sick and/or light-

5   duty hours divided by the full capacity, you know, like

6   2,080 except for the years where there was FMLA.  Those

7   hours is less on the chart, you can see, because I didn't

8   count them in.  I didn't hold them as -- you know, as

9   missed at all; so . . .

10      Q.   Was Officer Beets' scheduled paid vacation days,

11   holidays and compensatory days included in any of the sick

12   time or light-duty hours?

13      A.   No.

14      Q.   Where in Chief's Exhibit No. 1 were her paid

15   vacations days, holidays and compensatory days included?

16   Did you include those in any column, her vacation time,

17   her compensatory time or her --

18      A.   Just as hours worked.

19      Q.   Okay.  So in the column labeled Total Hours Worked

20   At Full Capacity, those are in those hours?

21      A.   Uh-huh.

22      Q.   Okay.  How many hours of vacation does Officer

23   Beets currently receive?

24      A.   Three weeks.

1    Q.    Three weeks?

2          And how many hours as scheduled holiday time does

3    she get currently paid per calendar year?

4    A.    Forty-eight hours.  And that has changed since

5    the home assignment, you know, because she's off on

6    holidays.

7    Q.    Okay.  And how many hours of compensatory time has

8    Officer Beets been paid so far this year?

9    A.    It would be 48 minus the holiday in October that we

10   had, which was an optional, so 40.

11   Q.    Okay.  Now, directing your attention to the summary

12   chart, during 1998, the calendar year of 1998, how many

13   hours of sick time did Officer Beets take?

14   A.    196.95.

15   Q.    Okay.  And that's where on the chart?

16   A.    Right here (indicating).

17   Q.    Okay.

18         THE WITNESS:  Do you want me to hold it up?

19         SECRETARY MAHER:  Is there a way for the easel to

20   hold the documents or not?

21         THE WITNESS:  I'll hold it up.

22         ATTORNEY GILIBERTI:  I can hold it up with you.

23   A.    Sick hours, 196.95.

24   BY ATTORNEY GILIBERTI:

1        Q.    Okay.  And during 1998 how many hours was Officer

2   Beets on light duty?

3        A.    287.55.

4        Q.    And for 1998 what is the percentage of hours that

5   Officer Beets was unable to work at full capacity?

6        A.    23.3 percent.

7        Q.    And that's right in this (indicating) column over

8   here; correct?

9        A.    Uh-huh.

10       Q.    Okay.  During the calendar year of 1999, how many

11  sick time hours did she take off?

12       A.    309.50.

13       Q.    And how many hours of light duty did she take off

14  in 1999?

15       A.    187.

16       Q.    In calendar year 1999 what is the percentage of

17  hours that Officer Beets was unable to work at full

18  capacity?

19       A.    23.9.

20       Q.    Let's go to the next year, 2000.  How many sick

21  time hours did she take off in that year?

22       A.    1,451.25.

23       Q.    How many light-duty hours in 2000?

24       A.    77.50.

1    Q.   And what's the percentage she was unable to work at

2    full capacity in 2000?

3    A.   73.5.

4    Q.   And the next year, 2001, how many sick time hours

5    did she take?

6    A.   470.

7    Q.   How many light-duty hours did she take?

8    A.   123.

9    Q.   And what's the percentage of unable to work at full

10   capacity in 2001?

11   A.   28.5 percent.

12   SECRETARY MAHER:  Attorney Giliberti, is the

13   document that is represented that's been blown up going to

14   be introduced as a marked exhibit?

15   ATTORNEY GILIBERTI:  Yes.  And, in fact, we have

16   copies of that in smaller versions.  Yes, it will be.  But

17   those -- we also have them in 8-1/2 by 11 size, as well.

18   SECRETARY MAHER:  My question then, I guess, to

19   Attorney O'Neil is, subject to cross-examination, is there

20   going to be an objection to the introduction of the exhibit

21   itself?

22   ATTORNEY O'NEIL:  No.

23   SECRETARY MAHER:  Okay.  With that, if the exhibit

24   is going to be introduced into evidence, you can dispense

1    with going line by line through each of those years because

2    if the Commissioners are going to get it as an exhibit and

3    there's no objection to the introduction of the exhibit, we

4    can save some time by not going through every single one of

5    those.

6            ATTORNEY GILIBERTI:  Thank you.

7            SECRETARY MAHER:  That way the Commissioners will

8    have it in front of them as they deliberate.

9            ATTORNEY GILIBERTI:  Okay.  Thank you.

10   BY ATTORNEY GILIBERTI:

11       Q.   Regarding Chief's Exhibit No. 2, could you tell us

12   what that is?

13       A.   It's just a bar graph made off of Exhibit No. 1.

14   And that's showing, you know, how much sick time, how much

15   light-duty hours and how many total hours worked -- that

16   she worked in full capacity as an officer.

17           ATTORNEY GILIBERTI:  Do you waive foundation on

18   that, Tim?

19           ATTORNEY O'NEIL:  I don't have a problem with that

20   exhibit.  It's demonstrative, I'm assuming.

21           ATTORNEY GILIBERTI:  Yes.

22   BY ATTORNEY GILIBERTI:

23       Q.   And regarding Chief's Exhibit No. 2, are there any

24   years on that exhibit in which the sick time is greater than

1   the total hours worked in full capacity?

2       A.   Yes.

3       Q.   Which years are those?

4       A.   2000, 2004, 2006, 2007.

5       Q.   And those -- the bar graph is color-coded; correct?

6       A.   Correct.

7       Q.   And the sick time --

8       A.   Purple is sick time.

9       Q.   Okay.  And the other colors are represented by what

10  codes?

11      A.   Light duty is like the deeper -- you know, like a

12  magenta and the white or beige is total hours worked.

13      Q.   Are there any years on Chief's Exhibit No. 2 in

14  which the light duty is greater than the total hours worked

15  in full capacity?

16      A.   Yes.

17      Q.   What years are those?

18      A.   2004 and 2007.

19      Q.   Out of the 2,080 hours that a Rockford police

20  officer is regularly scheduled to work in full capacity,

21  what is the most hours in Chief's Exhibit 2 that Officer

22  Beets has worked in full capacity?

23      A.   1998, 1,595.50.

24      Q.   And the top of the chart represents the 2,080;

1  correct?

2     A.   Correct.

3     Q.   And the vertical axis is the hours -- total hours

4  in 200-hour increments; right?

5     A.   Correct.

6     Q.   Were there any years on Chief's Exhibit 2 that

7  Officer Beets worked less than half of the 2,080 full-

8  capacity hours?

9     A.   2000, 2002, 2004, 2005, 2006, 2007.

10     Q.   How many full-capacity hours has Officer Beets

11  worked so far this calendar year?

12     A.   Zero.

13     Q.   Does Chief's Exhibit No. 2 accurately summarize

14  Officer Beets' sick time, light duty and hours worked in

15  full capacity from January 1st, 2000 -- I'm sorry --

16  January 1st, 1998, through August 5th, 2007?

17     A.   It does.

18       ATTORNEY GILIBERTI:  I have no further questions.

19       SECRETARY MAHER:  Cross-examination?

20       ATTORNEY O'NEIL:  Thank you.

21

22              CROSS-EXAMINATION

23            BY ATTORNEY O'NEIL:

24     Q.   What exactly are your duties within the police

1    department?

2        A.    I'm the payroll timekeeper.

3        Q.    Okay.  And what you do is take their sick slips,

4    their time slips and decide what category it goes in?

5        A.    Correct.  If the sick slip -- if a yellow comes in

6    and it says "sick" or "TC" or "vacation" or whatever, I just

7    log it; correct.

8        Q.    And how long have you been doing the payroll for

9    the police department?

10       A.    Since 1993.

11       Q.    Now, I noticed in this chart, Chief's Exhibit 1,

12   you didn't put the year 1997 in there.

13       A.    It was ten hours sick.  That's when she had

14   started.

15       Q.    Okay.  So she started March 24th --

16       A.    of '97.

17       Q.    -- 1997, and she called in sick one day in 1997;

18   is that correct?

19       A.    (No response.)

20       Q.    Is that correct?

21       A.    Correct.

22       Q.    Why wasn't that included on the chart?

23             ATTORNEY GILIBERTI:  Objection; irrelevant.

24             SECRETARY MAHER:  Overruled.

1          You can answer.

2      A.    There was hardly anything to even put in there.

3   She was just on their 18-month probation.  So I didn't --

4   I just didn't include it.  I couldn't find the calendar for

5   1997.  I found one sick slip; but the calendar for it, I

6   couldn't locate it.

7   BY ATTORNEY O'NEIL:

8      Q.    She called in sick one day when she had the flu in

9   November of '97; is that what you found?

10     A.    Yes, that's all I found.  I could not find the

11  calendar.

12     Q.    And had you included 1997, that would have

13  obviously raised many of the categories:  total hours worked

14  at full capacity as a police officer, unable to work at full

15  capacity?

16     A.    I don't know what it would have -- you know,

17  it would have raised it, yes, but I don't know to what

18  percentage.

19     Q.    Did someone tell you not to put it in there?

20         ATTORNEY GILIBERTI:  Objection; work product.

21         SECRETARY MAHER:  Sustained.

22         ATTORNEY O'NEIL:  If I may have a clarification of

23  work product, I think she's testified that she made this

24  from the records of the police department.

1        SECRETARY MAHER:  Correct.  And your question was

2  who told you to do what with respect to preparation for this

3  evening's hearing.

4        ATTORNEY O'NEIL:  All right.  Well, let me rephrase

5  the question.

6  BY ATTORNEY O'NEIL:

7     Q.   Did someone tell you not to put 1997 in Chief's

8  Exhibit 1?

9        ATTORNEY GILIBERTI:  Objection; irrelevant,

10  hearsay.

11        SECRETARY MAHER:  You can answer that question yes

12  or no.

13     A.   No.  I didn't have a calendar to go by.  I didn't

14  feel that it would have been accurate.  All I could find was

15  the sick slip -- the one sick slip, but the calendars were

16  not with it.  I wouldn't feel right putting that there.

17  BY ATTORNEY O'NEIL:

18     Q.   You made a previous calculation of this Chief's

19  Exhibit 1, too, didn't you?

20     A.   Correct.

21     Q.   And the numbers that you previously calculated --

22  if I may approach, I'll show you Union Exhibit 8.  Was this

23  created by you?

24     A.   Partially, yes.

1    Q.   Partially?

2    A.   Yes.  I gave the numbers; but then when I went

3  through them, I seen that some FMLA hours had been put into

4  the total hours sick and they shouldn't have been.  I had

5  ran some reports and that and some of the FMLA hours were

6  put into the total sick hours and they shouldn't have been,

7  so I separated them out and redid it.

8    Q.   All right.  Actually, when you redid it, it came

9  out lower hours that Tonya was being accused of being sick;

10  is that correct?

11    A.   Correct, because you cannot hold somebody

12  accountable for FMLA.

13    Q.   Why is that?

14    ATTORNEY GILIBERTI:  Objection; irrelevant.

15    ATTORNEY O'NEIL:  I don't think it's irrelevant at

16  all.  We have a theory of the case as well as the City.

17    SECRETARY MAHER:  Sure.  State your objection.

18    ATTORNEY GILIBERTI:  Objection based on relevance

19  and . . .

20    SECRETARY MAHER:  Overruled.

21    You can answer the question.

22    ATTORNEY O'NEIL:  Could you read back the last

23  question, please.

24    Can we go off the record.

```
 1                    (Discussion off the record.)

 2                    (Record read.)

 3    BY ATTORNEY O'NEIL:

 4        Q.   And why is that?

 5        A.   Because I pulled the FMLA out of there.

 6        Q.   Why did you pull the FMLA out of there?

 7        A.   It should never have been put in with sick hours.

 8        Q.   Why not?  What's your understanding of why it

 9    shouldn't have been put in there as sick hours?

10             ATTORNEY GILIBERTI:  Objection.  I still don't know

11    how this is relevant in that it's time off no matter what,

12    so I have a standing objection to this line of questioning.

13             SECRETARY MAHER:  You need to clarify.  The City is

14    not currently claiming any of those FMLA hours in the hours

15    that are being presented to the Board?

16             THE WITNESS:  Correct.

17             SECRETARY MAHER:  Then the objection is sustained,

18    because the hours that are being used as a basis for the

19    proceeding are not actually being included.

20             THE WITNESS:  Correct.

21    BY ATTORNEY O'NEIL:

22        Q.   Were there any -- well, strike that.

23             So you took the actual sick -- the time slips --

24    let's use a word that you're comfortable with.  What do you
```

1    call them when an officer calls in, the supervisor takes

2    the --

3        A.    Sick slip.

4        Q.    Okay.  So you took the actual sick slips and

5    calculated those numbers from the sick slips?

6        A.    Well, the sick slips get logged on calendars.

7    That's why I didn't do 1997, because I couldn't find the

8    calendars.  So the sick slips get logged onto the calendars.

9    And then I took the calendars and then I found all the sick

10   slips, and I did make sure that they all matched up with the

11   calendars.

12       Q.    Let's look at some of the sick slips.  I'm going to

13   show -- and I'll represent to you this is what was produced

14   to me by Mr. Giliberti, the sick slips for 1998.

15            ATTORNEY O'NEIL:  I think that's got the backup if

16   you want, but that's what you gave to me.

17            If I may approach, Mr. Maher?

18            SECRETARY MAHER:  Would it be easier if I carried

19   exhibits to the witness for you?  I mean, if all you want is

20   for her to have the documents, I'm happy to take care of

21   that.

22            ATTORNEY O'NEIL:  Oh, I appreciate that.  Thank

23   you.

24   BY ATTORNEY O'NEIL:

1      Q.   I'm going to show you, ma'am, Union Exhibit 1998.

2      A.   Okay.

3      Q.   Now, I know you haven't seen the front page before,

4   but do you recognize the other pages attached to it?

5      A.   Yes, I do.

6      Q.   And what are those?

7      A.   Sick slips.

8      Q.   Okay.  Now --

9      A.   I know when -- okay.  Go ahead.

10      Q.   On the sick slips, have the form of those sick

11   slips changed at all since you've been with the Rockford

12   Police Department since 1993?

13      A.   No.

14      Q.   They've maintained the same form?

15      A.   Correct.

16      Q.   Let's look at the first one that's attached.

17   It's dated January 14th, 1998.  Tonya called in with a sore

18   throat and swollen glands; is that correct?

19      A.   That's what it says.

20      Q.   And these are the documents you relied on in

21   compiling the charts?

22      A.   (Nods head.)  These documents are logged onto a

23   calendar.

24      Q.   Now, on January 14th, 1998, reason for absence is

1  marked illness; is that correct?

2      A.   Correct.

3      Q.   Now, on the right-hand column, there are two

4  choices:  sick leave pay or workers' comp?

5      A.   Correct.

6      Q.   Did you go through all the sick slips, say, in 1998

7  and differentiate between sick leave and workers' comp?

8      A.   Did I go through these at this point?  I did on the

9  calendars, you know.

10      Q.   When you made this exhibit, ma'am, it says Sick

11  Time Total Hours Off; is that correct?

12      A.   Correct.

13      Q.   On the sick slips themselves the supervisor is

14  supposed to check either sick leave pay or workers' comp;

15  is that correct?

16      A.   Correct.

17      Q.   Did you go through the sick slips for 1998 and

18  differentiate between sick time and workers' comp?

19      A.   Just -- no, not when I made the chart; just

20  originally when I logged them.

21      Q.   Do you understand that there's a difference between

22  sick pay and workers' comp?

23      A.   Correct.

24      Q.   And what is the difference?

1        ATTORNEY GILIBERTI:   Objection; relevance.

2    BY ATTORNEY O'NEIL:

3        Q.   What is your understanding?

4        SECRETARY MAHER:   Overruled based on the second

5    question.  She can explain her understanding.

6        A.   Sick pay is just regular sick time.  They just

7    call in for whatever reason.  Workers' comp is a work-

8    related injury.

9    BY ATTORNEY O'NEIL:

10       Q.   Okay.  And on the front sheet is a summary that I

11   have made, and you don't have to accept that.  But if you

12   want to look through all the sick slips, my calculations

13   show that she called in for 94.75 sick hours in 1998 and

14   101.2, which were classified by her supervisor as workers'

15   comp due to an on-the-job injury.  Did you do any such

16   analysis?

17       A.   I just marked them on the calendars.

18       Q.   Why would it be a difference?  Is there a different

19   source of payment for sick leave and/or on-the-job injury?

20       ATTORNEY GILIBERTI:   Objection.  I think --

21   my objection is this line of questioning, I think, is

22   irrelevant.  The City's position is no matter if it's

23   workers' comp or any other kind of time out, she's been off.

24       We'll present a case to the Board at closing

1    which states that -- from the Second District that if you're

2    absent, absenteeism can still be counted against you even

3    if it's a work-related injury.  That's the law in Illinois.

4        So I'd be happy to peruse that case now if the

5    secretary would like to read it.  But I think this line of

6    questioning for this witness is irrelevant.

7        ATTORNEY O'NEIL:  On the contrary, I would argue

8    that the Illinois Supreme Court has held that trying to fire

9    someone, terminate someone for exercising their statutory

10   workers' compensation rights is specifically prohibited.

11   And that's exactly what the City is trying to do here.

12   They're --

13       ATTORNEY GILIBERTI:  Objection.

14       ATTORNEY O'NEIL:  -- trying to hide it under --

15       ATTORNEY GILIBERTI:  Objection.

16       ATTORNEY O'NEIL:  -- sick time --

17       SECRETARY MAHER:  Hold on.

18       ATTORNEY O'NEIL:  -- when it's actually workers'

19   comp time.

20       SECRETARY MAHER:  I'm going to allow the line of

21   questioning subject to the caveat that I'm assuming that

22   you have witnesses that will testify on the retaliatory

23   motive that you've just posited as a part of your case.

24       If nobody is actually going to tie that up by

1  witness testimony at a later date or through the City's

2  witnesses, I'm going to cut you off.

3       Do you have witnesses that are actually going to

4  be able to testify that there's some motive behind the

5  decision to file the complaint based on a workers' comp

6  theory?

7       ATTORNEY O'NEIL:  It's based upon the Labor Board's

8  filing of the complaint in June of this year and the chief

9  filing this complaint six weeks later.

10      SECRETARY MAHER:  So your only evidence is the time

11 differential between the filing of this charge and the Labor

12 charge?

13      ATTORNEY O'NEIL:  It's certainly circumstantial.

14 I don't think the chief would admit to it.

15      SECRETARY MAHER:  In terms of the line of

16 questioning, I'll allow you to ask questions differentiating

17 between sick time and workers' compensation time on the

18 exhibit for purposes of making your record; but leave it

19 at that.

20 BY ATTORNEY O'NEIL:

21      Q.  Ma'am, do you have any reason that it wasn't all

22 just plain sick time, that more than half of it was workers'

23 comp?

24      A.  (Witness peruses document.)  The claim may have

1    been denied.  I don't know.

2    　　　　ATTORNEY O'NEIL:  If I may approach.

3    　　　　ATTORNEY GILIBERTI:  Let's have a standing

4    objection to this line of questioning for the previous

5    reasons stated.  I think it's not relevant.  This witness

6    has testified what she did already.  I just don't think this

7    line of questioning is very fruitful, to be frank with you.

8    　　　　SECRETARY MAHER:  I'm going to overrule the

9    objection.  He's entitled to explore the foundation of the

10   exhibit itself as long as the questions are relevant to the

11   foundation for the exhibit and the information that went

12   into preparing the exhibit.  If the exhibit is something the

13   Commission is going to consider, he's entitled to explore

14   the foundation for that exhibit.

15   BY ATTORNEY O'NEIL:

16   　　Q.   Ma'am, I'm going to you Union Exhibit No. 4.

17   　　　　ATTORNEY GILIBERTI:  I'd like to look at -- he's

18   not showing me exhibits when he's showing my witnesses

19   exhibits, so I object to that.  He needs to show me those

20   exhibits.  I made copies for him.  I would like to look at

21   these first before he shows them to our witness.

22   　　　　SECRETARY MAHER:  I'll sustain that objection.

23   　　　　And, actually, Attorney O'Neil, do you have -- both

24   attorneys I guess I'd ask the question of.  With respect to

1   exhibits that there's not going to be any objection to and

2   that will be coming into evidence, are there enough copies

3   that the Commissioners could have copies of the exhibit?

4           ATTORNEY GILIBERTI:  I have copies, yes.

5           ATTORNEY O'NEIL:  The only cop- -- the only

6   exhibits, documents I have other than this, which was handed

7   to me before the hearing tonight by my client, were all

8   produced by the City.

9           SECRETARY MAHER:  Okay.  And once we get to the

10  point of admitting evidence -- admitting the exhibits into

11  the record, I just would like to make sure that the

12  Commissioners have copies of that so they can use them both

13  in their deliberations and in evaluating testimony.

14          It's my understanding there's no objection to

15  Exhibits 1 and 2, in which case we show those -- if there

16  is no objection, I'd like to show those admitted.  And I

17  think it'd be helpful to the Commissioners to have copies of

18  those.

19          And then if either of these are going to come into

20  evidence either with or without objection, we can take time

21  if we need to to make copies.  But I think it'd be helpful

22  that anything that's in evidence I'd like the Commissioners

23  to have.

24          ATTORNEY GILIBERTI:  I'll make an objection to

40

1  this.  This is a settlement, a workers' comp settlement,

2  which has no bearing on this matter tonight.  The issue is

3  her absenteeism.  It's irrelevant; it's inflammatory; and

4  it should not be allowed into evidence.  So I would object

5  to Respondent's Exhibit No. 4.

6          SECRETARY MAHER:  May I see the exhibit?

7          ATTORNEY O'NEIL:  The relevance are the signed

8  workers' comp settlements signed off by the City admitting

9  that they were duty-related injuries and paying.

10         You know, at this time, Mr. Maher, I'll get this in

11 through my client.  She signed off on it.  There's another

12 one, as well.  So Mr. Giliberti, now he can look at them.

13         SECRETARY MAHER:  At this point you're withdrawing

14 it?

15         ATTORNEY O'NEIL:  Right.

16         SECRETARY MAHER:  Okay.

17         ATTORNEY O'NEIL:  All right.  Do you want to do

18 these one at a time or the different years?  I'm basically

19 showing her all the sick slips that she testified she used

20 and the summary attached.  Do you just want to --

21         ATTORNEY GILIBERTI:  That's fine.

22         ATTORNEY O'NEIL:  -- go through them one at a time

23 or all at once?

24         ATTORNEY GILIBERTI:  All at once is fine.