1      ATTORNEY O'NEIL:  Okay.

2   BY ATTORNEY O'NEIL:

3      Q.   Ma'am, I'm going to ask you to look at these and

4   just tell me if the backup documents, the sick slips, are

5   the documents that you relied upon in creating Chief's

6   Exhibit No. 1.  I will give you my word as an officer of

7   the court those are the documents, no exceptions, that were

8   produced to me by the City; but if you wish to look through

9   them, you can.

10     A.   No, no.  That's fine.  I recognize making copies of

11  these.

12         SECRETARY MAHER:  Just so that our record is clear,

13  could you identify what it is that you've tendered to her.

14         ATTORNEY O'NEIL:  All right.  We'll go through one

15  at a time.  The first one is Exhibit 1999, which is numbered

16  as such, which are the sick slips from 1999.

17         SECRETARY MAHER:  I think he's at the bottom of --

18         ATTORNEY O'NEIL:  Yeah.  They're probably the last

19  first and the first last.

20         THE WITNESS:  Okay.

21  BY ATTORNEY O'NEIL:

22     Q.   Does that appear to be the sick slips for the year

23  1999?

24     A.   (Witness peruses documents.)  Yes.  They say 1999

1    on them.

2        Q.    Why don't you put that one down on the floor.

3            Next will be year 2000.

4            SECRETARY MAHER:  And, again, one more

5    clarification.  These are coming in -- just as I'm looking

6    over her shoulder here, they're labeled Exhibit 2000.

7    That's not, obviously, a sequential exhibit number.  You've

8    labeled them so that the exhibit number corresponds to the

9    year that is being discussed in terms of leave time off

10    from work; correct?

11            ATTORNEY O'NEIL:  These are the -- yeah.  Like, for

12    instance, 2000 discusses all of the sick slips in the year

13    2000.

14            SECRETARY MAHER:  Okay.  And as with the first

15    exhibit that you tendered, is the first page that sits on

16    top of this document that you prepared --

17            ATTORNEY O'NEIL:  Yes.

18            SECRETARY MAHER:  -- as to each one of these?

19            And then each subsequent document is an official

20    document produced by the City?

21            ATTORNEY O'NEIL:  It's the backup.  Basically all

22    the cover sheets are is to give the dates, the sick hours

23    and the reason of the sick slips so you've got a chart so

24    you're not going through all the different documents.

1            SECRETARY MAHER:  Okay.  Just so that we understand

2    what's there.

3    BY ATTORNEY O'NEIL:

4        Q.   Do you recognize those?

5        A.   Yes.

6        Q.   And if you go to 2001, again, if you quickly go

7    through the backup, again accepting my assertation as an

8    offi- -- my affirmation as an officer of the court that

9    those are all documents with none pulled, none deleted that

10   the City produced to me, do those look like the documents

11   that you utilized?

12       A.   They do.

13       Q.   Okay.  If you go to 2002, again the same question.

14   Accepting my affirmation as an officer of the court that

15   those are the documents that were tendered to me by the

16   City, do those appear to be the sick leave slips that you

17   utilized in the creation of Chief's Exhibit 1?

18       A.   Yes.

19       Q.   Thank you.

20            2003, again accepting my affirmation as an officer

21   of the court that those are the documents that were tendered

22   to me by the City of Rockford, do those appear to be the

23   documents that you relied upon in the creation of Chief's

24   Exhibit No. 1?

1    A.    (Witness peruses documents.)   Yes, these are the

2  sick slips.

3    Q.    And then again with Exhibit 2004, again accepting

4  my affirmation as an officer of the court that these are

5  documents that were tendered to me by the City of Rockford,

6  do those appear to be the sick slips that you utilized with

7  respect to compiling Chief's Exhibit No. 1?

8    A.    I used the sick slips to log on the calendars, and

9  the calendars is what I used; correct.

10    Q.    Exhibit 2005, again accepting my affirmation as an

11  officer of the court that these are the documents that were

12  tendered to me by the City of Rockford, do those appear to

13  be the sick slips that you utilized in the creation of

14  Exhibit No. 1?

15    A.    Yes.

16    Q.    Okay.  Let's go to 2006.  Again accepting my

17  affirmation as an officer of the court that these are

18  documents that were tendered to me by the City of Rockford,

19  do these appear to be the sick slips that you utilized in

20  the creation of Chief's Exhibit No. 1?

21    A.    Yes.

22    Q.    And, finally, Exhibit 2007, again accepting my

23  affirmation as an officer of the court that these are the

24  documents that were tendered to me by the City of Rockford,

1    do they appear to be the sick slips that you utilized in

2    creation of Chief's Exhibit No. 1?

3        A.    Yes.

4            And, again, as I asked you before, all those sick

5    slips from the time you've been here in 1993 through 2007

6    all have a differentiation on the sick slip between sick

7    pay and workers' comp?

8        A.    Correct.

9        Q.    Have you ever processed a sick leave pay for

10   someone who's been off an extraordinary length of time?

11   I guess my better question would be, have you ever heard

12   of the concept in the City of Rockford Police Department

13   concerning unlimited sick time for police officers?

14       A.    That would be under policies and procedures.

15       Q.    And you're not aware of those?

16       A.    (Shakes head.)  They would go under -- unlimited

17   sick time would be under policies and procedures.  That

18   would be more Chief Sweeney's question.

19            ATTORNEY O'NEIL:  I have no further questions of

20   this witness.  I would move for the admission of the sick

21   slips and the summaries.

22            SECRETARY MAHER:  Hang on just a second.

23            First of all, any redirect?

24            ATTORNEY GILIBERTI:  No.

1          SECRETARY MAHER:  Any objection to the admission of

2     any of the exhibits?

3          ATTORNEY GILIBERTI:  No objection.

4          SECRETARY MAHER:  Okay.  Then you can leave those

5     with me.

6          ATTORNEY O'NEIL:  Brendan, do you want extra

7     copies?  I've got a whole . . .

8          SECRETARY MAHER:  What's that?

9          ATTORNEY O'NEIL:  I've got extra copies if you

10    want.

11         SECRETARY MAHER:  Well, these have the original

12    stickers on them; so unless you would like them back for

13    some reason, we'll keep them.

14         And then the only other exhibit was Union

15    Exhibit 8.  Did you want to move for admission of that

16    or not?

17         ATTORNEY O'NEIL:  No.

18         SECRETARY MAHER:  No?

19         ATTORNEY O'NEIL:  No.

20         SECRETARY MAHER:  I will return that to you.

21         We'll show for the record Union exhibits numbered

22    1998 consecutively through 2007 are admitted into the record

23    without objection and for consideration by the Commission.

24         There being no further questions, thank you, ma'am.

1               (Witness excused.)

2          ATTORNEY GILIBERTI:  I'd also move the Chief's

3     Exhibits 1 and 2.  I don't know when you want me to move

4     for admission of my exhibits, now or after my --

5          SECRETARY MAHER:  It'd be helpful, I think,

6     to do it now just so that they're available if the

7     Commissioners --

8          ATTORNEY GILIBERTI:  So I'd move for 1 and 2.

9          ATTORNEY O'NEIL:  No objection.

10         SECRETARY MAHER:  Do we have officially marked

11    copies as part of the record?

12         ATTORNEY GILIBERTI:  Yes.

13         ATTORNEY O'NEIL:  Here's one.

14         ATTORNEY GILIBERTI:  Here's one, and then I'll mark

15    this as --

16         ATTORNEY O'NEIL:  And as a point of order,

17    Mr. Maher, I think it would probably be good practice that

18    when whatever witness talks about the exhibits that we try

19    and enter it, otherwise we lose track of what's in and out.

20         SECRETARY MAHER:  I agree.  I think it makes sense

21    to do that now.  So we'll show for the record admitted

22    without objection the Chief's Exhibit No. 1 and the Chief's

23    Exhibit No. 2, Exhibit 1 being the paper version of the

24    chart discussing Officer Tonya Beets' absenteeism record

1   labeled January 1, 1998, to August 5th, 2007.  And we'll --

2   the record will reflect Chief's Exhibit 2 as being a paper

3   copy of the bar graph chart that was discussed by the first

4   witness, as well.  Show both exhibits admitted into the

5   record.

6          Your next witness, Mr. Giliberti.

7          ATTORNEY GILIBERTI:  We call Deputy Chief Mike

8   Booker.  And Deputy Chief Sweeney is going to get him right

9   now.  He will not be long.

10                    (Witness sworn.)

11          SECRETARY MAHER:  Have a seat and state your name

12   for the record, please.

13          THE WITNESS:  Michael D. Booker, B-o-o-k-e-r.

14          SECRETARY MAHER:  Mr. Giliberti.

15                DEPUTY CHIEF MICHAEL BOOKER,

16   called as a witness on behalf of the City of Rockford and

17   Police Chief Chet Epperson, having been first duly sworn,

18   testified as follows:

19                    DIRECT EXAMINATION

20                BY ATTORNEY GILIBERTI:

21   Q.    And, Deputy Chief Booker, how are you employed?

22   A.    Deputy Chief, Field Services, Rockford Police

23   Department.

24   Q.    How long have you worked for the Rockford Police

1    Department?

2        A.   Approximately 25 and a half years.

3        Q.   And how long have you been deputy chief, Field

4    Services?

5        A.   Since May of 2006.

6        Q.   Are you familiar with Rockford Police Officer Tonya

7    Beets?

8        A.   I am.

9        Q.   And how are you familiar with Officer Beets?

10       A.   I was her direct supervisor in Community Services

11   in January of '01 through May of '02.

12       Q.   Do you have any duties currently or supervision

13   over Officer Beets currently?

14       A.   I do.  I'm the commanding officer of the Patrol

15   and Special Operations Unit; and the unit that she's

16   currently assigned to, Central Reporting Unit, falls into

17   that -- those parameters.

18       Q.   What was Officer Beets' rank when you immediately

19   supervised her in 2000 to 2002?

20       A.   Patrol officer.

21       Q.   And was she in a specific unit at that time in

22   patrol?

23       A.   Actually, it was the Community Services Unit.

24   She was an officer in the Community Services Unit.

1    Q.   And what were Officer Beets' duties in the

2    Community Services Unit?

3    A.   She was assigned a specific geographical area in

4    which she was to be responsive to the citizens in those

5    areas, oversee neighborhood organizations, a crime

6    prevention role.

7    Q.   And when Officer Beets was in the Community

8    Services Unit, how many officers in addition to Officer

9    Beets were part of that unit?

10   A.   This were four additional officers, a total of

11   five.

12   Q.   When you immediately supervised Officer Beets from

13   2000 and 2001 through part of 2002, did she take any sick

14   time during that period?

15   A.   She did.

16   Q.   Do you know off the top of your head about how much

17   sick time she took during that time?

18   A.   I do recall from a performance evaluation that

19   went, I believe, from May till May, and it was 57 days or

20   458 hours.

21   Q.   And you've -- as part of your job duties, you

22   evaluated Officer Beets; correct?

23   A.   Yes, I did.

24   Q.   And how would you characterize Officer Beets' use

1    of sick leave when you immediately supervised her?

2        A.    It was excessive.

3        Q.    When she was on -- when she was in your unit in

4    that Community Services Unit, was she on light duty at any

5    time?

6        A.    I believe the entire time.

7        Q.    When Officer Beets was on light duty or sick, could

8    she perform her duties in the Community Services Unit?

9        A.    Not wholly, no.

10       Q.    Can you explain what you mean by "Not wholly"?

11       A.    Well, she was assigned to the desk; and she was

12   not able to go out and perform the crime prevention function

13   or report to the neighborhood organizations, not able to

14   respond to their concerns as it related to situations in

15   the field or in the neighborhoods.

16       Q.    When Officer Beets was on sick or light duty when

17   you immediately supervised her, what, if any, impact did

18   that have on the Community Services Unit?

19       A.    Well, we started every day down 20 percent.  There

20   were five officers, and so we were down one.  And so the

21   other offi- -- the other four officers in the unit were

22   required then to pick up extra duties for her.  It did

23   eventually start to have a negative impact on the morale

24   of the other officers on the unit.

1    Q.    And why is that?

2    A.    They felt that they were doing their work and, in

3    addition, a portion of hers, as well.

4    Q.    When Officer Beets was on sick or light duty when

5    you immediately supervised her, did you have to hire back

6    any other officers to cover her duties?

7    A.    Not in the Community Services Unit.

8    Q.    When you immediately supervised Officer Beets,

9    how was her dependability, her job atten- -- regular job

10   attendance?

11   A.    It was poor.

12   Q.    What is Officer Beets' current rank?

13   A.    Patrol officer.

14   Q.    And what is her current assignment?

15   A.    Central Reporting Unit, CRU unit.

16   Q.    What are her duties in the Central Reporting Unit?

17   A.    They're the first point of contact for any of the

18   public that comes into the building.  They're required

19   to take reports from citizens that walk in with specific

20   criminal complaints.  They take reports over the telephone

21   that are referred from police dispatch.  They are things

22   that can be handled over the phone rather than dispatching

23   an officer.  They assist officers with accident reports --

24   or citizens, I should say, with accident reports, completing

53

1    them.

2        Q.    Do officers have to work in full capacity without

3    any medical restrictions to work in the Central Reporting

4    Unit?

5        A.    We need some officers to work in full capacity in

6    that position, although we do supplement those officers with

7    light-duty officers that would work in a limited capacity.

8        Q.    Why do you need some officers in full capacity in

9    that unit?

10       A.    Officers sometimes are called upon to make arrests,

11   that there's people who turn themselves in.  There are on

12   occasion disorderly people, people that are angry, sometimes

13   emotionally disturbed people that need to be escorted from

14   the building, things like that.

15       Q.    Do you know the last time Officer Beets worked full

16   capacity in the Central Reporting Unit?

17       A.    I believe it was in 2006.

18       Q.    How, if any, does her current absence in the

19   Central Reporting Unit impact that unit?

20       A.    It creates a shortage there.  It requires us to

21   hire back additional officers at considerable expense to

22   the City.

23       Q.    When you say "considerable expense," could you

24   elaborate on that?

1    A.   Well, during the time that she is off, she's paid

2    her full salary and then we are hiring back another officer

3    at time and a half to fill that role.

4    Q.   Is there any impact on the public due to her

5    absence from the -- current absence from the Central

6    Reporting Unit?

7    A.   At times when there's a shortage down there, it

8    requires citizens to wait longer to receive assistance from

9    an officer; the phone may go unanswered for a little bit

10   longer period of time, and we're not able to deliver the

11   same level of service as we could when we're full-staffed.

12   Q.   Can you replace Officer Beets' position with hiring

13   another full-time police officer if she is still on the

14   police force?

15   A.   I'm sorry?

16   Q.   If she is still on the police force, can you

17   take her position and hire a new police officer, in effect

18   replacing her position?

19   A.   No, I don't believe we can.

20   Q.   Do you know approximately how much time Officer

21   Beets has missed working full capacity since approximately

22   the last ten years?

23   A.   I believe it's around 50 percent.

24   Q.   How would you characterize Officer Beets' absence

1    from full duty over the last ten years?

2        A.    Very excessive and very high.

3        Q.    How would you characterize Officer Beets'

4    reliability to be on the job over the last ten years --

5    full time on the job over the last ten years?

6        A.    It would be poor.

7        Q.    And is it important for an officer of the Rockford

8    Police Department to be consistently on the job full time?

9        A.    Yes, it is.

10        Q.    And why is that?

11        A.    It's important to maintain a delivery of service

12    to the citizens that we feel is appropriate, and it's also

13    important to the officers who are working in the same unit

14    to share the workload that exists.  If it were a patrol

15    position, it's important for the officers on the street to

16    have an officer that's reliable for backup and to assist on

17    calls and those types of things.

18        Q.    Deputy Chief Booker, are you familiar with the job

19    description of a Rockford patrol officer?

20        A.    Yes, I believe I am.

21        Q.    And how are you familiar with that job description?

22        A.    From the -- I believe it's in the general orders

23    or the rules and regs, rules of conduct from the Police and

24    Fire Commission.

1      ATTORNEY GILIBERTI:  I'd like to approach the

2  witness if I could.

3      SECRETARY MAHER:  Please.

4      ATTORNEY O'NEIL:  No objection.

5  BY ATTORNEY GILIBERTI:

6      Q.   Mike, I'm showing you what's marked Chief's Exhibit

7  No. 3.  Do you recognize Chief's Exhibit No. 3?

8      A.   (Witness peruses document.)  I do.

9      Q.   And what is it?

10      A.   It's the examples of duties for a patrol officer of

11  the Rockford Police Department.

12      Q.   And is it the job description of a Rockford patrol

13  officer?

14      A.   Yes.

15      Q.   And does that job description of a Rockford patrol

16  officer include patrolling City of Rockford streets?

17      A.   It does.

18      Q.   Does the job description include maintaining order?

19      A.   It does.

20      Q.   Does the job description include enforcing laws?

21      A.   Yes, it does.

22      Q.   Does that job description include protecting lives

23  and property of the citizens of Rockford?

24      A.   Yes, it does.

1    Q.   Does the job description include the words "may

2    use moderate to heavy physical exertion such as walking,

3    running, climbing and fighting"?

4    A.   It does.

5    Q.   When Officer Beets is sick, can she perform any of

6    the duties in the job description you just testified to?

7    A.   No, she cannot.

8    Q.   When she's on light duty, can she perform any of

9    those duties that you just testified to?

10   A.   No, she cannot.

11   Q.   When she is not on the job in full capacity, is she

12   performing her job duties efficiently pursuant to the job

13   description?

14   A.   No.

15        ATTORNEY GILIBERTI:  I have no further questions.

16        SECRETARY MAHER:  Attorney O'Neil, do you have any

17   objection to the exhibit being introduced --

18        ATTORNEY O'NEIL:  No.

19        SECRETARY MAHER:  -- as an exhibit?

20        ATTORNEY O'NEIL:  Not at all.

21        SECRETARY MAHER:  Do you have a marked copy of

22   that?

23        ATTORNEY O'NEIL:  We agree with those principles.

24        ATTORNEY GILIBERTI:  (Tenders exhibit.)

1    SECRETARY MAHER:  Thank you.

2    Cross-examination, Mr. O'Neil?

3    ATTORNEY O'NEIL:  Thank you.

4

5              CROSS-EXAMINATION

6              BY MR. O'NEIL:

7    Q.   Deputy Chief Booker, when did you testify you were

8    the direct supervisor of Tonya Beets?

9    A.   I was there from January -- I believe I was her

10   direct supervisor from January of '01 through May of '02.

11   Q.   And were you aware of the reasons that she was ill?

12   A.   I would have been at the time, yes.

13   Q.   Do you recall that for the first month of '01 she

14   was off on maternity leave?

15   A.   I do not know.

16        ATTORNEY O'NEIL:  Mr. Maher, will you show the

17   deputy chief, please, Exhibit 2001.

18        SECRETARY MAHER:  (Tenders exhibit.)

19   BY ATTORNEY O'NEIL:

20   Q.   If you wish, sir, you can look through the

21   documents attached to that; but that is a summary of

22   the documents that are attached.  It shows that she had

23   176 hours of maternity leave in 2001.  Do those documents

24   refresh your recollection?

1    A.    (Witness peruses documents.)  Specific to maternity

2    leave?

3    Q.    Yes, sir.

4    A.    They don't reflect my recollection in that I would

5    have had no personal knowledge of these.  They were filled

6    out by it looks like an administrative assistant or another

7    deputy chief or a supervisor.  But I acknowledge --

8    Q.    Is it the policy of the Rockford Police Department

9    to utilize maternity leave against an employee in a

10    termination proceeding?

11    A.    Not that I'm aware.

12    ATTORNEY GILIBERTI:  Objection; relevance.

13    SECRETARY MAHER:  Overruled.

14    Can you answer the question?

15    A.    Not that I recall ever happening before.

16    BY ATTORNEY O'NEIL:

17    Q.    Further on in 2001, Deputy Chief Booker, when you

18    were her supervisor, do you recall that she was off several

19    weeks with a bad kidney infection and kidney stones?

20    A.    I don't remember that, but I see and acknowledge

21    that the sick slips are here.

22    Q.    And later were you aware of her foot injury that

23    she received in a foot chase?

24    A.    I was aware of her foot injury, yes.

1    Q.   And that was the source of the light duty; is that

2    correct?

3    A.   As I recall.

4    Q.   Light duty is not ordered by a chief or an officer;

5    it's ordered by a physician, isn't it?

6    A.   Most of the time, I believe so.

7    Q.   As a matter of fact, an officer can't have light

8    duty in your experience in the Rockford Police Department

9    unless it is ordered by a physician?

10   A.   I believe that's correct.

11   Q.   And with respect to the year 2001 when you were

12   Tonya's supervisor, isn't it true that she accomplished --

13   not accomplished, but accrued 55 workers' comp hours?

14   A.   I don't know that.

15   Q.   You don't remember that?

16   A.   I don't remember.  I don't know.

17   Q.   Let's go to 2002.  How long were you her supervisor

18   in 2002, sir?

19   A.   It would have been January through May, I believe.

20   Q.   All right.  And were you aware of the continued

21   cortisone injections in her foot as a result of the

22   on-the-job injury?

23   A.   I was aware of continued doctor's visits, but I

24   didn't know what the therapy was.

61

1    Q.   And then the year 2002, of the 548 hours, 376.5

2    were workers' comp hours as ordered by her physician.  Were

3    you aware of that?

4    A.   No.

5    Q.   Does that change your opinion of the time you

6    directly supervised her, sir, that she was injured from an

7    on-the-job injury?

8    A.   I'm not sure what you're suggesting my opinion was.

9    Q.   I believe you stated before that her light -- and

10   if I'm paraphrasing or saying it wrong, tell me and I

11   apologize -- that her light duty was excessive?

12   A.   I don't remember saying her light duty was

13   excessive.  I think we were talking about sick time as a

14   whole.

15   Q.   And sick time, the Rockford Police Department on

16   those sick slips differentiates between sick time and

17   workers' comp, does it not?

18   A.   I can check.

19   Q.   Would you, please.

20   A.   (Witness peruses documents.)

21   Q.   If you'll accept my representation, the previous

22   witness stated that those forms haven't changed since at

23   least 1993.  So you just look at any one of the sick leave

24   forms.  They all look the same.

1      A.   Okay.

2      Q.   In the right column do you see two columns:  One,

3  Sick Leave; two, Workers' Comp?

4      A.   I do.

5      ATTORNEY O'NEIL:  I have no further questions of

6  this witness.

7      SECRETARY MAHER:  Any redirect?

8      ATTORNEY GILIBERTI:  Yes.

9

10                REDIRECT EXAMINATION

11              BY MR. GILIBERTI:

12     Q.   Deputy Chief Booker, regarding Exhibit 2001 that

13  Attorney O'Neil has given to you, do you have the -- the

14  better word is cover sheets regarding -- on the left side

15  there's the date and illness, reason, hours, job injury on

16  the far right.  Do you have that sheet?

17     A.   I believe I do (indicating).

18     Q.   Yes.  Okay.  And the kidney problems that Attorney

19  O'Neil asked you about, those range starting 3/26/01 through

20  6/29/01; correct?

21     A.   Correct.

22     Q.   And then on 10/18/2001 there's a "Stomach/sore

23  throat" for the reason; right?

24     A.   Correct.

1    Q.    10/19/2001 there's a stomach flu?

2    A.    Correct.

3    Q.    And then it says 11/7/2001 hospital?

4    A.    Correct.

5    Q.    Okay.  Regarding the 2002 cover sheet -- 2002-1

6    exhibit that Attorney O'Neil just showed you, do you have

7    that?

8    A.    2002-1?

9    Q.    Yes.

10   A.    I do have it.

11   Q.    Okay.  And under the Reason column, there's various

12   reasons, are there not, going down starting January 16th

13   through January 17th, 2002, all the way through -- under the

14   Reason column I just talked about, July 3rd through July

15   4th, 2002; right?  There's reasons --

16   A.    Yes; uh-huh.

17   Q.    And there's various reasons; isn't that right?

18   A.    Correct.

19   Q.    And, for example, January 16 through January 17,

20   2002, it says "Colonoscopy"; right?

21   A.    Yes.

22   Q.    January 21st, 2002, it says "Not feeling well";

23   right?

24   A.    Correct.

1      Q.   January 30th, 2002, it reads -- the reason on the

2    sheet reads "Sore stomach"; correct?

3      A.   That's correct.

4      Q.   January 31st through March 1st it says reason is --

5    indicated is "Intestinal"; right?

6      A.   January 31st through February 1st.

7      Q.   Right, 2002.

8      A.   "Intestinal," that's correct.

9      Q.   February 18th, 2002, the reason reads "Cold and

10   cough"; right?

11     A.   Correct.

12     Q.   And the same reason, "Cold and cough," is for the

13   following day, January 19th; correct?

14     A.   Correct.

15     Q.   January 20th, 2002, the reason is "Not feeling

16   well"; right?

17     A.   Correct.

18     Q.   January 21st, 2002, it reads the reason as "Flu";

19   right?

20     A.   That's correct.

21     Q.   January 22nd, 2002, the reason is "Bronchitis";

22   right?

23     A.   That's correct.

24     Q.   February 10th, 2002, the reason indicated on

1    Exhibit 2002-1 is "Called in sick"; correct?

2        A.    That would be April 10th.

3        Q.    I'm sorry.  April 10th, 2002.

4            The following day, April 11th, 2002, the reason

5    indicated is "Sore throat/sinus"; right?

6        A.    Correct.

7        Q.    April 22nd, 2002, "Not feeling well"; right?

8        A.    Correct.

9            ATTORNEY GILIBERTI:  That's all the questions I

10   have.  Thank you.

11           SECRETARY MAHER:  Any recross?

12           ATTORNEY O'NEIL:  Let me follow up on that.

13

14                    RECROSS-EXAMINATION

15                    BY MR. O'NEIL:

16       Q.    Now, Deputy Chief, would you agree or disagree with

17   me that police officers in their contact with the public

18   have a higher rate of exposure to viruses and diseases

19   versus someone who sits in an office?

20           ATTORNEY GILIBERTI:  Objection.  Unless he can tie

21   it into some specific incident, I don't see the relevance of

22   that.

23           SECRETARY MAHER:  I'm going to sustain the

24   objection but on a different ground.  You haven't

1    established any foundation for this witness to answer

2    that question.

3           ATTORNEY O'NEIL:  All right.

4    BY ATTORNEY O'NEIL:

5    Q.    You've been a police officer for 25 and a half

6    years; is that correct?

7    A.    I've been with the City police department 25 and a

8    half years.  The first three years was as a police cadet.

9    Q.    Okay.  And -- strike that.  We won't even go there.

10          On Exhibit 2002 if you look at Page 2, it shows

11   100 sick hours for the year; is that correct?

12   A.    (Witness peruses document.)  That's correct.

13   Q.    And at that time was Tonya working an eight-hour

14   shift or a ten-hour patrol shift?

15   A.    I believe at that time she was assigned to the

16   School Unit, and that would have been an eight-hour shift.

17   Q.    So if she had 100 sick hours for one year divided

18   by 8 hours, my math says that's 12 and a half sick days.

19   A.    I would agree with that.

20   Q.    That's about one a month?

21   A.    (Witness peruses documents.)  And this is for the

22   entire year?

23   Q.    The sick hours.  Didn't you just say that it was

24   100?

1    A.    The bottom of Page 2 says 100 sick hours, but I'm

2  just seeing this.  And if I put the two together, I believe

3  I'm coming up with the entire year.

4    Q.    Correct.

5    A.    Then I would agree with that.

6    Q.    So that would be 12 and a half sick days for the

7  entire year or about one a month?

8    A.    I think that's fair.

9    Q.    Is that unusually high?

10   A.    I believe that's above average.

11       ATTORNEY O'NEIL:  No further questions.

12       SECRETARY MAHER:  Anything further?

13       ATTORNEY GILIBERTI:  Nothing further.

14            (Witness excused.)

15       SECRETARY MAHER:  I'll need the exhibits back.

16  Thank you.

17       Mr. Giliberti.

18       ATTORNEY GILIBERTI:  I will rest at this stage

19  subject to rebuttal witnesses or witness.

20       SECRETARY MAHER:  So in terms of your case in

21  chief, you're resting on those two witnesses?

22       ATTORNEY GILIBERTI:  Yes.

23       SECRETARY MAHER:  Mr. Giliberti -- or I'm sorry.

24  Mr. O'Neil.

1    ATTORNEY O'NEIL:  At this time I move for a

2    directed finding.  The City has not offered any evidence to

3    support the charge of inefficiently performing her duties.

4    If you look at the charge as stated in the complaint, it

5    basically talks about what you do one year on duty that you

6    do your job right.  It doesn't talk about sick leave abuse,

7    which I think is what he's trying to allege here.  So at

8    this point I'll make a motion for a directed finding that

9    they have not proved one element of the charge.

10    SECRETARY MAHER:  All right.  What I'm going to

11    suggest to the Commissioners is that we take a motion and a

12    second to go into closed session to deliberate on the issue

13    of the directed verdict finding so that I can advise you as

14    to what that means and your options, and I would entertain

15    a motion in that respect.

16    COMMISSIONER DOTSON-WILLIAMS:  I'll so move.

17    COMMISSIONER CARUANA:  Second.

18    SECRETARY MAHER:  All in favor?

19    COMMISSIONER LOGAN:  Aye.

20    COMMISSIONER CARUANA:  Aye.

21    COMMISSIONER DOTSON-WILLIAMS:  Aye.

22    SECRETARY MAHER:  Okay.  With that, we're going to

23    go into closed session.  If I could have everybody leave the

24    room.  This shouldn't take more than five or ten minutes.

1      (The Commission went into closed

2      session, reported by the court

3      reporter.)

4      SECRETARY MAHER:  Okay.  A directed verdict simply

5  means -- he's using a civil court room legal request in an

6  administrative context.  There's nothing improper about

7  that.

8      What a directed verdict means in a civil context

9  or in this proceeding is he's saying that without putting

10  on a single witness of my own, I think if that's all they

11  have that you need to make a finding in our favor.  He's

12  essentially saying, I don't think I need to put on Officer

13  Beets.  I don't need to put on any other witnesses.  I don't

14  need to introduce any other exhibits.  I think I should win.

15      I will tell you a motion for a directed verdict

16  almost always is made in every civil case; it almost always

17  is denied so that there's a complete record of what both

18  sides would say.

19      I'm not suggesting to you that it needs to be

20  prejudged.  I'm just saying that a directed verdict is

21  typically made, typically denied.  Then there will usually

22  be a second motion for a directed finding at the close of

23  all evidence.  That motion is usually deliberated upon a

24  little more at length if it's a judge deciding the case.

1      COMMISSIONER CARUANA:  So you're saying this

2   directed verdict, two separate things here?

3      SECRETARY MAHER:  Uh-huh.

4      COMMISSIONER CARUANA:  We're meeting here to do a

5   directed verdict?

6      SECRETARY MAHER:  Right.  We're not deliberating

7   on the case itself, although technically you are in a way.

8   But what you're making the decision on right this moment

9   in time is whether you want to hear Tim O'Neil put on

10  witnesses, and presumably he would put on his client as a

11  witness.  And I see he brought a lot more folders, so there

12  probably is some additional evidence.

13      So to the extent that there's a feeling one way

14  or the other among the three of you or on anyone's behalf,

15  this is the time to discuss I guess whether or not you think

16  that the City has proven its case to a point that it gets

17  to continue mov- -- that the proceedings get to continue

18  moving forward, not that it wins or loses, but has the City

19  introduced enough evidence from each of your respective

20  standpoints that the case ought to continue moving forward.

21      If your decision is that it has, then we will

22  go forward and Attorney O'Neil will present additional

23  evidence.  If your belief is that it hasn't, then you would

24  discuss that among yourselves, come to that conclusion.  We

1     would have to go into open session to entertain a motion on

2     that.

3            But that's what a directed finding is.  So I guess

4     for purposes of this moment in time you all need to decide

5     whether or not the case needs to go any farther or not.

6     So talk amongst yourselves.

7            COMMISSIONER DOTSON-WILLIAMS:  I think it should.

8     I think we need to be fair about any verdict that we come

9     out with.  We need to hear all the information.  And that's

10    not saying which way I'm leaning at this point.  I just want

11    to hear it all.

12           COMMISSIONER CARUANA:  Yeah, I agree with you.

13           COMMISSIONER DOTSON-WILLIAMS:  You know, I don't

14    think it's fair to --

15           COMMISSIONER CARUANA:  I have not heard anything

16    yet to leach onto to say one way or the other.

17           COMMISSIONER DOTSON-WILLIAMS:  Right.

18           COMMISSIONER CARUANA:  I have a lot of questions,

19    but --

20           COMMISSIONER DOTSON-WILLIAMS:  I do, too.

21           COMMISSIONER CARUANA:  -- I guess that comes after.

22    With the FMLA and the workmen's comp and the sick time,

23    I need some clarification once we get again in closed

24    session and it comes to us.  Right now it's not coming

1   to us.

2           SECRETARY MAHER:  This is also -- I guess one thing

3   I should point out to you -- I think I mentioned it last

4   week, but I'll certainly reiterate -- if any witness is

5   giving testimony and one of you wants to ask a question that

6   has not been asked, you're entitled to do that before the

7   witness is dismissed.  And you don't have to, and it is

8   unusual.  It should be the exception rather than the rule.

9   But if there's something in particular that a witness said

10  that sticks in your head that you want clarification to help

11  you make your decision on before the witness is dismissed,

12  certainly you're entitled to ask that question.

13          Most of the time it's much more common to let the

14  attorneys do their thing and only listen to what they choose

15  to allow to come in.  But I know from sitting in courtrooms

16  that there are sometimes something that sits in your head

17  that you're like, I would like an answer to this and

18  nobody's asking it.  Why?

19          COMMISSIONER DOTSON-WILLIAMS:  Right.

20          SECRETARY MAHER:  You're entitled to do that in

21  this context.  You don't have to, but you're entitled to.

22          COMMISSIONER DOTSON-WILLIAMS:  And I have one of

23  those, but I didn't ask yet because I didn't know he was

24  going to do what he did.  But I do have a question, but I'm

```
 1   not sure who I'd ask it to.  Do you want to know what it is?

 2           SECRETARY MAHER:  Sure.

 3           COMMISSIONER DOTSON-WILLIAMS:  What happens to any

 4   female officer who is hired as a patrol officer when they

 5   are expecting a child?

 6           SECRETARY MAHER:  That would probably have been

 7   Mr. Booker.

 8           COMMISSIONER DOTSON-WILLIAMS:  Right, and I thought

 9   about that.

10           COMMISSIONER CARUANA:  Can we get him back up here?

11           COMMISSIONER DOTSON-WILLIAMS:  Huh?

12           COMMISSIONER CARUANA:  Can we get him back up here

13   to answer that question or no?

14           COMMISSIONER DOTSON-WILLIAMS:  Or is it a Lori

15   Sweeney question?  I don't know.

16           SECRETARY MAHER:  Well, I guess in terms of the

17   procedural status, John Giliberti is saying, I'm not putting

18   on another witness.

19           COMMISSIONER DOTSON-WILLIAMS:  Right.

20           SECRETARY MAHER:  So unless one of the officers is

21   called by Attorney O'Neil, there will be no more officers --

22           COMMISSIONER DOTSON-WILLIAMS:  Right.

23           SECRETARY MAHER:  -- coming up for the City.

24           Attorney O'Neil had indicated that he was going
```

1    to be calling now Lieutenant Block, formerly Sergeant Block.

2    I suppose if Sergeant Block -- Lieutenant Block takes the

3    stand he would probably know the answer to that, as well.

4         COMMISSIONER DOTSON-WILLIAMS:  And, see, I thought

5    Lori was going to be up here, too; so I just kind of wrote

6    it down and highlighted it like I would ask her because

7    she's the highest person in the room.

8         SECRETARY MAHER:  If you're inclined to deny the

9    motion for a directed verdict, then I would think you would

10   be able to ask that question of any police department

11   representative that has some experience on the management

12   side.

13        COMMISSIONER LOGAN:  Can I go back to what's the

14   real issue?  Because I think there's only -- if we come

15   back -- this (indicating) page that's real short and states

16   the complaint, that's what we have to measure everything

17   against; is that correct?

18        SECRETARY MAHER:  Correct.  And, actually, it's

19   the amended complaint that you'd be working off of but --

20        COMMISSIONER LOGAN:  But it's about whether she has

21   been absent enough to impede her ability to perform and the

22   department's ability to function; am I right about that

23   simplistic statement?

24        SECRETARY MAHER:  Yes, with this caveat:  They

1    charge a violation of a rule or a regulation and they cite

2    it to you.  And as with many things that exist in rules and

3    regulations, they're always subject to interpretation, and

4    that's your job in this context.

5        COMMISSIONER LOGAN:  Right, right.

6        SECRETARY MAHER:  The rules and regulations that

7    they have cited is Section 3, Paragraph 9 of their own

8    internal rules and regulations.  And they quote it and they

9    quote what they're charging her with is, quote, incompetency

10   or inefficiency in the performance --

11       COMMISSIONER LOGAN:  Right.

12       SECRETARY MAHER:  -- of any assigned duty.  That

13   is the standard that the City is alleging has been violated,

14   and it's entirely up to you to interpret as to whether

15   that's the case or not.

16       COMMISSIONER LOGAN:  Right, right.

17       SECRETARY MAHER:  So, I mean, it is literally as

18   simple or as complicated as figuring out whether you believe

19   that -- whether it's excessive or not, whether the amount of

20   sick time at issue rendered Offi- -- renders Officer Beets

21   either incompetent or inefficient.

22       COMMISSIONER LOGAN:  And it's not about why she

23   was gone?  It's does that amount equate to inefficient or

24   ineffective?

1    SECRETARY MAHER:  Well, as your legal advisor,

2    one of the things -- and this is what Attorney O'Neil was

3    getting at, and in HR I'm sure you certainly know this --

4    you absolutely cannot take into account in making a

5    termination decision either FMLA --

6    COMMISSIONER LOGAN:  Right.

7    SECRETARY MAHER:  -- or properly awarded workers'

8    comp time --

9    COMMISSIONER LOGAN:  Right.

10    SECRETARY MAHER:  -- with one exception.  He

11    oversimplified, so this is for all of you.  You can fire a

12    person who's on comp all the time.  You just can't fire them

13    because they filed the comp claim because you don't like

14    paying it.  But if you have someone who's not on the job at

15    all --

16    COMMISSIONER LOGAN:  Correct.

17    SECRETARY MAHER:  And so the reason that we had an

18    amended complaint and the reason then we had that follow-up

19    e-mail that I attached to the amended complaint this evening

20    is what Attorney Giliberti had to go back and do.  They

21    determined after their initial run through the paperwork

22    that they had included some FMLA time in that sick time, so

23    they pulled that out.

24    COMMISSIONER LOGAN:  Okay.  Now you're getting to

1    what I want to know.

2         SECRETARY MAHER:  So the only thing that shows

3    on that chart is sick time total hours off with FMLA not

4    included.

5         COMMISSIONER LOGAN:  Right.

6         SECRETARY MAHER:  What Attorney Giliberti was

7    getting at is that they did not --

8         COMMISSIONER LOGAN:  You mean O'Neil.

9         SECRETARY MAHER:  I'm sorry.  O'Neil.

10         COMMISSIONER LOGAN:  They didn't take the comp

11    time.

12         SECRETARY MAHER:  -- they didn't take the workers'

13    comp time out.  The City's position on that would be We're

14    allowed to leave the workers' comp time in because

15    regardless of reason it's time that she is not at work,

16    and we believe that that contributes to inefficiency or

17    incompetency.

18         Attorney O'Neil's position is simply that if it's

19    a work- -- I mean, he's taking the position that if it's a

20    work-related injury and it's provable that it's a work-

21    related injury because it was compensated as a work comp

22    injury, our argument is that you should not factor that in

23    as being evidence of incompetence or inefficiency because

24    she was hurt on the job and you shouldn't count that against

1    her.

2            At the end of the day, your determination is

3    whether or not the total amount of time off that is properly

4    considered as time off and workers' comp time can be

5    considered in the time-off equation -- whether that renders

6    her incompetent or inefficient in the performance of her

7    duties as a patrol officer.

8            COMMISSIONER LOGAN:  Okay.  How can we get a

9    simple, clean answer on every one of those years how much

10   of that is part of an injury?

11           SECRETARY MAHER:  I believe that --

12           COMMISSIONER LOGAN:  It's in one of the exhibits?

13           SECRETARY MAHER:  What O'Neil has introduced as his

14   Exhibit Nos. -- I think he goes back to 1997 and comes up

15   through 2007 -- which were introduced into the record, so

16   they're properly considered and not objected to.  When

17   you're deliberating ultimately on that question, he broke

18   out the reason for every hour that shows up on that sick

19   time total.

20           COMMISSIONER LOGAN:  Okay.  And then the other

21   thing -- and I just didn't quite track this -- there was

22   something about the Labor Board found that the City -- and

23   six weeks after that the chief brought this against Tonya.

24   Can you go into that, Brendan?

1    SECRETARY MAHER:  I will tell you I don't

2  completely understand what he's saying there.  I listened

3  and heard the same thing, and I have the same question as

4  to its relevance.

5    COMMISSIONER CARUANA:  Yeah.  And why did Chet

6  bring the charges up?  We could ask whether the Labor Board

7  changed something and then three weeks later --

8    COMMISSIONER LOGAN:  Six weeks later.

9    COMMISSIONER CARUANA:  Was it six?

10    COMMISSIONER LOGAN:  Yes.

11    SECRETARY MAHER:  I think what --

12    COMMISSIONER LOGAN:  The Labor Board found against

13  the City of Rockford.

14    SECRETARY MAHER:  On some topic.  And, I mean, I

15  guess what you can ask at some point or I can ask for you --

16  I can ask, "The Commissioners have a question as to this

17  Labor Board issue."

18    COMMISSIONER LOGAN:  I'd like to know.  Wouldn't

19  you?

20    COMMISSIONER DOTSON-WILLIAMS:  Uh-huh.

21    Would you, Gary?

22    COMMISSIONER CARUANA:  Yeah.

23    SECRETARY MAHER:  Yeah, a better explanation on

24  that.  And we can ask Attorney O'Neil to explain himself a

1    little bit better, and he will need to do that in closing

2    argument, anyway.  And if he goes to present his own theory

3    of the case -- in other words, if there's a denial of the

4    pending motion for directed verdict, he's going to have to

5    put on his own evidence.  And either through one of his

6    witnesses or through a direct question to him, we ought to

7    be able to get an answer to that.

8        COMMISSIONER LOGAN:  Uh-huh.  I can wait.  I just

9    didn't know if I was the only one that didn't get it.

10        COMMISSIONER DOTSON-WILLIAMS:  No, I didn't,

11    either.

12        COMMISSIONER CARUANA:  Pugh allowed her to be off.

13    There was some stipulation to the fact that you can be off

14    this amount of time, and then something happened that --

15        COMMISSIONER LOGAN:  They haven't proven that,

16    though.  I mean, somebody laid that out; but how do we know

17    that?

18        SECRETARY MAHER:  I think that the Union's

19    theory -- and they may put this on by Lieutenant Block's

20    testimony.  I believe their theory is -- and you remember

21    we've talked -- you've heard this term "past practice"

22    a lot from the Union because that's a labor-oriented term,

23    and it's what their position has been throughout these

24    proceedings and the court proceedings.

1          But what they would like to establish, I believe,

2     in their case is that under the prior administration it

3     didn't matter how many days of sick time you took, there

4     was no limit, there was no upper limit on it.

5          COMMISSIONER LOGAN:  Yep, yep.

6          SECRETARY MAHER:  And they're saying that now for

7     a new administration to come in and decide -- I don't know

8     whether their term would be arbitrarily; but, I mean, I

9     think their position is for a new administration to make a

10    determination arbitrarily that you can't have unlimited sick

11    time or we are going to use Section 3, Paragraph 9 against

12    you, their claim is that that somehow is not fair or that it

13    ought not to serve as the basis for termination.

14         COMMISSIONER CARUANA:  So it's more of an

15    administrative type of thing?

16         SECRETARY MAHER:  Right.

17         COMMISSIONER DOTSON-WILLIAMS:  My other question

18    was about who can define what light duty is.  Is that a

19    question for Lori or Booker or whomever?

20         SECRETARY MAHER:  What constitutes light duty?

21         COMMISSIONER DOTSON-WILLIAMS:  Uh-huh.

22         COMMISSIONER LOGAN:  Are you asking who assigns it

23    to the --

24         COMMISSIONER DOTSON-WILLIAMS:  I mean, what is

1    light duty?  Answering the phone --

2         COMMISSIONER LOGAN:  Oh, what tasks do they give

3    them?

4         COMMISSIONER DOTSON-WILLIAMS:  What tasks, yeah.

5    Because I remember at something -- I don't know if Gary was

6    here yet, but we were talking about the people who work

7    downstairs at the Public Safety Building answering the

8    phone, that's all they --

9         COMMISSIONER CARUANA:  The front desk.

10        COMMISSIONER LOGAN:  Which is where I think she

11   has been.  When Booker was talking about she was at the

12   community service desk --

13        COMMISSIONER DOTSON-WILLIAMS:  Right.

14        COMMISSIONER LOGAN:  -- that's when you come in the

15   lobby.

16        COMMISSIONER DOTSON-WILLIAMS:  Yeah.  I just

17   wondered, you know, why they couldn't assign her there.

18   But, I guess --

19        COMMISSIONER LOGAN:  Well, she was there.

20        COMMISSIONER DOTSON-WILLIAMS:  But she just wasn't

21   at work the other times.

22        COMMISSIONER LOGAN:  And she couldn't go out into

23   the lobby.  She's a desk only, can't get up and respond to

24   stuff.

1    COMMISSIONER DOTSON-WILLIAMS:  Right; right, I got

2    that.

3    SECRETARY MAHER:  Central Reporting Unit, the

4    testimony at least as to job duties, if I understood it

5    correctly, is that that's where she's currently assigned.

6    And although you don't need to have it fully staffed with

7    full-duty officers, you do need to have a few full-duty

8    officers there.  And he gave some reasons for why that was.

9    COMMISSIONER DOTSON-WILLIAMS:  Right.  I heard

10   that, yes.

11   COMMISSIONER LOGAN:  But it looks like she hasn't

12   been at work in --

13   COMMISSIONER DOTSON-WILLIAMS:  At all, yeah.

14   COMMISSIONER LOGAN:  -- several months.

15   COMMISSIONER CARUANA:  Yeah.  I wonder why.

16   COMMISSIONER LOGAN:  Yeah.  Okay.

17   SECRETARY MAHER:  If the consensus is to deny the

18   motion for a directed verdict, which is what I'm sensing

19   that all three of you are inclined to do, then we need to

20   go back into open session.  We'll need to have a motion --

21   COMMISSIONER LOGAN:  To deny?

22   SECRETARY MAHER:  Well, technically it'd be a

23   motion to grant the directed verdict because it's his motion

24   to do it.  So it'd be "I move to grant Attorney O'Neil's

1  motion for a directed verdict" with a second and then "All

2  in favor," then no one would vote for it, "All opposed,"

3  "Nay," "Motion denied."

4         So that's the way -- it would be a unanimous

5  denial.  And then it would be, "Attorney O'Neil, please call

6  your first witness."

7         COMMISSIONER LOGAN:  Okay.  So I move to grant just

8  Attorney O'Neil's . . .

9         SECRETARY MAHER:  Motion for a directed verdict.

10        COMMISSIONER LOGAN:  For dir- . . .

11        SECRETARY MAHER:  For a directed verdict.

12        COMMISSIONER DOTSON-WILLIAMS:  And then all in

13  favor of --

14        SECRETARY MAHER:  Somebody seconds it.  "All in

15  favor" --

16        COMMISSIONER LOGAN:  Just don't second it, and then

17  it dies.

18        SECRETARY MAHER:  Well, that would be if you were

19  moving to grant the motion and nobody seconds it, then it

20  fails for want of the second.  But I think here it's more

21  appropriate to move to grant the motion because that's the

22  request that's being made and then nobody vote for it.

23  Then it fails.

24        COMMISSIONER CARUANA:  She's going to move for it,

1    we'll grant it and then no one vote for it?

2         COMMISSIONER LOGAN:  Right.

3         SECRETARY MAHER:  Motion, second, "All in favor of

4    granting the motion for a directed verdict," silence, "All

5    opposed," "Aye" and "Your motion fails, Attorney O'Neil.

6    Let's go forward."

7         COMMISSIONER CARUANA:  Having this Paragraph 9 --

8    Section 3, Paragraph 9, helps in making the decision.

9    However, does maternity leave factor into Section 3,

10   Paragraph 9?

11        COMMISSIONER DOTSON-WILLIAMS:  Yeah.

12        SECRETARY MAHER:  No, because -- well, presumably

13   that was taken as FMLA, and that can't be counted.

14        COMMISSIONER CARUANA:  I thought it can be if it's

15   incompetency or inefficiency in performing any assigned

16   duties.  Isn't that a total picture?

17        SECRETARY MAHER:  No.

18        COMMISSIONER CARUANA:  It's not?

19        SECRETARY MAHER:  No.

20        COMMISSIONER CARUANA:  It's just sick time?  So

21   FMLA --

22        SECRETARY MAHER:  Anything that's a legally

23   protected manner of leave you cannot consider in determining

24   whether or not that qualifies as --

86

1    COMMISSIONER CARUANA:  So all these numbers we're

2  looking at here --

3    COMMISSIONER LOGAN:  That's, I think, why they

4  split it out.

5    COMMISSIONER CARUANA:  That's completely out?

6    SECRETARY MAHER:  It was pulled out, right, or at

7  least that's the City's -- the City's contention or what the

8  City's representation to you in its case in chief is that

9  Column 2 titled Sick Time Total Hours Off does not include

10  hours of FMLA leave.

11    COMMISSIONER CARUANA:  Okay.  That's just I'm sick,

12  I'm coughing?

13    SECRETARY MAHER:  That's what the City's

14  representation is.

15    COMMISSIONER CARUANA:  Is this the kidney problem?

16    SECRETARY MAHER:  That would encompass the kidney

17  problems.  It would encompass --

18    COMMISSIONER CARUANA:  The flu.

19    SECRETARY MAHER:  -- the I'm sick, I'm coughing.

20  It could encompass all of that.  And it would also encompass

21  the time off due to workers' compensation claims, and that

22  is properly considered as being -- I mean, if you determine

23  it's excessive, it is properly considered.  FMLA leave you

24  cannot consider.

1    COMMISSIONER CARUANA:  Workmen's comp is not in one

2    of those protected classes like FMLA or maternity?

3    SECRETARY MAHER:  Correct, unless the reason for

4    the termination is because of the filing of the claim.  But

5    if the injury causes a person to be absent such that they

6    cannot perform their job, you can, in fact, terminate them.

7    COMMISSIONER CARUANA:  Okay.

8    SECRETARY MAHER:  I'll let them know what's going

9    on.  Then we'll do a motion to go into open session, and

10   then we'll bring everybody back in.

11                    (Brief recess taken.)

12   COMMISSIONER DOTSON-WILLIAMS:  I will move to go

13   into open session.

14   COMMISSIONER CARUANA:  Second.

15   SECRETARY MAHER:  And second to return to open

16   session.  All in favor signify by saying "Aye."

17   COMMISSIONER CARUANA:  Aye.

18   COMMISSIONER DOTSON-WILLIAMS:  Aye.

19   COMMISSIONER LOGAN:  Aye.

20                    (The Commission went

21                    into open session.)

22   SECRETARY MAHER:  Prior to going into closed

23   session, there was a motion made by Attorney O'Neil for a

24   directed verdict at the close of the City's case in chief.

88

1    At this point I would entertain a motion to grant Attorney

2    O'Neil's motion for a directed verdict at the close of the

3    City's case in chief.

4         COMMISSIONER LOGAN:  So move.

5         SECRETARY MAHER:  Do I have a second?

6         COMMISSIONER CARUANA:  Second.

7         SECRETARY MAHER:  All those in favor of granting

8    Attorney O'Neil's motion signify by saying "Aye."

9                   (No response.)

10        SECRETARY MAHER:  All those opposed?

11        COMMISSIONER LOGAN:  Aye.

12        COMMISSIONER CARUANA:  Aye.

13        COMMISSIONER DOTSON-WILLIAMS:  Aye.

14        SECRETARY MAHER:  Motion unanimously fails.

15        With that, Attorney O'Neil, I'd ask you to call

16   your first witness.

17        ATTORNEY O'NEIL:  I thought the motion you called

18   for . . .

19        SECRETARY MAHER:  The motion was to grant your

20   motion, and no one voted for it --

21        ATTORNEY O'NEIL:  Oh, okay.

22        SECRETARY MAHER:  -- and everyone voted against it.

23        ATTORNEY O'NEIL:  Okay.  All right.

24        SECRETARY MAHER:  So it was unanimously denied.

1      ATTORNEY O'NEIL:  I will call Lieutenant Doug

2  Block.

3                  (Witness sworn.)

4      SECRETARY MAHER:  Would you have a seat, please,

5  and state your name for the record.

6      THE WITNESS:  Douglas Block, B- -- as in boy --

7  -l-o-c-k.

8      SECRETARY MAHER:  Attorney O'Neil.

9           LIEUTENANT DOUGLAS BLOCK,

10  called as a witness on behalf of PB&PA Unit 6 and Officer

11  Tonya Beets, having been first duly sworn, testified as

12  follows:

13                  DIRECT EXAMINATION

14             BY MR. O'NEIL:

15      Q.   Sir, what is your occupation?

16      A.   I'm a lieutenant with the Rockford Police

17  Department.

18      Q.   And how long have you been a sworn police officer?

19      A.   Almost 28 years.

20      Q.   And what is your current assignment?

21      A.   Internal Affairs.

22      Q.   How long have you held the rank of a lieutenant?

23      A.   Since January 19th this year.

24      Q.   Prior to holding the rank of lieutenant, what rank

1    did you hold?

2        A.    Sergeant.

3        Q.    How long were you a sergeant?

4        A.    Oh, like eight years, nine years.

5        Q.    And before that you were a patrolman?

6        A.    A detective.

7        Q.    Are you familiar with the collective bargaining

8    agreements and the negotiations between the Union and the

9    City?

10        A.    Yes.

11        Q.    Why don't you give us a little background on your

12    role with the executive board of the Union.

13        A.    From 1997 to 1998 I served as president of the

14    PB&PA Unit 6, which is the bargaining unit for the Rockford

15    Police Union.  January 19th when I was promoted, I had to

16    step down from that position because I went to an exempt

17    position with the police department.  And we had done

18    three contracts with the City, and we were currently in

19    contract negotiations when I stepped down.  Actually, we

20    had a federal mediator or a mediator appointed to the

21    negotiations.

22        Q.    Now, with respect to the concept of sick time, have

23    you ever had discussions in your role as a Union executive

24    with management concerning the amount of sick time an