1    officer can use?

2        A.    Yes.  The City had a proposal on the table for

3    contract negotiations to go from the current contract

4    language to change it to an accrual system.

5        Q.    And what does the current contract language state?

6        A.    Sick leave shall be as past practice.

7        Q.    And based upon your 28 years of experience, 27 of

8    them in the Union served, do you have an opinion as to what

9    the past practice between the Union and the City has been

10    with respect to sick time?

11        A.    An officer is allowed to be off work with pay until

12    either their doctor or the City doctor and an independent

13    doctor says that they can no longer work or the officer

14    recovers and comes back when they're done.

15        Q.    And so a year or so ago the City wanted to change

16    that to an accrual method?

17        A.    Yes.

18        Q.    What is an accrual method?

19        A.    I believe that the proposal the City had was to do

20    it like every other AFSCME employee and I think the exempt

21    employees, which would be like four hours per paycheck, and

22    it would accrue and they could have a maximum of -- I think

23    it's 1,008 on the books at any given time.

24        Q.    So instead of having unlimited, there'd be a

92

1    maximum based on what you actually worked?

2         A.    What your accrual was, yes, to a max.

3         Q.    And did the Union effectuate a counterproposal with

4    respect to the accrual?

5         A.    Yes, we made a counterproposal to the City.

6         Q.    And what was that counterproposal?

7         A.    To accept the accrual method.  But we had increased

8    the amount of hours you get per paycheck based on your

9    seniority, and I think we raised the limit from 1,008 to a

10   higher number.  But we did offer to accept accrual with our

11   first counterproposal.

12        Q.    And that was a dramatic change in the past practice

13   between the parties?

14        A.    Well, yes.  The previous two contract negotiations

15   we did not ever give them a counterproposal to accept.  This

16   one we did.

17        Q.    And you were part of the Union when this

18   counterproposal was made?

19        A.    That's correct.

20        Q.    And how did the City respond to that

21   counterproposal?

22        A.    Well, when we gave them the counterproposal, they

23   withdrew it from the table and did not want to talk about

24   it anymore and put us on notice.  In fact, the quote was

1   We're putting the Union on notice at this time --

2         ATTORNEY GILIBERTI:  Objection to hearsay and

3   strike anything based on hearsay.

4         SECRETARY MAHER:  Sustained.

5   BY ATTORNEY O'NEIL:

6      Q.   With respect to the past practice of unlimited

7   sick time between the parties, has the City attempted to

8   implement a new system?

9      A.   Yes.

10     Q.   And what is that new system?

11     A.   That a person can be off six months for nonduty-

12   related and a year for duty-related.

13     Q.   And pursuant to that new policy outside of the

14   contract, did you as the Union president direct any action

15   to be taken?

16     A.   Yeah.  When they told us that, we filed a ULP, an

17   unfair labor practice complaint.

18     Q.   And, to your knowledge, was the unfair labor

19   practice complaint issued by the Labor Relations Board?

20     A.   Yes.

21     Q.   I'm going to show you Exhibit 1, Union Exhibit 1.

22   Take a look at that document, sir, and tell me if you've

23   seen that before.

24     A.   (Witness peruses document.)  This is the complaint

1    that we had filed with the Labor Board.

2        Q.   And you have seen that before?

3        A.   Well, I got a copy of it, yes.

4        Q.   And that's pending the -- that was based upon the

5    City's implementation of a new sick leave policy without

6    bargaining?

7        ATTORNEY GILIBERTI:  Objection.  That's -- well,

8    I'll strike the objection.

9        A.   It was based on the comments they made at the table

10   that they were going to change it.

11       ATTORNEY O'NEIL:  I'd ask that Union 1 be admitted.

12       ATTORNEY GILIBERTI:  I'd object, first of all, on

13   two different grounds.  First of all, it's just a complaint

14   for hearing that the Labor Board issued.  There has been no

15   definitive ruling.  It's irrelevant to this proceeding.  The

16   Union is within their rights to pursue this, obviously; but

17   it has no bearing on Officer Beets' absenteeism.

18       So I would make an objection on irrelevancy and

19   it's just a complaint for a hearing.  That's all it is.

20       SECRETARY MAHER:  Has there been any determination

21   on this complaint that would have any kind of res judicata,

22   collateral estoppel, any other significant legal effect

23   other than the filing of the document itself?

24       ATTORNEY O'NEIL:  That is actually the complaint

1    filed by the Labor Board.  The way the system works is a

2    charge is filed, the City responds and basically it's a

3    probable cause hearing by the Board, who then issues the

4    complaint.  We're waiting on the hearing.  This is one of

5    the things we've been trying to get resolved.

6          SECRETARY MAHER:  So let me understand the

7    purpose for which it's being admitted.  It's simply being

8    admitted -- or being tendered for admission for purposes of

9    demonstrating that a complaint was issued by the Labor Board

10   but not for the truth of any matter set forth in the

11   complaint?

12         ATTORNEY O'NEIL:  That's correct.

13         SECRETARY MAHER:  Those matters have not yet been

14   determined?

15         ATTORNEY O'NEIL:  That it was issued by the Labor

16   Board in June of this year.

17         SECRETARY MAHER:  Okay.  For those limited

18   purposes, I think Lieutenant Block has established

19   sufficient foundation for the document.  And for the

20   purpose of establishing only that the document was filed

21   by -- or the complaint was issued by the Labor Board, it

22   will be admitted for the Commissioners' consideration.  But

23   it will not be admitted for the purpose of considering as

24   established any of the allegations set forth in that charge.

1          ATTORNEY O'NEIL:  Fine.

2          SECRETARY MAHER:  Do you need him to hold on to it?

3          ATTORNEY O'NEIL:  No.

4     BY ATTORNEY O'NEIL:

5          Q.   Now, in the past, Lieutenant Block, when you were

6     president of the Union, did you have any other discussions

7     with past chiefs concerning the sick leave policy and

8     whether implementation was appropriate or not?

9          A.   Yes.

10         Q.   And who were some of those chiefs?

11         A.   Well, Chief Nielsen and Deputy Chief Pugh.  We had

12    conversations about Tonya, No. 1, and some other officers

13    that we had some issues with.

14         Q.   Okay.  Chief Pugh, when was he chief?

15         A.   Just before Chief Epperson.

16         Q.   Would you recognize his signature?

17         A.   Most likely.

18         Q.   I'm going to show you what I've marked as Union

19    Exhibit 2.  Have you ever seen that document before?

20         A.   (Witness peruses document.)  No, I can't say if

21    I saw this particular one or not.

22         Q.   All right.  I want you to look at the bottom of the

23    page.  It says "Department Head."  There's a signature left

24    next to that.  Do you recognize that signature?

1    A.    Yes.

2    Q.    Whose signature is that?

3    A.    The department head?

4    Q.    Yes, sir.

5    A.    That's Chief Pugh.

6    Q.    Okay.  And then the second signature beyond that,

7    compensation and benefits manager, do you recognize that

8    signature?

9    A.    That's Kim Ryan.

10   Q.    And what's Kim Ryan's occupation?

11   A.    She's in human resources I think they call it now

12   but City Hall.  She takes care of these kinds of benefits.

13   Q.    Now, further up on the page it says "Sick-Unlimited

14   Sick Time."  Have you seen that box checked like that before

15   for an officer being granted unlimited sick time?

16   A.    You mean where it says (inaudible) unpaid, fully

17   paid or partially paid?  Oh, okay, where it says -- okay.

18         Well, we've talked about that before.  We've

19   told -- I've instructed officers to put in unlimited, you

20   know, for the sick leave policy or the contract language,

21   something to that effect.

22   Q.    And Chief Pugh was the chief on July 13th, 2005;

23   correct?

24   A.    That'd be right, yes.

1      Q.   And he signed off on sick-unlimited sick time;

2  is that correct?

3         ATTORNEY GILIBERTI:  Objection.  That

4  mischaracterizes the testimony that Officer Block just

5  testified to saying he instructs officers to put that

6  language down.  And I also have a standing objection to

7  the relevancy of an FMLA request form.  I don't see how

8  it's relevant to anything going on here tonight, so . . .

9         SECRETARY MAHER:  Well, in terms of the document

10  itself, I think Lieutenant Block has testified that he does

11  not recognize this particular document.  So he certainly can

12  identify what the document says; but unless there's going to

13  be further foundation for its admission into evidence, I

14  don't think Lieutenant Block can establish foundation for

15  its admission into evidence.  Until that foundation is laid,

16  I don't think there's proper foundation for asking questions

17  about a document that will not be coming into evidence.

18         ATTORNEY O'NEIL:  I'm just simply asking him, do

19  you recognize Chief Pugh's signature and Kim Ryan's

20  signature?

21     A.   Yes.

22         ATTORNEY O'NEIL:  I have no further questions of

23  this witness.

24         SECRETARY MAHER:  Attorney Giliberti, cross-

1   examination?

2       ATTORNEY GILIBERTI:   Thank you.

3

4                 CROSS-EXAMINATION

5                BY MR. GILIBERTI:

6   Q.   Good evening, Lieutenant Block.

7   A.   Good evening.

8   Q.   You testified that the collective bargaining

9   agreement indicates a sick leave shall be administered

10  pursuant to the past practice of the parties; correct?

11  A.   Yes.

12  Q.   And the administration of sick leave covers

13  employee absence reporting procedure pursuant to General

14  Order 72-6; right?

15  A.   Well, it has to do with the past practice, whatever

16  the past practice has been.

17  Q.   But there is a sick leave policy that the

18  department uses, General Order 72-6; right?

19  A.   And that's been argumentative -- I've argued that

20  with Chief Nielsen and Chief Pugh.  Actually, with Chief

21  Pugh it wasn't an argument.  But we've gone through that

22  general order, and it doesn't apply to our contract

23  language.

24      ATTORNEY GILIBERTI:  Well, I'd ask the witness to

1   answer the question whether or not there's a sick leave

2   pol- --

3   BY ATTORNEY GILIBERTI:

4       Q.    Yes or no, is there a sick leave policy, General

5   Order 72-6?

6       A.    There is a general order that covers sick leave,

7   yes.

8   BY ATTORNEY GILIBERTI:

9       Q.    Okay.  And that general order, 72-6, that covers

10  monitoring procedures pursuant to the sick leave general

11  order; correct?

12      A.    Yes.

13      Q.    And the administration of sick leave also covers

14  responsibilities of a supervisor pursuant to sick leave

15  General Order 72-6; correct?

16      A.    Yes.

17      Q.    The administration of sick leave also covers the

18  responsibilities of report review and the Administrative

19  Bureau pursuant to the sick leave General Order 72-6; right?

20      A.    I believe it does, yes.

21      Q.    Now, that section of the contract you talked about,

22  Lieutenant Block, it does not read, does it, that discipline

23  for abuse of sick leave shall be pursuant to the past

24  practice of the parties hereto; correct?

1    A.    No.  It just says sick leave shall be pursuant to

2    past practice.

3    Q.    Right.  And the word "discipline", Lieutenant

4    Block, is not used anywhere in that part of the collective

5    bargaining agreement; right?

6    A.    That's correct.

7    Q.    And that article, just for purposes of

8    clarification, is -- if you know off the top of your head,

9    is Article 7.5(a); right?

10    A.    I know it's Article 7.

11    ATTORNEY GILIBERTI:  Okay.  I'm going to mark that

12    as an exhibit.  I don't know if Tim has any objection to

13    that.  It will be Chief's Exhibit No. 4.

14    BY ATTORNEY GILIBERTI:

15    Q.    I'm showing you what's been marked as Chief's

16    Exhibit No. 4, Doug, and ask you to take a look at that.

17    A.    Is that a page out of the contract?

18    Q.    Right.

19    And does that contract pertain to Article 7.5(a)?

20    A.    Yes.

21    Q.    And can you read 7.5(a), please.

22    A.    "Sick leave shall be administered pursuant to the

23    past practice of the parties hereto, except as provided in

24    Article 7.5(b) below."

1    Q.    Okay.  I'll take that back from you.

2    A.    (Witness tenders document.)

3    Q.    Thank you.

4          And when you were present in the police union,

5    Doug, you never agreed with management during collective

6    bargaining negotiations about an attendance policy to sign

7    to control absenteeism; correct?

8    A.    Yes; that's correct.

9    Q.    And the collective bargaining agreement that's

10   currently in effect -- I think it's the one from 2002 to

11   2004 that's still in full force and effect today -- that

12   does not contain a provision entitled Excessive Absenteeism,

13   does it?

14   A.    The current contract that's been extended?

15   Q.    Right.

16   A.    What was the question again?

17   Q.    There's no article or provision -- you know how the

18   articles have the title of the section?  There's no article

19   in that collective bargaining agreement, the one that's

20   currently in effect, that reads Excessive Absenteeism;

21   correct?

22   A.    That's correct.

23   Q.    Now, the collective bargaining agreement also has a

24   Management Rights clause, does it not?

103

1     A.   Yes.

2          ATTORNEY GILIBERTI:  May I approach the witness?

3          SECRETARY MAHER:  Yes.

4     BY ATTORNEY GILIBERTI:

5     Q.   Showing you what's marked as Chief's Exhibit

6     No. whatever the next in order is --

7          ATTORNEY GILIBERTI:  Is that --

8          SECRETARY MAHER:  5.

9          ATTORNEY GILIBERTI:  5?  Okay.

10    BY ATTORNEY GILIBERTI:

11    Q.   I'd ask you to take a look at that, Doug, and tell

12    me what Chief's Exhibit No. 5 is.

13    A.   (Witness peruses document.)  Well, it's a copy of

14    the contract again on Page 1.  It starts with the preamble

15    and the City's rights.

16    Q.   Okay.  And is Article 1.2 on that exhibit, Chief's

17    Exhibit 5 -- is that the Management Rights section?

18    A.   Yes, it is.

19    Q.   Does Article 1.2 -- and if you need some time to

20    read it, feel free to do that.  Does Article 1.2 under

21    Management Rights provide that management can direct the

22    work forces?  Does it have that language?

23    A.   Yes.  I'm very familiar with this section, believe

24    me.

1     Q.    And does Article 1.2 also provide that management

2     has a right to make and enforce rules and regulations and

3     make changes therein?

4     A.    Yes.

5     Q.    Article 1.2 also provides that management can

6     demote, suspend, discipline or discharge employees for just

7     cause; correct?

8     A.    That's the words, yes.

9     Q.    Now, this past practice you have testified to and

10    Attorney O'Neil asked you about the past practice that you

11    have to wait, you know, until a doctor says an employee

12    can't work full time or -- those cases and those situations

13    that you testified to, those cases did not deal with job

14    performance in the context of an employee's duty of regular

15    job attendance, did it?

16    A.    No.  It's covered by except as expressly modified

17    by this agreement.

18    Q.    Right.  But those cases you talked about, Doug,

19    those did not -- those dealt with Disability issues,

20    correct, with other officers involved in that past practice?

21    A.    No.  They talked about long-term illnesses and sick

22    leave.

23    Q.    Right.  But in those cases, those had to do with

24    officers eventually who either filed for Disability or

1    retired, applied for Disability pensions; isn't that

2    correct?

3         A.   No.   Actually, some returned back to duty.

4         Q.   Okay.

5         A.   I mean, we've had several cases in the nine years

6    I was president where we sat down and discussed about

7    officers that had excessive -- that the department thought

8    was excessive sick leave, and we went over each and every

9    case.

10             And in some cases we did talk to the officers after

11   their doctor or two or more doctors said that they would not

12   return to duty ever or there was no time frame for them --

13   we did talk those people into retiring except for one way

14   back when.  They wanted to fight it.  But the other ones,

15   you know, they came back to work.

16        Q.   Right.  But you never agreed to an absenteeism

17   policy; isn't that correct?  All these discussions you had

18   with Management, Union and Management, you never reached an

19   agreement, did you, on employee absenteeism, putting that

20   provision in the contract, did you?

21        A.   Not while I was president, no.

22        Q.   Now, you directly supervised Officer Beets from

23   March of 2005 through January of 2007, approximately; right?

24        A.   Well, I was her assigned supervisor, yes.  She was

1    on the front desk.  I was upstairs on the second floor for

2    the last year.

3        Q.   You completed her last two job evaluations; isn't

4    that correct?

5        A.   I know I did at least two.

6        Q.   And her job evaluation that covered March of 2005

7    through February 2006, that was not done until January of

8    2007; correct?

9        A.   I'd have to look at it.  I don't recall.

10       ATTORNEY O'NEIL:  Mr. Maher, I'm going to object.

11   This is beyond the scope.  All I went into were the contract

12   issues and the past practice, not what the supervisor --

13       ATTORNEY GILIBERTI:  I'll call him on direct if I

14   have to.  That's fine if --

15       SECRETARY MAHER:  Well, you rested your case in

16   terms of --

17       ATTORNEY GILIBERTI:  I'll call him on rebuttal if

18   you want me to do that.

19       SECRETARY MAHER:  What is the objection?

20       ATTORNEY O'NEIL:  It's beyond the scope of my

21   direct.  I limited it specifically to the past practice on

22   sick leave.

23       SECRETARY MAHER:  Okay.  I'll sustain that

24   objection on this line of questioning at this moment in

1  time.

2          ATTORNEY GILIBERTI:  Okay.  I have no further

3  questions subject to I'd ask that Officer -- or Lieutenant

4  Block stay present.  I will need him on rebuttal as a

5  witness.  So I have no further questions at this time.

6          SECRETARY MAHER:  Are you moving for admission of

7  either 4 or 5?

8          ATTORNEY GILIBERTI:  Yes, I move for admission of

9  both.

10          SECRETARY MAHER:  Any objection --

11          ATTORNEY O'NEIL:  No objections.

12          SECRETARY MAHER:  -- to those two provisions?

13          Show both of those as admitted, although I think

14  you took 4 back.

15          ATTORNEY GILIBERTI:  Right.  (Tenders document.)

16          SECRETARY MAHER:  Show Chief's Exhibit No. 4 and

17  Chief's Exhibit No. 5 are admitted into the record without

18  objection.

19          And subject to the possibility of being re-called,

20  you're dismissed at this point in time.

21          ATTORNEY O'NEIL:  Redirect?

22          SECRETARY MAHER:  Oh, I'm sorry.

23          ATTORNEY O'NEIL:  Thank you.

24

108

REDIRECT EXAMINATION

BY MR. O'NEIL:

1    Q.    Very quickly, one point to the contract, Chief's

2    Exhibit 8, basically states except as expressly modified by

3    this agreement.  In other words, except what else is in this

4    contract, management reserves the right to do whatever they

5    want; is that a fair --

6    A.    Yes.

7    Q.    And 7.5(a) states sick leave shall be administered

8    pursuant to the past practice of the parties hereto?

9    A.    Correct.

10    Q.    And the past practice of the parties with respect

11    to sick leave was unlimited sick leave as long as it was

12    supported by a doctor's excuse?

13    A.    Yes.

14    Q.    And that has not been changed as we sit here today,

15    has it?

16    A.    Well, I mean, you have this hearing right now; but

17    other than that, no.

18        ATTORNEY O'NEIL:  No further questions.

19        SECRETARY MAHER:  Recross?

20

21            RECROSS-EXAMINATION

22            BY MR. GILIBERTI:

1    Q.   Unlimited sick leave means -- it doesn't mean you

2  can go on sick leave forever, does it, Lieutenant Block?

3    A.   No.

4    Q.   And at some point Management, especially the deputy

5  chief of administration, reviews those cases for individuals

6  that have been on sick leave; isn't that correct?

7    A.   Yes.

8    Q.   And there have been instances where charges have

9  been filed with the Board on officers who are unable to

10  return to work; isn't that correct?

11    A.   There have been some, yes.

12    ATTORNEY GILIBERTI:  No further questions.

13

14                FURTHER REDIRECT EXAMINATION

15                   BY MR. O'NEIL:

16    Q.   But those charges were never heard before the

17  Board, were they?

18    A.   I think only one might have been; but I'm not

19  positive on that one, either, to be honest with you.

20    ATTORNEY O'NEIL:  No further questions.

21    SECRETARY MAHER:  Anything else from either side?

22    ATTORNEY GILIBERTI:  No.

23    SECRETARY MAHER:  You're dismissed, but if you

24  could hang around.

1        THE WITNESS:  Right, I will.

2                    (Witness excused.)

3        SECRETARY MAHER:  Mr. O'Neil.

4        ATTORNEY O'NEIL:  I'll call Deputy Chief Lori

5   Sweeney.

6                    (Witness sworn.)

7        SECRETARY MAHER:  Please have a seat and state your

8   name for the record, please.

9        THE WITNESS:  Lori Sweeney, S-w-e-e-n-e-y.

10              DEPUTY CHIEF LORI SWEENEY,

11   called as a witness on behalf of PB&PA Unit 6 and Officer

12   Tonya Beets, having been first duly sworn, testified as

13   follows:

14                  DIRECT EXAMINATION

15               BY MR. O'NEIL:

16        Q.   Deputy Chief Sweeney, I'm going to try and keep

17   this short.  You investigated this and sent a report to

18   Chief Epperson; is that correct?

19        A.   That's correct.

20        Q.   And pursuant to your report, did you consider all

21   of the documents in Tonya Beets' file?

22        A.    At the original time of the report, I just glanced

23   at the sick time and the workers' comp.  The majority of

24   that report was reflected on the incident that took place

1    in August of 2006 to where we were today.

2         Q.   As we sit here today, Deputy Chief, does the City

3    have any evidence, medical evidence by a physician either

4    hired by the City, hired by Officer Beets, hired by anyone

5    that states Officer Beets cannot return to work?

6              ATTORNEY GILIBERTI:  Objection; irrelevant.  The

7    issue is absenteeism over the last ten years, not whether

8    she can return to work or not.

9              SECRETARY MAHER:  I'll sustain the objection.  The

10   complaint was filed based on hours missed from work up till

11   a given point in time, not based on an alleged inability to

12   return to work at a future point in time.

13   BY ATTORNEY O'NEIL:

14        Q.   And, as a matter of fact, on September 20th wasn't

15   Tonya released to work by her physician?

16             ATTORNEY GILIBERTI:  Objection; irrelevant on the

17   same grounds.

18             SECRETARY MAHER:  When was the complaint filed?

19             ATTORNEY O'NEIL:  Which one?

20             SECRETARY MAHER:  The original complaint to the

21   case.

22             ATTORNEY GILIBERTI:  The original complaint was

23   filed August 8, 2007.

24             SECRETARY MAHER:  Then the objection is sustained.

112

1    BY ATTORNEY O'NEIL:

2        Q.    Is it your recommendation to this Board that Tonya

3    Beets be fired for the time in her sick slips?

4        A.    Yes.

5        Q.    Based upon her pregnancy?

6        A.    No.  Over the ten years the fact that 51 percent of

7    the time she's unable to work.  Two of those years were

8    pregnancies.  She has a barrage of other illnesses and

9    injuries:  coughs, colds, bronchitis, backaches, kidney

10   issues, swelling of the chest wall.  So it's just the fact

11   that out of, you know, the entire time 51 percent of the

12   time she has been inefficient as a police officer.

13       Q.    Okay.  And is it your recommendation to this Board

14   that she be terminated because of her light duty?

15       A.    Once again, light duty -- your inability to

16   function as a police officer 51 percent of the time is

17   costly to the citizens, other police officers.  It's an

18   excessive amount of time not to be able to be a police

19   officer.

20       Q.    So is it your position, Deputy Chief, that if an

21   officer gets injured in the line of duty and ultimately

22   works her way back to light duty that that should be used

23   against them if they get hurt again and again?

24       A.    I would say that we've taken cases in front.  At

1    some point an officer has to come back to work.  They have

2    to be able to work as a police officer.

3         Q.   At some point?  And Tonya was released back to work

4    on September 20th, wasn't she?

5                   ATTORNEY GILIBERTI:  Object.

6                   SECRETARY MAHER:  Sustained.

7                   ATTORNEY O'NEIL:  It's based on her opinion.

8                   SECRETARY MAHER:  It's based on events that

9    occurred subsequent to the filing of the complaint.  It

10   puts it outside the scope of the charges that are being

11   brought by the City.  The complaint itself is based on the

12   conduct which by definition occurred prior to the filing of

13   the complaint.  The objection is sustained.

14   BY ATTORNEY O'NEIL:

15        Q.   All the sick slips were signed off and approved by

16   her supervisors, weren't they?

17        A.   Supervisors don't approve it.  What they strictly

18   do is when the officer calls in, they just do a written

19   documentation.  I could call in tomorrow with the flu, and

20   they don't question me if I have the flu.  They just put it

21   on the slip that I called in and said I have the flu.

22             There is -- there's not a check and balance that

23   way.  They don't question the officer.  If they call in and

24   say "I hurt my leg on duty," they're automatically going to

1    mark it as on duty because they don't pay attention to the

2    workers' comp or anything else.

3        Q.    And all of those sick slips were paid, weren't

4    they?

5        A.    Yes.

6        Q.    And prior to August 5th, 2007, no other chief had

7    taken action against Tonya Beets, had they?

8            ATTORNEY GILIBERTI:  Objection; irrelevant.

9            SECRETARY MAHER:  Overruled.

10       A.    I believe at some point Deputy Chief Jones filed a

11   report or at least a letter addressing sick time usage by

12   Officer Beets.

13   BY ATTORNEY O'NEIL:

14       Q.    And when was that?

15       A.    I think in 2004.

16       Q.    And was anything -- was anyone referred to the

17   Board?

18       A.    Not that I'm aware of.

19       Q.    So is it fair to say that prior to Chet Epperson

20   no police chief thought it was an issue enough to bring the

21   sick time before the Board?

22           ATTORNEY GILIBERTI:  Objection; irrelevant.

23           SECRETARY MAHER:  I'm going to sustain the

24   objection on different grounds.  It lacks foundation as

1    to this witness's knowledge of another person's thought

2    process.

3    BY ATTORNEY O'NEIL:

4        Q.    You went through her entire personnel file and

5    medical file, didn't you?

6        A.    Yes.

7        Q.    Have you seen any other referral to the Board of

8    Fire and Police Commissioners?

9            ATTORNEY GILIBERTI:  Objection; irrelevant.

10           SECRETARY MAHER:  Overruled.

11       A.    No.

12           ATTORNEY O'NEIL:  No further questions.

13           SECRETARY MAHER:  Redirect (sic)?

14           ATTORNEY GILIBERTI:  Thank you.

15

16                    CROSS-EXAMINATION

17                BY MR. GILIBERTI:

18       Q.    Just for the record, Deputy Chief Sweeney, how long

19    have you worked with the Rockford Police Department?

20       A.    I'll complete 14 years in January.

21       Q.    And you're a deputy chief of what bureau?

22       A.    Administration.

23       Q.    And how long have you been in your current

24    position?

1    A.    May of 2006.

2    Q.    And in connection with your current position, do

3    you administer the Rockford Police Department sick leave

4    policy?

5    A.    Yes, I do.

6    Q.    What are your duties in that regard?

7    A.    Usually I -- I'm given notice if somebody's hurt on

8    the job or if they're going to be out for an extended leave

9    or once Janet Otwell sees that somebody's past that seven

10   days, I'll be given notice so that I can make sure they get

11   us a doctor's note.  Anything outside of 28 days we start

12   to make them fill out medical evaluations for us to keep us

13   updated.  So I just monitor the 300 officers and anybody

14   that's using any large amount of time.

15   Q.    And Attorney O'Neil asked you a question about a

16   memo or some kind of written correspondence you gave to

17   Chief Epperson.  Regarding that, is the sick leave policy

18   covered under the Rockford Police Department -- any police

19   department general order?

20   A.    Yes, it is.

21   Q.    What general order is that?

22   A.    72-6.

23   Q.    Showing you what's marked as Chief's Exhibit No. 6,

24   do you recognize Chief's Exhibit No. 6?

1     A.   Yes, I do.

2     Q.   What is it?

3     A.   It's General Order 72-6.

4     Q.   And how long has that general order been in effect?

5     A.   It was originally issued in February of 1972.

6  It's been revised several times.  The final revisal was

7  November 12th of 1986.

8     Q.   And does that General Order 72-6 have any

9  monitoring for sick leave?

10     A.   Yes, it does under Section 3.

11     Q.   And under Section 3 are there any provisions that

12  allow the chief of police to review the case with an

13  employee that has been on extended sick leave or light duty?

14     A.   Yeah.  Under Section D it says the administrative

15  service commander will, if necessary, prepare and forward a

16  report to the chief.  And then under E it talks about based

17  on the available medical evidence either through a valid

18  impartial medical evaluator or what the (inaudible) that the

19  chief can make a determination to continue the employee on

20  sick leave or light duty or move for termination of the

21  employee.

22     Q.   Okay.  Thank you.  Regarding -- strike that.

23        In your capacity as deputy chief of the

24  Administrative Services Bureau, are you familiar with

1    Police Officer Tonya Beets?

2         A.    Yes, I am.

3         Q.    How are you familiar with Officer Beets?

4         A.    Through my patrol years and also as an

5    administrator of the police department.

6         Q.    And was Officer Beets absent from working full duty

7    in 1998?

8         A.    Yes.

9         Q.    And did Officer Beets' absence from full duty

10   in 1998 cause the department to do anything unusual in

11   connection with her employment?

12        A.    Her probationary status was extended.

13        Q.    Since you became deputy chief of the Administrative

14   Services Bureau last year, has Officer Beets' absenteeism

15   been any concern to you?

16        A.    Yes.

17        Q.    Why is that?

18        A.    One, the past history; and then, second, the fact

19   that, you know, since August of 2006, knowing that I was

20   appointed in May, she's been unable to work as a full-time

21   officer.

22        Q.    Since you became deputy chief of the administrative

23   services bureau, did you ever warn Officer Beets she needed

24   to improve her sick time usage?

1        A.    Yes.

2        Q.    Showing you what's marked Chief's Exhibit No. 7,

3    do you recognize Chief's Exhibit No. 7?

4            ATTORNEY O'NEIL:  Same objection.  This is way

5    beyond the scope of my direct.  You know, I called her for

6    the limited purposes on medical evidence in the file and

7    whether she's been released back to work.

8            SECRETARY MAHER:  What is the -- well, what is the

9    exhibit that's being tendered at the moment?

10           ATTORNEY GILIBERTI:  It's a letter from Deputy

11   Chief Sweeney to Officer Beets regarding her absenteeism,

12   sick time usage for several years and a warning to her that

13   her position as a police officer is in jeopardy if she does

14   not take immediate action to improve her attendance.

15           SECRETARY MAHER:  I'm going to overrule the

16   objection.  There was testimony on direct about the amount

17   of sick time being taken and to the effect of sick slips

18   being paid and what prior administrations and prior people

19   have done about the administration of the sick leave policy.

20   I find that the current line of questioning is within the

21   scope of that examination.

22   BY ATTORNEY GILIBERTI:

23       Q.    Deputy Chief Sweeney, do you recognize Chief's

24   Exhibit No. -- I believe that's 7?

1    A.    Yes, I do.

2    Q.    And what is it?

3    A.    It's a copy of the letter I'd written to Officer

4    Beets.

5    Q.    And what is the date of that letter?

6    A.    May 18th of 2007.

7    Q.    Chief's Exhibit 7, do you indicate what Officer

8    Beets' sick time usage was in 2006?

9    A.    Yes, I do.

10    Q.    And what was that sick time?

11    A.    She had used 1,405 hours, which is equivalent to

12    68 percent.

13    Q.    And in Chief's Exhibit 7, did you translate how

14    much in wages 1405 sick hours represent?

15    A.    Over 36,000.

16    Q.    Chief's Exhibit 7, do you indicate what Officer

17    Beets' sick time usage was in 2007 up to the time of the

18    date of the letter?

19    A.    At the date of the letter, she should have worked

20    800 hours; and at the time she had used 494 hours of sick

21    time.

22    Q.    And Chief's Exhibit 8 -- or I'm sorry -- 7, do you

23    indicate what the police department's average use of sick

24    time per officer a year is?

1     A.    Yes.

2     Q.    And what did you write in that regard?

3     A.    Thirty-two hours.

4     Q.    Chief's Exhibit 7, do you indicate the impact

5   Officer Beets' sick time has had on the department over her

6   entire career?

7     A.    Yes.

8     Q.    And what do you say in that regard -- or write in

9   that regard?

10    A.    It has a financial impact.  It impacts the fellow

11  officers who have repeatedly been adversely affected.

12  Patrol supervisors have continually rearranged shift

13  assignments, taken an officer off the street, likewise,

14  creating a shortage answering street calls in order to

15  further her position.  The ability to adequately respond

16  to calls to service to the community have been compromised.

17  And at this time officers have worked overtime to compensate

18  the shortage from her absence.

19    Q.    In Chief's Exhibit 7 do you warn Officer Beets to

20  improve her sick time usage?

21    A.    Yes.

22    Q.    And do you indicate in Chief's Exhibit 7 when she

23  needs to start improving her sick time usage?

24    A.    Effective immediately.

122

1    Q.   Did you indicate in Chief's Exhibit 7 why she

2    needed to immediately improve her sick time use?

3    A.   Yeah, the hardship it's creating to the department

4    and the community as a whole.

5    Q.   Did you ever indicate in that letter that her

6    position as an officer could be in jeopardy?

7    A.   Yes.

8    Q.   Well, why did you do that?

9    A.   Once again, when an individual is missing so much

10    work, we have to hire back somebody; or if we don't hire

11    back somebody, we go short on the street, the calls have a

12    tendency to pile up, an officer now doesn't have a backup

13    officer in the area.

14    Q.   Okay.  And did you indicate in Chief's Exhibit 7

15    that you will keep monitoring her sick time use?

16    A.   Yes, monthly.

17    Q.   Whose signature is on the bottom of Chief's

18    Exhibit 7?

19    A.   Mine.

20    ATTORNEY GILIBERTI:  Do you waive foundation on it?

21    ATTORNEY O'NEIL:  She just read the whole thing.

22    Yeah, go ahead.

23    COMMISSIONER CARUANA:  What date was that issued?

24    THE WITNESS:  May 18th, 2007.

123

1            COMMISSIONER CARUANA:   Sorry.   Thank you.

2    BY ATTORNEY GILIBERTI:

3       Q.   And did you mail this letter to Officer Beets?

4       A.   Certified mail, yes.

5       Q.   Did you receive a return receipt requested in the

6    mail indicating that she had --

7       A.   Yes.

8       Q.   -- received that letter?

9            And you kept monitoring her sick time use after

10   that; is that correct?

11      A.   That's correct.

12      Q.   And what was the result of that monitoring?

13      A.   Still unable to return to work.

14      Q.   In early August 2007 what, if any, further steps

15   did you take regarding Officer Beets' absenteeism?

16      A.   I think on August 3rd -- or is that the -- there's

17   a date I filed a report with the chief.

18      Q.   Deputy Chief Sweeney, I'm showing you what I've

19   marked as Chief's Exhibit No. 8.  Do you recognize Chief's

20   Exhibit No. 8?

21      A.   Yes, I do.

22      Q.   What is Chief's Exhibit No. 8?

23      A.   It is the officer's report to the attention of

24   Chief Epperson.

1    Q.   And how did you prepare that report?

2    A.   Looking through attendance for the last several

3 years and then the current documentation of an injury she

4 received returning from vacation in August of 2006. All

5 that documentation that came in after that, I attached that.

6    Q.   Did you go over her absenteeism from 1998 through

7 Aug- -- also in addition to August of 2006 to present, did

8 you also go over her entire absenteeism over her career or

9 at least from 1998 through August of 2006?

10    A.   Yes.

11    Q.   How did you do that?

12    A.   I had Janet Otwell run a report for me.

13    Q.   In Chief's Exhibit No. 8, do you characterize

14 Officer Beets' ability to work any length of time in the

15 capacity as a police officer?

16    A.   Yes, I do.

17    Q.   And how do you characterize it in that report or

18 that memo?

19    ATTORNEY O'NEIL:  I'm going to object.  Why doesn't

20 he ask her the question rather than reading from a memo?

21 If she has an opinion, ask it.

22    SECRETARY MAHER:  I'll sustain that objection.

23 BY ATTORNEY GILIBERTI:

24    Q.   Do you have an opinion on Officer Beets' ability to

1    work any length of time in the capacity of a police officer?

2         A.   At best it was questionable.

3         Q.   With your report to Chief Epperson, did you attach

4    any exhibits to that report?

5         A.   Yes, I did.

6         Q.   And what exhibits did you attach?

7         A.   Doctor's notes or excuses due to that particular

8    injury or illness along with any of the letters I sent to

9    the chief -- or to Officer Beets.  I attached copies of

10   those letters.

11        Q.   And isn't it true that you attached 25 exhibits to

12   that letter or memo, which were mostly notes and letters

13   from Officer Beets' doctors from the past year?

14        A.   That'd be correct.

15        Q.   How did you conclude Chief's Exhibit 8?

16        A.   That I felt based on her past history and her

17   current status that a decision should be made.

18        Q.   Does the City of Rockford Police Department have

19   unlimited sick leave?

20             ATTORNEY O'NEIL:  Objection; foundation.

21             SECRETARY MAHER:  Sustained.  You need to lay a

22   foundation for that testimony through this witness.

23   BY ATTORNEY GILIBERTI:

24        Q.   Deputy Chief Sweeney, since you have been in your

1   position as Administrative Services Bureau, have you had

2   occasion to deal with cases of sick leave?

3       A.   Yes.

4       Q.   How many cases approximately have you dealt with

5   since you've been Administrative Services Bureau commander?

6       A.   A variety of them from short-term to long-term.

7       Q.   And regarding those cases, is there anything that

8   guides you departmentalwise in reviewing or looking,

9   examining those cases?

10      A.   Usually I follow the General Order 72.6 and just

11  watch and monitor the sick time for all.

12          ATTORNEY GILIBERTI:  I have no further questions.

13          SECRETARY MAHER:  Do you have any redirect?

14

15                  REDIRECT EXAMINATION

16               BY MR. O'NEIL:

17      Q.   Do you have any quarrel with the past practice

18  between the parties as testified to by Lieutenant Block on

19  the stand?

20      A.   I wasn't privy to any of their conversations

21  but . . .

22      Q.   Did you just sit through the testimony of --

23      A.   Uh-huh.

24      Q.   -- Lieutenant Block?

1        Did you hear him talk about the past practices of

2   unlimited sick time between the parties?

3        A.   Yes.

4        Q.   Do you have any background in any of the Union

5   negotiations between the Union and Management with respect

6   to the past practices outlined in the contract?

7        A.   Not when it comes to sick leave, no, sir.

8             ATTORNEY O'NEIL:  Thank you.  No further questions.

9             SECRETARY MAHER:  Anything else?

10

11                      RECROSS-EXAMINATION

12                   BY MR. GILIBERTI:

13        Q.   Since you've been administering sick leave in your

14   position as deputy chief, is it your position that the City

15   of Rockford has unlimited sick leave?

16        A.   No.  At some point there has to be consequences for

17   one's actions.  So that's why I monitor to see where they're

18   at, if they're making medical improvements, if it's time for

19   us to do an independent medical exam, you know, what their

20   status is.

21        Q.   Is this case, Officer Beets -- is this distinct

22   based on your background as Administrative Services Bureau

23   commander from other cases you've dealt with?

24        A.   Yes.

1    Q.   How is it different?

2    A.   It's just a history of excessive absenteeism for

3    a variety of reasons.  I mean, there's not one catastrophic

4    event that characterizes some of the other issues I deal

5    with.  It's a variety from -- anywhere from a cold to, you

6    know, a sore back to a kidney infection to pregnancies to a

7    sore foot to surgeries.

8         ATTORNEY GILIBERTI:  I have no further questions.

9         SECRETARY MAHER:  Any follow-up?

10         ATTORNEY O'NEIL:  (Shakes head.)

11                        (Witness excused.)

12         SECRETARY MAHER:  Do you have any other witnesses?

13         ATTORNEY O'NEIL:  Yes.

14         SECRETARY MAHER:  Okay.

15         ATTORNEY GILIBERTI:  I'd ask that 7 and 8 be

16    admitted.

17         ATTORNEY O'NEIL:  There's no foundation for it.

18    I'll object.

19         SECRETARY MAHER:  For 7 and 8?

20         ATTORNEY GILIBERTI:  6, 7 and 8.  I'm sorry.  6, 7

21    and 8.

22         SECRETARY MAHER:  Well, let's take them one at

23    a time so that we're clear on the record as to what the

24    exhibit is and what the objection is.  The Exhibit No. 6

1    being offered is General Order 72-6.  It appears to be a

2    business record of the Rockford Police --

3            ATTORNEY O'NEIL:  I have no problem with that.

4            SECRETARY MAHER:  Okay.  Chief's Exhibit 6 is

5    admitted without objection.

6            Chief's Exhibit No. 7 is a May 18th, 2007, letter

7    directed to Officer Beets over Lori Sweeney's signature as

8    Deputy Chief, Administrative Services Bureau.

9            ATTORNEY O'NEIL:  She testified to it.  If it's

10   for demonstrative purposes, I have no objection; otherwise,

11   she -- she read it into the record; so . . .

12           SECRETARY MAHER:  Okay.  Show Chief's Exhibit No. 7

13   admitted without objection -- or admitted subject to

14   Attorney O'Neil's comments.

15           And Chief's Exhibit 8 is an officer's report dated

16   August 3rd, 2007, to Chief Chet Epperson and authored by the

17   witness, Lori Sweeney.

18           ATTORNEY O'NEIL:  There's an objection on the

19   foundation there.

20           SECRETARY MAHER:  What is the objection?

21           ATTORNEY O'NEIL:  There wasn't a foundation as to

22   what went into writing that.

23           SECRETARY MAHER:  Well, the -- I guess we'll take

24   it in two parts.  Are you objecting to her memo?  I mean,

1  she testified on the stand this is her memo and she signed

2  it and that she created it in her capacity as deputy chief.

3  So you're objecting to the foundation of her creating her

4  own memo?

5          ATTORNEY O'NEIL:  No.  If that's what it's being

6  offered for, I have no objection to it.

7          SECRETARY MAHER:  Okay.  Then I guess I'm not

8  understanding the objection.

9          ATTORNEY O'NEIL:  It was the earlier objection.

10 When he asked her to give an opinion, I said, Ask her the

11 question rather than have her read from the document.

12 Basically that's what it is.

13         SECRETARY MAHER:  Okay.  Are you objecting that a

14 foundation has been laid --

15         ATTORNEY O'NEIL:  I'll withdraw the objection.

16 That's fine.

17         SECRETARY MAHER:  I just need to know what --

18         ATTORNEY O'NEIL:  I'll withdraw the objection.

19         SECRETARY MAHER:  Okay.  Then we'll show Chief's

20 Exhibit No. 8 is admitted subject to Attorney O'Neil's

21 comments.

22         Your next witness.

23         ATTORNEY O'NEIL:  Tonya.

24                 (Witness sworn.)

1    SECRETARY MAHER:  Have a seat, please.  Would you

2  start off by stating your full name for the record.

3    THE WITNESS:  Tonya Yvette Beets, B- -- as in

4  boy -- -e-e-t-s.

5    OFFICER TONYA YVETTE BEETS,

6  called as a witness on behalf of PB&PA and herself, having

7  been first duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. O'NEIL:

10  Q.    Tonya, how old are you?

11  A.    Thirty-six.

12  Q.    And are you married?

13  A.    Yes.

14  Q.    Whom are you married to?

15  A.    Duane Beets.

16  Q.    Is he here in the room today?

17  A.    Yes.

18  Q.    And how long have you been married to Duane?

19  A.    Seven years.

20  Q.    And where do you and Duane live?

21  A.    In the city of Rockford.

22  Q.    What does Duane do for a living?

23  A.    He also works for the Rockford Police Department as

24  a detective.

1    Q.   And when were you hired by the City of Rockford as

2  a police officer?

3    A.   March of 1997.

4    Q.   And during 1997 did you have any medical issues?

5    A.   Not that I can recall other than the one incident

6  where there was one time slip.

7    Q.   I want to draw your attention to August 10th, 1998.

8    A.   Okay.

9    Q.   Do you recall what, if anything, unusual happened

10  that day?

11    A.   I was involved in a foot chase at work.

12    Q.   And what happened in the foot case?

13    A.   I injured my left foot while chasing a suspect.

14    Q.   And did you catch the person?

15    A.   Yes.

16    Q.   Now, when you say you injured it, how did you

17  injure it?  I mean, what did you feel?

18    A.   I was in the process of handcuffing the person,

19  and another officer showed up on the scene, and he asked

20  if he was arrested.  As I was saying yes, I was pulled --

21  the suspect started to pull away from me, pulled me off

22  balance.  I felt something twist in my left foot.  He took

23  off running.  I took off after him and so did the other

24  officer and apprehended him maybe about a block -- maybe

1    a block away from where we initiated the first . . .

2        Q.    And did you see a physician for that?

3        A.    Yes, I did.

4        Q.    And what did the physician prescribe for you?

5        A.    As far as?

6        Q.    Treatment.

7        A.    Treatment?  At the time, physical therapy.  He

8    did not feel that there was a need to do surgery because

9    my ligaments and my tissue muscles were damaged.  So he

10   recommended to go on his own with physical therapy.

11       Q.    And were all these reports supplied to the City of

12   Rockford?

13       A.    Yes.

14        ATTORNEY O'NEIL:  Mr. Maher, would you show the

15   witness Exhibit 1998, please.

16        SECRETARY MAHER:  (Tenders exhibit.)

17   BY ATTORNEY O'NEIL:

18       Q.    Tonya, would you look at Exhibit 1998.  Is that a

19   true and accurate summary of your off-work time that year?

20       A.    Yes.

21       Q.    And it shows that there was 101 workers' comp

22   hours.  Did that originate from the incident -- on-duty

23   incident of August 10, 1998?

24       A.    Yes.

1    Q.    Did you file a workers' compensation claim?

2    A.    Yes.

3    Q.    And, ultimately, did the City of Rockford settle

4    that claim and admit that you had been injured on the job?

5         ATTORNEY GILIBERTI:  Objection; irrelevant.

6         SECRETARY MAHER:  Overruled.

7    A.    Yes.

8    BY ATTORNEY O'NEIL:

9    Q.    Let's go to 1999.

10        ATTORNEY O'NEIL:  Mr. Maher, would you please show

11   the witness Exhibit 1999, please.

12        SECRETARY MAHER:  (Tenders exhibit.)

13        ATTORNEY GILIBERTI:  I'm not getting copies of

14   this.

15        ATTORNEY O'NEIL:  They've already been given to

16   you.

17        ATTORNEY GILIBERTI:  I haven't seen those.

18        ATTORNEY O'NEIL:  They're admitted in your case.

19        SECRETARY MAHER:  Well, it is I guess from a --

20        ATTORNEY GILIBERTI:  I stand corrected.  I'm sorry.

21        SECRETARY MAHER:  Okay.

22   BY ATTORNEY O'NEIL:

23   Q.    Now, Tonya, would you look at that summary, and is

24   that a true and accurate summary of your sick time and work

1    comp time in 1999?

2         A.   Yes.

3         Q.   And it shows 60.6 workers' comp hours; is that

4    correct?

5         A.   Yes.

6         Q.   And does that originate from the incident of

7    August 10, 1998?

8         A.   Yes.

9              ATTORNEY O'NEIL:  Now, I want to go to 2000,

10   Mr. Maher, if you would, please.

11             SECRETARY MAHER:   (Tenders exhibit.)

12   BY ATTORNEY O'NEIL:

13        Q.   At the end of 1999 and into early 2000, you

14   missed -- you called in sick for stomach disorders and

15   abdominal pains.  Ultimately, did you learn that you were

16   pregnant?

17        A.   Yes.

18        Q.   And does Exhibit 2000-1 illustrate what has been

19   documented on the City's sick slips as pregnancy problems

20   through February 25th, 2000?

21        A.   Yes.

22        Q.   Ultimately, Tonya, what resulted with that

23   pregnancy?

24        A.   For the first seven months of my pregnancy, I

1    couldn't eat or drink anything.  I was hospitalized several

2    times.  They started me out on --

3        Q.   No.  Hold on.  Late '99, early 2000 did you suffer

4    a miscarriage at the end of the month?

5        A.   Yes, January 31st I had a miscarriage.

6        Q.   And your doctor kept you off work for a --

7        A.   Yes.

8        Q.   -- few weeks after that?

9             Now I want to go to the exhibit again.  About

10   May 2nd of 2000 did you find out that you were pregnant

11   again?

12       A.   Yes.

13       Q.   And with respect to that pregnancy, what did your

14   physician tell you?

15       A.   In order to take -- carry my baby to term, I had to

16   go on intravenous fluids.

17       Q.   Okay.  Can you tell the Board how the intravenous

18   fluids were administered to you?

19       A.   At one point they were administered to me through

20   PICC lines, which is where they insert a needle into your

21   arm and you at least receive the nutrients that way.

22            My body started rejecting that after five PICC

23   lines, so then I had to undergo surgery and have a Groshong

24   catheter placed in my chest.  And I had . . .  Sorry.  I was

1   hooked up to the IVs for 14 hours out of the day, which

2   meant I could not work, had nurses coming in monitoring me

3   every day.  I was hospitalized several times.  And this went

4   on all the way up until the end of my seventh month.

5       Q.   Now, did you deliver that baby to term?

6       A.   Yes, I did.

7       Q.   I want you to look at 2000, which is in evidence.

8   It shows that 1,442 and a half hours off of the City's sick

9   slips were attributed to pregnancy; is that correct?

10      A.   Yes.

11      Q.   And in that year you only used 8.7 hours of sick

12  time?

13      A.   Yes.

14      Q.   Did you have any choice, Tonya, concerning the

15  birth of your child about what medical treatment you had to

16  seek?

17      A.   Yes, I had a choice whether or not to abort the

18  pregnancy or continue on with my pregnancy and by taking

19  the steps that I did to carry my baby to term.

20      Q.   Let's go to 2001.  Tonya, have you looked at that

21  exhibit before?

22      A.   Yes.

23      Q.   And does that accurately reflect your times you

24  missed work in 2001?

138

1    A.   Yes.

2    Q.   And it shows after the birth of your son in late

3  December 2000 you had 176 hours of maternity leave?

4    A.   Yes.

5    Q.   Later on that year you had a problem.  It was

6  fairly consistent with kidney infections and kidney stones.

7  Would you tell the Commission what that was about?

8    A.   These problems extended from my pregnancy.  During

9  my -- I want to say maybe in the sixth month my organs in

10  the left side of my body started to malfunction.  I was

11  rushed to the hospital, and it was because of all the

12  problems I had been having.  That's when they ended up

13  doing a Groshong catheter, and it caused my organs to

14  start shutting down and my kidneys was one.

15        And so after I had my son, I did go back into

16  uniform, but I started having problems a few months later.

17  And this was a result -- it was explained to me why I had

18  the kidney problems.

19    Q.   And all of the kidney problems were documented to

20  the City pursuant to the general order that Deputy Chief

21  Sweeney testified to?

22    A.   Yes.

23    Q.   And it was all approved, and no one gave you a hard

24  time?

1    A.    No, they did not.

2    Q.    Later on that year -- and again back to Exhibit

3    2001, Tonya -- I see that your left foot at the end of

4    November started posing problems again?

5    A.    Yes.

6    Q.    Does that stem from the original injury of

7    August 10th, 1998?

8    A.    Well, it was the same foot, but it was a different

9    injury.  In '98 I sprained my ligaments.  This time I

10   damaged the nerves chasing a suspect on November 16th,

11   I believe.

12   Q.    This is the second duty-related injury?

13   A.    Yes.

14   Q.    And because of that, you had to take 55 work comp

15   hours?

16   A.    Yes.

17   Q.    Then let's go to 2002.  Again, you reviewed that,

18   and that's consistent with the sick -- I'm sorry -- what

19   were described as the sick slips?

20   A.    I'm sorry; August of 2002?

21   Q.    2002 as a whole.

22   A.    Oh, okay.  Yes.

23   Q.    And that shows for the year you called in 100 sick

24   hours?

1    A.    I believe I'm missing the second page.  Oh, never

2   mind.  I'm sorry.  I see it.  Yes.

3    Q.    And 376 and a half hours for workers' comp?

4    A.    Yes.

5    Q.    And that workers' comp had to do with the second

6   injury to your foot in late 2001?

7    A.    That would have been my third injury to my foot.

8    Q.    Okay.  Tell us about the third jury.

9    A.    That was -- November 16th was the third injury.

10    Q.    I'm sorry.  You're right.

11          And all of these -- all of this has been documented

12   to the City; correct?

13    A.    Yes.

14    Q.    Pursuant to the general orders?

15    A.    Yes.

16    Q.    And no one called you in to question you about your

17   sick leave?

18    A.    No.

19    Q.    If we could go to 2004, please -- or are we on -3?

20   I'm sorry.  2003.

21          Tonya, have you had the opportunity to review that

22   summary with respect to the sick slips?

23    A.    Yes.

24    Q.    And is that correct?

1    A.    Yes.

2    Q.    Now, in that year it shows you used 125 hours sick

3    hours for -- it looks like 40 of them were an eye infection,

4    some impacted wisdom teeth but 671 and a half hours for

5    workers' comp.  Is that due to the injury -- your duty-

6    related injury to your foot?

7    A.    Yes.

8    Q.    You had another surgery again in 2003 with respect

9    to the foot, didn't you?

10   A.    Yes.

11   Q.    And were all those medical records given to the

12   City pursuant to the general orders?

13   A.    Yes.

14   Q.    You may go to 2004.  Tonya, have you had the

15   opportunity to review the summary on 2004?

16   A.    Yes.

17   Q.    And does that accurately reflect the time you

18   missed from work in that year?

19   A.    Yes.

20   Q.    And it shows 79.5 sick hours from anything from a

21   sinus infection to a root removed from your tooth for 79 and

22   a half hours and 840.5 workers' comp with respect to your

23   foot again?

24   A.    Yes.