1    Q.    And, again, all of these records were provided to

2    the City of Rockford pursuant to the general orders?

3    A.    Yes.

4    Q.    And no one took any job action against you?

5    A.    No.

6    Q.    If we could go to 2005, please.  Have you had the

7    opportunity to review 2005, Tonya?

8    A.    Yes.

9    Q.    And does that accurately reflect the time you

10    missed from work in that year?

11    A.    Yes.

12    Q.    And it shows that you used only 53 hours of sick

13    time in that year?

14    A.    Yes.

15    Q.    And 39 and a half hours of workers' comp due to the

16    injury to your foot?

17    A.    Yes.

18    Q.    And 977 hours due to your pregnancy?

19    A.    Yes.

20    Q.    Can you tell the Board again about your pregnancy

21    in 2005?

22    ATTORNEY GILIBERTI:  Objection; irrelevant.  I

23    don't know how it's relevant to what the issues are here

24    tonight.

1          SECRETARY MAHER:  Well, let me ask a question,

2     first of all, of either counsel.  The hours that are being

3     claimed by the City in the Sick Time Total Off column,

4     I believe it was established earlier the FMLA claim -- or

5     FMLA time was all pulled out of anything that is being

6     relied on in terms of what's being presented to the Board;

7     correct?

8          ATTORNEY GILIBERTI:  Yes.

9          SECRETARY MAHER:  Is it Ms. Beets' contention that

10    the pregnancy-related leave that was taken counted against

11    her as something other than FMLA?  In other words, is there

12    an issue in dispute as to whether that was designated and

13    taken as FMLA leave or there was --

14         ATTORNEY O'NEIL:  Yes.

15         SECRETARY MAHER:  Okay.

16         ATTORNEY O'NEIL:  It's in the documents.  The first

17    pregnancy was not.  The second one was, 2005.

18         SECRETARY MAHER:  Was what?

19         ATTORNEY O'NEIL:  Documented as FMLA.

20         SECRETARY MAHER:  Okay.  And I guess just on the

21    objection, in terms of 2005, what we're on right now, are

22    we talking about hours that are being utilized, so to speak,

23    against Officer Beets in these proceedings or have those

24    been pulled out of that calculation?

1    ATTORNEY O'NEIL:  No.  As you can see by the chart

2    that's in evidence, in 2005 the ones that were counted as

3    FMLA are from July 5th, 2005, through September 30th, 2005.

4    After that the sick slips do not show FMLA.

5        SECRETARY MAHER:  Okay.  And I guess, Attorney

6    Giliberti, in terms of 2005 is there any leave that's being

7    used as a part of either the amended complaint or the update

8    to the amended complaint that we received last week that is

9    related to this pregnancy?

10       ATTORNEY GILIBERTI:  No.  The FMLA hours have been

11   pulled out.  She did not qualify for FMLA after that point

12   because she had not accumulated enough hours to qualify for

13   FMLA leave.  But regarding 2005, all her FMLA hours relating

14   to her pregnancy are shown on that chart.

15       SECRETARY MAHER:  I mean, they're taken out?

16       ATTORNEY GILIBERTI:  Yes, they're taken out.  They

17   were put under the FMLA hours on that chart and were not

18   counted against her in any of the percentages that were

19   calculated in the chart.  So they were taken out and sorted

20   out, yes.

21       SECRETARY MAHER:  Okay.  I guess to the extent

22   that the questioning is getting at hours that are not being

23   used -- in other words, they've been pulled out for purposes

24   of these proceedings -- the objection is sustained.

1    To the extent that there are any hours that are

2   still being claimed as either sick time or comp time that

3   are being claimed in the amended complaint, I think that's

4   fair territory.

5    I guess I'm still not entirely sure what your

6   question is directed to, Mr. O'Neil.

7    ATTORNEY O'NEIL:  The hours on the summary that

8   were not designated FMLA by the City.

9    SECRETARY MAHER:  Okay.  And --

10   ATTORNEY O'NEIL:  And that's in the summary

11   starting the week of October 3rd.

12   COMMISSIONER CARUANA:  Were not designated FMLA?

13   ATTORNEY O'NEIL:  Correct.

14   COMMISSIONER CARUANA:  This second -- this

15   pregnancy in 2005?

16   ATTORNEY O'NEIL:  Correct.

17   ATTORNEY GILIBERTI:  And we have testimony that

18   shows she wouldn't qualify.  She maxed out for her FMLA.

19   She used 480 hours.  That's the law that that's the maximum,

20   and so she maxed out and that was her max.  And then she

21   didn't qualify the rest of her duration because she had not

22   worked enough hours to qualify for FMLA.

23   SECRETARY MAHER:  Let's do this.  I'm going to

24   overrule the objection.  I'm going to allow you to get a

1    limited explanation of what the time is so that we have

2    that for the record as to what has and has not been counted.

3            And you'll be allowed to do a rebuttal to the

4    extent that there's need to explain the FMLA/non-FMLA

5    distinction.

6            ATTORNEY O'NEIL:  Mr. Maher, this is an accurate

7    reflection.  It shows right there where the cutoff was.

8    And we're not using that in our calculation.  That's why

9    we have in there FMLA.

10            SECRETARY MAHER:  Okay.

11            ATTORNEY O'NEIL:  And we went through

12    September 30th, 2005.  But she was off for the rest of the

13    year from pregnancy complications without FMLA.

14            SECRETARY MAHER:  Okay.  Just briefly close the

15    loop on that question in terms of the reasoning for it.

16            ATTORNEY O'NEIL:  Right.

17            SECRETARY MAHER:  And if the City needs to, they

18    can rebut.

19    BY ATTORNEY O'NEIL:

20    Q.    When you became -- when you learned you became

21    pregnant, did you learn that you were ill again?

22    A.    Yes.

23    Q.    And what did the doctors say you had to do?

24    A.    This time they -- I didn't have to have a

1    Groshong catheter put back in.  They were able to give me

2    a Disetronic pump, which is basically the same -- kind of

3    the same thing.  It was intravenous fluids being pumped in

4    through a pump that was connected to my body.

5        Q.   Okay.  And were you required to do that once a day,

6    twice a day?

7        A.   Twenty-four hours a day every day.

8        Q.   You had a pump attached to you 24 hours a day?

9        A.   Yes.

10       Q.   And was this pregnancy and all the medical

11   documents provided to the City pursuant to the general

12   order?

13       A.   Yes.

14       Q.   Tonya, I'm going to show you what Lieutenant Block

15   earlier identified, two of the signatures in Exhibit 2.  Did

16   you hear Lieutenant Block testify here he recognized Chief

17   Pugh's signature and Kim Ryan's?

18       A.   Yes.

19       Q.   Okay.  There's one other signature on that page.

20   Can you tell me whose signature that is?

21       A.   Mine.

22       Q.   And did you fill out that form?

23       A.   Yes.

24       Q.   And at that time when you filled it out, was it

1    your intent to apply for the bargain for unlimited sick

2    time?

3        A.    Yes.

4    ·    Q.    Now, two-thirds of the way down it's checked "sick"

5    and then in handwriting it's "unlimited sick time."  Is that

6    your handwriting?

7        A.    No, it's not.

8        Q.    Do you know whose handwriting that is?

9        A.    I'm not sure.

10       Q.    But that was your intent when you applied under

11   this form?

12       A.    They asked for sick -- they asked for unlimited

13   sick time.

14       Q.    And that's actually when you found out you were

15   pregnant for the second time?

16       A.    Yes.

17            ATTORNEY O'NEIL:  I'd ask that Exhibit 2 be

18   admitted.

19            SECRETARY MAHER:  Any objection?

20            ATTORNEY GILIBERTI:  I object as irrelevant.  It's

21   an FMLA request form.  For that purpose I wouldn't object

22   to it, but I don't see the really value of -- they haven't

23   established who wrote that "unlimited sick time" on the

24   form.  But for the limited purpose that she applied for

```
1    FMLA, that's fine.  But I object to any other reason for
2    that coming in.
3             SECRETARY MAHER:  We'll note for the record that
4    all signatures on the document have been -- foundation has
5    been laid for all of the signatures on the document.  The
6    witness has identified the document as a form that she's
7    filled out.  The witness has stipulated that she's not the
8    person who wrote "unlimited sick time" on the document.
9             I find that a proper foundation has been laid for
10   its admission into evidence and for the limit purposes as
11   indicated by Attorney Giliberti.
12   BY ATTORNEY O'NEIL:
13       Q.   When was your baby born?
14       A.   February 27th, 2006.
15            ATTORNEY O'NEIL:  So if we can go into 2006,
16   please, Mr. Maher.
17            SECRETARY MAHER:  (Tenders exhibit.)
18   BY ATTORNEY O'NEIL:
19       Q.   With respect to 2006, it shows that you were on
20   sick pregnancy leave until your baby was born February 27th.
21   And then following that there was five, six weeks of
22   maternity leave; is that correct?
23       A.   Yes.
24       Q.   And then you returned to duty after your maternity
```

ELITE REPORTING SERVICES, LTD.
815.229.8787

1    leave?

2        A.    Yes.

3        Q.    What happened on or about August 14, 2006?

4        A.    Returning from vacation picking up my luggage,

5    which was over 50 pounds, something in my wrist shattered.

6        Q.    And was that reported to the City?

7        A.    Yes.

8        Q.    Ultimately, did you have surgery with respect to

9    your wrist?

10        A.    Yes.  After maybe a week or two of swelling in my

11    wrist, it went up -- I had swelling in my neck and shoulder

12    area, and they did an MRI and X-ray on me.  They didn't see

13    anything.  So at that time they wanted to do an exploratory

14    surgery, and that's where they found the problem with my

15    shoulder.

16        Q.    And that was also fractured?

17        A.    Yes.  It was injured at the time of me picking up

18    the bag.

19        Q.    Now, this wasn't a duty-related.  This was when you

20    were returning from vacation; correct?

21        A.    Yes.

22        Q.    So from August 14th when you fractured your wrist

23    and shoulder, you were off through the end of the year and

24    then following your surgery?

1      A.    Yes.

2      Q.    Okay.  And that exhibit shows 632 hours related to

3   your pregnancy earlier in the year and 773 hours related to

4   your wrist and shoulder injury?

5      A.    Yes.

6           ATTORNEY O'NEIL:  Now if we may go to 2007.

7           SECRETARY MAHER:  (Tenders exhibit.)

8   BY ATTORNEY O'NEIL:

9      Q.    Now, you were returned to work light duty by your

10   surgeon in early 2007; is that correct?

11      A.    Yes.

12      Q.    Ultimately, though, at some point you needed

13   another surgery.  Can you tell the Board why?

14      A.    Are you referring to May?  The April --

15      Q.    I'm referring to the -- it says March 2nd, 2007,

16   there's a surgery following a preop test.

17      A.    Okay.  Yes.  The first surgery that he performed on

18   my shoulder, the tissue muscles, based on what I was told,

19   when it healed, instead of healing over the clavicle and

20   shoulder area, the tissue muscles grew in between my

21   clavicle and my shoulder.  So he had to go in and repair

22   that.

23      Q.    And you're pointing to your right shoulder.

24   I should make that clear.  Which wrist and shoulder did

1    you injure?

2         A.   Right.

3         Q.   Okay.  And is that your dominant hand?

4         A.   Yes.

5         Q.   Is that your shooting hand?

6         A.   Yes.

7         Q.   In all of the -- this shows up through August 3rd,

8    2007, 888 hours of off-duty injury time.  That's all been

9    documented and sent to the City; is that correct?

10        A.   Yes.

11        Q.   In fact, you sent all these documents on an almost

12   weekly basis to Deputy Chief Sweeney per her request; isn't

13   that true?

14        A.   Yes.

15        Q.   And only 29.75 hours sick hours?

16        A.   Yes.

17        Q.   Did you have a conversation with Deputy Chief

18   Sweeney any earlier this spring?

19        A.   Yes, I did.

20        Q.   Do you remember who else was present?

21        A.   My husband, Duane.

22        Q.   Okay.  And what was the purpose of going in and

23   seeing Deputy Chief Sweeney?

24        A.   The day after I found out that I was going to have

153

1  to have surgery on my shoulder again I was upset because I

2  knew I had received that letter from her.  I'm sorry.  I was

3  upset because I knew that they would possibly come after me

4  to take my job because it was not a work-related injury;

5  it was just something that happened to me coming off of

6  vacation.

7        So I was concerned, so I went to her to explain to

8  her why I had to have the surgery again and told her that I

9  was in fear that they would come after me with my job.

10    Q.    What did Deputy Chief Sweeney tell you?

11        ATTORNEY GILIBERTI:  Objection; hearsay.

12        ATTORNEY O'NEIL:  Of course it's hearsay.  It's a

13  statement by a party opponent.

14        SECRETARY MAHER:  Overruled.  Chief Sweeney is here

15  as a representative of the department in this proceeding,

16  and it would be a statement of a party opponent.  She'll

17  have an opportunity to rebut anything that Ms. Beets

18  testifies to.

19    A.    She commended me on turning in all my documentation

20  to her -- to the department on time without having to be

21  asked.  She told me that she, you know, liked the fact that

22  she did not have to chase me around to get the information

23  and I provided it to her without her having to come after

24  me for it.

1          And then she went on to tell me that for my

2    family -- in order to be able to take care of myself and

3    my children and be able to come back to work that if the

4    doctors recommended that I have the surgery then I should

5    have the surgery in order for me to -- you know, for my

6    health, my children and to be able to take care of my

7    children and be able to return to work.

8    BY ATTORNEY O'NEIL:

9         Q.   Tonya, it seems like you've had your share of

10   unfortunate incidents, doesn't it?

11        A.   Yes.

12        Q.   Do you want to continue your career as a police

13   officer?

14        A.   Yes, I do.

15        Q.   But for injuring yourself three times at work, a

16   couple of problem pregnancies and an unfortunate accident at

17   the airport removing luggage, have you been a slacker?

18        A.   No.  When I was at work, I did my job.  To the

19   best of my ability, I did do my job.  That's how I resulted

20   in the injuries from work.  The complications with my

21   pregnancies, that was nothing I could control.  I wanted to

22   have my children, okay?  I did not want -- I wanted to carry

23   them to term, so I did what I had to do in order to do that.

24          So I can understand -- I mean, I understand the

1    complaints and everything they filed against me.  But

2    for workmen's comp injuries, for complications with my

3    pregnancies, those things I don't understand because I was

4    injured at work and the complication with my pregnancies,

5    nobody could control that.  If I could have controlled it,

6    I would have but I can't.  I'm happy I had my children, and

7    I'm happy that I went through -- I hate what I went through,

8    but I'm happy that it resulted in two healthy babies.

9             ATTORNEY O'NEIL:  Thank you, Tonya.

10            SECRETARY MAHER:  Do you have further questions?

11            ATTORNEY O'NEIL:  No.

12            SECRETARY MAHER:  Cross-examination?

13            ATTORNEY GILIBERTI:  Yes.

14            SECRETARY MAHER:  And I heard a Commissioner

15   indicate she had a question real quick.  Would you like her

16   to go first or do --

17            ATTORNEY GILIBERTI:  Sure.

18            SECRETARY MAHER:  -- you want to go next?

19            COMMISSIONER DOTSON-WILLIAMS:  Tonya, did you say

20   that the doctor said that you could return to work now at

21   this time?

22            THE WITNESS:  Yes.

23            COMMISSIONER DOTSON-WILLIAMS:  And when did he say

24   that?

1      THE WITNESS:  I believe back in -- it was twice.

2  It was once in August and then --

3      COMMISSIONER DOTSON-WILLIAMS:  Of '07?

4      THE WITNESS:  Yes, of this -- I'm sorry.  I'm

5  getting confused.  Yes, it was August that he said I could

6  go back, the end of August.

7      And the first notice I turned in I faxed attached

8  to all my documentations from the doctor, and apparently

9  Deputy Chief Sweeney did not receive it.  So I requested

10  another notice from my doctor, and I believe that one was

11  dated September 20th.  So instead of faxing it directly to

12  her like I did before, I turned that in to the Union vice

13  president, Bruce Brannum, and he in turn gave it to her.

14      COMMISSIONER DOTSON-WILLIAMS:  And what was the

15  second date?  September . . .

16      THE WITNESS:  I believe it was September 20th, if

17  I'm correct.

18      COMMISSIONER CARUANA:  I didn't get the first date.

19  Do you have the first date?

20      THE WITNESS:  I don't know the first date.  They

21  were given all the -- he has them and she has them.

22      COMMISSIONER DOTSON-WILLIAMS:  That's all I have.

23  Thank you.

24      SECRETARY MAHER:  Cross-examination,

1   Attorney Giliberti?

2          ATTORNEY GILIBERTI:  Yeah.

3

4                 CROSS-EXAMINATION

5          BY MR. GILIBERTI:

6     Q.   Officer Beets, regarding what -- on the same course

7  that Commissioner Dotson-Williams just asked you about,

8  that return to duty, though, it's not a full clean bill of

9  health, is it?  It returns you only in a limited-duty basis;

10  isn't that correct?

11    A.   At the time that it was issued, yes.

12    Q.   Right.  And that was issued in -- isn't it true

13  in September, just about a month and a half ago, the doctor

14  said you could come back to work but you had to do light

15  duty and you could lift no more than ten pounds; correct?

16    A.   At that time, yes.

17    Q.   Okay.  Now, let's go back to -- so as it stands

18  right now, you've not provided Deputy Chief Sweeney with

19  anything returning you to full duty unrestricted; isn't

20  that correct?

21    A.   No, not since I turned in those two notices.

22    Q.   Okay.  Attorney O'Neil asked you about, you

23  know, a lot of years going back when you've been on the

24  department.  And back in 2002 you had a -- specifically

1   April 3rd, 2002, you had an independent medical exam done

2   by Dr. Mercier; isn't that correct?

3       A.   Yes.

4       Q.   And Dr. Mercier's conclusion after he examined you

5   is that, quote, She could have and could return to work at

6   her regular job without restrictions; isn't that correct?

7       A.   Yes.

8       Q.   Okay.  Now, you talked about some workers' comp

9   claims that you filed, and those pertain to -- you filed

10   some claims pertaining to your ankle injury from August of

11   '98, and then you had another injury to that, maybe that

12   same ankle in October of '98?  You filed workers' --

13       A.   Yes.

14       Q.   -- comp claims for that; right?

15       A.   Yes.

16       Q.   Okay.  And in 2002 the City turned down your

17   workers' comp claim for anything beyond those initial

18   injuries in '98; isn't that correct?

19       A.   No.

20       Q.   Okay.  And you've only received a settlement for

21   those two injuries in 1998; isn't that correct?

22       A.   I received two settlements.

23       Q.   Okay.  And one was for --

24       A.   For the '98 injury.

1    Q.   Right.

2    A.   And the second one was from the injury of

3    November 16th of 2001.

4    Q.   Okay.  So anything beyond 2002 -- any injuries

5    after that second date the City has denied those claims;

6    isn't that true?

7    A.   No.  If you look at that form, they did not settle

8    with me until 2006.

9    Q.   Right.

10    A.   I had surgery in 2004 on my left foot again, so --

11    Q.   Okay.  Let me make it clear.  I don't think I made

12    myself clear to you.  Your settlement that Attorney O'Neil

13    has a copy of -- I guess it's labeled Exhibit No. --

14    Respondent's Exhibit 4 -- that pertains only to your

15    injuries on August 10th, 1998, and October 10th, 1998;

16    isn't that correct?

17    A.   For the first settlement, yes, for that one.  There

18    was two separate settlements.  One was from the injury in

19    1998.  The 2006 settlement is from my injury in 2001.

20    Q.   Okay.  But other than those injuries, you've not

21    received any settlement from the City regarding any other

22    claims; isn't that correct?

23    A.   I haven't filed any more workers' comp claims

24    against the -- to the City other than for those three

1  injuries.

2      Q.   Okay.  So just to make sure everybody's clear, you

3  filed claims for your August '98 injury, your October '98

4  injury and -- was it November 2001?

5      A.   Yes.

6      Q.   Okay.  And beyond those claims, you haven't filed

7  any workers' comp claims --

8      A.   No.

9      Q.   -- correct?

10     COMMISSIONER LOGAN:  Could you please give us the

11  date on the IME?

12     ATTORNEY GILIBERTI:  Yes.

13     COMMISSIONER LOGAN:  It was in '02, but you didn't

14  say when.

15     ATTORNEY GILIBERTI:  Yes.  It was . . .  Here it

16  is.  It was April 23rd, 2002.

17     COMMISSIONER LOGAN:  And that was a full release?

18     ATTORNEY GILIBERTI:  Yes.  April 23rd, 2002, from

19  Chicago Orthopaedics & Sports Medicine, Dr. Charles Mercier.

20  I think that's how you say it in French, but Mercier in

21  English.  Anyway . . .

22     ATTORNEY O'NEIL:  Could I see that, John?

23     ATTORNEY GILIBERTI:  Sure.  (Tenders document.)

24     I'd ask that that be admitted.  I'm going to put

1    an exhibit sticker on it and ask that that be admitted into

2    evidence.

3    　　　　COMMISSIONER CARUANA:  That's a full release?

4    　　　　ATTORNEY GILIBERTI:  Yes.

5    　　　　ATTORNEY O'NEIL:  I'm going to object to the

6    relevance of this.  This is an IME by a physician hired by

7    the City.  As Mr. Maher well knows, in a comp case the City

8    is entitled to hire an IME.  He says he's releasing her to

9    full work; but, obviously, the City settled the case long

10   after this.

11   　　　　It has no probative value.  It's hearsay.

12   Obviously, her doctor is going to say that she was injured

13   and does need further surgery, and the proof is in the

14   pudding.  She had surgery on her foot two years after this

15   doctor hired by the City said she was free to go to work.

16   So the relevance is not there.

17   　　　　SECRETARY MAHER:  I'm going to sustain the

18   objection on the foundation issue.  The author of the

19   document isn't present, and no one has laid foundation for

20   the document itself.

21   　　　　Ms. Beets could be asked questions about having

22   submitted to an IME, and she has been asked questions about

23   that.  And it has been properly established that she went to

24   an IME on 4/23/2002 and that the IME concluded that there

1    was a full release or it's been characterized.  The document

2    itself, though, without further foundation -- the objection

3    to having it admitted into evidence is sustained.

4    BY ATTORNEY GILIBERTI:

5        Q.    Officer Beets, you started working for the

6    department in 199- -- March 1997; right?

7        A.    Yes.

8        Q.    And during 1997 as a new police officer, you

9    attended the Police Training Institute in Champaign; right?

10       A.    Yes.

11       Q.    How long were you in Champaign for?

12       A.    I believe 12 weeks at the time.

13       Q.    12 weeks?  Okay.  And then did you go to any other

14   training?

15       A.    City school.

16       Q.    And how long was that training?

17       A.    Back then it was 21 weeks.

18       Q.    Okay.  So you were in training -- were you in

19   training for all of 1997 either at PTI or the City?

20       A.    Yes.

21       Q.    Okay.  And when you're a probationary employee,

22   it's not good to miss any time on the job; correct?

23       A.    Yes.

24       Q.    Okay.  And in 1998 you were still in your

1    probationary period?

2         A.    Yes.   I was coming to the end of my probationary

3    period.

4         Q.    And on or about September 1998, the police

5    department requested the Board of Fire and Police Commission

6    at that time to extend your probation by six months due to

7    you not being able to work full duty at that time; correct?

8         A.    That's correct because of my being injured at work.

9         Q.    Right.

10             Now, when you -- you've received job evalu- --

11    yearly job evaluations all your career with the department;

12    isn't that correct?

13        A.    Yes.

14        Q.    On those evaluations there's a category for

15    attendance; right?

16        A.    Yes.

17        Q.    And that's on -- if I remember, on the first page,

18    not including the cover page, they indicate how many hours

19    you've been gone or days in the past 12 months before the

20    evaluation; right?

21        A.    Yes.

22        Q.    And there is also a section labeled Dependability;

23    isn't that correct?

24        A.    Yes.

1    Q.   Now, on or about April 11th of 2000, you received

2    a job evaluation on that date.  If you don't remember,

3    that's fine.  I have the evaluations with me.  I'm going to

4    show them to you, anyway.

5         You received a job evaluation on that date from

6    then Sergeant Steve Jones.  I'll just go ahead and mark it

7    because you probably don't remember the date, and this will

8    be -- I think it's Chief's Exhibit 9.

9         SECRETARY MAHER:  I've got eight that have been

10   admitted.  Did you mark the one that was just denied?

11        ATTORNEY GILIBERTI:  No.

12        SECRETARY MAHER:  Then you'll be on No. 9.

13        ATTORNEY GILIBERTI:  Okay.  I'm giving a copy to

14   counsel.

15   BY ATTORNEY GILIBERTI:

16   Q.   Ms. Beets, I'd ask you to take a look at what's

17   been marked Chief's Exhibit No. 9 and -- take a look at

18   that.  And do you recognize what that exhibit is?

19   A.   Yes, that's my evaluation, performance evaluation.

20   Q.   Okay.  And that was done by at that time your

21   supervisor, then Sergeant Steve Jones; right?

22   A.   Yes.

23   Q.   In Chief's Exhibit No. 9, Sergeant Jones indicates

24   under Attendance you've missed 48.72 days in the last

1    12 months for illness; correct?

2       A.   Yes.  It was from complications with my pregnancy,

3    yes.

4       Q.   And I'd like you to go to the Dependability

5    section.  I think that's near the end of the evaluation.

6    It's not the last page but . . .  Okay.  And under that

7    section Sergeant Jones indicated at the top that your

8    leave -- your sick leave usage was 389.75 hours?

9       A.   Yes.

10       Q.   And on a scale from 1 to 5 for dependability with

11    1 being the lowest, Sergeant Jones rated you a 2; correct?

12       A.   Yes, he did.

13       Q.   Under his comments in the Dependability section,

14    Sergeant Jones wrote, quote, Due to events --

15       ATTORNEY O'NEIL:  Mr. Maher, I have to object.

16    This is hearsay again.  And what does this have to do with

17    the charges that we're here for?

18       ATTORNEY GILIBERTI:  Whether she's dependable as

19    a Rockford police officer and whether her absenteeism has

20    negated her dependability to the City and to the department

21    I think is very relevant.

22       ATTORNEY O'NEIL:  It's an out-of-court statement

23    given to you to prove the matter asserted by someone who's

24    unavailable for cross-examination.

1    ATTORNEY GILIBERTI:  If you want, I could have

2    Deputy -- I think Deputy Chief Jones -- former Deputy Chief

3    Jones lives in Wisconsin.  And I could have somebody from

4    the department testify to all these evaluations, but I think

5    since she is the one who received it she's competent to

6    testify to it.  She signed it.  She's able to testify to the

7    document.

8    SECRETARY MAHER:  I think she can lay a proper

9    foundation for the document, and I believe she has laid a

10   foundation for the document.  I guess the objection is going

11   more -- I overrule the objection to the extent it's based on

12   hearsay.  It's a business record that she's testified that

13   she recognizes, and it was a part of her job experience.

14   There's also been an objection on relevance

15   grounds, which I'm inclined to sustain.  But explain to me

16   the relevance of the job evaluation to the charges in the

17   complaint that deal with the number of hours that are missed

18   from work.

19   ATTORNEY GILIBERTI:  In the complaint she's charged

20   with inefficiently doing her job and in connection with all

21   the hours she's missed.  Dependability bears directly on

22   an employee's efficiency, whether or not they've been --

23   whether or not they're dependable and efficiently doing the

24   job.

1        And I'd say it's very relevant to what's at

2  issue here, whether or not she's dependable and should be

3  continued as an employee of this department.  It's also

4  relevant showing that from early on in her career these

5  issues, dependability and attendance, were issues all

6  throughout.  It isn't something that Chief Epperson is

7  just going after her based on what Attorney O'Neil claims,

8  workers' comp and pregnancy issues.  It's been an issue all

9  along her career, and the evaluations bear it out very

10  succinctly.

11        So I'd ask that -- the Commissioners have a right

12  as the deciders here to see those, and they have a right to

13  look at all the evaluations.  And they're not all bad; not

14  everything's bad.  But I think these two issues are what's

15  really relevant here and the Commissioners should have a

16  right to look at the evaluations.  She can testify to that.

17  He could ask her questions on cross-examination if he wants

18  based on what I'm asking her.

19        So I think it's very relevant.  Dependability goes

20  to the heart of somebody's efficiency and reliability.

21  That's what this case is all about.

22        SECRETARY MAHER:  Attorney O'Neil?

23        ATTORNEY O'NEIL:  They've charged one general

24  order, efficiency.  That's what it is, efficiency.  I still

1   have not heard any evidence in this case about her lack of

2   efficiency.  That's the only charge that's standing.

3          ATTORNEY GILIBERTI:  Deputy Chief Booker testified

4   to that.

5          SECRETARY MAHER:  I'm going to overrule the

6   objection.  I'm going to allow the -- I'm going to allow

7   the performance evaluation in.  I'm going to instruct the

8   Commissioners to give it only the weight that it is accorded

9   by Ms. Beets' testimony with respect to any particular

10  evaluation.

11         In other words, you need to limit your questions,

12  Mr. Giliberti, to allegations or aspects of the complaint

13  that's before the Board and stay away from anything in the

14  performance evaluations that does not directly relate to the

15  charges that are pending before the Board.

16         ATTORNEY GILIBERTI:  Thank you.

17                       (Brief recess taken.)

18         SECRETARY MAHER:  Attorney Giliberti.

19         ATTORNEY GILIBERTI:  Thank you.

20  BY ATTORNEY GILIBERTI:

21     Q.    Officer Beets, I was asking you about Sergeant

22  Jones' evaluation of you in 2000.  And on a scale of 1 to 5

23  for dependability with 1 being the lowest, Sergeant Jones

24  rated you a 2; correct?

1      A.    Yes.

2      Q.    And under his comments in the Dependability

3    section, Sergeant Jones wrote, quote, Due to events personal

4    and job related that have taken place this year, Tonya's

5    sick time was unacceptably high; right?

6      A.    Yes.

7      Q.    That's what he wrote?

8      A.    Yes.

9      Q.    Okay.  Thank you for looking at that evaluation.

10          Directing your attention now to April 17th of 2001,

11   you did not receive an evaluation April of 2001; correct?

12     A.    If there's not one there, no.

13     Q.    Okay.  I'll mark this as an exhibit.  This would be

14   No. 9, I guess.

15          COMMISSIONER DOTSON-WILLIAMS:  10.

16          ATTORNEY GILIBERTI:  10.

17   BY ATTORNEY GILIBERTI:

18     Q.    I'll show you what's been marked as City's Exhibit

19   No. 10, and I'll have you take a look at it, please.

20     A.    (Witness peruses document.)

21     Q.    Do you recognize City's Exhibit No. 10?

22     A.    It's a blank performance evaluation.

23     Q.    Okay.  And there is supervisor comments on Chief's

24   Exhibit No. 10 that read "I was not able to evaluate Officer

1    Cobb" -- and that was your name before Officer Beets;

2    correct?

3        A.   It used to be Cobb, yes.

4        Q.   -- "because of her lengthy absenteeism from work,

5    which stemmed from pregnancy complications"; correct?

6        A.   Yes.

7        Q.   Okay.  And the initials JM are near the date at the

8    bottom of the evaluation.  Do you see those?

9        A.   Yes.

10       Q.   And those are former Deputy Chief Jeff Moore's?

11       A.   I believe so.

12       Q.   Okay.   Thank you.

13            Then the following year after that, on or about

14   May 23rd of 2002, then Sergeants Glover and Booker did your

15   job evaluation; correct?

16            ATTORNEY O'NEIL:  Mr. Maher, can I just -- so

17   I'm not making an objection every time, just a standing

18   objection on the grounds that I stated on the first one so

19   I'm not interrupting on every one.

20            SECRETARY MAHER:  Yes.

21            ATTORNEY O'NEIL:  Thank you.

22            SECRETARY MAHER:  You would like the record to

23   reflect that you have a standing objection to the admission

24   of any of the evaluation reports for the reasons previously

1    stated?

2              ATTORNEY O'NEIL:  Correct.  Rather than object to

3    every one, I'll just --

4              SECRETARY MAHER:  So noted.

5              ATTORNEY O'NEIL:  Thank you.

6    BY ATTORNEY GILIBERTI:

7         Q.   Showing you, Officer Beets, what has been marked as

8    Exhibit No. 11, do you recognize Chief's Exhibit No. 11?

9         A.   Yes.

10        Q.   And can you tell us what Chief's Exhibit No. 11 is?

11        A.   It's a performance evaluation.

12        Q.   And that's your performance evaluation?

13        A.   Yeah; for me, yes.

14        Q.   And that occurred on or about May 23rd, 2002?

15        A.   Yes.

16        Q.   And under Attendance on Chief's Exhibit No. 11, it

17   indicates you were absent for illness 57 days in the last

18   12 months; correct?

19        A.   Yes.

20        Q.   And under Supervisor Comments, Sergeants Glover

21   and Booker write, quote, Officer Beets' sick time usage

22   continues to be unacceptably high.  Some of her sick leave

23   was caused by a duty-related injury; however, the unrelated

24   sick leave is also high.  Correct?

1    A.    Yes.

2    Q.    And if I could direct your attention to the

3  Dependability section of that evaluation, which is -- I

4  believe it's near the end of the evaluation.  And I'll wait

5  until you turn to that page.

6        Okay.  And in that section, Dependability, it

7  indicates you have 458.5 hours of sick leave used and of

8  that amount 111.5 for a job-related injury; correct?

9    A.    Yes, that's what it states.

10    Q.    And then in the Dependability section on a scale

11  from 1 to 5, Sergeants Glover and Booker rate you a 2, with

12  1 being the lowest rating; correct?

13    A.    Yes.

14    Q.    And under the comments in Dependability, Sergeants

15  Glove and Booker, write, quote, Tonya's sick leave usage

16  remains unacceptably high.  Some of her time was related

17  to a job-related injury; however, other sick time was used,

18  as well.  Tonya's extended absence negatively impacts her

19  ability to gain experience and become proficient in this

20  job; correct?

21    A.    Yes, that's what it states.

22    Q.    Okay.  And then the following year, showing you

23  what's marked Chief's Exhibit No. 12, take a look at that,

24  please.  In that year you signed an evaluation on April 8,

1   2003, that your immediate supervisor, then Sergeant Dan

2   Person, completed on or about that time; right?

3       A.   Yes.

4       Q.   And Sergeant Person indicates under Attendance

5   you were absent for almost 52 days in the last 12 months;

6   correct?

7       A.   You said 12 days or 12 months?

8       Q.   52 days in the last 12 months.

9       A.   Yes.

10      Q.   And under Supervisor Comments on the first page,

11  Sergeant Person indicates, quote, Officer Beets has had

12  surgery and recovery time that has contributed to the

13  excessive amount of time away from work.  Officer Beets

14  needs to decrease the amount of unscheduled time off to

15  improve her work consistency and productivity that her

16  assigned elementary schools require.  That's what he wrote;

17  isn't that right?

18      A.   Now, you said on the first page or what page are

19  you . . .

20      Q.   That's on the -- right, on the first page, other

21  than the cover page, under his comments, the supervisor

22  comments.

23      A.   Okay.  At the bottom, yes.

24      Q.   Okay.  And if I could turn your attention to the

1    Dependability section on that evaluation, which is --

2         COMMISSIONER CARUANA:  What date is that

3    evaluation?

4         ATTORNEY GILIBERTI:  I'm sorry?

5         COMMISSIONER CARUANA:  What date is that

6    evaluation?

7         ATTORNEY GILIBERTI:  That evaluation is April 8,

8    2003.

9    BY ATTORNEY GILIBERTI:

10        Q.   And in the Dependability section in that evaluation

11   under sick leave, Sergeant Person indicates you used 416

12   hours sick plus 12 hours workers' compensation; right?

13        A.   (Witness peruses document.)

14        Q.   And that would be at the top of the Dependability

15   section.

16        A.   Yes.

17        Q.   Okay.  So that was -- okay.  Strike that.

18             The following year after that evaluation, Sergeant

19   Person was again still your supervisor at that time, and he

20   did another job evaluation; isn't that correct?

21        A.   (No response.)

22        Q.   I'll show you what I've marked as City's --

23   or Chief's Exhibit 13.  And Sergeant Person did that

24   evaluation, didn't he?

1      A.   Yes.

2      Q.   And the date of that is September 25th, 2004;

3  correct?

4      A.   Yes.

5      Q.   And in that evaluation that was done in September

6  2004 under Attendance, Sergeant Person indicates you were

7  absent for almost 84 days in the last 12 months; right?

8  And that would be on the first page.

9      A.   Yes.

10      Q.   And under his comments on the bottom of the first

11  page, Sergeant Person writes, quote, Officer Beets has had

12  ongoing health problems that have led to a moderate growth

13  level of experience and skill within the unit.  As these

14  circumstances change, I expect Officer Beets to continue

15  to contribute positively to her duties; correct?

16      A.   Yes.

17      Q.   Okay.  And I'm going to veer off a little bit

18  momentarily from the job evaluations.  About the same time

19  you received that evaluation do you remember a letter that

20  Deputy Steve Jones wrote you to obtain your current medical

21  status with respect to return to full duty?

22      A.   I don't recall it.

23      Q.   Okay.  Let me show you what is marked -- is it

24  14? -- Chief's Exhibit 14.  Showing you that letter, do you

1    recognize that letter?

2        A.    (Witness peruses document.)  I don't remember

3    receiving it, but I recognize the letter as being a memo

4    from him.

5        Q.    Okay.  And what's the date on that letter?

6        A.    September 21st, 2004.

7        Q.    And whose signature is at the bottom of the letter?

8        A.    Deputy Chief Jones.

9        Q.    And this letter is addressed to you; correct?

10       A.    Yes.

11       Q.    And in this letter Deputy Chief Jones indicates you

12   last worked unrestricted duty on July 23rd, 2003; correct?

13       A.    Yes.

14       Q.    And Deputy Jone's letter also indicates the

15   Rockford Police Department does not have a permanent light-

16   duty position for its officers; right?

17       A.    Right.

18           ATTORNEY O'NEIL:  I've got to object to this form

19   of questioning.  Letters that were written years ago, he's

20   trying to authenticate them through a witness who does not

21   remember seeing it and reading it verbatim and saying, Is

22   that correct?  Is that correct?  This form of questioning

23   is improper.

24           SECRETARY MAHER:  I'm going to sustain the

1    objection to this exhibit.  The witness's testimony with

2    respect to the letter is that she does not recall seeing

3    it before and does not recall receiving it.  With that

4    testimony, there's no foundation for this letter and the

5    objection stated by Mr. O'Neil is sustained.

6         ATTORNEY GILIBERTI:  Okay.  I reserve the right

7    to question Chief Sweeney about that letter in my rebuttal

8    case.

9    BY ATTORNEY GILIBERTI:

10        Q.   About one year later after that letter -- the date

11   of that letter, on October 18th, 2005, showing you what's

12   marked -- I believe we're up to 15 now.

13        SECRETARY MAHER:  That's correct.

14   BY ATTORNEY GILIBERTI:

15        Q.   I'm showing you what's marked Chief's Exhibit

16   No. 15, and I'll ask you to take a look at that.  Do you

17   recognize what Chief's Exhibit No. 15 is?

18        A.   It's another performance evaluation.

19        Q.   And that evaluation was completed by Sergeant

20   McCluster (phonetic); isn't that correct?

21        A.   Yes.

22        Q.   And that was done on or about October 18, 2005?

23        A.   Yes; October 17th, yes.

24        Q.   October 17th?  Okay.

```
1          And on Chief's Exhibit 15 under Attendance,

2   Sergeant McCluster indicates you were absent for illness

3   40 days in the last 12 months; correct?

4      A.   Yes.

5      Q.   And I draw your attention to the Dependability

6   section in that evaluation.

7      A.   Okay.

8      Q.   Sergeant McCluster indicates you had a high amount

9   of sick leave usage in that section; is that correct?

10     A.   Yes.

11     Q.   Okay.  Now, showing you what's marked City's --

12  or Chief's Exhibit 16, and I'll ask you to take a look at

13  that, please.  Do you recognize City's Exhibit No. 16?

14     A.   Yes.

15     Q.   And that is a job evaluation that was done by

16  Lieutenant Block; correct?

17     A.   Yes.

18     Q.   And that was not done -- that evaluation covers

19  2006, but it was not done until 2007; right?

20     A.   Yes.  That's because I was off for my pregnancy,

21  I believe.

22     Q.   Right.  You had been on extended sick leave in

23  2006, right, and that's why the evaluation in part wasn't

24  done until 2007?
```

1    A.    Right.

2    Q.    Okay.  And that evaluation covered March 2005

3    through 2006; right?

4    A.    Yes.

5    Q.    And under Attendance on that evaluation, Lieutenant

6    Block indicates you were absent for illness 95 days in the

7    last 12 months; right?

8    A.    Yes.

9    Q.    And under Supervisor Comments, Lieutenant Block

10   writes on the first page that you had 940.50 hours of,

11   quote, non-FMLA sick leave from March 2005 to February 2006;

12   correct?

13   A.    Yes.

14   Q.    Under Dependability -- if you could turn to that

15   section, please.

16   A.    Okay.

17   Q.    -- Lieutenant Block rates you a 2 on a scale of 1

18   to 5 with 1 being the lowest; right?

19   A.    Right.

20   Q.    And in his comments portion under Dependability,

21   Lieutenant Block writes, quote, Officer Beets has been

22   frequently absent for various medical reasons that are not

23   FMLA qualified or as a result of a workers' compensation

24   injury; correct?

1    A.   (Witness peruses document.) Yes.

2    Q.   Okay. I'll show you now, Officer Beets, what's

marked as Chief's Exhibit 17 and ask you to please take a

look at that. Regarding Chief's Exhibit No. 17, do you

recognize that?

6    A.   Yes. It's my evaluation from this year done by

Lieutenant Block.

8    Q.   And that was done on February 8th -- on or about

February 8th, 2007; right?

10    A.   Right.

11    Q.   And under Attendance Lieutenant Block indicates

you were absent for illness 159 days in the last 12 months;

correct?

14    A.   Yes.

15    Q.   And under Supervisor Comments, Lieutenant Block

wrote, quote, Officer Beets had 1,272 hours of non-FMLA

sick leave for the period of 2/2/06 through 1/31/07. Her

non-FMLA sick time has been high for the last two yearly

evaluations and is an area she must take steps to improve

on; correct?

21    A.   Yes.

22    Q.   And I'd ask you, Officer Beets, to look at the

Dependability section in that evaluation, please.

24    A.   (Witness complies.)

1    Q.    And under that section, Lieutenant Block rates you

2    a 1 on a scale of 1 to 5 with 1 being the lowest rating;

3    correct?

4    A.    Yes.

5    Q.    Lieutenant Block indicates in his comments in

6    the Dependability section that, quote, Officer Beets used

7    1,272 hours of non-FMLA leave during this evaluation period.

8    Her absence creates additional workloads and disrupts the

9    performance of the other officers assigned to the CRU unit.

10   According to administration, Officer Beets has not worked

11   enough hours in the past 12 months to qualify for FMLA

12   leave, that 480 hours of sick leave could be counted towards

13   FMLA.   To qualify now, she still would have hadn't missed

14   792 hours or 99 days of work in the past 12 months.

15   Correct?

16   A.    Yes; that's correct.

17   Q.    And I have a couple more questions on that

18   evaluation.   Now, when you do these job evaluations, you

19   have an opportunity to write your own comments.   And those

20   are usually attached at the end of the evaluation; correct?

21   A.    Yes.

22   Q.    Okay.   In that particular job evaluation that

23   Lieutenant Block -- your last job evaluation, you wrote

24   under the Areas for Growth section -- isn't it?   I

1    specifically recall Areas of Growth.

2        A.   I've got it.

3        Q.   -- quote, I know my dependability has been a

4    problem because of my time off from work; right?

5        A.   It says that, but it also states more.

6        Q.   Okay.  And you also wrote in the Areas for Growth

7    in that same section that, quote, I am on light duty now,

8    and my main concern is the fact my coworkers feel they

9    cannot count on me; correct?

10       A.   (Witness peruses document.)  Yes.

11       Q.   Okay.  And when you're not working full duty --

12   that's all the questions I have on the evaluations.

13            When you're not working full duty, your workload

14   has to be covered by other police officers; isn't that

15   correct?

16       A.   (No response.)

17       Q.   When you're not on full duty, your full duties --

18   your duties then when you're not full duty have to be

19   covered by somebody else; isn't that correct?

20       A.   Yes.

21       Q.   And when you were hired as a Rockford police

22   officer, you were hired to perform the full duties of a

23   Rockford police officer; isn't that correct?

24       A.   Yes.

1      Q.  Now, just to revisit briefly this workers'

2  compensation issue from 2002 . . .

3      ATTORNEY GILIBERTI:  And I don't have a copy of

4  this for Attorney O'Neil.  I guess we're on No. what, 18?

5      SECRETARY MAHER:  18.

6      ATTORNEY GILIBERTI:  I'll show it to Attorney

7  O'Neil real quick so he can look that over.

8      SECRETARY MAHER:  While we're doing that,

9  Ms. Beets, can I have the exhibits.

10      THE WITNESS:  (Tenders exhibits.)

11  BY ATTORNEY GILIBERTI:

12      Q.  I'm showing you, Officer Beets, what I've marked as

13  Chief's Exhibit No. 18.  And I'd ask you to take a look at

14  it.  And I don't have a copy, so I'll have to look at it

15  after you're done reading it.

16      A.  (Witness peruses document.)  Okay.

17      Q.  And that's a letter, isn't it, dated August 19th,

18  2002, from Employer's Claim Services, Incorporated, from a

19  Randy Bullock, who worked for that company, to you; correct?

20      A.  Yes.

21      Q.  Okay.  And do you remember receiving that letter

22  from Mr. Bullock?

23      A.  Yes.

24      Q.  And near the top, Officer Beets, there it reads

1    "DOI" and it reads "11/16/2001"; correct?

2        A.    Yes.

3        Q.    And DOI stands for date of injury; isn't that

4    correct?

5        A.    Yes.

6        Q.    And the gist of the letter, isn't it, is that

7    Mr. Bullock is telling you -- if I could just look at it --

8    the letter is to inform you -- I administer the workers'

9    compensation for the City of Rockford.  This letter is to

10   inform you that based upon the information received from

11   your employer and the IME doctor this claim will no longer

12   be accepted under workers' compensation.

13              ATTORNEY O'NEIL:  Objection to the form of the

14   question.  It's double hearsay.  It's someone who's not

15   available for cross-examination stating what her employer

16   told him and it's a conclusion from that claims adjuster

17   based upon what the employer told him.

18              SECRETARY MAHER:  Sustained.

19   BY ATTORNEY GILIBERTI:

20       Q.    That letter dated August 19th, 2002, what, if

21   anything, does it tell you in response to that claim

22   regarding that date of injury?

23       A.    Well, at that time they were denying the claim for

24   my injury when I hurt my foot in November, but they picked

1    it up once they got the proper documentation.

2         Q.   Okay.  But that letter is based on that IME that I

3    asked you about earlier; isn't that correct?

4         A.   For which IME?

5         Q.   The one from Dr. Mercier.

6         A.   Yes, it's based on Dr. Mercier but not -- after

7    that I went to another physician.

8              ATTORNEY GILIBERTI:  Okay.  Thank you.  No further

9    questions.

10

11                      REDIRECT EXAMINATION

12                      BY MR. O'NEIL:

13        Q.   Let's deal with the first subject last -- or the

14   last subject first.  Dr. Mercier was the IME from the City?

15        A.   Yes.

16        Q.   He said you could go back to work; correct?

17        A.   Yes.

18        Q.   You didn't go back to work, did you?

19        A.   I believe I went on light duty.

20        Q.   Three months later -- I'll refer you to

21   Exhibit 2002 -- you again had surgery on your foot.

22   Do you recall that?

23        A.   Yes.

24        Q.   Despite what Dr. Mercier and this claims adjuster

186

1  said; is that correct?

2      A.  Yes.

3      Q.  And now I'm going to show you Respondent's

4  Exhibit 4, which again is the only copy I have.  But John's

5  had it for the last two hours.  And these are the settlement

6  contracts in the workers' compensation case; correct?

7      A.  Yes.

8      Q.  And they're signed off by you and the attorney for

9  the City of Rockford?

10     A.  Yes.

11     Q.  And they're admitting that these were duty related

12  and compensating you for those injuries on duty --

13     A.  Yes.

14     Q.  -- that we've described?

15         ATTORNEY O'NEIL:  I'd move for the admission of

16  Exhibit 4.

17         ATTORNEY GILIBERTI:  Well, I have some questions

18  regarding that.  I would object as irrelevant, but I do have

19  some questions pertaining to it if it will be admitted.

20         SECRETARY MAHER:  Explain the relevance objection,

21  please.

22         ATTORNEY GILIBERTI:  That, again, case law will

23  be submitted to the Commission from this district that has

24  jurisdiction over Winnebago County Circuit Court that

1    provides absenteeism, even though -- the law in Illinois

2    is even if it's a workers' comp injury, if you still have

3    excessive absenteeism, an employee can be discharged even

4    if it pertains to your job, even if you receive it during

5    your work, an on-the-job duty in this case.  So I would

6    think that's irrelevant.  But if it is going to be admitted,

7    I have some questions.

8        SECRETARY MAHER:  In light of the fact that both

9    parties have focused questions certainly of this witness

10   and of the prior witnesses on the workers' compensation

11   claims in their discussion of what hours are and are not

12   appropriately taken into consideration by the Commission,

13   I'm going to overrule the City's objection to the admission

14   of the exhibit.  And you will be permitted to ask follow-up

15   questions to Mr. O'Neil's questions about this exhibit.

16   BY ATTORNEY O'NEIL:

17       Q.   Tonya -- because I'm getting really tired -- in

18   follow-up to the Commissioner's question, if they don't let

19   you return to light duty, can you qualify for full duty?

20       ATTORNEY GILIBERTI:  Objection; speculation, no

21   foundation.

22       SECRETARY MAHER:  Sustained.

23   BY ATTORNEY O'NEIL:

24       Q.   Can you qualify with your weapon if they don't

188

1    allow you to return to light duty?

2         ATTORNEY GILIBERTI:  Objection; irrelevant.

3         SECRETARY MAHER:  Sustained.

4         ATTORNEY O'NEIL:  I'm just following up on the

5    question of the Commissioners.  I have no further questions.

6         SECRETARY MAHER:  Any follow-up limited to the

7    issue of the comp settlements.

8         ATTORNEY GILIBERTI:  Right.

9

10                    RECROSS-EXAMINATION

11              BY MR. GILIBERTI:

12    Q.   Now, regarding the settlement you received on your

13    workers' comp claims, on the first page under -- it says

14    Illinois Workers' Compensation Commission, Settlement

15    Contract, Lump Sum Petition and Order.  Under the Date of

16    Accident, it says 10/30/98; correct?

17    A.   On that one, yes.

18    Q.   Okay.  And then on -- I know on the other one,

19    which the heading is Illinois Industrial Commission,

20    Arbitration decision regarding the nature and extent of

21    the injury, it says on August 10th, '98, and 10/30/98

22    the respondent, City of Rockford Police Department, was

23    operating and subject to the provisions of the act.  And

24    those are the only two dates mentioned --

1      A.    No.

2      Q.    -- on the first page under -- right there

3  (indicating); isn't that correct?

4      A.    You have two separate --

5      Q.    Well, sort them out.

6      A.    You have two separate settlements here.  The first

7  one is from the injury in 1998, October -- August and

8  October.

9      Q.    Okay.

10     A.    They settled with me on this.  That's this

11  (indicating) one here.

12          SECRETARY MAHER:  By "this one here" --

13          THE WITNESS:  I'm sorry.

14          SECRETARY MAHER:  Because the documents -- they

15  should have a case number on them.  The exhibit has been

16  admitted for all four, but why don't you identify the case

17  number.

18          THE WITNESS:  Okay.  The one for the year '98, the

19  case number is 99 WC 17583.

20          SECRETARY MAHER:  Thank you.

21          THE WITNESS:  And then there's a second case number

22  for the October 30th injury, and that's 99 WC 17838.  And

23  this is a settlement for that -- those two specific

24  injuries.

1          SECRETARY MAHER:  Thank you.

2          THE WITNESS:  The second settlement case -- first

3   case number is 99 WC 17583; and then there's also an '02

4   case number, 02 WC 45181.

5   BY ATTORNEY GILIBERTI:

6      Q.   Okay.  And regarding that last case you mentioned,

7   Tonya, those two cases, 99 WC 17583 and 02 WC 45181, under

8   Date of Accident the only date of accident on that form says

9   10/30/98; correct?

10     A.   Let me see that.

11     Q.   (Counsel tenders document.)

12     A.   Okay.  Here's what -- if you read through --

13     Q.   I'd just ask you to answer that question.

14     A.   Well, yes, that's the date that's on here; but they

15   lumped --

16     Q.   Okay.  That's all I'm asking you.

17     A.   Okay.

18     Q.   That's all I'm asking you.  That's the only date of

19   accident that is on that form.  Thank you.

20          ATTORNEY O'NEIL:  That's been admitted into

21   evidence.

22          ATTORNEY GILIBERTI:  If I could just have a minute

23   with Deputy Chief Sweeney.  (Counsel confers with Deputy

24   Chief Sweeney.)

1       I don't have any other questions.  Thank you.

2       SECRETARY MAHER:  Did you have any follow-up on

3  this exhibit?

4       ATTORNEY O'NEIL:  No.  It speaks for itself.

5       SECRETARY MAHER:  Okay.  You don't have any further

6  questions for Ms. Beets?

7       ATTORNEY GILIBERTI:  No.

8       SECRETARY MAHER:  Do you have any further follow-up

9  for Ms. Beets?

10      ATTORNEY O'NEIL:  No.

11      SECRETARY MAHER:  Do you have any additional

12  witnesses to present?

13      ATTORNEY O'NEIL:  No.  I'm going to rest.

14      SECRETARY MAHER:  Do you have any rebuttal that

15  you'd like to do at this time?

16      ATTORNEY GILIBERTI:  Deputy Chief Sweeney.

17      SECRETARY MAHER:  You may step down.  Thank you.

18                   (Witness excused.)

19      ATTORNEY O'NEIL:  I'm really running out of gas,

20  so I'm just -- I don't know how late we're going to go, and

21  I've got an hour and a half drive after this.

22      SECRETARY MAHER:  I understand.  And we discussed

23  that at the break.  The Commissioners would like, if at all

24  possible, to get the evidence in this evening.  They've